**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| Tayleur Raye Pickup, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:20-cv-00346-JB-JFJ |
| | ) | |
| District Court of Nowata County, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF *AMICI CURIAE* CHEROKEE NATION, CHICKASAW NATION, CHOCTAW NATION OF OKLAHOMA, MUSCOGEE (CREEK) NATION, QUAPAW NATION, AND SEMINOLE NATION OF OKLAHOMA IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO THE CURTIS ACT ARGUMENTS RAISED IN DEFENDANT MUNICIPALITIES' MOTIONS TO DISMISS**

173005-1

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................ 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ................................................................................................ 4

I.    The Nations, in Cooperation with Willing Governmental Partners, Are Exercising Jurisdiction to Ensure that Reservation Roads are Safe ........................... 4

II.   The Local Government Provisions of Section 14 Were Abrogated by the Oklahoma Enabling Act .......................................................... 9

    A.    Congress Established the Pre-Statehood Municipalities as a Temporary Measure. ............................................................. 9

    B.    Congress Abrogated the Provisions of Section 14 That Defined Municipal Authority and Applied Arkansas Law in the Indian Territory Upon Statehood. ................................................... 13

    C.    State Law Did Not Preserve Municipalities' Section 14 Authority ..................... 19

III.  Defendant Municipalities' Position Would Seriously Impede Governance on the Reservations and Compromise Tribal Sovereignty, For No Practical Benefit. ............................................. 23

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*B.T. ex rel. G.T. v. Santa Fe Pub. Schs.*,
  506 F. Supp. 2d 718 (D.N.M. 2007) (Browning, J.) ................................................... 4

*Benner v. Porter*,
  50 U.S. (9 How.) 235 (1850) ...................................................................................... 14

*Bosse v. State*,
  2021 OK CR 30, 499 P.3d 771, *cert. denied*, 142 S. Ct. 1136 (2022) ...................... 1

*Camreta v. Greene*,
  563 U.S. 692 (2011) ..................................................................................................... 4

*Cheyenne-Arapaho Tribes v. Oklahoma*,
  618 F.2d 665 (10th Cir. 1980) ................................................................................. 4-5

*Choctaw Nation v. City of Atoka*,
  207 F.2d 763 (10th Cir. 1953) .................................................................................. 13

*Coyle v. Smith*,
  221 U.S. 559 (1911) .................................................................................................. 24

*Dunn v. Micco*,
  106 F.2d 356 (10th Cir. 1939) .................................................................................. 17

*Elephant Butte Irr. Dist. v. U.S. Dep't of Interior*,
  269 F.3d 1158 (10th Cir. 2001) ................................................................................ 18

*Grayson v. State*,
  2021 OK CR 8, 485 P.3d 250, *cert. denied*, 142 S. Ct. 934 (2022) ........................... 1

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .................................................................................................. 24

*Hooper v. City of Tulsa*, No. 21-cv-165-WPJ-JFJ, 2022 WL 1105674 (N.D. Okla.
  Apr. 13, 2022), *appeal docketed*, No. 22-5034 (10th Cir. May 3, 2022) ...................... *passim*

*In re Pigeon's Estate*,
  198 P. 309 (Okla. 1921) ................................................................ 3, 16-17, 23

*Inc. Town of Hartshorne v. Inc. Town of Haileyville*,
  104 P. 49 (Okla. 1909) .............................................................................................. 12

*Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*,
  829 F. 2d 967 (10th Cir. 1987) ...................................................................... 2, 10, 11

*Iowa Mut. Ins. Co. v LaPlante*,
  480 U.S. 9 (1987) .................................................................................................. 23-24

*Jefferson v. Fink*,
  247 U.S. 288 (1918) ............................................................................................. 2, 17

*Kremer v. Chem. Const. Co.*,
  456 U.S. 461 (1982) .................................................................................................. 17

*Lackey v. State*,
  116 P. 913 (Okla. 1911) ........................................................................................3, 20, 21

*MacArthur v. San Juan County*,
  497 F.3d 1057 (10th Cir. 2007) ......................................................................................5

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020) ........................................................................................1, 15, 16

*Me. Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020) ..................................................................................................18

*Murphy v. Royal*,
  875 F.3d 896 (10th Cir. 2017) ...................................................................................2, 10

*Muscogee (Creek) Nation v. Hodel*,
  851 F.2d 1439 (D.C. Cir. 1988) ...............................................................................14, 17

*Okla., Kan. & Mo. Interurban Ry. v. Bowling*,
  249 F. 592 (8th Cir. 1918) ......................................................................................2-3, 11

*Oklahoma v. Castro-Huerta*,
  142 S. Ct. 2486 (2022) ....................................................................................................5

*Plains Elec. Generation & Trans. Coop. v. Pueblo of Laguna*,
  542 F.2d 1375 (10th Cir. 1976) ....................................................................................18

*Pueblo Aircraft Serv., Inc. v. City of Pueblo*,
  679 F.2d 805 (10th Cir. 1982) ........................................................................................5

*Puerto Rico v. Sánchez Valle*,
  579 U.S. 59 (2016) ........................................................................................................12

*Riley v. Kennedy*,
  553 U.S. 406 (2008) ......................................................................................................21

*Ross v. Neff*,
  905 F.2d 1349 (10th Cir. 1990) ......................................................................................2

*S. Sur. Co. v. Oklahoma*,
  241 U.S. 582 (1916) ................................................................................................13, 16

*Sands v. Manistee River Improvement Co.*,
  123 U.S. 288 (1887) ......................................................................................................14

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) ........................................................................................................24

*Shulthis v. McDougal*,
  225 U.S. 561 (1912) ................................................................................................2, 14-15

*Sizemore v. State*,
  2021 OK CR 6, 485 P.3d 867, *cert. denied*, 142 S. Ct. 935 (2022) ...........................1

*Spears v. State*,
  2021 OK CR 7, 485 P.3d 873, *cert. denied*, 142 S. Ct. 934 (2022) ...........................1

*State ex rel. Kline v. Bridges*,
   94 P. 1065 (Okla. 1908) ......................................................................... 3, 19-20

*State ex rel. West v. Ledbetter*,
   97 P. 834 (Okla. 1908) ........................................................................11, 12, 20

*State v. Lawhorn*,
   2021 OK CR 37, 499 P.3d 777 ............................................................................1

*Tiger v. Slinker*,
   4 F.2d 714 (E.D. Okla. 1925), *aff'd sub nom. United States v. Tiger*,
   19 F.2d 35 (8th Cir. 1927) .................................................................................17

*Toland v. Sprague*,
   37 U.S. (12 Pet.) 300 (1838) .............................................................................12

*United States v. City of McAlester*,
   604 F.2d 42 (10th Cir. 1979) (en banc) .......................................................11, 13

*United States v. Kagama*,
   118 U.S. 375 (1886) .............................................................................................5

*United States v. Lara*,
   541 U.S. 193 (2004) .............................................................................................5

*United States v. Maravilla*,
   907 F.2d 216 (1st Cir. 1990) .............................................................................12

*United States v. Thomas*,
   151 U.S. 577 (1894) ...........................................................................................15

*United States v. Tynen*,
   78 U.S. 88 (1870) .......................................................................................... 17-18

*United States v. Wheeler*,
   435 U.S. 313 (1978) ...........................................................................................12

*Ute Indian Tribe v. City of Myton*,
   835 F.3d 1255 (10th Cir. 2016) (Gorsuch, J.)....................................................5

*Williams v. Lee*,
   358 U.S. 217 (1959)..............................................................................................5

*Wisconsin v. Hitchcock*,
   201 U.S. 202 (1906) ...........................................................................................15

## STATUTES AND CONSTITUTIONS

18 U.S.C. § 1151(a) ...............................................................................................1

1908 Okla. Sess. Laws 184 .................................................................................20

Act of Aug. 23, 1842, ch. 188, 5 Stat. 516........................................................24

Act of June 7, 1897, ch. 3, 30 Stat. 62 ..............................................................10

Act of Mar. 1, 1895, ch. 145, 28 Stat. 693.............................................13, 24, 25

Act of March 1, 1889, ch. 333, 25 Stat. 783 .................................................................10

Cherokee Allotment Agreement Act of 1902, ch. 1375, 32 Stat. 716 ...........................18

Cherokee Nation Code tit. 47 ...........................................................................................8

Chickasaw Nation Code tit. 21 .........................................................................................8

Choctaw Nation Res. No. CB-89-21 (Aug. 20, 2021) ......................................................8

Choctaw Nation Traffic Code § 17-100...........................................................................8

Creek Allotment Agreement Act, ch. 676, 31 Stat. 861 (1901)......................................18

Curtis Act, ch. 517, 30 Stat. 495 (1898)

    § 11....................................................................................................................13

    § 14.............................................................................................................. *passim*

    § 29............................................................................................................18, 19

H.B. 3501, 2022 Reg. Sess. (Okla.)

    § 1......................................................................................................................6

    § 2......................................................................................................................7

Indian Appropriations Act of 1895, ch. 188, 28 Stat. 876 .............................................19

Judiciary Act of 1789, ch. 20, 1 Stat. 73 .......................................................................24

Major Crimes Act, 18 U.S.C. § 1153...............................................................................16

Muscogee (Creek) Nation Code tit. 14, ch. 3 ...............................................................8-9

Muscogee (Creek) Nation NCA 20-087 (Oct. 31, 2020) .................................................8

Okla. Stat.

    tit. 11 ............................................................................................................3, 20

    tit. 21

        § 99..............................................................................................................9

        § 99a(D) ......................................................................................................9

    tit. 47

        § 6-201.2 .....................................................................................................6

        § 6-205.2 .....................................................................................................7

        § 11-902(C)(2) to (5) ...................................................................................7

Oklahoma Constitution

    art. XVIII

        § 2..............................................................................................................21

        § 3(a) .........................................................................................................22

    Schedule

§ 10..................................................................................................................19

Oklahoma Indian Welfare Act of 1936, ch. 831, 49 Stat. 1967...............................14, 17

Oklahoma Organic Act, 26 Stat. 81 (1890) ................................................................9

§ 29..................................................................................................................10

§ 31..................................................................................................................10

Oklahoma Enabling Act, Act of June 16, 1906, ch. 3335, §§ 1-22, 34 Stat. 267,
267-73 (1906)................................................................................2, 19, 25

§ 13.............................................................................................................15, 16

§ 21.............................................................................................................15, 16

Okla. Terr. Stats. chs. 14-15 (1893)........................................................................10

Quapaw Nation Traffic Enforcement Code, Res. No. 031922-B (Apr. 16, 2022) .........9

Seminole Allotment Act, ch. 542, 30 Stat. 567 (1898)..............................................19

## OTHER AUTHORITIES

18 *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011) ........................................4

87 Fed. Reg. 4,636 (Jan. 28, 2022) ..........................................................................1

Adair Memorandum (Feb. 9, 2022), https://bit.ly/3Rz4zQK.......................................7

Aff. of Valerie Devol (Apr. 4, 2022), https://bit.ly/3AQr9hP .....................................8

Amended City of Bartlesville Charter (Nov. 2, 2010), https://bit.ly/3Rvj0pf ..............22

Amended City of Claremore Charter (Mar. 6, 2012), https://bit.ly/3z8fObC ...............22

Bartlesville Addendum (Nov. 2, 2020), https://bit.ly/3PpWsEr...................................6

Betty Lou Harper Thomas, "Disney," *Encyclopedia of Oklahoma History and
Culture*, https://bit.ly/3O2NeNn ...............................................................21

Betty Lou Harper Thomas, "Locust Grove," *Encyclopedia of Oklahoma History
and Culture*, https://bit.ly/3PexVlZ ...........................................................21

Betty Lou Harper Thomas, "Spavinaw," *Encyclopedia of Oklahoma History and
Culture*, https://bit.ly/3RCgtJA ................................................................21

Chelsea Addendum (Nov. 17, 2015), https://bit.ly/3uO2Uxg .....................................6

Chelsea Memorandum (Dec. 20, 2021), https://bit.ly/3Ryn3RA ................................7

Chouteau Addendum (Sept. 25, 2020), https://bit.ly/3ASOAHC.................................6

City of Owasso Charter (Mar. 3, 2015), https://bit.ly/3PrXLCD ................................22

City of Pryor Creek Charter (Jan. 16, 1951), https://bit.ly/3o6k2um ..........................22

Claremore Addendum (Apr. 9, 2021), https://bit.ly/3AQJPxV ...................................6

Collinsville Code of Ordinances Pt. 1, https://bit.ly/3ARKH5I ..................................................21

Craig Cnty. Genealogical Soc'y, "Big Cabin," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3o6jMeS ..................................................................21

Craig Cnty. Genealogical Soc'y, "Bluejacket," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RCMcdG ............................................................10

Craig Cnty. Genealogical Soc'y, "Vinita," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RyOSZW ............................................................10

Dale Denney, "Jay," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3APTtkx ............................................................................................21

Deputation Addenda (various dates), https://bit.ly/3O1U7hS .......................................6

Deputation Agreement (approved Apr. 18, 2007), https://bit.ly/3uNS0aq......................6

Dewey Addendum (Oct. 5, 2020), https://bit.ly/3RzDSeV .........................................6

Dianna Everett, "Verdigris," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3aM0b0a..........................................................................................22

Disney Addendum (Aug. 10, 2020), https://bit.ly/3z7OdYr ......................................6

Donna Casity McSpadden, "Chelsea," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3aCuw1d ................................................................10

Dorothy Dell Welsh, "Langley," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3PuHmgY ...............................................................................21

Gary L. Cheatham, "South Coffeyville," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3zgorBn ....................................................................21

Jay Memorandum (Oct. 22, 2021), https://bit.ly/3z72G6M .......................................7

Jon D. May, "Bartlesville," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RC4tYE ....................................................................................... 10-11

Kansas Memorandum (July 12, 2021), https://bit.ly/3IHjfcs .........................................7

Locust Grove Memorandum (Jan. 18, 2022), https://bit.ly/3cgpkAw............................7

Law Enf't Agreement Between & Among Cherokee Nation, United States of America, State of Okla. & Its Political Subdivisions, Various Bds. Of Cnty. Comm'rs, & Various Law Enf't Agencies (July 8, 1992), https://bit.ly/3OmXsIF ...........................................................................................6

*McGirt v. Oklahoma Supreme Court Decision*, Choctaw Nation of Okla., https://bit.ly/3IBUjmZ (last visited July 6, 2022)....................................................8

Michael Overall, *The Cherokee Nation's Budget Will Hit a Record $3 Billion as the Tribe Responds to COVID and McGirt*, Tulsa World (updated Oct. 22, 2021), https://bit.ly/3PbnG1J ...........................................................................8

Mozelle Stockton, "Strang," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3yFoxRd ........................................................................................ 21-22

News Release, Choctaw Nation, Choctaw Nation Forms Sovereignty Committee to Guide Future Efforts (Sept. 2, 2020), https://bit.ly/3Pm3ni4 ............................... 8

Nowata Cnty. & City Addenda (July 14, 2014), https://bit.ly/3RAHE7D .................... 6

Oologah Addendum (Oct. 6, 2020), https://bit.ly/3uSk6S3 ....................................... 6

Owasso Memorandum (Oct. 13, 2021), https://bit.ly/3ITFVXr ................................... 7

Press Release, Cherokee Nation, Cherokee Nation Files 1000th Case in Tribal Court Following McGirt Ruling (June 7, 2021), https://bit.ly/3P7HmDV ............................ 8

Press Release, Chickasaw Nation Pub. Rels. Off., Chickasaw Nation Expands Criminal Justice Capabilities (Mar. 11, 2022), https://bit.ly/3AONQ68 ................................ 8

*Quapaw Nation Building Law Enforcement Network*, Joplin Globe (Feb. 9, 2022), https://bit.ly/3yKoHqq ................................................................................................ 8

Rose Stauber, "Grove," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3PqBo0u ............................................................................................... 11

Salina Memorandum (May 12, 2022), https://bit.ly/3RCLLA4 ................................... 7

Sharon Koons, "West Siloam Springs," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3cfxBox ................................................................................... 22

South Coffeyville Addendum (Sept. 9, 2014), https://bit.ly/3RxDdul ......................... 6

Spavinaw Addendum (Apr. 2, 2019), https://bit.ly/3yJ5JR4 ...................................... 6

Talala Addendum (Apr. 9, 2021), https://bit.ly/3ITFCvL ........................................... 6

*Tribal Compacts and Agreements*, Okla. Sec'y of State, https://bit.ly/3o2frcn (last visited July 6, 2022) .................................................... 6

Verdigris Addendum (Apr. 9, 2021), https://bit.ly/3O8labn ....................................... 6

Vinita Addendum (Mar. 10, 2021), https://bit.ly/3IDisJE .......................................... 6

Vinita Memorandum (July 7, 2022), https://bit.ly/3aCC2tc ........................................ 7

W.W. Mansfield, *Statutes of Arkansas Embracing All Laws of a General and Permanent Character* (Little Rock, Ark., Mitchell & Bettis 1884), https://bit.ly/3aCAi2W ............................................................................................... 11

Warner Addendum (Apr. 9, 2021), https://bit.ly/3RzOLxi .......................................... 6

Warner Memorandum (Dec. 16, 2021), https://bit.ly/3OahHJ8 ................................. 7

West Siloam Springs Addendum (Nov. 4, 2020), https://bit.ly/3yESQri ...................... 6

West Siloam Springs Memorandum (June 29, 2021), https://bit.ly/3PsgfD5 ............... 7

Pl.'s Resp. to Def. City of Tulsa's Mot. to Dismiss Pl.'s Compl. & Br. in Supp.,
   *Hooper v. City of Tulsa*, No. 21-cv-165-JED-JFJ (N.D. Okla. June 2, 2021)
   (ECF No. 12)......................................................................................................14

Pl.'s Resp. to Order for Supp'l Br'g at 15-17, *Hooper v. City of Tulsa*, No. 21-cv-
   165-JED-JFJ (N.D. Okla. Mar. 13, 2022) (ECF No. 23).........................................14

Def. City of Tulsa's Mot. to Dismiss Pl.'s Compl. & Br. in Supp., *Hooper v. City
   of Tulsa*, No. 21-cv-165-JED-JFJ (N.D. Okla. May 26, 2022) (ECF No. 6).....................14, 25

## INTEREST OF *AMICI CURIAE*

Amici Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, [Muscogee (Creek) Nation,] Quapaw Nation, and Seminole Nation of Oklahoma ("Nations"), are federally recognized Indian tribes. *See* 87 Fed. Reg. 4,636, 4,637, 4,639 (Jan. 28, 2022). They occupy and govern Reservations that are Indian country under federal law. *See* 18 U.S.C. § 1151(a); *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020); *Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867, *cert. denied*, 142 S. Ct. 935 (2022); *Spears v. State*, 2021 OK CR 7, 485 P.3d 873, *cert. denied*, 142 S. Ct. 934 (2022); *Grayson v. State*, 2021 OK CR 8, 485 P.3d 250, *cert. denied*, 142 S. Ct. 934 (2022); *Bosse v. State*, 2021 OK CR 30, ¶ 12, 499 P.3d 771, 774, *cert. denied*, 142 S. Ct. 1136 (2022); *State v. Lawhorn*, 2021 OK CR 37, 499 P.3d 777.

The Nations submit this brief only to vindicate their interest in ensuring law enforcement and criminal prosecutions on their Reservations are conducted in accord with settled principles of federal law. The Cherokee Nation's interest is directly implicated here because Defendant Municipalities are within the Cherokee Reservation and are asserting jurisdiction over Cherokee Nation citizens. The Cherokee Nation's fellow *amici*'s interests are also implicated because acceptance of Defendant Municipalities' argument could impact law enforcement on their Reservations within the former Indian Territory. Accordingly, the Nations respectfully urge the Court to reject Defendant Municipalities'[1] arguments that they have criminal authority over Indians in Indian country under Section 14 of the Curtis Act, ch. 517, 30 Stat. 495 (1898) ("Section

---

[1] Specifically, Defendants the Towns of Adair, Big Cabin, Bluejacket, Chelsea, Chouteau, Copan, Disney, Kansas, Langley, Locust Grove, Oologah, Ramona, Salina, South Coffeyville, Spavinaw, Strang, Talala, Verdigris, Warner, and West Siloam Springs, and the Cities of Bartlesville, Catoosa, Claremore, Collinsville, Dewey, Grove, Jay, Nowata, Owasso, Pryor, and Vinita.

14") (Act attached as Ex. 1), as their motions to dismiss and notices of supplemental authority contend.  *See* ECF Nos. 27, 87, 133, 135.  The Nations take no position on any other issue.

Section 14 is the sole basis on which the Defendant Municipalities assert jurisdiction over Indians in Indian country.  They do not dispute that States and their municipalities lack jurisdiction over Indians in Indian country absent express congressional authorization.  Nor do they claim that Congress has ever granted Oklahoma jurisdiction over Indians in Indian country.  They could not do so, as the Tenth Circuit has settled that issue: Congress has never authorized Oklahoma to exercise jurisdiction over Indians in Indian country.  *See Murphy v. Royal*, 875 F.3d 896, 936-37 (10th Cir. 2017) (citing, *inter alia*, *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 980 n.6 (10th Cir. 1987)).  And, as "there has been no express delegation of jurisdiction to [Oklahoma], *a fortiori*, there has been no grant of local jurisdiction." *Ross v. Neff*, 905 F.2d 1349, 1352 (10th Cir. 1990).  Because Section 14 was abrogated by statehood as a matter of federal and state law, Defendant Municipalities' claim of jurisdiction must be rejected.

## SUMMARY OF ARGUMENT

Oklahoma is now a State, not a Territory, and is governed by state law.  Two related but independent reasons stymie Defendant Municipalities' effort to revive a historical relic from the Indian Territory and apply it to Indian country in the State today.

First, as a matter of federal law, Oklahoma's admission to statehood less than ten years after enactment of the Curtis Act extinguished the federal law authority of the municipalities Congress had authorized in the Indian Territory.  The provisions of Section 14 on which Defendant Municipalities rely were "intended to be merely provisional," *Jefferson v. Fink*, 247 U.S. 288, 294 (1918); *accord Shulthis v. McDougal*, 225 U.S. 561, 571 (1912), and as a result of Oklahoma's admission to statehood under the Oklahoma Enabling Act, Act of June 16, 1906, ch. 3335, §§ 1-22, 34 Stat. 267, 267-78 (1906) ("Enabling Act"), statutes like Section 14, that were "enacted for

the territory upon subjects of state, as distinguished from federal, cognizance [we]re automatically abrogated, except so far as they may [have been] affirmatively continued to prevent an interregnum or hiatus." *Okla., Kan. & Mo. Interurban Ry. v. Bowling*, 249 F. 592, 594 (8th Cir. 1918).   The Enabling Act and the terms on which Oklahoma became a state terminated pre-statehood law, including the conditions Congress placed upon the authority that municipalities organized under Arkansas law could exercise.  *See In re Pigeon's Estate*, 198 P. 309, 317 (Okla. 1921).

Second, Oklahoma state courts have squarely held that Oklahoma municipalities in the former Indian Territory are governed solely by state law, not pre-statehood enactments.  *See Lackey v. State*, 116 P. 913, 914 (Okla. 1911); *State ex rel. Kline v. Bridges*, 94 P. 1065, 1067 (Okla. 1908).  Indeed, an entire title of Oklahoma's statutes is devoted to Oklahoma cities and towns and the various forms of municipal governments they can form.  *See* Okla. Stat. tit. 11. Nothing in state law authorizes the jurisdiction which the Defendant Municipalities claim.

While the Defendant Municipalities rely heavily on Chief Judge Johnson's recent unpublished decision in *Hooper v. City of Tulsa*, No. 21-cv-165-WPJ-JFJ, 2022 WL 1105674 (N.D. Okla. Apr. 13, 2022), *appeal docketed*, No. 22-5034 (10th Cir. May 3, 2022), to support their position, *Hooper* is no guide here.  First, *Hooper* concerned a municipality that first incorporated *before* statehood, but many of the Defendant Municipalities incorporated *after* statehood – so they can make no claim to Section 14 authority.  Second, the *Hooper* Court did not consider either of the grounds for abrogation of Section 14 that *amici* advance here.  Furthermore, if Section 14 were still in effect, it would establish two systems of municipal laws in Oklahoma, as municipalities in the other half of the State would lack Section 14 authority.  It would also allow an otherwise-unheard of system, of federal district court appellate review of quotidian state

municipal court decisions. These curious results, which *Hooper* did not consider, would be contrary to the Enabling Act, Congress's intent in authorizing Oklahoma statehood, and state law.

## ARGUMENT

Defendant Municipalities argue that Section 14 was never repealed and still governs their jurisdiction today, relying on their own interpretation of Section 14 and Chief Judge Johnson's recent unpublished decision in *Hooper*, which determined that Section 14 of the Curtis Act currently defines the authority of state municipalities over Indians in Indian country, *see* ECF No. 132-1 ("slip op."). But the municipalities established under Section 14 were federal instrumentalities whose tenure expired at statehood, as clear rules of federal law show. And under Oklahoma law, which has entirely displaced pre-statehood laws in the Indian Territory, municipalities in Oklahoma are creatures of state law. The *Hooper* court was neither presented with, nor did it consider, these governing rules. Furthermore, as an unpublished district court decision, *Hooper* is not precedential in this Court, and may only be accepted to the extent it is persuasive. *See, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 714 n.7 (2011) (quoting 18 *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011)); *B.T. ex rel. G.T. v. Santa Fe Pub. Schs.*, 506 F. Supp. 2d 718, 727 (D.N.M. 2007) (Browning, J.). The Court should neither accept Defendant Municipalities' argument nor follow *Hooper* because, as settled rules of federal law and the rulings of state and federal courts on the effect of Oklahoma statehood demonstrate, municipal authority under Section 14 was abrogated by the Enabling Act and the statehood that followed.

## I. The Nations, in Cooperation with Willing Governmental Partners, Are Exercising Jurisdiction to Ensure that Reservation Roads are Safe.

The Defendant Municipalities do not contend, nor did the *Hooper* court conclude, that municipalities have jurisdiction over Indians in Indian country absent express congressional authorization. Nor do Defendant Municipalities challenge the Tenth Circuit's rulings that "[s]tates

have no authority over Indians in Indian Country unless it is expressly conferred by Congress," *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980) (citing *Williams v. Lee*, 358 U.S. 217, 220 (1959); *United States v. Kagama*, 118 U.S. 375, 383-84 (1886)), and that municipal officials are generally barred from exercising authority over Indians in Indian country, *see Ute Indian Tribe v. City of Myton*, 835 F.3d 1255, 1258, 1260 (10th Cir. 2016) (Gorsuch, J.); *MacArthur v. San Juan County*, 497 F.3d 1057, 1074 (10th Cir. 2007) ("In its 'governmental capacity' a municipality acts as an arm of the state for the public good on behalf of the state." (quoting *Pueblo Aircraft Serv., Inc. v. City of Pueblo*, 679 F.2d 805, 810 (10th Cir. 1982))).

Nor do Defendant Municipalities suggest these rules are incompatible with public safety. As *Hooper* acknowledged, Indian tribes "have jurisdiction over misdemeanors that Indians commit within reservation boundaries." Slip op. at 9-10 (citing *United States v. Lara*, 193, 199 (2004)).[2] The Nations have long worked hand in glove with municipal law enforcement agencies on their Reservations to protect public safety and continue to do so. That includes policing the roads and enforcing traffic codes and criminal laws that cover vehicle offenses. These efforts are reaping benefits and protecting the public, while Defendant Municipalities' grasp for additional authority under Section 14 of the Curtis Act serves only themselves, at a steep cost to tribal sovereignty and inter-governmental relations. The court in *Hooper* was not made aware of the protection that these efforts afford the public, which this dispute would scuttle.

Pursuant to dozens of cross-deputization agreements, the Cherokee Nation has agreed that state, county, and municipal law enforcement officers on the Cherokee Reservation can arrest or

---

[2] *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2526 (2022) (Gorsuch, J., dissenting) ("[T]he ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization—for that would touch the heart of 'tribal self-government' . . . can never be balanced away."); *see also id.* at 2501 n.6, 2504 n.9 (majority op.).

cite offenders who violate tribal law, including Indians, and then refer those cases to tribal prosecutors, who prosecute the cases over which the Nation has jurisdiction.[3]  Municipalities may enter into a uniform cross-deputization agreement with the Nation at any time by signing a one-page addendum.[4]  The Cherokee Nation has already entered into such agreements with twenty-seven of the Defendant Municipalities.[5]  And the other *amici* Nations have hundreds more that apply on their Reservations.  In addition, under recently passed state legislation, the Oklahoma Department of Public Safety treats tribal court convictions for traffic offenses the same way that it treats state court convictions for such offenses.  *See* H.B. 3501, § 1, 2022 Reg. Sess. (Okla.), *to be codified at* Okla. Stat. tit. 47, § 6-201.2.[6]  Under this legislation, a tribal conviction for driving under the influence ("DUI") or unsafe driving will result in suspension of a person's commercial state driver's license, and tribal convictions for DUI offenses will be considered a prior conviction

---

[3] These agreements are available on the Oklahoma Secretary of State's website, *see Tribal Compacts and Agreements*, Okla. Sec'y of State, https://bit.ly/3o2frcn (last visited July 6, 2022), and can be found by searching "Cherokee" and "deputization" or "deputation" in the "Doc Type" search bar.

[4] *See* Law Enf't Agreement Between & Among Cherokee Nation, United States of America, State of Okla. & Its Political Subdivisions, Various Bds. Of Cnty. Comm'rs, & Various Law Enf't Agencies (July 8, 1992), https://bit.ly/3OmXsIF; Deputation Agreement (approved Apr. 18, 2007), https://bit.ly/3uNS0aq.

[5] *See* Deputation Addenda (various dates), https://bit.ly/3O1U7hS (Big Cabin, Catoosa, Jay, Langley, Locust Grove, Owasso, Pryor, Salina, Vinita, Ramona, Kansas, Collinsville); Bartlesville Addendum (Nov. 2, 2020), https://bit.ly/3PpWsEr; Chelsea Addendum (Nov. 17, 2015), https://bit.ly/3uO2Uxg; Chouteau Addendum (Sept. 25, 2020), https://bit.ly/3ASOAHC; Claremore Addendum (Apr. 9, 2021), https://bit.ly/3AQJPxV; Dewey Addendum (Oct. 5, 2020), https://bit.ly/3RzDSeV; Disney Addendum (Aug. 10, 2020), https://bit.ly/3z7OdYr; Nowata Cnty. & City Addenda (July 14, 2014), https://bit.ly/3RAHE7D; Oologah Addendum (Oct. 6, 2020), https://bit.ly/3uSk6S3; South Coffeyville Addendum (Sept. 9, 2014), https://bit.ly/3RxDdul; Spavinaw Addendum (Apr. 2, 2019), https://bit.ly/3yJ5JR4; Talala Addendum (Apr. 9, 2021), https://bit.ly/3ITFCvL; Verdigris Addendum (Apr. 9, 2021), https://bit.ly/3O8labn; Vinita Addendum (Mar. 10, 2021), https://bit.ly/3IDisJE; Warner Addendum (Apr. 9, 2021), https://bit.ly/3RzOLxi; West Siloam Springs Addendum (Nov. 4, 2020), https://bit.ly/3yESQri.

[6] https://bit.ly/3o501UU.

for enhanced state punishment for felony DUI.  *See id.* § 2, *to be codified at* Okla. Stat. tit. 47, § 6-205.2; Okla. Stat. tit. 47, § 11-902(C)(2) to (5).

Case referrals under the Cherokee Nation's agreements, including those with Defendant Municipalities, have resulted in thousands of traffic citations and criminal charges in tribal courts across the Reservation.  Since the Cherokee Reservation was acknowledged in 2021, the Cherokee Nation has issued 2,987 traffic citations and filed 554 DUI cases.[7]  The Cherokee Nation also has over a dozen additional agreements with municipalities on its Reservation—including ten of the Defendant Municipalities[8]—under which the signatory municipalities agree "the State of Oklahoma, and the municipalities therein do not have jurisdiction over crimes occurring on the Cherokee Reservation involving Indian defendants and/or victims," *id.* § 1, and the Nation shares a portion of the fines assessed under tribal law within the municipality in which the offense was committed, equal to the share the municipality would obtain from fines for offenses committed outside Indian country, *id.* § 5(G)-(H).  The Nation has also taken direct action to ensure policing on its Reservation is fully funded.  In fiscal year 2020, the Cherokee Nation spent $10 million to expand its justice system; in fiscal year 2021, the budgets for the Nation's court system, Attorney

---

[7] Since their Reservations were acknowledged by the United States Supreme Court or Oklahoma Court of Criminal Appeals, the Chickasaw Nation has issued 804 traffic citations and filed 296 DUIs, the Choctaw Nation has issued 1,301 traffic citations and filed 314 DUIs, and the Muscogee (Creek) Nation has issued 1,001 civil and criminal sanctions for traffic violations.

[8] *See* Adair Memorandum (Feb. 9, 2022), https://bit.ly/3Rz4zQK; Chelsea Memorandum (Dec. 20, 2021), https://bit.ly/3Ryn3RA; Jay Memorandum (Oct. 22, 2021), https://bit.ly/3z72G6M; Kansas Memorandum (July 12, 2021), https://bit.ly/3IHjfcs; Locust Grove Memorandum (Jan. 18, 2022), https://bit.ly/3cgpkAw; Owasso Memorandum (Oct. 13, 2021), https://bit.ly/3ITFVXr; Salina Memorandum (May 12, 2022), https://bit.ly/3RCLLA4; Warner Memorandum (Dec. 16, 2021), https://bit.ly/3OahHJ8; West Siloam Springs Memorandum (June 29, 2021), https://bit.ly/3PsgfD5; Vinita Memorandum (July 7, 2022), https://bit.ly/3aCC2tc.

General's office, and Marshal Service more than doubled.[9]  The other *amici* Nations have also

made significant investments to expand their law enforcement and prosecutorial capacity.[10]

Law enforcement on the Nations' Reservations is supported by other cooperative efforts.

The Cherokee Nation has enacted a traffic code which mirrors state traffic laws, so that the laws

that govern traffic are uniform throughout the Reservation.  *See* Cherokee Nation Code tit. 47.[11]

Its fellow *amici* have taken similar steps.  *See* Chickasaw Nation Code tit. 21[12]; Choctaw Nation

Res. No. CB-89-21 (Aug. 20, 2021), *codified at* Choctaw Nation Traffic Code § 17-100[13];

Muscogee (Creek) Nation NCA 20-087 (Oct. 31, 2020), *codified* at Muscogee (Creek) Nation

---

[9] Press Release, Cherokee Nation, *Cherokee Nation Files 1000th Case in Tribal Court Following McGirt Ruling* (June 7, 2021), https://bit.ly/3P7HmDV; Michael Overall, *The Cherokee Nation's Budget Will Hit a Record $3 Billion as the Tribe Responds to COVID and McGirt*, Tulsa World (updated Oct. 22, 2021), https://bit.ly/3PbnG1J.

[10] The Choctaw Nation has spent over $24.8 million in response to the affirmation of its Reservation, including by hiring two new judges, forty-seven new police and criminal investigators, and six new prosecutors, and by establishing a public defenders' office.  News Release, Choctaw Nation, *Choctaw Nation Forms Sovereignty Committee to Guide Future Efforts* (Sept. 2, 2020), https://bit.ly/3Pm3ni4; *McGirt v. Oklahoma Supreme Court Decision*, Choctaw Nation of Okla., https://bit.ly/3IBUjmZ (last visited July 6, 2022).  The Chickasaw Nation hired more than thirty new personnel in its Lighthorse Police Department, more than doubled its prosecutorial staff, hired a new criminal investigator and a supervisory probation officer, and established a new Office of Detention Administration to oversee housing its growing prisoner population.  Press Release, Chickasaw Nation Pub. Rels. Off., *Chickasaw Nation Expands Criminal Justice Capabilities* (Mar. 11, 2022), https://bit.ly/3AONQ68.  The Muscogee (Creek) Nation has likewise invested significant additional resources in its law enforcement system— including hiring five new prosecutors, eight new administrative staff, three new judges, eight new investigators, fifty new police officers, and seven new dispatchers.   The Seminole Nation has increased its court funding by over 117 percent.  Aff. of Valerie Devol (Apr. 4, 2022), https://bit.ly/3AQr9hP.  And the Quapaw Nation is making historic investments in its tribal court system, law enforcement, and Department of Public Safety.  *Quapaw Nation Building Law Enforcement Network*, Joplin Globe (Feb. 9, 2022), https://bit.ly/3yKoHqq.

[11] https://bit.ly/3PrguOF.

[12] https://bit.ly/3yDMIzK.

[13] https://bit.ly/3Oa100H.

Code tit. 14, ch. 3;[14] Quapaw Nation Traffic Enforcement Code, Res. No. 031922-B (Apr. 16, 2022).[15]  And under state law, Tribal law enforcement officers with proper state certification can be commissioned as state law enforcement officers and can enforce state law on the Reservation against non-Indians.  Okla. Stat. tit. 21, §§ 99, 99a(D).  Exercising authority under these provisions and jurisdictional agreements, the Nations' law enforcement officers have referred thousands of cases involving non-Indians to state prosecutors for prosecution in the state system.

Defendant Municipalities seek to detour jurisdictional rules and hopscotch the Nations' efforts to ensure public safety by relying solely on Section 14 of the Curtis Act to establish municipal jurisdiction over Indians in Indian country.  Section 14 cannot sustain that weight, however, because it was a provisional enactment that did not last beyond Oklahoma statehood.

## II.    The Local Government Provisions of Section 14 Were Abrogated by the Oklahoma Enabling Act.

Defendant Municipalities' reliance on Section 14 seeks to resurrect a short-lived relic of the territorial era, under which municipalities that organized under federal law exercised authority as federal instrumentalities in the former Indian Territory, as discussed more fully below.  As a matter of federal and state law, existing municipalities in Oklahoma are now solely governed by *state* law.  And state law does not give Defendant Municipalities the authority they assert here.

### A.    Congress Established the Pre-Statehood Municipalities as a Temporary Measure.

In 1890, Congress established a territorial government for the Oklahoma Territory in what is now western Oklahoma.  Oklahoma Organic Act, ch. 182, 26 Stat. 81 (1890) ("Organic Act").

---

[14] https://bit.ly/3RApDGD.

[15] https://bit.ly/3RyOQ4g.

The Oklahoma Territory's Legislature passed laws governing the incorporation and power of municipalities in the Oklahoma Territory.  *See* Okla. Terr. Stats. chs. 14-15 (1893).[16]

In contrast, "[n]o territorial government was ever created in the reduced Indian Territory, and it remained subject directly to tribal and federal governance." *Murphy*, 875 F.3d at 933.  Some municipalities, including Defendants Vinita and Chelsea, originally incorporated under Cherokee Nation law.[17]  Additionally, Congress directly legislated for the territory and authorized the incorporation of municipalities as federal instrumentalities to assist in its governance.  For instance, in the Organic Act, Congress expanded the jurisdiction of the existing United States Court for the Indian Territory established by the Act of March 1, 1889, ch. 333, 25 Stat. 783,[18] Organic Act § 29, and provided that "certain general laws of the State of Arkansas" were "hereby extended over and put in force in the Indian Territory until Congress shall otherwise provide," *id.* § 31.  Those included Arkansas laws "relating . . . to municipal corporations, chapter twenty-nine, division one . . . ." *Id.*; *accord* Act of June 7, 1897, ch. 3, 30 Stat. 62, 83 (giving Indian Territory court jurisdiction to hear all civil and criminal cases and applying Arkansas law to "all persons" in the Territory).  At least two Defendant Municipalities incorporated under these pre-Curtis Act provisions of federal law.[19]

---

[16] https://bit.ly/3yIYAjV.

[17]  Donna Casity McSpadden, "Chelsea," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3aCuw1d; Craig Cnty. Genealogical Soc'y, "Vinita," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RyOSZW.  These and all other *Encyclopedia of Oklahoma History and Culture* websites cited in this brief were last accessed July 13, 2022.

[18] Congress originally established this "special federal court of limited jurisdiction" to deal with "problems of lawlessness" caused by non-Indian intruders in the Indian Territory, over whom tribal courts lacked authority.  *Indian Country, U.S.A.*, 829 F.2d at 977.  Congress gradually expanded the court's jurisdiction as part of the measures it took to coerce Indian tribes into allotment of their lands.  *Id.* at 977-78; *see infra* at 11.

[19] *See* Craig Cnty. Genealogical Soc'y, "Bluejacket," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RCMcdG; Jon D. May, "Bartlesville," *Encyclopedia of Oklahoma History*

Section 14 was only a small part of the Curtis Act, which was "intended among other things to coerce the Creek Nation to agree to allotment and cession of tribal lands . . . ." *Indian Country, U.S.A.*, 829 F.2d at 978; *accord Hooper*, slip op. at 4. Section 14 "provide[d] settlers in the Indian Territory a means by which they might exercise some control, political and possessory, over the lands in which they lived." *United States v. City of McAlester*, 604 F.2d 42, 64 (10th Cir. 1979) (en banc). It did so by authorizing cities and towns in the Indian Territory to incorporate under Chapter Twenty-Nine of Mansfield's Digest of the Statutes of Arkansas.[20] Section 14 simply borrowed Arkansas law for that purpose—the municipalities that organized under it were federal instrumentalities, not state entities, as the Oklahoma Supreme Court has explained:

> The municipal corporations of the Indian Territory prior to the admission of the state into the Union were agencies of the government of the United States, created by Congress under its plenary power to govern the territories in any manner not forbidden by the federal Constitution, for the purpose of permitting the people of those cities and towns in a measure to control their local affairs.

*State ex rel. West v. Ledbetter*, 97 P. 834, 835 (Okla. 1908); *accord Bowling*, 249 F. at 593-94 ("Before [territories] are admitted to statehood [Congress] exercises as to them the combined powers of the national and state governments by direct legislation, and also through local legislative bodies whose acts are subject to its supervision, or, as was the case with the Indian Territory, by extending thereto certain of the laws of an organized state.").

Congress further provided in Section 14 that "such city or town government" as it authorized to incorporate would "possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas . . . ." Congress further defined the scope of the city or

---

*and Culture*, https://bit.ly/3RC4tYE. Grove may also have incorporated before the Curtis Act was passed. *See* Rose Stauber, "Grove," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3PqBo0u.

[20] W.W. Mansfield, *Statutes of Arkansas Embracing All Laws of a General and Permanent Character* (Little Rock, Ark., Mitchell & Bettis 1884), https://bit.ly/3aCAi2W.

town government's authority over local affairs, particularly the affairs of those living within their

borders while Section 14 was in effect, by providing that

> all inhabitants of such cities and towns, without regard to race, shall be subject to
> all laws and ordinances of such city or town governments, and shall have equal
> rights, privileges, and protection therein.

That this authority extended only to those living with the municipal boundaries is confirmed by

Congress's use of the word "inhabitants" to describe those over whom municipalities had

authority.  *See Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 319 (1838) ("inhabitant" is synonymous

with "citizen"); *United States v. Maravilla*, 907 F.2d 216, 224 (1st Cir. 1990) ("we have examined

dictionary definitions of the word "inhabitant," definitions found both in general and legal

dictionaries, both modern dictionaries and nineteenth century dictionaries . . . .  All of them define

the word in terms of 'dwelling' in a place, which, in turn, they define in terms of 'living in,' 'having

a habitation in,' or 'residing in,' a place. None of these terms can be used to describe a daytime

visit by one who lives elsewhere.")  And although Congress authorized the municipal governments

to enact such laws and ordinances, rather than passing ordinances itself, Congress was still the

ultimate source of power for such ordinances as the municipalities were themselves "agencies of

the government of the United States."  *Ledbetter*, 97 P. at 835, *see Puerto Rico v. Sánchez Valle*,

579 U.S. 59, 70, 75-76 (2016) ("ultimate source" of authority for a government Congress

establishes in a territory "remains the U.S. Congress, just as back of a city's charter lies a state

government," while the source of state or tribal power is "'pre-existing' sovereignty" that is

"attributable in no way to any delegation . . . of federal authority" (alteration in original) (quoting

*United States v. Wheeler*, 435 U.S. 313, 320, 322, 328 (1978))); *see also Inc. Town of Hartshorne*

*v. Inc. Town of Haileyville*, 104 P. 49, 50 (Okla. 1909) (municipalities are either created by states

or, in the territories, by Congress or congressionally empowered territorial governments).

Congress further provided that

> mayors of such cities and towns, in addition to their other powers, shall have the same jurisdiction in civil and criminal cases arising within the corporate limits of such cities and towns as, and coextensive with, United States commissioners in the Indian Territory . . . .

The commissioners to which Section 14 referred had "all the powers of commissioners of the circuit courts of the United States," the power to act "as justices of the peace in criminal cases" with jurisdiction to "hold preliminary examinations and discharge, hold to bail, or commit in cases of offenses which, under the laws applicable to the Territory, amount to felonies," and could preside over civil and criminal proceedings, with appeals from commissioners' rulings to the "United States court in the Indian Territory."  Act of Mar. 1, 1895, § 4, ch. 145, 28 Stat. 693, 695-96; *see S. Sur. Co. v. Oklahoma*, 241 U.S. 582, 584 (1916).

Section 14, in effect only during the brief territorial era between the Organic Act and statehood, no longer exists.  It died upon statehood, as explained further below, and so Defendant Municipalities can claim no authority under the Curtis Act in the present day.[21]

### B. Congress Abrogated the Provisions of Section 14 That Defined Municipal Authority and Applied Arkansas Law in the Indian Territory Upon Statehood.

Defendant Municipalities cannot sever the provisional authority Section 14 once provided from its expired federal source and transplant it to state law to exercise authority over Indians in Indian country.  Section 14 created only a temporary authority for municipalities, by applying a modified version of Arkansas law, that was abrogated upon statehood.  The question whether the Enabling Act and statehood abrogated Section 14 as a matter of federal and state law was not

---

[21] Actions that the municipalities took *before* statehood or under any other provision of the Curtis Act, are not at issue.  For that reason, the Tenth Circuit's decisions upholding *pre-statehood* actions by municipalities to condemn interests in land under *Section 11* of the Curtis Act, could not give Defendant Municipalities any support.  *McAlester*, 604 F.2d 42; *Choctaw Nation v. City of Atoka*, 207 F.2d 763 (10th Cir. 1953).

presented to the district court in *Hooper*.[22]  That question is presented here.  And as the subsequent

enactment of the Enabling Act inexorably shows, Section 14 was abrogated under federal law.

In the Enabling Act, Congress authorized the formation of the State of Oklahoma out of

the Oklahoma Territory, Indian Territory, and Public Land Strip.  That Act entirely replaced the

transitory scheme Congress had established under which municipalities in the Indian Territory

could incorporate and exercise authority under a modified version of Arkansas law.  As a general

rule, upon statehood, the federal law Congress enacts to prescribe the formation and functioning

of government in a territory becomes "inoperative except as adopted by [the State]," *Sands v.

Manistee River Improvement Co.*, 123 U.S. 288, 296 (1887), and is "displaced, abrogated, every

part of it," *Benner v. Porter*, 50 U.S. (9 How.) 235, 242-43 (1850) (emphasis added).  This

displacement occurred in the Indian Territory.  When Congress established the Indian Territory

and provided for its governance in acts like the Curtis Act, it was

> contemplating the early inclusion of [the Indian T]erritory in a new state, and the
> purpose of those acts was to provide, for the time being, a body of laws adapted to

---

[22] In *Hooper*, the plaintiff argued to the district court that Section 14 of the Curtis Act granted judicial authority to enforce Arkansas law only to the United States Court for the Indian Territory, not the municipal courts, *see* Pl.'s Resp. to Def. City of Tulsa's Mot. to Dismiss Pl.'s Compl. & Br. in Supp. at 4-6, *Hooper v. City of Tulsa*, No. 21-cv-165-JED-JFJ (N.D. Okla. June 2, 2021) (ECF No. 12) ("Pl. *Hooper* Resp."), that municipalities in Oklahoma "[w]hether through practice or modification of law" do not exercise authority in excess of the State's, *see id.* at 6-8, that the municipality provisions in Section 14 of the Curtis Act were repealed by the Oklahoma Indian Welfare Act of 1936, ch. 831, 49 Stat. 1967, Pl. *Hooper* Resp. at 8-10 (citing *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988)), that the Curtis Act was only intended to authorize mayors to exercise functions in municipal mayors' courts, which no longer exist, Pl.'s Resp. to Order for Supp'l Br'g at 15-17, *Hooper v. City of Tulsa*, No. 21-cv-165-JED-JFJ (N.D. Okla. Mar. 13, 2022) (ECF No. 23), and that the reference to "all inhabitants regardless of race" in Section 14 was not intended to include members of Indian tribes, *id.* at 18.  Defendant City of Tulsa's keystone argument was that Congress has never repealed or changed Section 14, without discussion of the Enabling Act or state cases determining its effect on Oklahoma municipalities. Def. City of Tulsa's Mot. to Dismiss Pl.'s Compl. & Br. in Supp. at 9, *Hooper v. City of Tulsa*, No. 21-cv-165-JED-JFJ (N.D. Okla. May 26, 2022) (ECF No. 6) ("Tulsa *Hooper* Mot.") ("**Importantly, Congress has made no law repealing or otherwise limiting Section 14 of the Curtis Act since its passage in 1898.**") (emphasis in original).

the needs of the locality and its people in respect of matters of local or domestic concern.  There being no local legislature, Congress alone could act.  *Plainly, its action was intended to be merely provisional, and not to encroach upon the powers which rightfully would belong to the prospective state.*

*Shulthis*, 225 U.S. at 571 (emphasis added).  As a result, although federal statutes passed before statehood "discuss[] the assignment of cases among courts in the *Indian Territory*[,] [t]hey say nothing about the division of responsibilities between federal and state authorities after Oklahoma entered the Union."  *McGirt*, 140 S. Ct. at 2477.

That Section 14 was provisional is confirmed by how Congress ultimately wrapped up the business of the Indian Territory in the Enabling Act.  That Act terminated the Indian Territory and extinguished the authority that federal instrumentalities could exercise under Section 14.  Section 1 of the Enabling Act first made clear, consistent with the general principle that statehood does not diminish existing Indian rights or the federal supremacy in Indian affairs, *see Wisconsin v. Hitchcock*, 201 U.S. 202, 213-14 (1906) (quoting *United States v. Thomas*, 151 U.S. 577, 582, 584 (1894)), that "nothing contained in the [Oklahoma] constitution"

> shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights . . . which it would have been competent to make if this Act had never passed.

The Enabling Act then authorized one system of state laws in Oklahoma, which did not include Section 14 of the Curtis Act.  Section 13 of the Enabling Act instead provided that, post-statehood, "the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State until changed by the legislature thereof."  Section 21 then provided:

> all laws in force in the Territory of Oklahoma at the time of the admission of said State into the Union shall be in force throughout said State, except as modified or changed by this Act or by the constitution of the State, and the laws of the United States not locally inapplicable shall have the same force and effect within said State as elsewhere within the United States.

Section 21 of the Enabling Act thus, by its own terms, ended the effectiveness of Section 14 of the Curtis Act after statehood. First, Section 14 of the Curtis Act was not one of the "law[s] in force in the Territory of Oklahoma" which the Enabling Act made applicable throughout the State. Second, Section 14 was not a statute in effect "elsewhere within the United States," and so was not one of the federal statutes made applicable in Oklahoma in addition to Oklahoma Territory law. Third, Section 21 of the Enabling Act provided that the only modifications or changes to Oklahoma law that would apply after Statehood would be those of "this Act" or "the constitution of the State," and so prior laws like the Curtis Act could not prospectively modify state law.

This abrogation also eliminated any portion of Section 14 that might be argued to expand municipal jurisdiction beyond that which a State might, in the normal course, exercise. As the Supreme Court explained in *Southern Surety*, under the Enabling Act and the state Constitution, "the test of the jurisdiction of the state courts was to be the same that would have applied had the Indian Territory been a state when the offenses were committed." 241 U.S. at 586.[23] *Accord McGirt*, 140 S. Ct. at 2477 ("When Oklahoma won statehood in 1907, the [Major Crimes Act, 18 U.S.C. § 1153] applied immediately according to its plain terms."). Likewise, in *Pigeon's Estate*, 198 P. 309, the Oklahoma Supreme Court concluded that Sections 13 and 21 of the Enabling Act repealed both the Arkansas descendency law Congress had applied to certain unrestricted fee lands in the Indian Territory and the provisos Congress had imposed on the operation of Arkansas law in the Territory, and that applying such provisos would

> require[] the court by an unreasonable rule of construction to detach from the dead corpse of the Arkansas law . . . the provisos . . . and ingraft them onto the laws of

---

[23] *Southern Surety* "pass[ed] the question" of Oklahoma state courts' authority over "tribal Indians," but that broader issue is not before the Court. Rather, the issue here is limited to the question whether Section 14 of the Curtis Act established post-statehood municipal authority over enforcement of municipal laws as to Indian offenders, *see supra* at 2.

Oklahoma without any authority whatever of any legislative act of the Congress or of the state . . . .

*Id.* at 317.  *Accord Tiger v. Slinker*, 4 F.2d 714 (E.D. Okla. 1925), *aff'd sub nom. United States v. Tiger*, 19 F.2d 35, 36 (8th Cir. 1927); *see also Dunn v. Micco*, 106 F.2d 356, 358-59 (10th Cir. 1939) (both adopting the reasoning of *Pigeon* and *Tiger* and following them under *stare decisis*).

In sum, the Enabling Act authorized a new State under a single, uniform set of laws that replaced the provisional measures that Congress had enacted for the Indian Territory. Accordingly, just as Municipal Defendants cannot rely on Section 14 of the Curtis Act to conduct elections under Arkansas law today, they cannot rely on Section 14 to exercise jurisdiction over Indians in Indian country today.  The survival of Section 14 would be plainly inconsistent with the establishment of the State and Congress's intent in the Enabling Act to replace the provisional system in the Indian Territory with "*a body of laws applying with practical uniformity throughout the state.*"  *Jefferson*, 247 U.S. at 292 (emphasis added).

For similar reasons, the Enabling Act also impliedly repealed Section 14 of the Curtis Act, as when "a later act covers the whole subject of an earlier one and is clearly intended as a substitute, it will operate to repeal the earlier act."  *Hodel*, 851 F.2d at 1445 (citing *Kremer v. Chem. Const. Co.*, 456 U.S. 461, 469 (1982)).  The *Hooper* district court concluded that *Hodel* did not hold that Section 14 of the Curtis Act was repealed.  Slip op. at 7.  But *Hodel* found that Section 28 of the Curtis Act, which abolished Muscogee (Creek) courts, was repealed, as a result of the conjunction of a general repealer provision in the OIWA, and the OIWA's express recognition of the authority of Oklahoma tribes to establish constitutions and exercise powers of self-government, because OIWA "appears to cover the 'whole subject' of the earlier legislation."  851 F.2d at 1445.  For the same reasons, the Enabling Act repealed Section 14, as it *entirely* replaced the old laws of the Indian Territory with Oklahoma state law.  *Accord United States v. Tynen*, 78 U.S. 88, 92 (1870)

("even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."); *Elephant Butte Irr. Dist. v. U.S. Dep't of Interior*, 269 F.3d 1158, 1164 (10th Cir. 2001) ("Repeal by implication may be found . . . if the later act covers the whole subject of the earlier one and is clearly intended as a substitute . . ." (quoting *Plains Elec. Generation & Trans. Coop. v. Pueblo of Laguna*, 542 F.2d 1375, 1376 (10th Cir. 1976)); *see Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020).

Although Defendant Municipalities have argued that Section 14 of the Curtis Act was preserved under Section 73 of the Cherokee Allotment Agreement Act of 1902, ch. 1375, 32 Stat. 716, 727, that provision did not purport to immunize Section 14 from any later enactment, much less to extend Section 14's lifespan past statehood.  Defendant Municipalities say the Cherokee Allotment Agreement Act "expressly preserved" Section 14, ECF No. 27 at 5; ECF No. 87 at 13, but that phrase appears nowhere in the Act.[24]  Instead, Section 73 of that Act said that Section 14 of the Curtis Act would "continue in force as if this agreement had not been made."  It did not say that Section 14 would continue in force even if statehood were later granted, and statehood abrogated Section 14.  That provision of the pre-statehood Act is therefore irrelevant to whether statehood abrogated Section 14.  That conclusion holds true for the other Nations' Reservations, as well.  Section 41 of the Creek Allotment Agreement Act, ch. 676, 31 Stat. 861, 872 (1901), contained a substantively identical provision that fell upon statehood for the same reason as Section 73 of the Cherokee Act.  In Section 29 of the Curtis Act, Congress enacted an agreement

---

[24] Even if this language did appear in the 1902 agreement, the "preserv[ation]" of Section 14 of the Curtis Act in that agreement would not have survived statehood in 1907 for the same reason the "continu[ing] in force" of Section 14 (the words of the actual 1902 agreement) did not survive statehood in 1907.

between the United States and the Chickasaw and Choctaw Nations that prescribed how those

Nations' lands would be allotted.  That agreement superseded many of the provisions of the Curtis

Act, but also provided that it "shall not in any manner affect the provisions of section fourteen

. . . ."  30 Stat. at 505.  The Enabling Act itself later "affect[ed]" Section 14 by abrogating it.[25]  In

fact, these provisions cut against Defendant Municipalities' argument that Section 14 is still in

effect.  They show that if Congress had intended Section 14 to survive the Enabling Act, it knew

how to enact provisions that would have continued Section 14 in effect.  But it did not.

### C.   State Law Did Not Preserve Municipalities' Section 14 Authority.

Defendant Municipalities also lack authority over Indians on Indian country for the related,

but independent reason, that Oklahoma decided as a matter of state law in its Constitution to

terminate municipalities' authority under laws that applied in the Indian Territory.  Section 10 of

the Schedule to the Oklahoma Constitution provided that

> [u]ntil otherwise provided by law, incorporated cities and towns, heretofore
> incorporated under the laws in force in the territory of Oklahoma or in the Indian
> Territory, shall continue their corporate existence under the laws extended in force
> in the state . . . .

*Bridges*, 94 P. at 1066.  The adoption of the state Constitution terminated the laws that governed

municipalities in the Indian Territory:

> The state of Oklahoma is a different government from the government that existed
> in the Indian Territory prior to the admission of the state, *and the laws for the*
> *administration of the affairs of municipal corporations that were in force in the*
> *Indian Territory prior to the admission of the state are no more the laws of the state*
> *of Oklahoma than they are of any other state of the Union, unless made so by the*
> *provisions of the Enabling Act or some provision of the Constitution.*  The Enabling
> Act contains no provision that extends in force in the state after its admission into

---

[25] The Seminole allotment agreement, approved by Congress only two days after enactment of the Curtis Act, did not reference Section 14 at all.  *See* Seminole Allotment Act, ch. 542, 30 Stat. 567 (1898).  Quapaw allotment was approved by Congress *before* the Curtis Act, and the act authorizing Quapaw allotment made no reference to Section 14.  *See* Indian Appropriations Act of 1895, ch. 188, 28 Stat. 876, 907.

the Union any of the laws governing municipal corporations that were in force in the Indian Territory prior to its admission, nor does the Constitution adopt or continue in force in the state any of said laws except certain specific laws for certain specific purposes, to which reference will be made later.

*Id.* at 1067 (emphasis added).

This is clearly confirmed by *Ledbetter*.  There, the Oklahoma Supreme Court explained that while Section 14 put Arkansas laws in force in the Indian Territory, the Enabling Act displaced them with Oklahoma Territory law.  97 P. at 835.  "No provision was made in the enabling act or in the Constitution for extending in force in the [Arkansas] laws under which the municipal corporations of the Indian Territory were created, organized, and governed."  *Id.*  At statehood,

the form of government theretofore existing in the Indian Territory ceased to exist, and the laws in force in that territory under which [a municipality incorporated during the Indian Territory era] held its charter and exercised its municipal powers became inoperative.

*Id.*  Instead, "the Constitution created them municipal corporations under [Oklahoma Territory] law . . . the corporate existence of said cities . . . continued, after the admission of the state, under the laws extended in force, and not under the laws theretofore in force in the Indian Territory."  *Id.*  As a result, "while the municipal corporations of the Indian Territory continued to exist as municipal corporations in the state after its admission, the powers of such corporations, except as otherwise provided by the Constitution, are to be found in the general statutes of Oklahoma Territory, extended in force in the state, providing for the organization of municipal corporations and defining their powers."  *Lackey*, 116 P. at 914.[26]

---

[26] Moreover, the State shortly thereafter "otherwise provided by law" the powers of most municipalities by passing a statute that provided that existing cities of the first class that had organized under the laws applicable in the former Indian Territory would automatically become "cities of the first class under the laws of this State."  1908 Okla. Sess. Laws 184.  *See also Ledbetter*, 97 P. at 835-36.  Now the powers of municipalities are comprehensively defined in Okla. Stat. tit. 11—and none of those provisions purport to preserve the repealed Curtis Act or otherwise authorize municipalities to exercise jurisdiction over Indians in Indian country.

The Oklahoma Constitution art. XVIII, § 2, contains a provision temporarily preserving municipal corporations' "present rights and powers until otherwise provided by law."  The decision in *Hooper* relied on that provision to conclude that "statehood did not put an end to municipalities' powers under the Curtis Act."  Slip op. at 7.  But, as the Oklahoma Supreme Court has explained, municipalities' "present rights and powers" upon statehood were those defined by Oklahoma territorial law which applied throughout the State upon statehood—not those defined in the laws formerly in effect in the Indian Territory.  *Lackey*, 116 P. at 914-15.  The Oklahoma Supreme Court's interpretation of the state Constitution in *Lackey* is binding on this Court, *see Riley v. Kennedy*, 553 U.S. 406, 425 (2008), and its interpretation of the effect of the Enabling Act and statehood is manifestly correct, *supra* at 9-19.

Moreover, many Municipal Defendants unequivocally incorporated under state law, after statehood, and so have abandoned any claim to authority conferred by pre-statehood laws authorizing municipal incorporation.  Section 14 only confers authority on "such city or town" as had "incorporated as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas" under its terms.  30 Stat. at 499.  Yet at least eleven of the Defendant Municipalities incorporated for the first time *after statehood*, under state law.[27]  Similarly, at least four Defendant

---

[27] Collinsville Code of Ordinances Pt. 1 n.1, https://bit.ly/3ARKH5I (Collinsville incorporated in 1913); Craig Cnty. Genealogical Soc'y, "Big Cabin," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3o6jMeS (Big Cabin incorporated in 1958); Betty Lou Harper Thomas, "Disney," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3O2NeNn (Disney incorporated in 1959); Dale Denney, "Jay," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3APTtkx (Jay incorporated in 1939); Dorothy Dell Welsh, "Langley," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3PuHmgY (Langley incorporated in 1939); Betty Lou Harper Thomas, "Locust Grove," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3PexVlZ (Locust Grove incorporated in 1913); Gary L. Cheatham, "South Coffeyville," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3zgorBn (South Coffeyville incorporated in 1909); Betty Lou Harper Thomas, "Spavinaw," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3RCgtJA (Spavinaw incorporated in 1930); Mozelle Stockton, "Strang," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3yFoxRd

Municipalities chose to reincorporate under Oklahoma law after statehood, including Bartlesville,[28] Claremore,[29] Owasso,[30] and Pryor.[31]  The first eleven could never have claimed authority under the Curtis Act, and the latter four jettisoned any such claim when they reincorporated under the Oklahoma Constitution art. XVIII, § 3(a), which provides that a city charter approved after statehood "shall become the organic law of such city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it."  The same is true for any other Defendant Municipalities which incorporated under state law after statehood.

This case law, the meaning of the Oklahoma Constitution, and this history were not presented to the court in *Hooper* and the *Hooper* decision did not consider them.  Accordingly, while the district court in *Hooper* concluded that "Oklahoma's statehood did not put an end to municipalities' powers under the Curtis Act" and that "statehood did not terminate the continued power of municipalities to operate municipal courts," slip op. at 7, it did not address—much less reject—the authorities relied on here.  Indeed, *Hooper* acknowledged that the mayor's courts contemplated by the Curtis Act "did not survive Indian Territory's conversion to statehood as Oklahoma" but then wrongly concluded that "the provisions of Mansfield's Digest incorporated by reference into the Curtis Act expressly authorize other forms of municipal jurisdiction."  Slip op. at 6.  Statehood *did* terminate the power of municipalities to operate under provisions of

---

(Strang incorporated in 1921); Dianna Everett, "Verdigris," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3aM0b0a (Verdigris incorporated in 1980); Sharon Koons, "West Siloam Springs," *Encyclopedia of Oklahoma History and Culture*, https://bit.ly/3cfxBox (West Siloam Springs incorporated in 1969).

[28] Amended City of Bartlesville Charter (Nov. 2, 2010), https://bit.ly/3Rvj0pf.

[29] Amended City of Claremore Charter (Mar. 6, 2012), https://bit.ly/3z8fObC.

[30] City of Owasso Charter (Mar. 3, 2015), https://bit.ly/3PrXLCD.

[31] City of Pryor Creek Charter (Jan. 16, 1951), https://bit.ly/3o6k2um.

Arkansas law and to exercise jurisdiction as defined by Section 14 of the Curtis Act, because statehood entirely replaced Section 14 of the Curtis Act and Arkansas laws concerning municipalities with Oklahoma state law. *See Pigeon's Estate*, 198 P. at 317. The Oklahoma courts have long since rejected that gambit. Finally, while *Hooper* also concluded that municipalities in Oklahoma can exercise authority that the State itself cannot exercise, slip op. at 8, that incorrectly assumes that Congress's decision to "affirmatively grant" jurisdiction to municipalities in the Indian Territory is still in effect in the state of Oklahoma—and it is not.

### III. Defendant Municipalities' Position Would Seriously Impede Governance on the Reservations and Compromise Tribal Sovereignty, For No Practical Benefit.

The Defendant Municipalities' position, if adopted, threatens to establish a new presumption in eastern Oklahoma—that municipalities have jurisdiction over Indians within their boundaries. Such a change would upset the hundreds of agreements between tribes and local governments which currently govern law enforcement and criminal prosecution in Indian country in eastern Oklahoma, including within Defendant Municipalities' borders. *See supra* at 4-9. The Cherokee Nation's and other Nations' inter-governmental cooperation to ensure law enforcement on their Reservations depends on mutual respect and recognition of the long-settled principles that assign jurisdiction over activities on the Reservation. Defendant Municipalities would unsettle those principles, which have until now been institutionalized in agreements that are working well for people on the Reservations, and in doing so strike at the heart of tribal authority.

If municipalities had jurisdiction over crimes by Indians on the Nations' Reservations, it would infringe on tribal self-government by subjecting reservation Indians to an additional criminal justice system, with different laws applied by different courts, in which punishment would be meted out by municipalities. It would be difficult to imagine a greater intrusion on tribal self-government. The adjudication of any case arising on the Reservation involving Indians "by any

nontribal court . . . infringes upon tribal lawmaking authority." *Iowa Mut. Ins. Co. v LaPlante*, 480 U.S. 9, 16 (1987). Such an adjudication "cannot help but unsettle a tribal government's ability to maintain authority." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978).

Moreover, if Section 14 were still in effect, it would senselessly wedge municipalities into the federal court system, which would raise constitutional concerns. Section 14 gave mayors of municipalities the authority to act as United States commissioners, who could enforce federal criminal law and hold hearings in and preside over federal criminal proceedings.[32] If municipal officials somehow retained that authority, they could effectively operate as federal courts in the absence of any state law authorization. Conscripting the State's municipal courts in this manner —and doing so without the State's consent—would violate the rule that

> when a new state is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original states, and that such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission.

*Coyle v. Smith*, 221 U.S. 559, 573 (1911); *see Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991) (State has "constitutional responsibility for the establishment and operation of its own government" in which federal courts avoid interfering).

---

[32] In addition to the powers expressly described in the Act of March 1, 1895, *see supra* at 13, the "powers of commissioners of the circuit courts" established by federal law when the Curtis Act was passed were in relevant part:

> [t]o take acknowledgments of bail and affidavits, and also to take depositions of witnesses in civil cases . . . [and] all the powers that any justice of the peace, or other magistrate, of any of the United States may now exercise in respect to offenders for any crime or offense against the United States, by arresting, imprisoning, or bailing the same, under and by virtue of [the Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91-92.]

Act of Aug. 23, 1842, § 1, ch. 188, 5 Stat. 516, 516-17.

The Defendant Municipalities' arguments could also have unanticipated impacts on the federal courts.   The Act of March 1, 1895, which authorized appeals of United States commissioners' decisions to federal courts, does not limit appeals to cases involving Indians.  This means *anyone* tried in a municipal court could seek an appeal to district court.  *Cf.* Tulsa *Hooper* Mot. at 8 (City of Tulsa asserts that the District Court for the Northern District of Oklahoma "has jurisdiction of the appeal from the City of Tulsa Municipal Criminal Court because, as shown, the Curtis Act is still in force and applies to the proceedings of the City of Tulsa Municipal Court."). There is no indication in the Enabling Act that Congress, after substituting the Indian Territory for a new State governed by uniform state law, intended to establish a permanent system in Oklahoma where municipalities in half the State would act as federal criminal courts whose decisions could be appealed to the Article III courts.

## CONCLUSION

For the foregoing reasons, the Court should reject Defendant Municipalities' arguments that Section 14 of the Curtis Act gives them jurisdiction over Indians in Indian country.

Dated: July 15, 2022                                       Respectfully submitted,

                                                           */s/ Frank S. Holleman*
                                                           Frank S. Holleman
                                                           SONOSKY, CHAMBERS, SACHSE,
                                                             ENDRESON & PERRY, LLP
                                                           145 Willow St., Suite 200
                                                           Bonita, CA 91902
                                                           Tel: 619-267-1306
                                                           E-mail: fholleman@sonosky.com

                                                           *Additional Counsel on Following Pages*

Douglas B. L. Endreson
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY, LLP
1425 K St. NW, Suite 600
Washington, DC 20005
Tel: 202-682-0240
E-mail: dendreso@sonosky.com

*Counsel for Amici Cherokee Nation, Chickasaw
    Nation, and Choctaw Nation of Oklahoma*

Sara Hill
*Attorney General*
Chrissi Nimmo
*Deputy Attorney General*
CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74465
Tel: 918-458-6998
E-mail: sara-hill@cherokee.org
            chrissi-nimmo@cherokee.org

*Counsel for Amicus Curiae the Cherokee Nation*

Stephen H. Greetham
*Senior Counsel*
CHICKASAW NATION
Office of Senior Counsel
4001 N. Lincoln Blvd.
Oklahoma City, OK 73105
Tel: 580-272-5236
E-mail: stephen.greetham@chickasaw.net

*Counsel for Amicus Curiae the Chickasaw Nation*

Brian Danker
*Senior Executive Officer*
DIVISION OF LEGAL & COMPLIANCE
CHOCTAW NATION OF OKLAHOMA
1802 Chukka Hina Dr.
Durant, OK 74701
Tel: 580-642-7423
E-mail: bdanker@choctawnation.com

*Counsel for Amicus Curiae the Choctaw Nation of
    Oklahoma*

Geri Wisner
*Attorney General*
Kevin W. Dellinger
*Assistant Attorney General*
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447
Tel: 918-295-9270
Email: gwisner@mcnag.com
        kdellinger@mcnag.com

*Counsel for Amicus Curiae the Muscogee (Creek)
  Nation*

Robert H. Henry
ROBERT H. HENRY LAW FIRM
512 N. Broadway Ave, Suite 230
Oklahoma City, OK 73102
Tel: 405-516-7824
Email: rh@rhenrylaw.com

*Counsel for Amicus Curiae the Quapaw Nation*

Valerie Devol
*Attorney General*
Garrett A. Eller
*Assistant Attorney General*
DEVOL & ASSOCIATES
15205 Traditions Lake Parkway
Edmond, OK 73103
Tel: 405-225-2300
E-mail: vdevol@devollaw.com
        geller@devollaw.com

*Counsel for Amicus Curiae the Seminole Nation
  of Oklahoma*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, I electronically filed the above and foregoing document and attachments with the Clerk of Court via the ECF System for filing.

*/s/ Frank S. Holleman*
Frank S. Holleman