# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

TAYLEUR RAYE PICKUP; CHANDA
LYNELLE BUTCHER; LINDSEY REANNA
BUTCHER; CRYSTAL LEE LEACH;
SHYANNE NICOLE SIXKILLER, *and others
similarly situated*,

      Plaintiffs,

vs.                                                                      No. CIV 20-0346 JB/JFJ

DISTRICT COURT OF NOWATA COUNTY,
OKLAHOMA; DISTRICT COURT OF
WASHINGTON COUNTY, OKLAHOMA;
DISTRICT COURT OF DELAWARE
COUNTY, OKLAHOMA; DISTRICT COURT
OF CRAIG COUNTY, OKLAHOMA;
DISTRICT COURT OF MAYES COUNTY,
OKLAHOMA; DISTRICT COURT OF
ROGERS COUNTY, OKLAHOMA; KEVIN
BUCHANAN, District Attorney of Nowata and
Washington Counties, Oklahoma, in his official
capacity; KENNY WRIGHT, District Attorney
of Delaware County, Oklahoma, in his official
capacity; MATT BALLARD, District Attorney
of Craig, Mayes, and Rogers Counties,
Oklahoma, in his official capacity; STEVE
KUNZWEILER, District Attorney of Tulsa
County, Oklahoma, in his official capacity;
APRIL FRAUENBERGER, Court Clerk of
Nowata County, Oklahoma, in her official
capacity; JILL SPITZER, Court Clerk of
Washington County, Oklahoma, in her official
capacity; CAROLINE WEAVER, Court Clerk
of Delaware County, Oklahoma, in her official
capacity; DEBORAH MASON, Court Clerk of
Craig County, Oklahoma, in her official
capacity; JENNIFER CLINTON, Court Clerk
of Mayes County, Oklahoma, in her official
capacity[1]; CATHI EDWARDS, Court Clerk of

---

[1]Pursuant to rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes

Rogers County, Oklahoma, in her official
capacity; DON NEWBERRY, Court Clerk of
Tulsa County, Oklahoma, in his official
capacity; TOWN OF ADAIR, OKLAHOMA;
CITY OF BARTLESVILLE, OKLAHOMA;
TOWN OF BIG CABIN, OKLAHOMA;
TOWN OF BLUEJACKET, OKLAHOMA;
CITY OF CATOOSA, OKLAHOMA; TOWN
OF CHELSEA, OKLAHOMA; TOWN OF
CHOTEAU, OKLAHOMA; CITY OF
CLAREMORE, OKLAHOMA; CITY OF
COLLINSVILLE, OKLAHOMA; TOWN OF
COPAN, OKLAHOMA; CITY OF DEWEY,
OKLAHOMA; TOWN OF DISNEY,
OKLAHOMA; CITY OF GROVE,
OKLAHOMA; CITY OF JAY, OKLAHOMA;
TOWN OF KANSAS, OKLAHOMA; TOWN
OF LANGLEY, OKLAHOMA; TOWN OF
LOCUST GROVE, OKLAHOMA; CITY OF
NOWATA, OKLAHOMA; TOWN OF
OOLAGAH, OKLAHOMA; CITY OF
OWASSO, OKLAHOMA; CITY OF PRYOR,
OKLAHOMA; TOWN OF RAMONA,
OKLAHOMA; TOWN OF SALINA,
OKLAHOMA, TOWN OF SOUTH
COFFEYVILLE, OKLAHOMA; TOWN OF
SPAVINAW, OKLAHOMA; TOWN OF
STRANG, OKLAHOMA; TOWN OF
TALALA, OKLAHOMA; TOWN OF
VERDIGRIS, OKLAHOMA; CITY OF
VINITA, OKLAHOMA; TOWN OF
WARNER, OKLAHOMA; TOWN OF WEST
SILOAM SPRINGS, OKLAHOMA,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendants, the District Court of Nowata

County, the District Court of Washington County, the District Court of Delaware County, the

_____

Jennifer Clinton for Laura Wade, who is named in the Complaint, filed July 20, 2020 (Doc. 2).
See Fed. R. Civ. P. 25(d).

District Court of Craig County, the District Court of Mayes County and the District Court of Rogers County's Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 18)("District Courts MTD"); (ii) Defendants Kevin Burchanan[2], Kenny Wright, Matt Ballard and Steve Kunzweiler's Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 24)("DA MTD"); (iii) Defendants' Town of Adair, City of Bartlesville, Town of Big Cabin, Town of Bluejacket, City of Catoosa, City of Collinsville, Town of Copan, City of Dewey, Town of Disney, City of Grove, City of Jay, Town of Kansas, Town of Langley, Town of Locust Grove, Town of Nowata, Town of Oologah, City of Pryor, Town of Ramona, Town of Salina, Town of South Coffeyville, Town of Spavinaw, Town of Strang, Town of Talala, Town of Verdigris, City of Vinita, Town of Warner and Town of West Siloam Springs, Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 27)("Municipality MTD"); (iv) Defendants April Frauenberger, Jill Spitzer, Caroline Weaver, Deborah Mason and Laura Wade's Motion to Dismiss and Brief in Support, filed September 16, 2020 (Doc. 70)("Clerk MTD"); (v) the Motion to Dismiss and Brief in Support of Defendant Cathi Edwards, Court Clerk of Rogers County, in Her Official Capacity, filed September 17, 2020 (Doc. 71)("Edwards MTD"); (vi) Defendant Don Newberry's Motion to Dismiss and Brief in Support, filed September 17, 2020 (Doc. 72)("Newberry MTD"); (vii) Defendants' Motion to Dismiss, filed October 19, 2020 (Doc. 87)("Owasso MTD"); and (viii) the Motion and Opening Memorandum in Support of Leave to File Brief of *Amici Curiae* Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Muscogee (Creek) Nation, Quapaw Nation, and Seminole Nation of Oklahoma in Support of

---

[2]The DA MTD refers to Kevin Buchanan as Kevin "Burchanan." DA MTD at 1. The District Attorney for Nowata and Washington Counties is Kevin Buchanan. See Kevin Buchanan, District Attorneys Council, https://www.ok.gov/dac/District_Attorneys/Kevin_Buchanan /index. html.

Plaintiffs' Oppositions to the Curtis Act Arguments Raised in Defendant Municipalities' Motions to Dismiss, filed July 15, 2022 (Doc. 143)("Amicus Motion").  The Court held hearings on March 16, 2022, see Clerk's Minutes at 1, filed March 16, 2022 (Doc. 131)("March 16 Clerk's Minutes"), and November 21, 2022, see Clerk's Minutes at 1, filed November 21, 2022 (Doc. 161)("November 21 Clerk's Minutes").   The primary issues are: (i) whether Plaintiffs Tayleur Raye Pickup, Chanda Lynelle Butcher, Lindsey Reanna Butcher, Crystal Lee Leach, Shyanne Nicole Sixkiller, and all others similarly situated ("the Plaintiffs") have standing to pursue their claims; (ii) whether the Plaintiffs served properly Defendants District Court of Nowata County, District Court of Washington County, District Court of Delaware County, District Court of Craig County, and District Court of Rogers County ("District Court Defendants") under rule 4 of the Federal Rules of Civil Procedure; (iii) whether the Rooker-Feldman doctrine[3] bars the Plaintiffs' claims; (iv) whether, under Younger v. Harris, 401 U.S. 37, 43-45 (1971)("Younger"), the Court must abstain from considering the Plaintiffs' requested declaratory relief; (v) whether the Declaratory Judgment Act, 28 U.S.C. § 2201(a), permits the Court to issue the Plaintiffs' requested declaratory relief declaring that the Cherokee Reservation has not been disestablished; (vi) whether the District Court Defendants are persons for 42 U.S.C. § 1983's purposes; (vii) whether Heck v. Humphrey, 512 U.S. 477, 486-87 (1994)("Heck"), bars the Plaintiffs' claims;  (viii) whether (a) the Court should consider the Brief of *Amici Curiae* Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Muscogee (Creek) Nation, Quapaw Nation, and Seminole Nation of Oklahoma in Support of Plaintiffs' Oppositions to the Curtis Act Arguments

---

[3]The Rooker-Feldman doctrine embodies the principle that federal district courts may not serve as courts of appeal for State courts.  See Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.).

Raised in Defendant Municipalities' Motions of Dismiss, filed November 21, 2022 (Doc. 160)("Amicus Brief"), to decide (b) whether the Curtis Act of 1898, 30 Stat. 499, forecloses the Plaintiffs' claims against Defendants Town of Adair, City of Bartlesville, Town of Big Cabin, Town of Bluejacket, City of Catoosa, Town of Chelsea, Town of Chouteau, City of Claremore, City of Collinsville, Town of Copan, City of Dewey, Town of Disney, City of Grove, City of Jay, Town of Kansas, Town of Langley, Town of Locust Grove, Town of Nowata, Town of Oologah, City of Pryor, Town of Ramona, Town of Salina, Town of South Coffeyville, Town of Spavinaw, Town of Strang, Town of Talala, Town of Verdigris, City of Vinita, Town of Warner and Town of West Siloam Springs ("Municipality Defendants"), and Defendant City of Owasso; (ix) whether the Plaintiffs allege sufficient facts against Defendants April Frauenberger, Jill Spitzer, Caroline Weaver, Deborah Mason, and Jennifer Clinton ("the Clerk Defendants"), Defendant Don Newberry, and Defendant Cathi Edwards to state a claim under 42 U.S.C. § 1983 for violating the due process rights of the Tribal members; (x) whether the District Court Defendants, the Clerk Defendants, Edwards, Newberry and Defendants Kevin Buchanan, Kenny Wright, Matt Ballard, and Steve Kunzweiler ("the DA Defendants"), have sovereign immunity under the Eleventh Amendment to the Constitution of the United States of America; (xi) whether the Clerk Defendants and Newberry are entitled to quasi-judicial immunity; (xii) whether the Oklahoma Governmental Tort Claims Act, Okla. Stat. tit. 51 §§ 151-172 ("OGTCA"), bars the Plaintiffs' State law claims; (xiii) whether the Plaintiffs are not entitled to relief, because they did not seek collateral review under the Oklahoma Uniform Post-Conviction Procedure Act, Okla. Stat. tit. 22 §§ 1080-89 ("OUPCPA"); (xiv) whether equitable considerations, including laches, waiver and estoppel, unclean hands, and the voluntary pay doctrine bar the Plaintiffs' claims; (xvi) whether the Plaintiffs allege sufficient facts against the Clerk Defendants, Edwards, and Newberry to state a

claim for money had and received; (xvi) whether the Plaintiffs comply with Oklahoma's fee protest statute, Okla. Stat. tit. 62 § 206(A),[4] and, if the Plaintiffs do not comply, whether the Court must dismiss the Plaintiffs' money-had-and-received claim;[5] and (xvii) whether the Court must remand the Plaintiff's State-law claims if it lacks subject-matter jurisdiction.  The Court concludes that: (i)  Pickup, C. Butcher, L. Butcher, and Leach have standing against Ballard, Clinton, and the District Court of Mayes County, but Sixkiller does not have standing against any Defendant because she has not shown that any Defendant caused her injuries; (ii) the Plaintiffs properly served the District Court Defendants; (iii) the Rooker-Feldman doctrine bars the Plaintiffs' claims and prevents the Court from exercising jurisdiction, because all three claims require the Court to determine that the Plaintiffs' State convictions are void.  Because the Court concludes that the Rooker-Feldman doctrine prevents it from exercising jurisdiction, the Court does not decide many of the remaining issues.  The Court provides alternative analyses, however, on several issues that also would be dispositive if the Court had determined that it had jurisdiction over this case.  The Court concludes on those issues that: (iv) Younger abstention does not apply, because there is no ongoing State proceeding at issue; (v) the Declaratory Judgment Act prevents the Court from issuing the Plaintiffs' requested declaratory relief declaring that the Cherokee Reservation has not been disestablished, because the requested relief is retrospective; (vi)  the District Court

---

[4]Okla. Stat. tit. 62 § 206(A) creates a cause of action for parties who believe that the State made them pay a fee or tax that is "in whole in part unconstitutional or otherwise invalid," and lays out the procedure for bringing such a suit.  Okla. Stat. tit. 62 § 206(A).

[5]Oklahoma law permits a claim for money had and received.  A suit for money had and received "may be maintained when a person has in his possession money belonging to another which in equity and good conscience he ought to pay over to the claimant.  The action is founded upon the principle that a person should not be unjustly enriched at the expense of another."  Ryan v. Spaniol, 193 F.2d 551 (10th Cir. 1951).  See Cont'l Oil Co. v. Rapp, 301 P.2d 198, 202 (Okla. 1956)(relying on Ryan v. Spanoil).

Defendants are not persons for 42 U.S.C. § 1983's purposes; (vii)  Heck bars the Plaintiffs' claims, because the claims necessarily imply the invalidity of the Plaintiffs' State conviction and the Plaintiffs cannot demonstrate that their convictions have already been invalidated;  (viii) (a) the Court will consider the Amicus Brief, because it is helpful to the Court in resolving the Curtis Act issue; and (b) Curtis Act § 14 forecloses the Plaintiffs' claims against the Municipality Defendants and the City of Owasso, because Curtis Act § 14 remains good law and establishes that Oklahoma Municipalities have authority to prosecute Indians for crimes that Indians commit within the Municipalities.  Accordingly, the Court will grant the District Court MTD, DA MTD, Municipality MTD, Clerk MTD, Edwards MTD, Newberry MTD, and Owasso MTD in part, and dismiss the Plaintiff's claims without prejudice for lack of jurisdiction.

## FACTUAL BACKGROUND

When considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept as true all well-pled factual allegations in the complaint and view those allegations in the light most favorable to the plaintiff.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).   At the rule 12(b)(6) stage, a court is permitted to take judicial notice of facts that are a matter of public record.  See Johnson v. Spencer, 950 F.3d 680, 705 (10th Cir. 2020).  The Court, therefore, takes most of its facts from the Complaint, filed July 20, 2020 (Doc. 2).  Where the Complaint does not allege sufficient background facts, the Court takes judicial notice of those facts from other sources.

1.   **Early Conflicts Regarding the Cherokee Nation.**

In the early nineteenth century, as American Indian tribes "increasingly resisted demands to relinquish their lands by treaties of cession, the federal government accelerated a policy of removing" Native Americans to territory further west in exchange for their existing territory in the

East.  1 Cohen's Handbook of Federal Indian Law § 1.03 (2019)("Cohen Handbook").  For thirty years after the War of 1812, "Indian treaty making was concerned primarily with removing certain tribes to western territories, thus making a vast area available for white settlement while reducing the conduct of sovereign authority caused by the presence of independent Indian governments within state boundaries."  Cohen Handbook § 1.03.  On April 24, 1802, Georgia agreed to cede a large tract of land to the United States in return for the United States extinguishing Native American title to land within Georgia.  See Cohen Handbook § 1.03.  Although many Cherokee "bitterly opposed" a land exchange, the Cherokee Nation accepted a treaty that Andrew Jackson, as Commissioner for the United States, had prepared that "provided for the tribe's voluntary removal from" some disputed land.  Cohen Handbook § 1.03.  Nevertheless, many Cherokee people did not want to leave their homeland, and treaty negotiations continued.  See Cohen Handbook § 1.03.

With President Andrew Jackson's election as President in 1828, however, the federal government took a more forceful approach to relocating American Indians, including the Cherokee Tribe.  See Cohen Handbook § 1.03.  On May 28, 1830, Congress narrowly passed the Indian Removal Act, Pub. L. 21-148, 4 Stat. 411 (1830), which authorized the President to provide lands east of the Mississippi river in exchange for "the whole or any part or portion of the territory claims and occupied" by "any tribe or Nation now residing within the limits of any of the state or territories, and with which the United States have existing treaties."   4 Stat. 411 § 2.  Although the Indian Removal Act did not authorize forceful removal, "Indians were advised . . . that refusal to emigrate meant the end of federal protection and abandonment to state jurisdiction."  Cohen Handbook § 1.03.  At the same time, the Georgia State Legislature began to enact "laws designed to harass the Eastern Cherokees," including laws that "abolished the Cherokee government,

extended all Georgia laws to Cherokee lands, and distributed all Cherokee lands among five Georgia counties." Cohen Handbook § 1.03. The conflict between federal law, Georgia law, and the Cherokee nation eventually resulted in the Supreme Court of the United States of America's decisions in Cherokee Nation v. Georgia, 30 U.S. 1 (1831), and Worcester v. Georgia, 31 U.S. 515 (1832).

In Cherokee Nation v. Georgia, the Supreme Court concludes that the Cherokee Nation is not a "foreign state[]" under U.S. Const. art. III § 2 and that, as a result, the Supreme Court does not have original jurisdiction over the dispute. Cherokee Nation v. Georgia, 30 U.S. at 10. In Worcester v. Georgia, the Supreme Court concludes that a Georgia statute that prohibited any "white person" from "living in Cherokee territory without first obtaining a state license and taking an oath to support the laws of Georgia," Cohen Handbook § 1.03, is unconstitutional, because it interferes with the federal government's power to define and regulate the relationship with foreign states, see 31 U.S. at 561-63. The Honorable John Marshall, Chief Justice of the United States, writes that the Georgia laws at issue interfere

> forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, are committed exclusively to the government of the Union.
>
> They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; and recognize the pre-existing power of the nation to govern itself.
>
> They are in equal hostility with the acts of Congress for regulating this intercourse, and giving effect to the treaties.

Worcester v. Georgia, 31 U.S. at 520.

President Jackson was displeased with Justice Marshall's decision and famously declared:

"John Marshall has made his law; now let him enforce it."  Cohen Handbook § 1.03.  Although Worcester himself eventually was pardoned, Jackson "did nothing" to "protect the Cherokees from increasing abuse from white settlers."  Cohen Handbook § 1.03.  Sensing that removal and relocation was inevitable, some Cherokees signed a Treaty with the United States on December 29, 1835, that "ceded to the United States all land east of the Mississippi River for $5 million" and "provided for the sale of 800,000 acres of western land to the Cherokees in fee simple, since lands granted in earlier treaties were insufficient for the entire nation."  Cohen Handbook § 1.03.  See Treaty with the Cherokee, 7 Stat. 478 (1835)("1835 Treaty").  In addition, the 1835 Treaty states that the Cherokee Nation can "make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them."  1835 Treaty at art. V.  The federal government's Cherokee removal project began soon after the Treaty's execution, and eventually culminated with the forced migration in late 1838 known as the Trail of Tears, during which thousands of Cherokee people died.  See Cohen Handbook § 1.03.

2.      **The Plaintiffs' Oklahoma State Court Convictions.**

Plaintiff Tayleur Pickup is a member of the Cherokee Nation.  See Complaint ¶ 1, at 4. On June 30, 2017, he was convicted of Escape from Arrest or Detention in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 59, at 13.  Pickup's case number for the Escape from Arrest or Detention conviction is CM-2016-472. See Complaint ¶ 59, at 13.  On October 30, 2019, Pickup was convicted of Obstructing an Officer in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 60, at 14.  Pickup's case number for the Obstructing an Officer conviction is CM-2019-482.  See Complaint ¶ 60, at 14.  According to the Plaintiffs, Oklahoma "and/or its

political subdivisions" prosecuted Pickup unlawfully "and without jurisdiction."  Complaint ¶ 59, at 13-14.  According to the Plaintiffs, Pickup's prosecutions unjustly enriched Oklahoma "and/or its political subdivisions."  Complaint ¶ 59, at 14.

Plaintiff Chanda Lynelle Butcher is a member of the Cherokee Nation.  See Complaint ¶ 2, at 4.  On November 2, 2015, she was convicted of Obtaining Money by Bogus Check in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 61, at 14.  C. Butcher's case number for the Obtaining Money by Bogus Check conviction is CM-2014-343.  See Complaint ¶ 61, at 14.  According to the Plaintiffs, Oklahoma "and/or its political subdivisions" prosecuted C. Butcher unlawfully "and without jurisdiction."  Complaint ¶ 61, at 14.  According to the Plaintiffs, C. Butcher's prosecution unjustly enriched Oklahoma "and/or its political subdivisions."  Complaint ¶ 61, at 14.  C. Butcher was ordered to pay $40.00 per month to the Mayes County District Attorney's Office.  See Complaint ¶ 61, at 14.

Plaintiff Lindsay Reanna Butcher is a member of the Cherokee Nation.  See Complaint ¶ 3, at 4.  On July 26, 2019, she was convicted of Operating a Motor Vehicle Without a Valid Driver's License in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 62, at 14.  L. Butcher's case number for the Operating a Motor Vehicle Without a Valid Driver's License conviction is TR-2019-2754.  See Complaint ¶ 62, at 14.  On July 26, 2019, L. Butcher was convicted of Failing to Wear a Seatbelt While Operating a Motor Vehicle in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 63, at 14.  L. Butcher's case number for the Failing to Wear a Seatbelt While Operating a Motor Vehicle conviction is TR-2019-2755.  See Complaint ¶ 63, at 14.  According to the Plaintiffs, Oklahoma "and/or its political subdivisions" prosecuted L. R. Butcher unlawfully "and without jurisdiction."  Complaint ¶ 63, at 15.  According to the Plaintiffs,

L. Butcher's prosecution unjustly enriched Oklahoma "and/or its political subdivisions." Complaint ¶ 63, at 15.

Plaintiff Crystal Lee Leach is a member of the Cherokee Nation.  See Complaint ¶ 4, at 4. On October 3, 2019, she was convicted of Failing to Wear a Seatbelt While Operating a Motor Vehicle in Mayes County District Court for "events that occurred within the boundaries of the Cherokee Nation."  Complaint ¶ 64, at 15.  Leach's case number for the Failing to Wear a Seatbelt While Operating a Motor Vehicle conviction is CM-2019-173.   See Complaint ¶ 64, at 15. According to the Plaintiffs, Oklahoma "and/or its political subdivisions" prosecuted Leach unlawfully "and without jurisdiction."  Complaint ¶ 64, at 15.  According to the Plaintiffs, Leach's prosecution unjustly enriched Oklahoma "and/or its political subdivisions."  Complaint ¶ 64, at 15.  Leach was ordered to pay $40.00 per month to the Mayes County District Attorney's Office. See Complaint ¶ 64, at 15.

Plaintiff Shyanna Nicole Sixkiller is a member of the Cherokee Nation.  See Complaint ¶ 5, at 4. On April 20, 2019, the Locust Grove Police Department, a political subdivision of Oklahoma, gave Sixkiller a traffic ticket for speeding.  See Complaint ¶ 65, at 15.  According to the Plaintiffs, Oklahoma "and/or its political subdivisions" prosecuted Sixkiller unlawfully "and without jurisdiction."  Complaint ¶ 65, at 15.  Sixkiller 's prosecution unjustly enriched Oklahoma "and/or its political subdivisions."  Complaint ¶ 65, at 15.

**3.**          **The Supreme Court of the United States' Decision in McGirt v. Oklahoma.**

On July 9, 2020, the Supreme Court of the United States of America decided McGirt v. Oklahoma, 140 S. Ct. 2452 (2020)("McGirt").  See Complaint ¶ 53, at 12.  McGirt is a member of the Seminole Nation who was charged and convicted in Oklahoma State court for sex crimes he committed on the Creek Reservation.  See McGirt, 140 S. Ct. at 2459.  McGirt challenged his State

convictions on the grounds that under the Major Crimes Act, 18 U.S.C. § 1153(a), only the federal government had authority to prosecute him, an Indian accused of committing a major crime in Indian Country.  See McGirt, 140 S. Ct. at 2459.    McGirt's argument compelled the Supreme Court to decide whether the lands that the Treaty with the Creeks, 7 Stat. 366, 368 (1832), and the Treaty with the Creeks, 7 Stat. 418 (1833), ceded to the Creek Nation "remain[] an Indian Reservation for purposes of federal criminal law."  McGirt 140 S. Ct. at 2459.  In McGirt, the Supreme Court concludes that Congress never disestablished the Creek Reservation for the Major Crimes Act's purposes, and that, "[o]nly the federal government, not the State, may prosecute Indians for major crimes committed in Indian country."  McGirt, 140 S. Ct. at 2478.  See Complaint ¶ 53, at 12.

## PROCEDURAL BACKGROUND

The Plaintiffs filed their Complaint on July 20, 2020.  See Complaint at 1.  According to the Plaintiffs, under McGirt, "neither the State of Oklahoma, nor any of its political subdivisions," has subject-matter jurisdiction to charge and criminally prosecute the members of a federally recognized Tribe "for crimes committee on the Cherokee Reservation."  Complaint ¶ 56, at 12-13. According to the Plaintiffs, only the Cherokee Nation and the United States have subject-matter jurisdiction to prosecute members of the Cherokee Nation for crimes committed within the Cherokee Nation.  See Complaint ¶ 56, at 13.  According to the Plaintiffs, "[i]t is well recognized that crimes allegedly committed by members of a federally recognized tribe that occurred in Indian country must be subject to the sovereign immunity possessed by such Indian nations."  Complaint ¶ 56, at 13.

According to the Plaintiffs, 18 U.S.C. § 1151 defines "Indian Country" to include "'all land within the limits of any Indian reservation under the jurisdiction of the United States Government,

notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.'"  Complaint ¶ 56, at 13 (no citation for quotation).  According to the Plaintiffs, 18 U.S.C. § 1152 "establishes the jurisdiction of the federal Government over Indian Country" and states:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
>
> This section shall not extend to the offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing an offense who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

Complaint ¶ 57, at 13 (no citation for quotation).  The State of Oklahoma and its political subdivisions "have been arresting, fining, and assessing fees against Tribal members for over a hundred years," as well as "[d]uring the argument in McGirt."  Complaint ¶ 58, at 13.  Oklahoma "and its political subdivisions" have a "pattern and practice" of "arresting, fining, and assessing fees against Tribal members."  Complaint ¶ 58, at 13.

Pursuant to rule 23 of the Federal Rules of Civil Procedure, the Plaintiffs seek to certify a class consisting of:

> [a]ll Native American persons who were members of a federally recognized tribe and or had been issued CDIB card[6] from the (Department of Interior Bureau of Indian Affairs) at the time they were prosecuted by the State of Oklahoma or one of its political subdivisions for traffic offenses or misdemeanor offenses, and the

---

[6]The Bureau of Indian Affairs issues Certificate of Degree of Indian Blood cards, or CDIB cards, to identify the holder's Native American ancestry.   See Certificate of Degree of Indian Blood (CDIB), The Chickasaw Nation, https://chickasaw.net/Our-Nation/Government/Tribal-Government-Services-(CDIB-Citizenship)/Certificate-of-Degree-of-Indian-Blood-(CDIB).aspx#:~:text=The%20Certificate%20of%20Degree%20of%20Indian%20Blood%20%28CDIB%29,Indian%20tribe%2C%20band%2C%20nation%2C%20pueblo%2C%20village%20or%20community.

prosecution took place for actions which were alleged to have occurred solely within the boundaries of the Cherokee Reservation within the applicable statute of limitations as allowed by law.

Complaint ¶ 66, at 15.  The Plaintiffs believe that the proposed class "numbers into the thousands, if not tens of thousands," and is, therefore, "so numerous that joinder of all class members is impracticable."  Complaint ¶ 67, at 16.  The Plaintiffs seek three forms of relief: (i) a declaratory judgment that "the Cherokee Reservation has not been disestablished and therefore any action by the State of Oklahoma or its political subdivisions is void because the court would have lacked subject matter jurisdiction," Complaint ¶ 86, at 20; (ii) the return of money the Plaintiffs paid to the State of Oklahoma or its political subdivisions "pursuant to void orders or that were otherwise obtained without jurisdiction," Complaint ¶ 88, at 20, through a claim for money had and received; and (iii) damages under 42 U.S.C. § 1983 for "violating the due process rights of the Tribal members by subjecting them to trial and punishment before a Court that had no subject matter jurisdiction," Complaint ¶ 92, at 21.

1.     **District Courts MTD.**

The District Court Defendants ask the Court to dismiss the Plaintiffs' claims against them pursuant to rules 12(b)(1), (4), (5), and (6) of the Federal Rules of Civil Procedure.  See District Courts MTD at 1.  The District Court Defendants contend that the Complaint names only one of the six District Court Defendants, Mayes County District Court, in its factual allegations, and that "this one allegation plus the allegations about Plaintiffs' status as members of a federally recognized tribe are insufficient to state claims against the" District Court Defendants.  District Courts MTD at 3.  In addition, the District Court Defendants note that the Plaintiffs do not allege that their convictions have been vacated through any State court post-conviction proceeding, and that the Plaintiffs instead ask the court to "collaterally declare [their] convictions void" and "award

money to Plaintiffs."  District Courts MTD at 3.  Accordingly, the District Court Defendants argue that the Court should dismiss the Plaintiffs' claims against them for failing to state a claim.  See District Courts MTD at 3.  The District Court Defendants indicate that, "to reduce redundancy and promote efficiency," they "incorporate" the DA Defendants' Rooker-Feldman doctrine and Heck arguments, as well as the argument "for failure to state a claim under Count II."  District Courts MTD at 3.

The District Court Defendants make seven arguments.  See District Courts MTD at 5-15. First, the District Court Defendants assert that the Plaintiffs have not complied with rule 4 of the Federal Rules of Civil Procedure, because "summons was issued to individual district courts, through the elected court clerks in their official capacities[,] and was then served to the court clerk at the clerk's business address."  District Courts MTD at 5.  According to the District Court Defendants, however, "a county district court in Oklahoma is not a political subdivision capable of being sued" but that, even if a county district court in Oklahoma were capable of being sued, "a county court clerk is a distinct elected official and does not exercise care or control over the court." District Courts MTD at 5.  The District Court Defendants request, therefore, that the Court dismiss the Plaintiff's claims against them under rules 12(b)(4) and 12(b)(5) for insufficient service of process.  See District Courts MTD at 5 (citing Whitsell v. United States, 198 F.3d 260, 260 (10th Cir. 1999)).

Second, the District Court Defendants argue that sovereign immunity bars the Plaintiffs' claims against them.  See District Courts MTD at 6.  According to the District Court Defendants, the Eleventh Amendment to the Constitution of the United States of America, U.S. Const. amend. XI, immunizes "states and state agencies from suits brought in federal court for either damages or injunctive relief."  District Courts MTD at 6.  The District Court Defendants assert that Congress

has not abrogated Oklahoma's sovereign immunity and that the Eleventh Amendment, therefore, bars the Plaintiffs' claims.  See District Courts MTD at 6-7.

Third, the District Court Defendants argue that they are not proper Defendants for claims under 42 U.S.C. § 1983.  See District Courts MTD at 7.  The District Court Defendants allege that, because a plaintiff may not bring a § 1983 claim against a State, the Plaintiffs cannot bring a § 1983 claim against them, because "[n]aming an agency of the state as a defendant actually names the state itself."  District Courts MTD at 7.  According to the District Court Defendants, "[n]either a state, its agencies nor its officials are 'persons' under 42 U.S.C. § 1983."  District Courts MTD at 8.  The District Court Defendants assert, therefore, that "there is no basis in the Complaint which would entitle the Plaintiffs to monetary relief against" them and that the Court lacks jurisdiction to "entertain" the Plaintiffs' § 1983 claim.  District Courts MTD at 8 (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 64 (1989)).

Fourth, the District Court Defendants assert that they are not entities that are "capable of being sued" under Oklahoma State law.  District Courts MTD at 8.  The District Court Defendants allege that rule 17(b) of the Federal Rules of Civil Procedure indicates that the "capacity of an entity to sue or be sued is determined by the law of the state where the court is located."  District Courts MTD at 8.  According to the District Court Defendants, the Oklahoma judiciary's structure establishes that the District Court Defendants are "not political subdivisions[,] which is necessary to make them entities capable of being named in order to sue the State," because the "judicial district or district court" is a "legal fiction" that is "incapable of being brought to court."  District Courts MTD at 8-9.  The District Court Defendants allege that the OGTCA sets out which State agencies can be sued, and that the District Court Defendants are not included in the OGTCA's sovereign-immunity waiver, because "the judicial district/district court is not included" in the

OGTCA's definition of "the state" or one of its political subdivisions.  District Courts MTD at 9.

Fifth, the District Court Defendants contend that the Court cannot entertain the Plaintiffs' declaratory-relief claim, because "[t]he Tenth Circuit has said that a declaratory judgment is not meant to proclaim liability for a past act, but to define the legal rights and obligations of the parties in anticipation of some future conduct."  District Courts MTD at 10 (citing Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1266 (10th Cir. 2004)).  The District Court Defendants allege that the Plaintiffs seek retrospective declaratory relief and are attempting to make an "end-run around a decision being made by the criminal court in which each Plaintiff was convicted." District Courts MTD at 10.  The District Court Defendants argue that the Plaintiffs' "attempt at end-running should result in the Court utilizing its discretion and dismissing the claim."  District Courts MTD at 10.

Sixth, the District Court Defendants argue that, because the Court lacks subject-matter jurisdiction, the Court cannot hear the Plaintiffs' supplemental State law claims and should dismiss them.  See District Courts MTD at 10.  The District Court Defendants state that, under their other arguments, the Plaintiffs do not state a viable claim for declaratory relief or a viable claim for damages under § 1983, and, therefore, the Court lacks federal-question jurisdiction under 28 U.S.C. § 1331, meaning the Court cannot exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining money-had-and-received State-law claim.  See District Courts MTD at 11.  According to the District Court Defendants, the Plaintiffs' money-had-and-received State-law claim is "better decided by the state court," and that the Court should dismiss the claim. District Courts MTD at 11.

Seventh, the District Court Defendants argue that the OGTCA bars the Plaintiffs' tort claims.  See District Courts MTD at 11-12.  According to the District Court Defendants, the

Plaintiffs assert a tort claim for "liability under state law against state officials and institutions," but the OGTCA bars suits against the District Court Defendants, because they are "not actually political subdivisions capable of being sued."  District Courts MTD at 12.  Moreover, the District Court Defendants allege that the Plaintiffs do not comply with Okla. Stat. tit. 51 §§ 156-57, OGTCA provisions, which require that a person seeking relief against "the state or a political subdivision" to "present the written claim within one year of the date the loss occurs and must present the claim in writing to the Office of Risk Management and the state agency or political subdivision," and bar suits against the State "unless the claim presented to the State has been denied in whole or in part by the State."  District Courts MTD at 12.  The District Court Defendants contend that the Plaintiffs do not allege sufficient facts to "determine whether actual or substantial requirements of the notice provisions of the OGTCA have been satisfied."  District Courts MTD at 12 (citing Girdner v. Bd. of Comm'rs of Cherokee Cnty., 227 P.3d 1111 (Okla. Civ. App. 1956)).

## 2.    **District Courts MTD Response.**

The Plaintiffs respond to the District Courts' MTD.  See Plaintiff's Response to Defendants, the District Court of Nowata County, the District Court of Washington County, the District Court of Delaware County, the District Court of Craig County, the District Court of Mayes County and the District Court of Rogers Count's Motion to Dismiss and brief in Support, filed October 1, 2020 (Doc. 75)("District Courts MTD Response").  The Plaintiffs assert that this "lawsuit has been brought by the Plaintiffs on their own behalf, and all others similarly situated, to disgorge the State and its political subdivisions of their ill-gotten gains."  District Courts MTD Response at 8.  Consequently, the Plaintiffs argue that the Court should not dismiss their claims against the District Court Defendants.  See District Courts MTD Response at 7-8.

The Plaintiffs assert that "part" of this case's analysis should "start" with the United States

Court of Appeals for the Tenth Circuit's opinion in <u>Murphy v. Royal</u>, 875 F.3d 896 (10th Cir. 2017)("<u>Murphy</u>"), which, the Plaintiffs contend, "analyzed the treaties and other history concerning the Creek Nation and determined that the Creek Reservation has never been disestablished and therefore remained an Indian Reservation." District Courts MTD Response at 8. The Plaintiffs state that the Tenth Circuit's opinion in <u>Murphy</u> "also discussed Cherokee specific legislation" and supports their argument that "the Cherokee allotment laws did not disestablish the Cherokee Nation's reservation." District Courts MTD Response at 9. The Plaintiffs state that they do not seek restitution, nor do they seek "to recover from an intentional or negligent tort." District Courts MTD Response at 9.

In the District Courts MTD Response, the Plaintiffs make ten arguments. <u>See</u> District Courts MTD Response at 9-28. First, the Plaintiffs respond that the Court should deny the District Court MTD insofar as it argues that the Plaintiffs do not state a claim upon which relief can be granted, because the Plaintiffs comply with the Federal Rules of Civil Procedure's pleading requirements. <u>See</u> District Courts MTD Response at 10. According to the Plaintiffs, the Complaint "has enough factual specificity" to survive rule 12(b)(6)'s "requirements to describe the constitutional violations and claims for relief." District Courts MTD Response at 13.

Second, the Plaintiffs contend that all the District Court Defendants and Clerk Defendants are proper Defendants in this case. <u>See</u> District Courts MTD Response at 13. The Plaintiffs assert that the "legal process of illegally asserting jurisdiction and authority over tribal citizens, for crimes committed in Indian country, occurred by virtue of the power vested in the district court and district attorneys." District Courts MTD Response at 14. According to the Plaintiffs, they can sue the District Court Defendants in federal court, because the District Court Defendants are "persons," the actions at issue occurred "in the complete absence of all jurisdiction," and a district

court in Oklahoma "is an entity that exists without regard to the person occupying the position of judge."  District Courts MTD Response at 9-10.

Third, the Plaintiffs argue that the District Court Defendants do not have sovereign immunity.  See District Courts MTD Response at 16.  The Plaintiffs assert that the District Court Defendants do not have sovereign immunity or Eleventh Amendment immunity, because the Fourteenth Amendment to the Constitution of the United States of America, U.S. Const. amend. XIV, "gives a federal court jurisdiction to enforce a constitutional right only as against state, not private, action," District Courts MTD Response at 16 (citing Hill v. Kemp, 478 F.3d 1236, 1256 (10th Cir. 2007)), and because Ex Parte Young, 209 U.S. 123 (1908), indicates that the Eleventh Amendment does not bar suits for declaratory or injunctive relief against state officers acting in their official capacity, see District Courts MTD Response at 17.  The Plaintiffs state that, under Ex Parte Young, 209 U.S. at 123, the Eleventh Amendment does not preclude the Court granting "monetary, declaratory or injunctive relief" against a government entity.  District Courts MTD Response at 18.

Fourth, the Plaintiffs contend that the Court can enjoin the District Court Defendants, because Ex Parte Young "allows [injunctive relief] in response to 11th Amendment claims and Monell [v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658 (1978)("Monell"] allows it under § 1983 claims."  District Courts MTD Response at 19.  The Plaintiffs allege that it is "particularly important in this case that there be one court that makes finding[s] pursuant to McGirt and Murphy rather than having to rely for a uniform decision from the six district courts, four district attorneys, seven court clerks and twenty municipal court defendants."  District Courts MTD Response at 19.  Accordingly, the Plaintiffs contend that the Court should deny the District Courts MTD.  See District Courts MTD Response at 19.

- 21 -

Fifth, the Plaintiffs argue that the Court should hear their declaratory-relief claim.  See District Courts MTD Response at 19.  The Plaintiffs state that they do not seek a declaration "that would establish liability," but rather a "ruling that would require the Defendants to disgorge monies wrongly taken from those over whom they lacked subject matter jurisdiction."  District Courts MTD Response at 19.  According to the Plaintiffs, this request is not for retroactive relief, because it is "merely seeking that the Court confirm what is over a century old body of law that the Supreme Court reaffirmed in McGirt."  District Courts MTD Response at 19.  The Plaintiffs assert that the Oklahoma Attorney General has "circulated a memorandum requesting that all cases dealing with the Cherokee Reservation be put on hold while they try to find a way around McGirt" and that the "best way" to deal with this issue is for the Court to issue the requested declaratory judgment."  District Courts MTD Response at 20.

Sixth, the Plaintiffs assert that the OGTCA and Oklahoma's fee protest statute, Okla. Stat. tit. 62 § 206(A), do not apply here.  See District Courts MTD Response at 20.  The Plaintiffs contend that the Supreme Court of Oklahoma concludes that the OGTGA does not bar a disgorgement claim like the Plaintiffs'.  See District Courts MTD Response at 21 (citing Sholer v. State ex rel. Dep't of Pub. Safety, 945 P.2d 469, 472-73 (Okla. 1995)("Sholer").  In addition, the Plaintiffs argue that the fee protest statute does not apply, because they "are merely seeking disgorgement of monies paid for which the Defendants had no authority to force the plaintiffs to pay."  District Courts MTD Response at 21.  The Plaintiffs also note that the Honorable Robert Lavender, Justice of the Supreme Court of the State of Oklahoma, concurring in part and dissenting in part in Sholer, "opined that the better cause of action against the state would be an unjust enrichment claim."  District Courts MTD Response at 22.

Seventh, the Plaintiffs argue that the Court should exercise supplemental jurisdiction and

consider their State law claims.  See District Courts MTD Response at 16.  The Plaintiffs allege

that, even if the Court dismisses their § 1983 claims, "there is inherent jurisdiction of the Federal

Court because of the necessity to interpret the treaties between the United States and the Cherokee

Indian Tribe."  District Courts MTD Response at 22-23.  According to the Plaintiffs, it is

"essential" that the Court exercise supplemental jurisdiction over their State law claims, because

the Court must "afford complete relief."  District Courts MTD Response at 23.

Eighth, the Plaintiffs contend that they are not required to obtain post-conviction relief

before pursuing their claims here.  See District Courts MTD Response at 23.  According to the

Plaintiffs, it makes "no sense" to require them to pursue post-conviction relief "when the United

States Supreme Court has already ruled that if the Plaintiff's [sic] crimes occurred in Indian

Country and the Plaintiff was an 'Indian' the state would have no jurisdiction."  District Courts

MTD Response at 23 (citing Rice v. Olson, 324 U.S. 786, 789 (1945), and Cravatt v. State, 825

P.2d 277, 279 (Okla. Crim. App. 1992)).  The Plaintiffs state that the Court "should declare all

such convictions void *ab initio*, and not subject all the similarly situated plaintiffs to run the

gauntlet and vagaries of every district and municipal court process when . . . this Court can declare

the result once and for all."  District Courts MTD Response at 24 (emphasis in original).  The

Plaintiffs contend that requiring them individually to pursue post-conviction relief would violate

their due process rights, see District Courts MTD Response at 24 (citing Nelson v. Colorado, 137

S. Ct. 1249 (2017)), and that they "do not seek to have their records changed to reflect that they

have not received a conviction as a predicate to seeking disgorgement of wrongly taken monies,"

District Courts MTD Response at 25.

Ninth, the Plaintiffs ask the Court to prevent Oklahoma from denying either the existence

of the Cherokee Reservation or their knowledge of the Cherokee Reservation's existence.  See

District Courts MTD Response at 19.  The Plaintiffs argue that, because Oklahoma entered into a gaming compact with the Creek Nation under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), in 2005, it should be estopped from arguing that the Cherokee Reservation does not exist for federal criminal law's purposes, see District Courts MTD Response at 27-28.  The Plaintiffs contend that the State of Oklahoma "seems oblivious" to recognizing Tribal sovereignty over criminal law despite recognizing that it must enter into an IGRA gaming compact with the Creek Nation.  See District Courts MTD Response at 28.

Tenth, and finally, the Plaintiffs argue that the Court should permit them to amend their Complaint if the Court grants any of the Defendants' motions to dismiss.  See District Courts MTD Response at 28.  The Plaintiffs contend that rule 15(a)(2) of the Federal Rules of Civil Procedure permits the Court to grant them leave to amend when justice so requires.  See District Courts MTD Response at 28.  Consequently, the Plaintiffs contend that the Court should permit them to amend their Complaint if the Court dismisses their claims.  See District Courts MTD Response at 28.

### 3.    **District Courts MTD Reply**.

The District Court Defendants reply to the Plaintiffs.  See Defendants the District Court of Nowata County, the District Court of Washington County, the District Court of Delaware County, the District Court of Craig County, the District Court of Mayes County and the District Court of Rogers County's Reply to Plaintiffs' Response to Motion to Dismiss and Brief in Support, filed October 14, 2020 (Doc. 84)("District Courts MTD Reply").  The District Court Defendants argue that the Plaintiffs do not comply with the Federal Rules of Civil Procedure's pleading standards. See District Court MTD Reply at 1.  According to the District Court Defendants, "in the context of a civil rights complaint specificity in pleading is essential," and the Plaintiffs do not identify them "as Defendants in the section of their complaint identifying the individual defendants by

name," but rather "lump all defendants together in the other paragraphs making allegations." District Court MTD Reply at 2.

The District Court Defendants make six arguments.  See District Court MTD Reply at 2-9.  First, the District Court Defendants allege that they are entitled to Eleventh Amendment immunity, because the Plaintiffs seek only retrospective relief.  See District Court MTD Reply at 2-4.  Second, the District Court Defendants assert that the Plaintiffs do not state a § 1983 claim for relief, because Monell does not apply, given that the "District Courts are not municipalities or political subdivisions" of Oklahoma.  District Court MTD Reply at 5 (citing Okla. Stat. tit. 51 § 152(10)-(111), and Steadfast Inc. Co. v. Agric. Ins. Co., 507 F.3d 1250, 1253 (10th Cir. 2007)).  Third, the District Court Defendants contend that the Plaintiffs are not entitled to their requested declaratory relief, because declaratory relief is available neither for past acts nor for isolated issues in future controversies.  See District Court MTD Reply at 5-7 (citing Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1266 (10th Cir. 2004), and Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1379-81 (10th Cir. 2011)).  Fourth, the District Court Defendants maintain that a money-had-and-received claim is a tort claim and that the OGTCA bars that claim.  See District Court MTD Reply at 6-7.  Fifth, according to the District Court Defendants, the Plaintiffs "clearly are relying on unnamed putative class members['] alleged injuries to create standing against the District Courts" other than Mayes County District Court.  District Court MTD Reply at 8.  Sixth, the District Court Defendants assert that the Plaintiffs are not entitled to amend their Complaint, because the Plaintiffs' request is "perfunctory."  District Court MTD Reply at 9.

### 4.    The DA MTD.

The DA Defendants ask the Court to dismiss the Plaintiffs' claims against them pursuant to rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure.  See DA MTD at 9.

According to the DA Defendants, the Plaintiffs are suing under § 1983 "while their convictions for misdemeanors and traffic offenses remain intact," and are requesting that the Court "collaterally declare their state convictions void." DA MTD at 9. The DA Defendants contend, therefore, that "the case against the district attorneys should be dismissed." DA MTD at 11.

The DA Defendants make four arguments. See DA MTD at 11-28. First, the DA Defendants contend that the Rooker-Feldman doctrine divests the Court of subject-matter jurisdiction over the Plaintiffs' § 1983 claim. See DA MTD at 11. According to the DA Defendants, the Plaintiffs are asking the Court to declare their convictions or deferred adjudications to be void, a request that triggers Rooker-Feldman's bar to "requests for reversal of a municipal conviction." DA MTD at 12.

Second, the DA Defendants allege that they are immune from the Plaintiffs' § 1983 claim, because the Eleventh Amendment "protects the district attorneys from suit in federal court for the relief Plaintiffs seek," and because Ex Parte Young does not entitle the Plaintiffs to their requested declaratory relief. See DA MTD at 13. The DA Defendants argue that the Plaintiffs' allegations against them "fall within the category of prosecutorial conduct outlined by the Tenth Circuit," because they "relate to initiating and pursuing criminal prosecution and presenting the state's case at trial." DA MTD at 14. The DA Defendants suggest, therefore, that they are "absolutely immune from liability" and that the Court should dismiss the § 1983 claim against them. DA MTD at 14. Moreover, the DA Defendants contend that the Plaintiffs are not entitled to the declaratory relief that they request, because Ex Parte Young does not extend to retrospective claims. See DA MTD at 15. In addition, the DA Defendants assert that the Plaintiffs' § 1983 claim "does not raise a federal question at all," because it is "purely one of state jurisdiction." DA MTD at 15 (citing Jones v. Att'y Gen. of Cal., 280 F. App'x 646, 647 (9th Cir. 2008)(unpublished)).

Third, the DA Defendants state that the Court should not exercise supplemental jurisdiction over the State law claims, because the Court "should dismiss all the claims over which it has original jurisdiction." DA MTD at 16. The DA Defendants contend, however, that the Plaintiffs nevertheless do not state a claim for money had and received, and come to court with "unclean hands," because the Plaintiffs do not plead sufficient facts that "any defendant is holding a sum certain under an implied contract that in equity and good conscience the defendant should not retain." DA MTD at 17. According to the DA Defendants, they are not "actually holding the money at issue," let alone the required sum certain, because Oklahoma law requires them to deposit the funds at issue into the General Revenue Fund of the State Treasury. DA MTD at 18. In addition, the DA Defendants argue the Plaintiffs do not state a claim for funds had and received, because there is no implied contract between the Plaintiffs and the DA Defendants. See DA MTD at 19. Moreover, the DA Defendants allege that equitable defenses bar the Plaintiffs' State law claims, because the Plaintiffs have unclean hands, specifically "the commission of a criminal act." DA MTD at 21. The DA Defendants state that the Court should not award the Plaintiffs relief, because the Plaintiffs "would have had to violate the State's criminal and traffic laws to get" here, which would, in turn, "avert an injury to the public." DA MTD at 21. Next, the DA Defendants argue that the Court should not exercise supplemental jurisdiction over the Plaintiffs' State law claims, because a State court, not a federal court, should hear the question of OUPCPA's scope. See DA MTD at 22. The DA Defendants contend that, under Heck, 512 U.S. at 486-87, the Court should dismiss the Plaintiffs' claims, because they imply that the underlying convictions are invalid, and that Oklahoma State courts and not a federal court should "decide whether state law demands a Heck-like favorable termination rule based on collateral attacks implicit in civil actions outside post-conviction relief." DA MTD at 23. The DA Defendants make the same argument

about the OGTCA and the fee protest statute -- namely, that State courts, and not a federal court, should decide the scope of the OGTCA and whether the Plaintiffs comply with Okla. Stat. tit. 62 § 206(A), or whether they need to comply with Okla. Stat. tit. 62 § 206(A).  See DA MTD at 23-26.

Fourth, the DA Defendants contend that the Court must abstain under Younger from considering the Plaintiffs' request for declaratory relief.  See DA MTD at 26.  The DA Defendants allege that, after McGirt, the Oklahoma Court of Criminal Appeals remanded numerous cases to the State district courts to determine whether Congress had established a reservation for the Cherokee Nation and, if so, whether Congress erased those boundaries and disestablished the reservation.  See DA MTD at 26.  The DA Defendants note that the Cherokee Nation has requested to file an amicus brief for "all direct appeals that raise the issue concerning the Cherokee nation as a reservation as defined by 18 U.S.C. § 1151(a)," which gives State courts "an adequate opportunity answer the question."  DA MTD at 27.  Further, the DA Defendants contend that McGirt does "not extend to traffic offenses or misdemeanor offenses," but affects only offenses within the General Crimes Act, 18 U.S.C. § 1152.  DA MTD at 27.  Finally, the DA Defendants indicate that a State court will hold an evidentiary hearing whether the Cherokee Nation has been disestablished "within the next sixty days," meaning sometime before November, 2020.  DA MTD at 28.

**5.    DA MTD Response.**

The Plaintiffs respond to the DA MTD.  See Plaintiff's Response to Defendants Kevin Burchanan [sic], Kenny Wright, Matt Ballard, and Steve Kunzeweiler's Motion to Dismiss and Brief in Support, filed October 1, 2020 (Doc. 76)("DA MTD Response").  In the DA MTD Response, the Plaintiffs make nine arguments why the Court should not dismiss their Complaint.

See DA MTD Response at 6-27.  Four of those arguments are duplicated from their District Courts MTD response.  See District Courts MTD Response at 1-28.  The Plaintiffs make five new arguments that respond directly to the DA MTD.  See DA MTD Response at 6-27.

First, the Plaintiffs argue that the Rooker-Feldman doctrine does not bar their claims.  See DA MTD Response at 9.  The Plaintiffs assert that Rooker-Feldman does not apply, because this case neither is an appeal from a State court judgment nor is a de facto appeal of a State court judgment.  See DA MTD Response at 10.  The Plaintiffs contend that their request that the Court determine "whether the Cherokee Reservation has in fact been disestablished" would "void" their convictions, thus dissolving any argument that this case is an "appeal or a review of a state court decision."  DA MTD Response at 10.  Moreover, the Plaintiffs allege that Rooker-Feldman does not bar disgorgement claims for "illegally obtained funds under the . . . official state action."  DA MTD Response at 11 (citing Cowan v. Hunter, 762 F. App'x 521, 523 (10th Cir. 2019)(unpublished)).[7]

_____

[7]Cowan v. Hunter is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent that its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Cowan v. Hunter, 762 F. App'x 521, 523 (10th Cir. 2019), Tso v. Murray, 822 F. App'x 697, 2020 WL 4200126 (10th Cir. 2020), Anderson v. Private Capital Grp., 549 F. App'x 715, 717-18 (10th Cir. 2013), Smith v. Glanz, 662 F. App'x 595, 597 (10th Cir. 2016), Archilita v. Oklahoma, 123 F. App'x 852, 856-67 (10th Cir. 2005), Lawson v. Engleman, 67 F. App'x 524, 526 n.2 (10th Cir. 2003), Bishop v. Oklahoma, 33 F. App'x 361 (10th Cir. 2009), Legacy Church, Inc. v. Collins, 853 F. App'x 316 (10th Cir. 2021), Lasky v. Lansford, 76 F. App'x. 240, 240-41 (10th Cir. 2003),

Second, the Plaintiffs argue that the DA Defendants are not immune from § 1983 claims. See DA MTD Response at 11.  The Plaintiffs aver that the DA Defendants do not have absolute immunity, because there is "no immunity for administrative functions or a myriad of other functions," DA MTD Response at 11, and that the DA Defendants' offices "had an official policy and custom of filing criminal charges against Indians, for crime committed in Indian Country," which they "had ZERO right to do," DA MTD Response at 12.  Moreover, the Plaintiffs assert that the DA Defendants would have immunity if this suit were "a damages case in the sense of a case of malicious prosecution," but that this is a case "seeking the refund of the ill gotten gains from the various defendants."  DA MTD Response at 12.  According to the Plaintiffs, the DA Defendants' actions are "not remotely related to" the DA Defendants' decision to prosecute someone.  DA MTD Response at 13.

Third, the Plaintiffs contend that they state plausibly a claim for unjust enrichment, disgorgement of money taken wrongly, and money had and received.  See DA MTD Response at 8.  The Plaintiffs argue that the DA Defendants misstate their claim by distorting the elements of a claim for money had and received, and that the Plaintiffs state plausibly each element of a money-had-and-received claim: (i) the defendant received money that belonged to the plaintiff; (ii) the defendant benefited from the money's receipt; and (iii) under principles of equity and good

---

Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001), Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016), Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017), Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016), Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), Lawrence v. Kuenhold, 271 F. App'x 763, 766 (10th Cir. 2008), Estate of Angel Place v. Anderson, No. 19-1269, 2022 WL 1467645 (10th Cir. May 10, 2022), Yancey v. Thomas, 441 F. App'x 552, 555 n.1 (10th Cir. 2011), Shell v. Meconi, 123 F. App'x 866, 867-68 (10th Cir. 2005), and Baldwin v. O'Connor, 466 F. App'x 717 (10th Cir. 2012) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

conscience, the defendant should not be permitted to keep the money.  See DA MTD at 14 (citing

Nordlicht v. N.Y. Tel. Co., 799 F.2d 859, 865 (2d Cir. 1986); Aaron Ferer & Sons, Ltd. v. Chase

Manhattan Bank, 731 F.2d 112, 125 (2d Cir. 1984); Superior Edge, Inc. v. Monsanto Co., 44

F. Supp. 3d 890, 899 (D. Minn. 2014)(Tunheim, J.); Ellington Credit Fund, Ltd. v. Select Portfolio

Servicing, Inc., 837 F. Supp. 2d 162, 205 (S.D.N.Y. 2011)(Sullivan, J.); Pitman v. City of

Columbia, 309 S.W.3d 395, 402 (Mo. Ct. App. 2010)).   The Plaintiffs assert that they plead

plausibly each element, because the DA Defendants received their money -- the exact amounts can

be verified through "[c]ourt records" -- the DA Defendants benefitted from receiving the money,

and the DA Defendants should not be permitted to keep this money, because they had no

jurisdiction to impose fees.  DA MTD Response at 15.

Fourth, the Plaintiffs argue that equity principles do not bar their recovery.  See DA MTD

Response at 17.  The Plaintiffs state that there is a "'smell of mendacity' to the State's argument

it wants to retain its ill-gotten gains by claiming the Plaintiff's [sic] are being 'rewarded' for

violating the law" and that the DA Defendants want the Court to "reward them for ignoring law

that is over a century old."  DA MTD Response at 18 (paraphrasing Tennessee Williams, Cat on a

Hot Tin Roof; no citation for second quotation).  In addition, the Plaintiffs contend that the unclean

hands argument "cannot be decided in a motion to dismiss" and "stretch[es] the doctrine past the

breaking point."   DA MTD Response at 19.   Moreover, according to the Plaintiffs, the DA

Defendants' "superior public interest" argument is incorrect, because it would not be equitable for

the State to retain the money at issue.  DA MTD Response at 20.  The Plaintiffs assert that they

are entitled to recovery based on equity principles alone.  See DA MTD Response at 21.

Fifth, the Plaintiffs argue that the Court should consider their declaratory relief claim,

because Younger abstention does not apply.  See DA MTD Response at 23.  The Plaintiffs allege

that <u>Younger</u> does not apply, because the cases that the DA Defendants cite "will ultimately rest on the determination of a Federal Court decision for several reasons," and because, if the Court dismisses this case and remands it to State court, "there will be a multitude of conflicting decisions whether or not the Cherokee Reservation has been disestablished."  DA MTD Response at 23-24. Moreover, the Plaintiffs contend that the Court should consider its declaratory relief claim, because the Major Crimes Act applies only in Indian Country.  <u>See</u> DA MTD Response at 24.  According to the Plaintiffs, the treaties that establish the Cherokee Reservation and the Creek Nation "must be considered on their own terms," but that the DA Defendants "never assert how the Cherokee Treaties are different than the Creek Treaties."  DA MTD Response at 24.

      **6.**     **<u>DA MTD Reply</u>.**

      The DA Defendants reply to the Plaintiffs' DA MTD Response.  <u>See</u> Defendants' Kevin Buchanan, Kenny Right, Matt Ballard and Steve Kunzweiler's Reply in Support of Their Motion to Dismiss and Brief in Support, filed October 14, 2020 (Doc. 85)("DA MTD Reply").  The DA Defendants contend that the Plaintiffs "misrepresent" <u>McGirt</u>'s scope by asserting improperly that it covers "*any* crime committed by *any* Indian on *any* Indian land."  DA MTD Reply at 1 (emphasis in DA MTD Reply).  The DA Defendants make five specific rebuttals to the Plaintiffs' DA MTD Response.  <u>See</u> DA MTD Reply at 1-9.

      First, the DA Defendants argue that the Plaintiffs' "failure to seek any appellate or post-conviction relief is fatal to their claims."  DA MTD Reply at 1.  Second, the DA Defendants contend that the Plaintiffs' <u>Rooker-Feldman</u> arguments are "circular" and would make <u>Rooker-Feldman</u> "a nullity."  DA MTD Reply at 3.  Third, according to the DA Defendants, the Plaintiffs' characterization of the remedies that they seek does not refute the DA Defendants assertion of prosecutorial immunity.  <u>See</u> DA MTD Reply at 5-6.  Fourth, the DA Defendants allege that the

Plaintiffs "gloss over" their Eleventh Amendment immunity argument and do not confront their argument that the Plaintiffs are not entitled to a declaratory judgment, because the Plaintiffs seek retrospective relief.  See DA MTD Reply at 6.  Fifth, the DA Defendants argue that the Plaintiffs "do not refute that they come to the Court with unclean hands," because the Plaintiffs have convictions that the Plaintiffs allege are illegal.  DA MTD Reply at 6.

### 7.  __Municipality MTD__.

The Municipality Defendants ask the Court to dismiss the Plaintiffs' claims against them pursuant to rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.  See Municipality MTD at 10.  The Municipality Defendants contend that, of all of the Plaintiffs, only Sixkiller makes any specific allegations about a prosecution in municipal court, but does not allege that she was convicted, paid a fine, or that the Town of Locust Grove collected a fine.  See Municipality MTD at 11.  According to the Municipality Defendants, none of the Plaintiffs allege that he or she sought appellate review of their convictions or any post-conviction relief.  See Municipality MTD at 11. Moreover, the Municipality Defendants contend that the Plaintiffs conclude erroneously that McGirt makes municipalities "unable to enforce their ordinances within their boundaries" against Tribal members.  Municipality MTD at 11.

In the Municipality MTD, the Municipality Defendants make seven arguments.  See MTD at 11-27.  First, the Municipality Defendants argue that the Curtis Act, Pub. L. No. 55-517, 30 Stat. 495 (1898), bars the Plaintiffs' claims against the Municipality Defendants.  See Municipality MTD at 13.  According to the Municipality Defendants, the Curtis Act "unequivocally says cities and towns may adopt and enforce municipal ordinances," and forecloses the Plaintiffs' claims, because the Municipality Defendants "were merely exercising their congressionally created grant of authority."  Municipality MTD at 13.  The Municipality Defendants argue that the Curtis Act

provides that municipalities within "Indian Territory" can be incorporated pursuant to Oklahoma law and that the Cherokee Nation's agreement with Oklahoma in 1902 "expressly preserved" this Curtis Act provision. Municipality MTD at 14. According to the Municipality Defendants, the Plaintiffs rely improperly on McGirt, because McGirt deals only with the Major Crimes Act and does not affect the Curtis Act's provision that municipalities can enforce municipal ordinances. See Municipality MTD at 14-15. The Municipality Defendants assert that McGirt "does not abolish municipalities or their authority." Municipality MTD at 15. As a result, the Municipality Defendants argue that "[c]ities and towns retain the power to adopt and enforce municipal ordinances," and, therefore, that there "can be no claim against" them. Municipality MTD at 15.

Second, the Municipality Defendants argue that the Rooker-Feldman doctrine bars the Plaintiffs' claims, because the Plaintiffs, in effect, seek appellate review of their State court judgments. See Municipality MTD at 15-16. According to the Municipality Defendants, all of the Plaintiffs' claims against the Municipality Defendants are "asserted injuries allegedly caused by municipal court judgments." Municipality MTD at 16. The Municipality Defendants contend that, because the Plaintiffs ask the Court to "overturn state court judgments and return the monies they allegedly paid," Rooker-Feldman bars the Plaintiffs' claims. Municipality MTD at 17.

Third, the Municipality Defendants argue that the Court must dismiss the Plaintiffs' claims, because the Plaintiffs did not seek redress under the OUPCPA. See Municipality MTD at 17. According to the Municipality Defendants, the Plaintiffs are seeking "disgorgement of fines and fees they allege they paid as a consequence of having been found guilty of various criminal charges," but the Plaintiffs never sought any redress in State court; the Plaintiffs could have "challenged the municipal courts' jurisdiction" or "appealed," or "sought redress under" OUPCPA, but, instead, the Plaintiffs "did nothing until they filed this case," which is "fatal to their

claims." Municipality MTD at 18. In addition, the Municipality Defendants contend that res judicata, claim preclusion, and collateral estoppel bar the Plaintiffs' claims, because the Plaintiffs are challenging their criminal convictions based on a lack of jurisdiction, but "that issue has been decided in court." Municipality MTD at 18.

Fourth, the Municipality Defendants argue that Heck bars the Plaintiffs' § 1983 claims, because they did not "first obtain direct relief in state court or a writ of habeas corpus in federal court." Municipality MTD at 19. The Municipality Defendants assert that a damages claim that that bears "'a relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983,'" and that the Court "'must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.'" Municipality MTD at 19-20 (emphasis removed)(quoting Heck, 512 U.S. at 487). The Municipality Defendants allege that other district courts have "repeatedly" concluded that Heck "applies with relief under OUPCPA is available." Municipality MTD at 20 (citing Taylor v. City of Bixby, No. CIV 12-0066-CVE-FHM, 2012 WL 6115051 (N.D. Okla. December 10, 2012)(Eagen, J.), McFadden v. City of Midwest City, No. CIV 12-1419-HE, 2014 WL 798013 (W.D. Okla. February 27, 2014)(Heaton, J.); Dutton v. City of Midwest City, No. CIV 13-0911-HE, 2014 WL 348982 (W.D. Okla. January 31, 2014)(Heaton, J.)).

Fifth, the Municipality Defendants contend that equity requires that the Court dismiss the Plaintiffs' Complaint. See Municipality MTD at 20. The Municipality Defendants aver that laches bar the Plaintiffs' claims, because the Plaintiffs "cannot show that there was no reasonable delay in asserting their claims" and the delay prejudices substantially the Municipality Defendants. Municipality MTD at 21. Next, the Municipality Defendants contend that waiver and estoppel bar

the Plaintiffs' claims, because the Municipality Defendants relied in good faith on interpretation of the law before <u>McGirt</u>.  <u>See</u> Municipality MTD at 22-23.  In addition, the Municipality Defendants allege that the unclean-hands doctrine bars the Plaintiffs' claims, because the "entire basis of Plaintiffs' claims involves Plaintiffs having committed criminal conduct," and because the Plaintiffs failed to pursue diligently their claims on direct appeal or in post-conviction proceedings. Municipality MTD at 23.

Sixth, the Municipality Defendants argue that the Plaintiffs do not allege sufficient facts to state plausibly a claim for money had and received.  <u>See</u> Municipality MTD at 24.  According to the Municipality Defendants, the Plaintiffs' failure to plead a precise amount of money that the Municipality Defendants retain renders their money-had-and-received claim deficient.  <u>See</u> Municipality MTD at 24-25.  Accordingly, the Municipality Defendants assert that the Plaintiffs' "vague and indeterminate requests for a refund are insufficient to state a claim for money had and received," so the Court should dismiss the claim.  Municipality MTD at 25.

Seventh, the Municipality Defendants allege that the Plaintiffs do not have standing to assert their claims.  <u>See</u> Municipality MTD at 25-26.  According to the Municipality Defendants, of all the Plaintiffs, only Sixkiller "even asserts having been prosecuted by one of these Municipalities," but does not offer any details about her prosecution.  Municipality MTD at 26. The Municipality Defendants argue that the Plaintiffs "essentially ask the Court to issue an impermissible advisory opinion" about the Municipality Defendants' liability for fines that the Plaintiffs do not "allege they even paid."  Municipality MTD at 26.  Moreover, the Municipality Defendants argue that Sixkiller does not have standing, because she does not allege that she suffered any injury traceable to the Municipality Defendants or an injury that the Court can redress. <u>See</u> Municipality MTD at 26.  Consequently, the Municipality Defendants request that the Court

dismiss the Plaintiffs' claims against them.

### 8. **Municipality MTD Response.**

The Plaintiffs respond to the Municipality Defendants.   See Plaintiff's Response to Defendants Town of Adair, City of Bartlesville, Town of Big Cabin, Town of Bluejacket, City of Catoosa, Town of Chelsea, Town of Chouteau, City of Claremore, City of Collinsville, Town of Copan, City of Dewey, Town of Disney, City of Grove, City of Jay, Town of Kansas, Town of Langley, Town of Locust Grove, Town of Nowata, Town of Oolagah, City of Pryor, Town of Ramona, Town of Salina, Town of South Coffeyville, Town of Spavinaw, Town of Strang, Town of Talala, Town of Verdigris, City of Vinita, Town of Warner, and Town of West Siloam Springs, Motion to Dismiss and Brief in Support, filed October 2, 2020 (Doc. 77)("Municipality MTD Response").  In the Municipality MTD Response, the Plaintiffs make thirteen arguments for why the Court should not dismiss their Complaint.  See Municipality MTD Response at 6-31.  Eight of those arguments are duplicated from their District Courts MTD Response or their DA MTD Response.  See Municipality MTD Response at 6-31.  The Plaintiffs make four new arguments that respond specifically to the DA MTD.  See Municipality MTD Response at 6-31.

First, the Plaintiffs argue that the Court should apply a "relaxed" standard to assess whether they state a claim upon which relief can be granted.  Municipality MTD Response at 11.  The Plaintiffs ask the Court to apply the "no set of facts" pleading standard from Conley v. Gibson, 355 U.S. 41, 45-46 (1957), rather than the stricter "plausibility" standard from Bell Atl. Corp. v. Twombly, 550 U.S. 544, 575 (2007).  Municipality MTD Response at 10.  The Plaintiffs maintain, however, that, even if the Court applies the Bell Atl. Corp. v. Twombly, 550 U.S. at 575, standard, their Complaint is "more than adequate."  Municipality MTD Response at 12.  The Plaintiffs contend that Complaint ¶¶ 53-58, at 21-13, "state with specificity that the municipalities, district

attorneys and state district courts have systematically prosecuted" members of federally recognize American Indian tribes for crimes committed on the Cherokee Reservation, and that Complaint ¶¶ 59-65, at 13-15, indicate that "specifically named Plaintiffs were illegally prosecuted, convicted and paid court costs and finds for Oklahoma state law crimes in the Cherokee Nation reservation." Municipality MTD Response at 12-13.  Moreover, the Plaintiffs allege that Complaint ¶¶ 1-49, at 1-12, "specifically" allege "how the district attorneys, court clerks and other defendants systematically enforced Oklahoma state criminal laws against the named Plaintiffs."  Municipality MTD Response at 13.  In sum, the Plaintiffs assert that their Complaint is sufficiently specific to satisfy rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Municipality MTD Response at 12-13.

Second, the Plaintiffs argue that the Curtis Act does not bar their claims, because the Curtis Act never gave towns or municipalities, including the Municipality Defendants, "the ***authority*** to ***prosecute*** the Indians for violating those laws."  Municipality MTD Response at 15 (emphasis in original).  The Plaintiffs argue that, to agree with the Municipality Defendants, "one would have to conclude that as a result of the Curtis Act, a patchwork of areas exists where political subdivisions of Oklahoma have jurisdiction but that state itself does not."  Municipality MTD Response at 15.  According to the Plaintiffs, McGirt and Murphy foreclose the Municipality Defendants' Curtis Act argument.  See Municipality MTD Response at 15.  The Plaintiffs allege that Oklahoma's political subdivisions cannot have more authority or greater jurisdiction than the State of Oklahoma itself.  See Municipality MTD Response at 16.

Third, the Plaintiffs contend that that Heck does not bar their § 1983 claim, because their underlying convictions are not valid.  See Municipality MTD Response at 20.  The Plaintiffs argue that Heck would bar their claims if they were contending that their convictions "be nullified

through being overturned on appeal or declared invalid by a state tribunal or called into question

by a federal court's issuance of a writ of habeas corpus," but that is not the situation here, because

McGirt voids their underlying convictions.  Municipality MTD Response at 20.  Moreover, the

Plaintiffs reiterate that this case is "about a custom and policy of state offices and political

subdivisions (municipalities) prosecuting Indians, for offenses allegedly committed, in Indian

Country."  Municipality MTD Response at 20.  According to the Plaintiffs, Heck "only serves to

muddy the water."  Municipality MTD Response at 22.

Fourth, the Plaintiffs argue that the Court cannot consider equitable defenses at the rule

12(b)(6) stage.  See Municipality MTD Response at 22.  The Plaintiffs assert that granting a motion

to dismiss on the Municipality Defendants' "affirmative defenses of laches, waiver, estoppel and

unclean hands" arguments would be "in total derogation of the fact based inquiry and affirmative

burdens of proof and persuasion placed on the Defendants to prove these claims."  Municipality

MTD Response at 22.  According to the Plaintiffs, the Municipality Defendants do not meet their

burden of proof to prevail on waiver, estoppel, or laches grounds.  See Municipality MTD

Response at 22-23.  Moreover, the Plaintiffs argue that the unclean-hands doctrine favors them,

because "[a] citizen has the right to expect fair dealing from his government, and thus entails in

the present context treating the government as a unit rather than as an amalgam of separate

entities."  Municipality MTD Response at 23.  Further, the Plaintiffs contend that laches does not

bar their claims, because, before McGirt, Oklahoma "and its subdivisions turned a deaf ear to any

claims involving jurisdiction based upon Indian[s] committing crimes on reservations."

Municipality MTD Response at 24.  The Plaintiffs allege that the Municipality Defendants do not

show that the Plaintiffs waiting for the Supreme Court McGirt decision prejudiced the

Municipality Defendants and that, had the Municipality Defendants "taken heed" of the Tenth

Circuit's <u>Murphy</u> decision, "the amount to be refunded would be zero." Municipality MTD Response at 24.

Fifth, the Plaintiffs maintain that they have standing to pursue this case. <u>See</u> Municipality MTD Response at 27. According to the Plaintiffs, the Municipality Defendants' arguments are "spurious," because Sixkiller was "prosecuted by a political subdivision of the State of Oklahoma" and "has paid monies in the form of fines to that defendant." Municipality MTD Response at 27. The Plaintiffs respond that they have standing, because "it is fair to say that the population of the Cherokee Reservation would contain a larger percentage of citizens that are classified as 'Indians' under law" than <u>McGirt</u>'s estimated ten to fifteen percent. Municipality MTD Response at 27 (no citation for quotation). The Plaintiffs contend that "[e]very dollar paid to those municipalities by a member of the class would be a reason that the Plaintiffs and the Plaintiff Class has standing to proceed with this case." Municipality MTD Response at 27-28.

### 9.    **Municipality MTD Reply.**

The Municipality Defendants Reply to the Plaintiffs' Municipality MTD Response. <u>See</u> Defendant Municipalities' Reply to Response to Plaintiff's (sic) Motion to Dismiss and Brief in Support, filed October 15, 2020 (Doc. 86)("Municipality MTD Reply"). The Municipality Defendants Maintain that the Plaintiffs "do not and cannot state a claim," and "do not and cannot demonstrate that the Court has subject matter jurisdiction." Municipality MTD Reply at 6. In addition, the Municipality Defendants contend that the Plaintiffs' attempts to amend their Complaint will be "futile." Municipality MTD Reply at 6. In the Municipality MTD Reply, the Municipality Defendants make five principal arguments and five more arguments they label "miscellany." Municipality MTD Reply at 2.

First, the Municipality Defendants contend that the Plaintiffs misstate the standard of

review, because they fail to direct the Court's attention to Ashcroft v. Iqbal, 556 U.S. 662 (2009).

See Municipality MTD Reply at 6.  Second, the Municipality Defendants argue that the Plaintiffs

wrongly refute the Municipality Defendants' Curtis Act argument, because the Plaintiffs "equate

municipal enforcement of municipal laws -- petty offenses -- to State attempts to prosecute major

crimes -- specified major felonies -- despite the provisions of the Major Crimes act," but "Section

14 of the Curtis Act and the major Crimes Act are not especially related for purposes of this case."

Municipality MTD Reply at 7.  Third, the Municipality Defendants maintain that Rooker-Feldman

bars the Plaintiffs' claims, because the "Tenth Circuit has repeatedly ruled that it has 'not adopted

the "void ab initio" exception' to the Rooker-Feldman doctrine."  Municipality MTD Reply at 9

(quoting Tso v. Murray, 822 F. App'x 697, 2020 WL 4200126 (10th Cir. 2020)(unpublished), and

citing Anderson v. Private Capital Grp., 549 F. App'x 715, 717-18 (10th Cir. 2013)(unpublished)).

Fourth, the Municipality Defendants assert that the Plaintiffs "proudly proclaim" that they never

sought post-conviction relief, and the OUPCPA bars their claims for that reason.  Municipality

MTD Reply at 10.  Fourth, according to the Municipality Defendants, the Plaintiffs do not get

around Heck because the Plaintiffs do not allege and cannot allege that their convictions have been

reversed, expunged, declared invalid, or called into question by a federal habeas writ.  See

Municipality MTD Reply at 7.

The Municipality Defendants then make five "[m]iscellany" arguments.  Municipality

MTD Reply at 13.  First, the Municipality Defendants assert that the Court can dismiss the

Plaintiffs' claims for equitable reasons.  See Municipality MTD Reply at 13.  Second, the

Municipality Defendants allege that the Plaintiffs do not have standing, because they do not allege

sufficient facts that the Municipality Defendants retain money or that the Plaintiffs sought post-

conviction review.  See Municipality MTD Reply at 8-9.  Third, the Municipality Defendants

contend that the Court should ignore the Plaintiffs' arguments about issues that the Municipality Defendants do not address.  See Municipality MTD Reply at 14.   Fourth, the Municipality Defendants argue that the Plaintiffs' attempts to get affirmative relief are improper, because they violate "LCvR 7.2(e),"[8] and because courts do not permit parties to raise requests for affirmative relief in responses, see Municipality MTD Reply at 14.   Fifth and finally, the Municipality Defendants assert that the Plaintiffs conflate improperly the Municipality Defendants with the State of Oklahoma, when "[m]unicipalities are not the State."  Municipality MTD Reply at 15.

**10.    Clerk MTD.**

The Clerk Defendants ask the Court to dismiss the Plaintiffs' claims against them pursuant to rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.  See Clerk MTD at 10.  The Clerk Defendants make three principal arguments, all of which echo the District Court Defendants' arguments, the DA Defendants' arguments, and the Municipality Defendants' arguments.  See Clerk MTD at 10-31.   First, the Clerk Defendants argue that they are entitled to Eleventh Amendment immunity, because "a county district court clerk is 'both a county officer and an officer or 'arm' of the court," meaning that, "because of the nature of their job duties," the Clerk Defendants "act as arms of the state with regard to their ministerial court duties."  Clerk MTD at 14 (quoting Speight v. Presley, 203 P.3d 173 (Okla. 2008)).  Moreover, the Clerk Defendants

---

[8]The Court cannot tell what rule the Municipality Defendants are invoking.  There is no rule 7.2(e) in the Northern District of Oklahoma's local rules.  Moreover, neither LCvR7-1(e) nor any other Northern District of Oklahoma local rule contains the statement "may not also include a motion or a cross-motion made by the responding party."  Municipality MTD Reply at 14.  Both the Western District of Oklahoma and the Eastern District of Oklahoma have, however, a local rule that contains the language the Municipality Defendants invoke.  See LCvR7.1(c)(W.D. Okla.); LCvR7.1(d)(E.D. Okla.).

suggest that, under Okla. Stat. tit. 20, Appendix 2, Rules 1 and 3, and Okla. Stat. tit. 19, § 221, they are subsidiaries of the district court judges, despite being elected county officials under Okla. Const. art. 17, § 2.  See Clerk MTD at 14.  The Clerk Defendants assert that, because the Plaintiffs' claims are "premised upon their alleged collection of judicially imposed fines, fees, and costs resulting from criminal convictions," the Clerk Defendants have Eleventh Amendment immunity, because they were "acting as arms of the state with regard to such activity."  Clerk MTD at 15 (citing N. Side Bank v. Bd. of Cnty. Comm'rs of Tulsa Cnty., 894 P.2d 1046 (Okla. 1994)).

Second, for four reasons, the Clerk Defendants contend that the Court should dismiss the Plaintiffs' § 1983 claim against them.  See Clerk MTD at 16-21.  First, the Clerk Defendants assert that the Plaintiffs do not allege plausibly a § 1983 claim, because the Complaint is "completely devoid of any supporting allegation of fact indicating that the Defendants were involved in arresting, investigating, or issuing citations to Tribal members within the boundaries of the purported Cherokee Reservation, and Plaintiffs do not name any county officials other than the Court Clerks as defendants."  Clerk MTD at 16.  Second, the Clerk Defendants allege that the Plaintiffs do not plead sufficient facts to state a claim against Nowata County, Washington County, Delaware County, or Craig County, and, because their only allegation is against Mayes County, the Plaintiffs do not state a claim against Frauenberger, Spitzer, Waver, or Mason.  See Clerk MTD at 17-18.  Third, the Clerk Defendants suggest that the Rooker-Feldman doctrine and Heck bar the Plaintiffs' § 1983 claim.  See Clerk MTD at 18-20.  Fourth, the Clerk Defendants contend that they are entitled to "quasi-judicial" immunity, because "there can be no doubt that the collection of judicially imposed fines, fees, and costs is either a judicial act or an act performed in assistance of a judge."  Clerk MTD at 21.

Third, the Clerk Defendants argue that the Court should dismiss the Plaintiffs' declaratory

relief claim, because the Plaintiffs seek retrospective relief.  See Clerk MTD at 21-22.  Fourth, for

four reasons, the Clerk Defendants assert that the Court should dismiss the Plaintiffs' State law

claims against them.  See Clerk MTD at 22-31.  First, the Clerk Defendants assert that the Plaintiffs

do not state a money-had-and-received claim against them, because such a claim must "be brought

against the actual 'receiver and holder of the money,'" but the Clerk Defendants do not "actually

hold any fines, fees, or costs which area assessed as a result of a criminal conviction," and do not

"allege any amount due."  Clerk MTD at 22-23 (quoting Duncan v. Anderson, 250 P. 1018, 1019

(Okla. 1926)).  Second, the Clerk Defendants assert that the OUPCPA bars the Plaintiffs' State-

law claims, because they are, "in reality, an attempt to collaterally attack their underlying criminal

convictions."  Clerk MTD at 24.  Third, the Clerk Defendants suggest that the OGTCA bars the

Plaintiffs' claims, because the OGTCA is "the exclusive remedy by which an injured plaintiff may

recover against an Oklahoma government entity in tort," Clerk MTD at 25, but the Plaintiffs do

not comply with OGTCA's notice and filing provisions, see Clerk MTD at 26 (citing Okla. Stat.

tit. 51 §§ 156-157).  Fourth, the Clerk Defendants argue that laches, waiver, estoppel, and the

unclean-hands doctrine bar the Plaintiffs' claims, and that these equitable principles "clearly"

apply, because the Plaintiffs' claims "are 'in the nature of a suit in equity and [are] governed by

equitable principles.'"  Clerk MTD at 29 (quoting Continental Oil v. Rapp, 301 P.2d 198 (Okla.

1956))(alterations in Clerk MTD).

**11.    Clerk MTD Response.**

The Plaintiffs Respond to the Clerk MTD.  See Plaintiffs' Response to Defendants April

Frauenberger, Jill Spitzer, Caroline Weaver, Deborah Mason and Laura Wade's Motion to Dismiss

and Brief in Support, filed October 7, 2020 (Doc. 78)("Clerk MTD Response").  The Plaintiffs

contend that the Clerk Defendants' arguments boil down to an assertion that a "judicially construed

and created exception to liability is an accepted way of repealing Congress' will in enacting § 1983." Clerk MTD Response at 10.  Further, the Plaintiffs state that the Clerk Defendants "want this Court to sanction the keeping of their ill gotten gains from Indian Citizens that they have taken from statehood forward."  Clerk MTD Response at 10.  After restating their argument that the Court should apply the "no set of facts" pleading standard from Conley v. Gibson, 355 U.S. at 45-46, rather than the stricter standard from Bell Atl. Corp. v. Twombly, 550 U.S. at 575, the Plaintiffs make eighteen arguments, see Clerk MTD Response at 10-33.

First, the Plaintiffs argue that the Clerk Defendants do not have Eleventh Amendment immunity, because the Plaintiffs sue the Clerk Defendants in their official capacity.  See Clerk MTD Response at 12.  According to the Plaintiffs, the Clerk Defendants are "like Sheriffs, who it is known can be sued for § 1983 claims."  Clerk MTD Response at 12.  The Plaintiffs contend that § 1983 suits are "specifically directed against abuse of a public office by the officials holding the office," Clerk MTD Response at 12, and that, because the Clerk Defendants "were paid court costs, fines, fees, and other sums of money in the total absence of jurisdiction to either receive or demand such fees," Clerk MTD Response at 14, the Clerk Defendants do not have immunity.

Second, the Plaintiffs allege that § 1983 permits courts to award equitable relief.  See Clerk MTD Response at 14.  The Plaintiffs cite to Rizzo v. Goode, 423 U.S. 362, 378 (1976), noting that "'Section 1983 by its terms confers authority to grant equitable relief as well as damages.'"  Clerk MTD Response at 14 (quoting Rizzo v. Goode, 423 U.S. at 378).  The Plaintiffs also cite to Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1 (1971), stating that a court has "'broad'" equitable powers "'to remedy past wrongs'" "[o]nce a right and a violation have been shown.'"  Clerk MTD Response at 14 (citing Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. at 11-15).

Third, the Plaintiffs assert that a district court has "broad remedial powers over parties who have legitimate right to ill-gotten gains" and that disgorgement is an equitable remedy.   Clerk MTD Response at 15.  According to the Plaintiffs, the "fact [that] funds are no longer in the original parties' possession" does "not affect the return."  Clerk MTD Response at 15.  The Plaintiffs allege that the Court can consider disgorgement, because disgorgement "'does not seek to compensate the victims of the wrongful acts, as restitution does.'"  Clerk MTD Response at 16 (quoting S.E.C. v. Huffman, 996 F.2d 800, 802 (5th Cir. 1993)).

Fourth, the Plaintiffs duplicate their first argument and argue that the Clerk Defendants are not entitled to sovereign immunity, because the "Eleventh Amendment does not bar individual liability for violations of federal law by individuals performing their state duties under color of state law."  Clerk MTD Response at 16.  According to the Plaintiffs, this lawsuit "raises the sole question of whether the defendants are" acting in excess of their authority.  Clerk MTD Response at 16.  The Plaintiffs contend that the Clerk Defendants are not entitled to sovereign immunity, because the Clerk Defendants violated federal law under color of State law.  See Clerk MTD Response at 16.

Fifth, the Plaintiffs allege that granting immunity to the Clerk Defendants would amount to repealing "the Civil Rights Act."[9]  Clerk MTD Response at 16.  The Plaintiffs argue that judges

---

[9]The Plaintiffs do not explain which Civil Rights Act the Court would allegedly functionally be repealing were it to grant immunity to the Clerk Defendants.  See Clerk MTD Response at 16.  The two most obvious choices are the perhaps best-known civil rights act, the Civil Rights Act of 1964, 78 Stat. 241, or the Act that created § 1983.  The Act that created § 1983, 17 Stat. 13, is better known as the Second Enforcement Act of 1871 or the Ku Klux Klan Act of 1871.  Because, however, the Second Enforcement Act of 1871 is sometimes misleadingly called the Civil Rights Act of 1871, the Court assumes that the Plaintiffs' reference to "the Civil Rights Act" is a reference to the Second Enforcement Act of 1871, also known as the Ku Klux Klan Act of 1871.  Clerk MTD Response at 16.

do not have absolute immunity for their administrative functions, and that "ordering the payment of . . . court costs, finds and probation fees, to be paid through the court clerk's office . . . is not an adjudicative process, but administrative." Clerk MTD Response at 17. According to the Plaintiffs, because "this is not a lawsuit for traditional type damages that are historically barred by 11th Amendment or common law immunity claims," the Clerk Defendants do not have sovereign immunity. Clerk MTD Response at 18.

Sixth, the Plaintiffs argue that the Clerk Defendants have a burden to prove that § 1983 incorporated "the common law immunity they claim" when Congress enacted it. Clerk MTD Response at 18. The Plaintiffs contend that a defendant is not entitled to immunity against a § 1983 action unless he or she can "point to a common-law counterpart to the privilege" he or she asserts. Clerk MTD Response at 18. According to the Plaintiffs, courts cannot create new forms of immunity. See Clerk MTD Response at 19.

Seventh, the Plaintiffs contend that the Clerk Defendants are not entitled to immunity, because it is "rare." Clerk MTD Response at 20. The Plaintiffs assert that there is a presumption that the Clerk Defendants are entitled to qualified immunity and that the Clerk Defendants have the burden to show they get more than qualified immunity. See Clerk MTD Response at 20. The Plaintiffs urge the Court to apply a "functional approach" to determine the Clerk Defendants' immunity. Clerk MTD Response at 20.

Eighth, the Plaintiffs argue that Ex Parte Young does not bar the Plaintiffs' suit, because it "specifically allows for" suits against State officials in their official capacity. Clerk MTD Response at 20. In addition, the Plaintiffs assert, without explanation, that Ex Parte Young does not bar equitable disgorgement relief. See Clerk MTD Response at 20. Moreover, the Plaintiffs contend that the Clerk Defendants are proper Defendants, because court clerks can be sued for

marriage license fees.  <u>See</u> Clerk MTD Response at 21.

Ninth, the Plaintiffs allege that, although State court judges and personnel "typically" are immune from damages claims, they are not immune for actions that allege failure to "act in his/her judicial capacity and when that person has acted in absence of all jurisdiction."  Clerk MTD Response at 22 (citing <u>Smith v. Glanz</u>, 662 F. App'x 595, 597 (10th Cir. 2016)(unpublished)).  According to the Plaintiffs, they do not seek damages under § 1983, but rather seek equitable relief. <u>See</u> Clerk MTD Response at 24.  Moreover, the Plaintiffs argue that personal jurisdiction is "integrated into the concept of proper subject matter jurisdiction."  Clerk MTD Response at 24.

Tenth, the Plaintiffs argue that they state a claim upon which relief can be granted, because "civil rights liability is based on tort theory that a person is responsible for the natural consequences of his/her acts."  Clerk MTD Response at 24.  According to the Plaintiffs, the Clerk Defendants are not entitled to immunity, because "[e]very step in the process of approving charges, setting bail, prosecuting the Plaintiffs, ordering the payment and collection of every species of court costs, fines, probation fees, etc., under threat of imprisonment," was "in excess of every Defendants' jurisdiction and authority."  Clerk MTD Response at 25.  In addition, the Plaintiffs argue that § 1983 creates liability for "all persons involved, or who set in motion a series of acts that results in a deprivation of ones [sic] rights" is liable regardless whether "they directly participated."  Clerk MTD Response at 26.

Eleventh, the Plaintiffs argue that they state plausibly a claim against the Clerk Defendants, because they have standing.  <u>See</u> Clerk MTD Response at 26-27.  Twelfth, the Plaintiffs reassert that <u>Rooker-Feldman</u> does not bar their claims.  <u>See</u> Clerk MTD Response at 27-28.   Thirteenth, the Plaintiffs contend that they are entitled to declaratory relief "that would entitle them to disgorgement from the Defendants," and not to declaratory relief that "would establish *liability*."

Clerk MTD Response at 28 (emphasis in original).  Fourteenth, the Plaintiffs allege that they state plausibly a money-had-and-received claim, because there is "no reason that the court clerks would be allowed to retain monies that are derived from fines and fees which were obtained from the Plaintiffs based convictions that are *void ab initio*."  Clerk MTD Response at 30 (emphasis in original).  Fifteenth, the Clerk Defendants maintain that the OGTCA and Oklahoma's fee protest statute do not apply.  See Clerk MTD Response at 30-31.  Sixteenth, the Plaintiffs reiterate that they are not required to seek or have sought post-conviction relief before filing this suit.  See Clerk MTD Response at 31-32.  Seventeenth, the Plaintiffs argue that the equity doctrine and unclean-hands doctrine do not bar their recovery, because the Clerk Defendants do not meet their "burden of proof and persuasion to prove" that these doctrines bar the Plaintiffs' claims.  Clerk MTD Response at 32.  Eighteenth, the Plaintiffs reiterate their contention that the Court should estop the Clerk Defendants from denying the Cherokee Reservations' existence or knowledge of its existence.  See Clerk MTD Response at 32-33.  Nineteenth, and finally, the Plaintiffs maintain that the Court should grant them leave to amend their Complaint if the Court grants any of the Defendants' motions to dismiss.  See Clerk MTD Response at 33.

**12.**     **Clerk MTD Reply.**

The Clerk Defendants respond to the Plaintiffs' Clerk MTD Response.  See Reply to Plaintiffs' Response to Defendants Frauenberger, Spitzer, Weaver, Mason and Wade's Motion to Dismiss, filed October 21, 2020 (Doc. 88)("Clerk MTD Reply").  The Clerk Defendants assert that the Plaintiffs state the wrong standard of review, and argue that the Court should apply the standard from Bell Atl. Corp. v. Twombly, 550 U.S. at 575.  See Clerk MTD Reply at 2.  Next, the Clerk Defendants make four arguments.  See Clerk MTD Reply at 2-12.

First, the Clerk Defendants maintain that they are entitled to sovereign immunity under the

Eleventh Amendment.  See Clerk MTD Reply at 2-3.  The Clerk Defendants state that the Plaintiffs "only assert claims against" the Clerk Defendants in the Clerk Defendants' official capacities "and it is clear that any award will be paid out of the state treasuries, not by the individual Defendants themselves."  Clerk MTD Reply at 3.  The Clerk Defendants contend that the Plaintiffs do not provide any factual allegations "indicating that the [Clerk] Defendants acted outside of their statutory authority."  Clerk MTD Reply at 3.  Moreover, according to the Clerk Defendants, the Plaintiffs' citation to Ex Parte Young is unavailing, because the Plaintiffs' request only monetary relief for past actions and do not request any prospective injunctive relief, meaning that the "exception to Eleventh Amendment immunity addressed in Ex Part Young simply does not apply to Plaintiffs' § 1983 claims and the [Clerk] Defendants are immune from suit for said claims."  Clerk MTD Reply at 3.

Second, the Clerk Defendants reiterate that the Court should dismiss the Plaintiffs' § 1983 claims.  See Clerk MTD Reply at 3.  The Clerk Defendants assert that the Plaintiffs do not supply sufficient plausible factual allegations, because the Plaintiffs allege only that the Clerk Defendants collected fines and costs from Cherokee Nation members, and Eleventh Amendment immunity protects the Clerk Defendants from liability for this practice.  See Clerk MTD Reply at 4.  The Clerk Defendants argue that the Plaintiffs do not state a claim against Nowata County, Washington County, Delaware County, or Craig County, because the Plaintiffs "cannot rely on unnamed class members in order to create standing."  Clerk MTD Reply at 5.  According to the Clerk Defendants, class representatives do not have standing to sue defendants who have not injured them, and, therefore, the Plaintiffs do not state a plausible claim against "Defendants Frauenberger, Spitzer, Weaver, or Mason, and Plaintiff Sixkiller has failed to state a plausible claim against any of the Defendants."  Clerk MTD Reply at 6.  Next, the Clerk Defendants maintain that the Rooker-

Feldman doctrine and Heck bar the Plaintiffs' claims, and that the Plaintiffs' contention that the doctrines "only appl[y] to valid judgments" is not accurate, because the Tenth Circuit "has expressly declined to adopt a 'void ab initio exception' to the Rooker-Feldman doctrine." Clerk MTD Reply at 6 (citing Tso v. Murray, 822 F. App'x 697, 701 (10th Cir. 2020)(unpublished)) . The Clerk Defendants assert that the Plaintiffs "are not seeking money damages but rather an equitable disgorgement of court fines, fees, and costs paid as a result of their allegedly invalid criminal convictions." Clerk MTD Reply at 6.

Third, the Clerk Defendants contend that the Court should dismiss the Plaintiffs' declaratory relief claim, because, contrary to the Plaintiffs' own assertion, the Plaintiffs "have not sought any sort of prospective relief to enjoin such future prosecution in the Complaint," but rather seek only "the return of court ordered fines, fees, and costs allegedly paid for past prosecution." Clerk MTD Reply at 6.  According to the Clerk Defendants, the Plaintiffs' declaratory relief claim is retrospective, because it requests that the Court "declare the [Clerk] Defendants' past actions" to be "unlawful and without jurisdiction." Clerk MTD Reply at 7.  The Clerk Defendants argue, therefore, that the Eleventh Amendment bars the Plaintiffs' declaratory relief claim.  See Clerk MTD Reply at 7.

Fourth, the Clerk Defendants maintain that the Court should dismiss the Plaintiffs' State law claims against the Clerk Defendants.  See Clerk MTD Reply at 7.  The Clerk Defendants state that the Plaintiffs do not allege sufficient factual allegations to state a plausible money-had-and-received claim, because the Plaintiffs "are not the actual holders of the court fines, fees or costs allegedly paid by Plaintiffs."  Clerk MTD Reply at 8.  Moreover, the Clerk Defendants allege that the Plaintiffs' claims are an impermissible collateral attack on the Plaintiffs' convictions, and that the Plaintiffs are required to seek post-conviction relief before they can sue for damages in the

form that they have brought in the claims here.  See Clerk MTD Reply at 8.  The Clerk Defendants state that McGirt, 140 S. Ct. at 2479 "clearly indicates that Plaintiffs must seek appellate or post-conviction review" rather than suing for damages.  Clerk MTD Reply at 8.  Next, the Clerk Defendants reiterate their contention that the OGTCA bars the Plaintiffs claims, and that the Plaintiffs' reliance on Sholer is unavailing, because the Plaintiffs do not address the Clerk Defendants' attempt to distinguish Sholer, and that the Clerk Defendants' argument "should be deemed conceded and the claim dismissed."  Clerk MTD Reply at 9.  Finally, the Plaintiffs maintain the laches, waiver, estoppel, and unclean hands doctrines bar the Plaintiffs' claims.  See Clerk MTD Reply at 9-10.

### 13.   Edwards MTD.

Edwards asks the Court to dismiss the Plaintiffs' case under rule 12(b)(1) and rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Edwards MTD at 11.  Edwards argues that the Court does not have subject-matter jurisdiction over the Plaintiffs' claims and that the Plaintiffs "otherwise" do not state a claim upon which relief can be granted.  Edwards MTD at 11.  Edwards states that the Court should apply the "'no set of facts'" pleading standard.  Edwards MTD at 14 (quoting Dubbs v. Head Start, Inc., 336 F.3d 1194, 1201 (10th Cir. 2003)).  Edwards then makes five arguments in favor of the Court dismissing the Plaintiffs' case.  See Edwards MTD at 5-22.

First, Edwards asserts that she is entitled to Eleventh Amendment immunity, because district court clerks in Oklahoma "act as arms of the state" with respect to "their ministerial court duties."  Edwards MTD at 15.  Edwards alleges that, under Oklahoma law, a court clerk acts as an arm of the state "when acting as a bursar for the district court."  Edwards MTD at 15 (citing N. Side State Bank v. Bd. of Cnty. Comm'rs of Tulsa Cnty., 894 P.2d 1046 (Okla. 1994)).  Edwards notes that Eleventh Amendment immunity "applies not only to a state but also to an entity that is

an arm of the state."  Edwards MTD at 16 (citing Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002)).  Edwards states that a court clerk in Oklahoma "serves as 'judicial personnel' for purposes of collecting court costs and fees" and that, as a result, Edwards, "in her official capacity, is entitled to Eleventh Amendment immunity with respect to Plaintiffs' § 1983 claim for damages." Edwards MTD at 16 (no citation for quotation)(citing Speight v. Presley, 203 P.3d at 173).

Second, Edwards argues that the Court does not have subject-matter jurisdiction over the Plaintiffs' claims, because the Rooker-Feldman doctrine bars the Plaintiffs' claims, and because the Court must abstain under Younger.   See Edwards MTD at 17.   Edwards suggests that Rooker-Feldman "applies to complaints seeking review and rejection of a state court judgment, such as where a plaintiff 'allege[s] that a defect in the state court proceeding invalidate[s] the state judgment' or where a plaintiff alleges violations of constitutional rights by the state court itself." Edwards MTD at 17 (quoting Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Trust Mortg. Pass-Through Certificates, Series 2006-4, 880 F.3d 1169, 1175 (10th Cir. 2018("Mayotte")).   According to Edwards, this case "fits precisely" within Rooker-Feldman's scope, because the Plaintiffs "argue that the state court-judgments were wrongfully entered and seek an order from this Court declaring said judgments to be 'void,'" and "seek damages caused by those judgments in the form of an order requiring Defendants to reimburse them for the fees and costs demanded by those judgments."  Edwards MTD at 18 (quoting Complaint at 21).  In addition, Edwards argues that the Court must abstain under Younger, because "there are ongoing state criminal proceedings related to each of the plaintiffs, at least insofar as each plaintiff has a right to seek redress in their individual pursuant to" OUPCPA.  Edwards MTD at 20.  Edwards alleges that Oklahoma State courts offer an "adequate forum to hear plaintiffs' claims," because the Plaintiffs "can make their subject matter jurisdiction and disgorgement argument there."

Edwards MTD at 10.  Moreover, Edwards contends that the State proceedings at issue "involve important state law policies, as 'state criminal proceedings are viewed as a traditional area of state concern.'"  Edwards MTD at 21 (quoting Winn v. Cook, 945 F.3d 1253, 1258 (10th Cir. 2019)).

Third, Edwards contends that the Plaintiffs do not allege sufficient facts to state a claim against Edwards in her official capacity.  See Edwards MTD at 21.  Edwards argues that the Plaintiffs do not state "*any* constitutional violation caused by" Edwards, and do not allege "that she, in fact, retains the funds at issue for purposes of Plaintiffs' state law" money-had-and-received claim.  Edwards MTD at 21 (emphasis in original).  Next, Edwards asserts that Heck bars the Plaintiffs' claims, because, before the Plaintiffs can "seek damages for harms caused by alleged unlawful state court convictions, they must show that the convictions or sentences have been declared invalid by a state tribunal authorized to make that determination."  Edwards MTD at 22.  Edwards alleges that the Plaintiffs have not pursued any postconviction relief in the Oklahoma state court system.  See Edwards MTD at 23.  According to Edwards, even if Heck does not bar the Plaintiffs' claims, the Plaintiffs nevertheless do not state a claim for relief, because, to state a § 1983 claim against a county government, a plaintiff "must show that a municipal policy or custom was the moving force behind the constitutional deprivation of a right secured by the constitution or laws of the United States."  Edwards MTD at 23 (citing Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. at 658).  Edwards alleges that the Plaintiffs do not "identify any violation of their due process rights that can be remedied under § 1983 as against . . . Edwards," because: (i) the Plaintiffs do not show that their injuries are related to Edwards' final policymaking authority; (ii) the Plaintiffs do not allege sufficient facts to create a procedural due process claim; and (iii) the Plaintiffs do not allege sufficient facts to state a substantive due process claim.  Edwards MTD at 24.  In addition, Edwards argues that the Court should dismiss the Plaintiffs' declaratory relief

claim, because the Plaintiffs have not pursued postconviction relief in State court, and "it would be anomalous for the Court to preemptively issue an advisory opinion on the status of the Cherokee reservation." Edwards MTD at 27. According to Edwards, the Plaintiffs' requested declaratory relief would imply that their State convictions are invalid, and the Tenth Circuit concludes that, if Heck bars a § 1983 claim, then "a related request for declaratory relief should also be dismissed." Edwards MTD at 27 (citing Archilita v. Oklahoma, 123 F. App'x 852, 856-67 (10th Cir. 2005)(unpublished); Lawson v. Engleman, 67 F. App'x 524, 526 n.2 (10th Cir. 2003)(unpublished); Wilkinson v. Dotson, 544 U.S. 74, 82 (2005)). Moreover, Edwards contends that the Plaintiffs' requested declaratory relief is retrospective and that, as a result, the Eleventh Amendment bars the requested declaratory relief. See Edwards MTD at 28.

Fourth, Edwards argues that the Court should not exercise supplemental jurisdiction over the Plaintiffs' State law claims, because the Plaintiffs do not state a federal claim. See Edwards MTD at 29. Fifth, and relatedly, Edwards argues that the Court should dismiss the Plaintiffs' money-had-and-received claim, because: (i) the OGCTCA bars the claim; (ii) the Plaintiffs do not comply with Oklahoma's fee protest statute, Okla. Stat. tit. 62 § 206(A); and (iii) the Plaintiffs do not identify the amount in which the Defendants have been unjustly enriched or allege that Edwards holds a sum certain. See Edwards MTD at 30-31. In addition, Edwards suggests that, in Oklahoma, "a party cannot pursue a civil claim that, in essence, amounts to a collateral attack on a criminal judgment," meaning that, here, the Plaintiffs' money-had-and-received claim is barred. Edwards MTD at 31. Further, Edwards contends that equitable principles bar the Plaintiffs' State law claims. See Edwards MTD at 32. Accordingly, Edwards requests that the Court dismiss the Plaintiffs' claims. See Edwards MTD at 32.

14.   **Edwards MTD Response**.

The Plaintiffs respond to the Edwards MTD, asserting that, in a rule 12(b)(6) motion, "a defendant cannot legitimately claim the elements of a claim or relief are not properly plead, when only notice pleading is required." Plaintiffs' Response to Motion to Dismiss and Brief in Support of Defendant Cathi Edwards, Court Clerk of Rogers County, in her Official Capacity at 9, filed October 8, 2020 (Doc. 79)("Edwards MTD Response"). The Plaintiffs contend that "[t]his is a case where necessarily this court must retain the case to correct past abuses that occurred under color of state law, and to prevent abuses because the Defendants will each employ their own, separate interpretations of the McGirt and Murphy decisions." Edwards MTD Response at 32-33. In the Edwards MTD Response, the Plaintiffs make twenty arguments.

First, the Plaintiffs argue that the Eleventh Amendment does not grant immunity to the Defendants, because the Plaintiffs sue Edwards in her official capacity, and a court clerk is "locally elected" and "like Sheriffs." Edwards MTD Response at 9. In addition, the Plaintiffs note that § 1983 claims are "specifically directed against abuse of a public office by the officials holding the office," and that the Plaintiffs' claims are "brought against the office of the court clerk and in their official capacities for violations of federal law." Edwards MTD Response at 11. According to the Plaintiffs, neither the Eleventh Amendment, judicial immunity, nor quasi-judicial immunity bars actions against State official, like court clerks, "acting in their official capacities, performing ministerial acts." Edwards MTD Response at 3.

Second, the Plaintiffs argue that § 1983 allows "all claims" for equitable relief. Edwards MTD Response at 12-13. Third, the Plaintiffs state that disgorgement is "an equitable remedy for which a court has broad authority." Edwards MTD Response at 13. Fourth, according to the Plaintiffs, Edwards is not entitled to sovereign immunity, because the "Eleventh Amendment does

not bar individual liability for violations of federal law by individuals performing their state duties under color of state law." Edwards MTD Response at 14-15. Fifth, the Plaintiffs argue that the Court cannot extend immunity "to the point of repealing the Civil Rights Act," because § 1983 claims require "an act of state officers." Edwards MTD Response at 15. Sixth, the Plaintiffs contend that the Defendants have the burden to prove that "the common law immunity they claim has been incorporated into § 1983 when it was enacted." Edwards MTD Response at 17. Seventh, the Plaintiffs argue that absolute immunity is "rare" and qualified immunity is "the norm." Edwards MTD response at 10. Eighth, the Plaintiffs state that Ex Parte Young does not bar their equitable disgorgement claims, because Ex Parte Young allows for suits against State officials in their official capacity. See Edwards MTD Response at 19. Ninth, according to the Plaintiffs, a judge can be sued for "failing to act in his/her judicial capacity and when that person has acted in the absence of all jurisdiction," because a judge in that scenario is not entitled to immunity. Edwards MTD Response at 21. Tenth, the Plaintiffs argue that Younger abstention does not apply, because there are no ongoing State criminal proceedings, and because Younger "has nothing to do with the instant lawsuit against" Edwards. Edwards MTD Response at 23. Eleventh, the Plaintiffs allege that liability under § 1983 is based on a tort theory that holds a person responsible for his or her acts' natural consequences, meaning that "everyone in the chain of wrongdoers is liable for depriving the Plaintiffs of their rights to due process of law." Edwards MTD Response at 24. Moreover, the Plaintiffs assert that, under § 1983, "all persons involved, or who set in motion a series of acts that results in a deprivation of ones [sic] rights, has liability whether or not they directly participated." Edwards MTD Response at 25 (citing Miller v. City of Mission, Kan., 705 F.2d 368, 275 (10th Cir. 1983)). The Plaintiffs allege that the "court clerks are necessarily involved in depriving the Plaintiffs of their rights by collecting the court costs, fines and other fees from the

wrongly prosecuted Plaintiffs." Edwards MTD Response at 25.

Twelfth, the Plaintiffs argue that they have standing, because "it is common sense that" ten to fifteen percent of "citations issues by law enforcement were issued to Indians on the Cherokee Reservation" and that "[e]very dollar paid to the court clerk by a member of the class would be a reason that the Plaintiffs and the Plaintiff Class have standing in this case." Edwards MTD Response at 26. Thirteenth, the Plaintiffs maintain that the Rooker-Feldman doctrine does not apply, because there is "no appeal of a state court judgment nor is there *de facto* appeal of a state court judgment," because the judgments that the Plaintiffs contest are not valid judgments. Edwards MTD Response at 27. Fourteenth, the Plaintiffs assert that they are entitled to declaratory relief, because they are "not seeking a declaration that would establish *liability*," but a ruling "that would entitle them to a disgorgement from the Defendants of the monies taken when they lacked the subject matter and personal jurisdiction to collect these monies." Edwards MTD Response at 27 (emphasis in Edwards MTD Response). According to the Plaintiffs, this declaratory relief is not retroactive. See Edwards MTD Response at 27. Fifteenth, the Plaintiffs maintain that they state a money-had-and-received claim, because "only notice pleadings is required." Edwards MTD Response at 28. Sixteenth, the Plaintiffs argue that the OGTCA does not apply, because they Plaintiffs do not seek damages "arising in 'tort.'" Edwards MTD Response at 29 (no citation for quotation). Moreover, the Plaintiffs argue that Oklahoma's fee protest statute, Okla. Stat. tit. 62 § 206(A), does not apply. See Edwards MTD Response at 30 (citing Sholer, 945 P.2d at 478). Seventeenth, the Plaintiffs contend that they do not need to seek postconviction relief to obtain relief here, because that "makes no sense when the United States Supreme Court has already ruled that if the Plaintiffs' crimes occurred in Indian Country and the Plaintiffs were 'Indian' the state or its political subdivisions would have no jurisdiction." Edwards MTD Response at 30-31 (no

citation for quotation).  Eighteenth, the Plaintiffs assert that equitable principles, like the unclean hands doctrine, do not bar their claims, because those doctrines "are fact based inquiries that cannot be granted in a 12(b)(6) motion."  Edwards MTD Response at 31.  Nineteenth, the Plaintiffs assert that the Court should estop the Clerk Defendants from denying the Cherokee Reservation's existence or knowing of the Cherokee Nation's existence.  See Edwards MTD Response at 31-32.  Twentieth, and finally, the Plaintiffs ask that, if the Court dismisses the Complaint, the Court grant it leave to amend its Complaint.  See Edwards MTD Response at 32.

### 15.    Edwards MTD Reply.

Edwards replies to the Plaintiffs and maintains that the Court should dismiss the Plaintiffs' claims.  See Reply Brief of Defendant Cathi Edwards in Support of her Motion to Dismiss, filed October 22, 2020 (Doc. 89)("Edwards MTD Reply").  In the Edwards MTD Reply, Edwards makes eight arguments.  See Edwards MTD Reply at 1-4.  First, Edwards argues that she is an arm of the state and has Eleventh Amendment immunity "with regard to *her ministerial court duties*."  Edwards MTD Reply at 2 (emphasis in Edwards MTD Reply).  Second, Edwards argues that Ex Parte Young does not apply, because the Plaintiffs do not seek prospective relief and do not identify an ongoing federal law violation.  See Edwards MTD Reply at 2-5.  Third, Edwards suggests that the Rooker-Feldman doctrine bars the Plaintiffs' claims, even if the Plaintiffs' State court judgments are void.  See Edwards MTD Reply at 5.  Fourth, Edwards maintains that Heck bars the Plaintiffs' claims and that the Court should "deem this point conceded."  Edwards MTD Reply at 7.  Fifth, according to Edwards, the Court must abstain under Younger, because "any orders entered by this Court would have preclusive effects on state court proceedings."  Edwards MTD Reply at 7.  Sixth, Edwards states that the Plaintiffs do not address their argument that, "when pleading a constitutional violation against a state official, only those officials with 'final

policymaking authority' can subject a governmental entity to liability."  Edwards MTD Reply at 8 (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 125 (1988)).  Edwards argues that the Plaintiffs do not identify any facts "showing that Defendant Edwards violated Plaintiffs' constitutional rights."  Edwards MTD Reply at 8.  Seventh, Edwards contends that the Plaintiffs are not entitled to a declaratory judgment, because the Plaintiffs do not identify "sufficient facts to justify an advisory opinion on whether the Cherokee Nation has been disestablished" and do not point to "any violation of any federal right by" Edwards.  Edwards MTD Reply at 9.  Eighth, according to Edwards, the Plaintiffs do not address Edwards' OGTCA arguments, and the OGTCA applies.  See Edwards MTD Reply at 9.  Moreover, Edwards alleges that Sholer is distinguishable, that Oklahoma's fee protest statute, Okla. Stat. tit. 62 § 206(A), applies for the same reason, and that the Plaintiffs do not plead the elements of a money-had-and-received claim.  See Edwards MTD Reply at 9-11.

  **16. Newberry MTD.**

  Newberry asks the Court to dismiss the Plaintiffs' claims against him.  See Newberry MTD at 9.  Newberry contends that the Court should dismiss the Plaintiffs' claims against him under rule 12(b)(1) and rule 12(b)(6) "on the grounds that he is an improper party in his county capacity, this Court lacks subject-matter jurisdiction, and Plaintiffs' Complaint fails to state a claim upon which relief can be granted."  Newberry MTD at 9.  Newberry argues that the Plaintiffs' only allegation against him is that he "'collected monies from Tribal members that were assessed by the Court as a fine, a court cost, or other fees.'"  Newberry MTD at 10 (quoting Complaint ¶ 93, at 21).  Newberry states that the Plaintiffs do not allege that "any of the Plaintiffs were prosecuted in Tulsa County," or that the "Plaintiffs paid any money to Newberry or one of his deputy clerks."  Newberry MTD at 10.  Newberry makes six arguments.  See Newberry MTD at 4-23.

First, Newberry argues that the Plaintiffs cannot hold Tulsa County liable for Newberry's acts when Newberry "functions as the State Court's bursar."  Newberry MTD at 12.  Newberry argues that, when he and his deputies collect fines, fees, and costs, they do so "under the administrative and supervisory control of the Presiding Judge of the judicial administrative district, and ultimately, the Chief Justice of the Supreme Court."  Newberry MTD at 13.  According to Newberry, his actions "confirm the legal principle that a court clerk is 'both a county officer and an officer or "arm" of the court.'"  Newberry MTD at 14 (quoting Speight v. Presley, 203 P.3d at 177 (quoting Petuskey v. Cannon, 742 P.2d 1117 (Okla. 1987))).  Newberry argues, therefore, that Tulsa County "is not responsible for the actions of Newberry or his deputies when they collect money from those convicted of state law violations as neither a county actor nor county policy was the moving cause of the harm alleged."  Newberry MTD at 15.

Second, Newberry argues that he is entitled to Eleventh Amendment immunity.  See Newberry MTD at 15.  Newbery alleges that he is a State actor when he works as the State court's bursar and that, as a result, he is immune from suit in federal court, because a "judgment against a government official in his official capacity is a judgment against the entity that the official represents."  Newberry MTD at 15.  Newberry contends that he is not a person subject to suit under § 1983.  See Newberry MTD at 16.

Third, Newberry suggests that Rooker-Feldman bars the Plaintiffs' claims.  See Newberry MTD at 16.  Newberry contends that the Plaintiffs ask the Court for a declaration that orders the Plaintiffs' convictions or deferred adjudication "to be overturned so that they can receive money from the State of Oklahoma."  Newberry MTD at 16.  Newberry argues that the Plaintiffs' convictions are "necessarily intertwined with the judgment of the state court, as they are one and the same," meaning that Rooker-Feldman bars the claims.  Newberry MTD at 16.

Fourth, Newberry argues that the Plaintiffs are not entitled to declaratory relief, because the Ex Parte Young exception to Eleventh Amendment immunity cannot be used to seek retrospective relief that "would void past criminal violations."  Newberry MTD at 17.  Fifth, Newberry contends that the Plaintiffs do not allege sufficient facts to state a claim against Newberry, because Tulsa County "did not maintain a constitutionally deficient policy that caused Plaintiffs' alleged harms nor have Plaintiffs pled sufficient fact to show that Newberry acted with deliberate indifference."  Newberry MTD at 17.  Further, Newberry states that Heck bars the Plaintiffs' claims, because the Plaintiffs "request a declaration which voids their criminal judgments," and argues that Newberry is entitled to quasi-judicial immunity, because Newberry's actions are "intertwined with the judicial process."  Newberry MTD at 23.

Sixth, Newberry lists four reasons that the Court should dismiss the Plaintiffs' State law money-had-and-received claim.  See Newberry MTD at 23-31.  First, Newberry contends that the Plaintiffs do not allege that Newberry's duties in collecting fines, fees, and costs are discretionary, and Newberry acts as an arm of the State when collecting that money.  See Newberry MTD at 32-24.  Second, Newberry states that equitable considerations, including laches, the voluntary pay doctrine, and unclean hands, bar the Plaintiffs' claim.  See Newberry MTD at 25-27.  Third, according to Newberry, the Plaintiffs can obtain relief only if they obtain an order overturning their convictions, which they can do by suing under the OUPCA.  See Newberry MTD at 27.  Fourth, Newberry contends that the Plaintiffs do not comply with the OGTCA and that whether the OGTCA "applies to an action presents a jurisdictional question for the court."  Newberry MTD at 29.  Accordingly, Newberry requests that the Court dismiss all of the Plaintiffs' claims against Newberry.  See Newberry MTD at 31.

17.    **Newberry MTD Response.**

The Plaintiffs respond to the Newberry MTD, arguing that the Court should not dismiss their claims against Newberry.  See Plaintiffs' Response to Motion to Dismiss and Brief in Support of Defendant Don Newberry, Court Clerk of Tulsa County, In His Official Capacity, filed October 8, 2020 (Doc. 80)("Newberry MTD Response").  In the Newberry MTD Response, the Plaintiffs make all the same arguments that the Plaintiffs make in their Edwards MTD Response, with one exception.  See Newberry MTD Response at 9-35.  In the Newberry MTD Response, the Plaintiffs do not make an argument about Younger abstention.  See Newberry MTD Response at 9-35.  The Plaintiffs conclude by asserting that they "have plead sufficient facts to defeat the FCRP 12(b)(6) motion to dismiss."  Newberry MTD Response at 35.

18.    **Newberry MTD Reply.**

Newberry replies to the Plaintiffs, maintaining that the Court should dismiss the Plaintiffs' claims against him under rules 12(b)(1), 12(b)(6), and 21 of the Federal Rules of Civil Procedure.  See Defendant Don Newberry's Reply to Plaintiffs' Response to His Motion to Dismiss, filed October 22, 2020 (Doc. 90)("Newberry MTD Reply").  Newberry reiterates that the Plaintiffs do not "demonstrate that Tulsa County is a proper party to this suit."  Newberry MTD Reply at 1.  In the Newberry MTD Reply, Newberry makes five arguments.  See Newberry MTD Reply at 2-10.

First, Newberry notes that the Plaintiffs state the wrong standard of review.  See Newberry MTD Reply at 2.  Second, Newberry argues that Tulsa County is not a proper party, because Oklahoma law establishes that "a court clerk acts as an arm of the state district court when he performs ministerial court functions."  Newberry MTD Reply at 3.  Moreover, Newberry alleges that the Plaintiffs "do not and cannot allege that Newberry's duties in colleting fines, fees, and costs set forth by judicial order and state stature, are discretionary."  Newberry MTD Reply at 4.

Newberry asserts that the Plaintiffs "aren't allowed" to subject the Defendants "to the federal judicial system, while they pray for some unnamed person to sign on and fill a gaping hole in their suit."   Newberry MTD Reply at 5.   Third, Newberry argues that he is entitled to Eleventh Amendment immunity and quasi-judicial immunity, because the Plaintiffs sue Newberry in his official capacity.   See Newberry MTD Reply at 5.   Fourth, according to Newberry, the Plaintiffs need to seek post-conviction relief in State court, because their criminal convictions are not void ab initio.   See Newberry MTD Reply at 8-9.   Fifth, Newberry asserts that the Plaintiffs do not state a claim under any valid theory, because he is immune, the Plaintiffs seek retrospective relief, the Plaintiffs do not address "how Newberry can be liable for money had and received when he acted solely as an agent (cashier) for the State of Oklahoma," the Plaintiffs "cannot articulate why Plaintiffs' state law claims are not torts and lie outside of" OGTCA, and the Plaintiffs assert incorrectly that equitably affirmative defenses cannot be decided at the motion to dismiss stage. Newberry MTD Reply at 9-10.

### 19.   <u>Owasso MTD</u>.

Owasso moves to dismiss the Plaintiffs' Complaint under rules 12(b)(1) and 12(b)(6).   <u>See</u> Owasso MTD at 6.   Owasso argues that the Court does not have subject-matter jurisdiction over the Plaintiffs' claims and that the Plaintiffs do not state a claim upon which relief can be granted. <u>See</u> Owasso MTD at 6.   Owasso requests that the Court dismiss the Plaintiffs' Complaint with prejudice so the Plaintiffs cannot amend their Complaint.   <u>See</u> Owasso MTD at 6.   Owasso notes that the Plaintiffs filed their Complaint seven working days after the Supreme Court decided <u>McGirt</u> and that the Plaintiffs are "rush[ing] to use <u>McGirt</u> as the means to convert their traffic citations into winning lottery tickets, to be redeemed by this Court."   Owasso MTD at 6.

Owasso makes six arguments.   <u>See</u> Owasso MTD at 8-21.   First, Owasso argues that the

Plaintiffs do not have standing to assert claims against Owasso, because "[n]one of the named Plaintiffs allege any personal connection or injury arising out of the actions or inactions of Owasso." Owasso MTD at 8. According to Owasso, when "representative plaintiffs sue multiple defendants on behalf of a class, the representatives must still have standing to pursue each claim against each defendant." Owasso MTD at 8 (citing James v. City of Dallas, 254 F.2d 551, 563 (5th Cir. 2001)). Owasso argues that the Plaintiffs do not allege that Owasso "or 43 other Defendants" ever caused the Plaintiffs harm. Owasso MTD at 10.

Second, Owasso contends that the Court does not have subject-matter jurisdiction to declare the Plaintiffs' State court judgments and municipal court judgments void, because the Rooker-Feldman doctrine bars the Plaintiffs' claims. See Owasso MTD at 11. Third, Owasso alleges that Heck bars the Plaintiffs' § 1983 claims, because the Plaintiffs do not "establish that their respective state and municipal conviction or sentences were either reversed to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Owasso MTD at 15. Fourth, Owasso suggests that the OGTCA bars the Plaintiffs' claims, because it entitles Owasso to sovereign immunity, and because the Plaintiffs do not comply with the OGTCA's notice requirements. See Owasso MTD at 16-17.

Fifth, Owasso asserts that the Curtis Act bars the Plaintiffs' claims, because "the Curtis Act unequivocally says cities and towns may adopt and enforce municipal ordinances," meaning that the Plaintiffs' "claims against Owasso cannot survive." Owasso MTD at 18. The Plaintiffs argue that the Curtis Act abolished all Tribal courts, and Curtis Act § 14 "empowered the inhabitants of any city or town in Indian Territory to incorporate, and provided that 'the city or town government . . . shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas.'" Owasso MTD at 18 (quoting Curtis Act § 14, 30 Stat.

499).  The Plaintiffs argue that the Cherokee Nation was "the last of the Five Tribes to enter into an allotment agreement with the federal government," codified as the Act of July 1, 1902, 32 Stat. 716, and that the allotment agreement expressly preserved Curtis Act § 14.  Owasso MTD at 18. According to Owasso, references to Arkansas were, in the Oklahoma Enabling Act, 34 Stat. 267 (1906), later replaced with references to Oklahoma.  See Owasso MTD at 19.

Sixth, Owasso argues that the Plaintiffs must seek postconviction relief through the OUPCPA before seeking damages.  See Owasso MTD at 20.  Owasso alleges that the Plaintiffs' "failure to seek -- let alone obtain -- any type of appellate or post-conviction relief is fatal to their claims."  Owasso MTD at 20.  Owasso notes that the Plaintiffs "do not allege they were prevented from asserting the municipal courts' lack of jurisdiction because of their tribal membership." Owasso MTD at 20.  Moreover, Owasso asserts that res judicata and collateral estoppel bars the Plaintiffs' claims, because the Plaintiffs "are asking this court to find their criminal convictions invalid based on a lack of jurisdiction."  Owasso MTD at 21.

**20.  <u>Owasso MTD Response</u>.**

The Plaintiffs respond to the Owasso MTD, arguing that the Court should not dismiss their claims.  See Plaintiffs' Response to Defendant City of Owasso's Motion to Dismiss, filed November 12, 2020 (Doc. 94)("Owasso MTD Response").  The Plaintiffs indicate that they "merely ask the Court to look at the same statutes and evidence regarding the Cherokee Indians explained in <u>McGirt</u> and similarly find the Cherokee boundaries were never disestablished by Congress."  Owasso MTD Response at 7-8.  According to the Plaintiffs, a "federal court" is necessary "so only one decision can be rendered instead of having every one of the 48 Defendants separately rule and there be potentially 48 separate appeals."  Owasso MTD Response at 8.

In the Owasso MTD Response, the Plaintiffs make nine arguments.  See Owasso MTD

Response at 8-25.  First, the Plaintiffs assert that they have standing, because "it is common sense that the same percentage of citations issued by law enforcement were issued to Indians on the Cherokee Reservation," and "[e]very dollar paid to those municipalities, including the City of Owasso, by a member of the class would be a reason that the Plaintiffs and the Plaintiff Class have standing to proceed with this case."  Owasso MTD Response at 13-14.  Second, the Plaintiffs argue that Rooker-Feldman does not bar their claims, because McGirt "was a direct appeal on a *writ of certiorari* from the Oklahoma Court of Criminal Appeals."  Owasso MTD Response at 9 (emphasis in original).  Third, the Plaintiffs assert that Heck does not bar their claims, because "[t]his is not a damages lawsuit, but a claim for equitable disgorgement of ill-gotten gains."  Owasso MTD Response at 16.  Fourth, according to the Plaintiffs, the OGTCA does not apply, because "refunds do not fall in the realm of tort."  Owasso MTD Response at 16 (citing Sholer, 945 P.2d at 479).  Fifth, the Plaintiffs argue that the Curtis Act does not bar their recovery, because the Curtis Act did not "give the towns the ***authority*** to ***prosecute*** the Indians for violating" the "laws of Arkansas."  Owasso MTD Response at 18 (emphasis in original).  The Plaintiffs assert that "whatever the Curtis Act did . . . it did *not* change the boundaries of the reservation and the United States Supreme Court found that at no time did the State of Oklahoma have jurisdiction over crimes not covered by the Major Crimes Act," meaning that, if the State does not have jurisdiction, "its political subdivisions cannot be said to have more jurisdiction than it does."  Owasso MTD Response at 20 (emphasis in original).

Sixth, the Plaintiffs assert that are not required to obtain postconviction relief before pursuing their claims here, because that "makes no sense when the United States Supreme Court has already ruled that if the Plaintiffs' crimes occurred in Indian Country and the Plaintiff was an 'Indian' the state would have no jurisdiction."  Owasso MTD Response at 20 (no citation for

quotation).   Further, the Plaintiffs cite <u>Nelson v. Colorado</u>, 137 S. Ct. 1249 (2017), for the proposition that "post conviction relief is not required to achieve a refund for fines and fees." Owasso MTD Response at 21.  The Plaintiffs state that they are not seeking to have the State change its records to reflect that the Plaintiffs were not convicted, but instead seek refunds of the "monies that have been paid pursuant to judgments that are void ab initio as a result of a lack of jurisdiction of the courts of this state or its political subdivision."  Owasso MTD Response at 22.

Seventh, the Plaintiffs reiterate their proposed alternate theory of recovery, arguing that Justice Lavender asserted in <u>Sholer</u> that "the better cause of action against the state would be an unjust enrichment claim."  Owasso MTD Response at 17 (citing <u>Sholer</u>, 945 P.2d at 479).  Eighth, the Plaintiffs contend that the Court should estop Owasso from denying either the Cherokee Reservation's existence or knowledge of the Cherokee Reservation's existence.  <u>See</u> Owasso MTD Response at 23.  Ninth, the Plaintiffs restate their argument that, if the Court grants the Owasso MTD, the Court should permit the Plaintiffs to amend their Complaint.  <u>See</u> Owasso MTD Response at 25.

### 21.    **Owasso MTD Reply**.

Owasso replies to the Plaintiffs, maintaining that the Court does not have subject-matter jurisdiction over the Plaintiffs' claims and that the Plaintiffs do not state a claim upon which relief can be granted.  <u>See</u> Reply in Support of City of Owasso's Motion to Dismiss and Brief in Support, filed December 1, 2020 (Doc. 95)("Owasso MTD Reply").  Owasso makes six arguments.  <u>See</u> Owasso MTD Reply at 2-11.  First, Owasso argues that the Plaintiffs do not have standing to assert claims against Owasso.  <u>See</u> Owasso MTD Reply at 2-3.  Second, Owasso contends that <u>Rooker-Feldman</u> bars the Plaintiffs' claims.  <u>See</u> Owasso MTD Reply at 3-5.  Third, Owasso maintains that <u>Heck</u> bars the Plaintiffs' claims, because the Plaintiffs ask that the Court conclude that their

State court convictions are invalid.  See Owasso MTD Reply at 5-6.  Fourth, according to Owasso, the Plaintiffs "underplay" the OGTCA's breadth, and the OGTCA bars the Plaintiffs' unjust enrichment claims.  Owasso MTD Reply at 6.  Fifth, Owasso alleges that the Plaintiffs cannot around the Curtis Act, because the Plaintiffs "cannot identify any case law or Congressional act to directly support their position that the plain language of Section 14 does not apply here."  Owasso MTD Reply at 9.  Sixth, Owasso asserts that McGirt does not "grant Plaintiffs the right to ignore Oklahoma's post-conviction procedural requirements."  Owasso MTD Reply at 10.

**22.    March 16, 2022, Hearing.**

The Court held a hearing on March 16, 2022.  See March 16 Clerk's Minutes at 1.  The hearing began with the Court indicating that the best way to proceed is to take each motion to dismiss in turn.  See Transcript of Hearing at 5:22-6:16, taken March 16, 2022 ("March 16 Tr.")(Court).[10]  The Court noted that it is approaching the issues thinking that Rooker-Feldman likely applies and bars the Plaintiffs' claims, because "if we were in a situation where the cases were pending, for example in state court," the Plaintiffs could raise their arguments in State court and, if the State courts do not grant them their requested relief, then the Plaintiffs may take them to the Supreme Court of the United States.  March 16 Tr. at 6:23-25 (Court).  The Court stated that "a good chunk, 50 percent maybe of the briefing in this is devoted to the state law issues," which suggests that "it should remain in the state system."  March 16 Tr. at 7:23-8:1 (Court).  Further, the Court noted that the Plaintiffs have an "[up]hill battle on the clearly established prong for the 1983 claims to go forward."  March 16 Tr. at 8:5-6 (Court).

---

[10]The Court's citations to the transcript of the March 16 hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

The District Court Defendants began their argument, asserting that they have immunity under the Eleventh Amendment, because "the judges are state employees, they are elected state officials" and the State district courts "don't even exist" and are "a fiction for judicial district purposes." March 16 Tr. at 9:4-12 (Moore). The District Court Defendants asserted that Monell, therefore, does not apply, because the District Court Defendants are "not political subdivisions." and "these are official capacity claims and you can't sue the state directly." March 16 Tr. at 10:8-12 (Moore). The District Court Defendants stated that the Eleventh Amendment "covers all the relief" that the Plaintiffs are requesting, including damages and declaratory relief, because the Plaintiffs "have never said they want individual damages" and instead "want money from the state treasury." March 16 Tr. at 11:2-13 (Moore). According to the District Court Defendants, the Eleventh Amendment issue and the rule 12(b)(6) issue "go together." March 16 Tr. at 11:17 (Moore).

Next, the DA Defendants echoed the District Court Defendants' arguments and asserted that they are "considered the state itself," because they are acting "in their official capacity" and are "arms of the state." March 16 Tr. at 12:15-20 (Weaver)(citing Will v. Mich. Dep't of State Police, 491 U.S. at 58). The Court noted that whether a defendant is sued in his or her official capacity does not matter for Eleventh Amendment immunity, and stated that "it really depends on how Oklahoma sets up its" district attorneys and whether Oklahoma considers individual district attorneys to be "arms of the state or arms of the county." March 16 Tr. at 12:24-13:2 (Court). The DA Defendants asserted that they are arms of the State. See March 16 Tr. at 13:3-4 (Weaver)(citing Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151 (10th Cir. 2001)).

The Clerk Defendants contended that they are in a unique position under State law, because they are "elected as county officials," but Oklahoma State law established that "when the court

clerk is acting as the arm of the district court, which is a state office, that the court clerks are acting as . . . state officials in their official capacity." March 16 Tr. at 15:2-7 (Poe).  The Clerk Defendants asserted that, when they are collecting "monies that have been imposed either under fees or nay type of court costs, they are acting on behalf of the state of Oklahoma as such they are state employees" and, therefore, have Eleventh Amendment immunity.  March 16 Tr. at 16:5-8 (Poe). In response to the Court's question, the Clerk Defendants clarified that Oklahoma State law, not federal law, says that the Clerk Defendants have dual roles as county officials and State officials, depending on their work.  See March 16 Tr. at 16:19-17:1 (Court, Poe).  Edwards then stated that the same Eleventh Amendment arguments apply to her that apply to the Clerk Defendants.  March 16 Tr. at 17:8-15 (Free).  Newberry then directed the Court's attention to Bishop v. Oklahoma, 33 F. App'x 361 (10th Cir. 2009)(unpublished), and argued that "a district court clerk in Oklahoma is judicial personnel" and "an arm of the court whose duties are ministerial."  March 16 Tr. at 18:5-7 (Shouse).  Newberry contended that it is "unquestioned that collecting fines, fees[,] and costs which were ordered by the court were clearly ministerial so therefore they are state actors for the purposes of accepting money which the district court said to pay."  March 16 Tr. at 18:8-12 (Shouse).  The Municipality Defendants then indicated that they do not have any Eleventh Amendment argument.  See March 16 Tr. at 18:20-19:11 (Powell, Ferate, Wilkes).

Then Plaintiffs then addressed the Eleventh Amendment issue and asserted that there "has to be an understanding recognized there that this lawsuit is not a claim for damages."  March 16 Tr. at 19:17-18 (Lyons).  The Court asked the Plaintiffs what difference that makes, since that distinction is "certainly not written into the Eleventh Amendment."  March 16 Tr. at 19:24 (Court). The Plaintiffs argued that the relevant distinction comes from Monroe v. Pape, 365 U.S. 167 (1961), because "the big picture that we're dealing with" is "a system from the bottom to the top

that refuses to acknowledge the fact that Oklahoma doesn't have jurisdiction over Indians and Indian territory."   March 16 Tr. at 21:1-5 (Lyons).   The Plaintiffs noted that they do not seek "equitable damages," but "disgorgement."   March 16 Tr. at 21:16-19 (Lyons).   Moreover, the Plaintiffs asserted that they ask for equitable relief in the form of an "injunction in the affirmative sense to make the district courts and the district attorneys and the court clerks recognize that McGirt" and Murphy are retroactive.   March 16 Tr. at 21:25-22:3 (Lyons).   The Plaintiffs contended that the "federal courts need to take over this issue."   March 16 Tr. at 22:15-16 (Lyons).

The discussion then turned to Rooker-Feldman, and the Court asked what "gives me the right to be an appellate court and say all right, now we're going to hear that argument that was not raised in" earlier State cases and "come in and be a very late and a very super appellate court over all those cases in the state system"?   March 16 Tr. at 24:1-6 (Court).   The Court indicated that this situation is one where "we're just trying to give those people a new argument, a new bite at the apple by coming over the federal court."   March 16 Tr. at 24:8-12 (Court).   The Plaintiffs stated that they do not agree with the Court's statement, because Murphy was a direct appeal and had "a couple of post conviction relief" claims that were "all denied and a federal habeas corpus which was denied."   March 16 Tr. at 24:18-20 (Lyons).   The Court asked the Plaintiffs to explain the procedural history of Murphy.   See March 16 Tr. at 25:10-13 (Court).   According to the Plaintiffs, Murphy came before the Tenth Circuit on a habeas petition.   See March 16 Tr. at 25:22-24 (Lyons).

The Court observed that this case "is not a 2254 case in which state prisoners are seeking release from custody."   March 16 Tr. at 26:25-27:1 (Court).   In response, the Plaintiffs argued that, in Nelson v. Colorado, 137 S. Ct. 1249 (2017), the Supreme Court concluded that "once there is no . . . subject matter jurisdiction, and your conviction is voided, it's void ab initio you don't have to do anything else to prove entitlement to the returns of your fines and costs."   March 16 Tr. at

27:20-25 (Lyons).  According to the Plaintiffs, McGirt and Murphy are "self-proving that they can be, that lack of subject matter jurisdiction could be raised after a direct appeal, after post conviction relief, after a denial of federal habeas corpus relief and then a second habeas corpus parties under those circumstances" should not have their case dismissed.  March 16 Tr. at 28:15-20 (Lyons). The Plaintiffs stressed that a "recent lawless case from the Oklahoma Court of Criminal Appeals [concluded that] . . . McGirt isn't retroactive," because it "establishes a new rule of criminal procedure," but "nobody can find in McGirt any language that says a recognition that Oklahoma never had subject matter jurisdiction is a new rule of criminal procedure."  March 16 Tr. at 29:1-9 (Lyons).

The Court observed that Nelson v. Colorado, 137 S. Ct. at1249, "[came] out of the Colorado system" and "wasn't a federal court ordering that relief there," because it "was coming up through the state system from through the Supreme Court and the Supreme Court said that the petitioners there didn't have to file a second lawsuit to get their money back."  March 16 Tr. at 2-10 (Court).  The Court stated: "I'm still trying to figure out how the Eleventh Amendment allows you to come over to federal court and bring those claims."  March 16 Tr. at 31:5-7 (Court).  The Plaintiffs responded that, because the Oklahoma Court of Criminal Appeals decided that McGirt doesn't apply retroactively, "[w]e don't have any other avenue of relief except for a federal court." March 16 Tr. at 32:16-17 (Lyons).  The Plaintiffs contended that the Eleventh Amendment "does not prevent . . . a lawsuit against state officials who have acted in excess of their authorities" and that Rooker-Feldman does not bar the Court from "acting when courts may have acted in the absence of jurisdiction."  March 16 Tr. at 32:10-18 (Lyons).  According to the Plaintiffs, because this is not a damages lawsuit, the Eleventh Amendment does not bar their claims, even though the Plaintiffs sue all the Defendants in the Defendants' official capacities.  See March 16 Tr. at 35:1-

26:2 (Lyons, Court).

In response, the District Court Defendants observed that the Plaintiffs want to "somehow say these are not state officials," but that the law supports the opposite conclusion.  March 16 Tr. at 38:2-3 (Moore).  The Court stated that it is "a little surprised that the district court is a non entity," and asked "[b]y that argument[,] are you saying that it can't be used under" § 1983?  March 16 Tr. at 38:17-20 (Moore).  The District Court Defendants stated that the judiciary "can be sued" if a plaintiff names "a judge in their official capacity."  March 16 Tr. at 38:21-23 (Moore).  The District Court Defendants cited Ok. Const. art. 7, § 7 and asserted that provision "mandates that the state is to be divided into judicial districts, each consisting of an entire county or of contiguous . . . counties and further directs that there shall be one district court for each judicial district which shall have as many judge[s] as prescribed by statute."  March 16 Tr. at 40:6-11 (Moore).  Further, the District Court Defendants asserted that Steadfast Insurance Co. v. Agricultural Insurance Co., 507 F.3d 1250 (10th Cir. 2007), indicates that sovereign immunity "applies where the plaintiff seeks declaratory or injunctive relief or money."  March 16 Tr. at 41:8-10 (Moore).  According to the District Court Defendants, this is "an important issue," but the Plaintiffs "have state remedies," including "post conviction, they can appeal it, and they can appeal it to the U.S. Supreme Court," but the Plaintiffs "want to bypass all that [and] come to you and have a mass action to recover money."  March 16 Tr. at 41:17-22 (Moore).  The Court indicated that it is "inclined" to think that the district courts "are entities that can be used," but that, if they are not entities that can be sued, then "the Eleventh Amendment is going to block this."  March 16 Tr. at 42: 8-14 (Court).  The Court stated that it will "have to study Oklahoma law."  March 16 Tr. at 42:20 (Court).

Next, the District Court Defendants argued that Ex Parte Young does not help the Plaintiffs, because the Plaintiffs do not ask for prospective relief.  See 44:2-25 (Moore).  The District Court

Defendants encouraged the Court to "[t]oss the state law claims if there is no federal jurisdiction." March 16 Tr. at 44:25-435:1 (Moore).  Further, the District Court Defendants maintained that the Plaintiffs do not comply with the OGTCA and that, if "you don't comply with that act you cannot even bring a lawsuit to recover."  March 16 Tr. at 45:9-10 (Moore).  Moreover, the District Court Defendants asserted that <u>Sholer</u> "predates" the relevant OGTCA amendments and that the "Oklahoma Supreme Court and the district courts in the state of Oklahoma" should deal with this case.  March 16 Tr. at 45:19-23 (Moore).  The Court stated that, if there are no federal claims, "I'm not going to exercise supplemental jurisdiction," because "I don't think the Tenth Circuit would want me to do that."  March 16 Tr. at 46:2-4 (Court).  The Clerk Defendants interjected to note that the <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. at 58, "argument . . . would also apply to court clerks as if they are state employees," meaning that they have Eleventh Amendment immunity.  March 16 Tr. at 46:18-20 (Poe).

The Plaintiffs then responded to the District Court Defendants' "other reasons that the district court cannot be sued in federal court."  March 16 Tr. at 47:134-15 (Court).  The Plaintiffs argued that, if "there is no such entity as a district court and that individual judges had to be sued," that "the petition can be amended to correct that deficiency," and that the Plaintiffs can, if necessary, amend their Complaint accordingly.  March 16 Tr. at 48:4-7 (Lyons).  According to the Plaintiffs, a sheriff can be sued "even though he is a locally elected, paid employee that is also an employee of the state," and, therefore, "district attorneys and court clerks . . . should also be allowed to be sued."  March 16 Tr. at 48:16-21 (Lyons).  The Plaintiffs asserted that "the core thread of this analysis" should be "whether or not the courts, the district attorneys, the court clerks, anybody involved, all the defendants involved acted in the absence of jurisdiction, and we know from <u>McGirt</u> and <u>Murphy</u> that they did."  March 16 Tr. at 49:12-17 (Lyons).  The Plaintiffs argued

that, even if the Court "were to defer to" the Oklahoma Court of Criminal Appeals and conclude that McGirt is not retroactive, the Court has "the ability to independently review that, especially with the flawed . . . [decision] that [it] is a new rule of criminal procedure." March 16 Tr. at 49:17-23 (Lyons). Moreover, the Plaintiffs contended that the OGTCA "does not apply to a condemnation act because it isn't a tort" and that, as a result, the OGTCA does not apply to "disgorgement of ill-gotten gains." March 16 Tr. at 50:17-19 (Lyons). The Plaintiffs indicated that they can name individual judges as Defendants if necessary, but that it does not "help[]" to "name the 14 judicial district of the 12 judicial district because it is the entity itself that is causing the violations and not necessarily separate judges." March 16 Tr. at 51:11-14 (Lyons). The Plaintiffs stated that, "without federal court relief[,] nobody is going to get any [relief]." March 16 Tr. at 52: 14-16 (Lyons). The Plaintiffs noted that, as "part of" their relief, they want "an order from this court directing all judges, [district attorneys,] and court clerks to recognize the rulings of McGirt and Murphy that Oklahoma never [had] jurisdiction in the past and they still don't have jurisdiction over Indians in Indian territory." March 16 Tr. at 52:25-53:5 (Lyons).

The District Court Defendants then argued that judicial immunity and sovereign immunity are conceptually distinct, because judicial immunity "is a personal defense" for a judge sued in their individual capacity, but the claims in this case are against the District Court Defendants in his or her official capacity. March 16 Tr. at 55:8-9 (Moore). The District Court Defendants asserted that, as a result, "we're stuck with the sovereign immunity issue." March 16 Tr. at 55:17-18 (Moore). According to the District Court Defendants, it would not make a difference for the Plaintiffs to name the judges as Defendants, because the Plaintiffs would still be asking for money from the Judges and sovereign immunity still would bar the claims. See March 16 Tr. at 55:18-21 (Moore). The District Court Defendants asserted that a 1996 amendment to § 1983 states:

"[E]xcept that any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity injunctive relief shall not be granted unless declaratory decree was violated or declaratory relief was unavailable."  March 16 Tr. at 57:16-21 (Moore).  The Plaintiffs briefly responded, noting that "people" are "in fear of being arrested again," because Oklahoma's Attorney General and the Oklahoma Court of Criminal Appeals "have taken cases in which they granted post conviction relief, set aside convictions, then" reversed course and reinstated the convictions after deciding that <u>McGirt</u> is not retroactive, and that "people [are] out there being arrested again."  March 16 Tr. at 58:4-10 (Lyons).

The Court stated its inclination not to allow any claims to proceed against the District Court Defendants, and that amending the Complaint to name the Judges likely does not overcome the sovereign immunity issue.  <u>See</u> March 16 Tr. at 59:4-18 (Court).  The Court then turned the discussion to the Plaintiffs' State claims.  <u>See</u> March 16 Tr. at 59:19-60:1 (Court).  The District Court Defendants argued that the Plaintiffs are making a tort claim under the OGTCA and that the Plaintiffs have not complied with the OGTCA.  <u>See</u> March 16 Tr. at 60:2-25 (Moore).  According to the District Court Defendants, the Plaintiffs still can seek post-conviction relief in State court.  <u>See</u> March 16 Tr. at 60:24-61:1 (Moore).

Next, the DA Defendants contended that the Court should not exercise supplemental jurisdiction over the Plaintiffs' State law claim -- the money-had-and-received claim -- because the OGTCA, the OUPCPA, and "a few notice provisions" bar the claim.  March 16 Tr. at 61:22 (Weaver).  The DA Defendants alleged that the State law claim "requires some kind of a judicial finding that the conviction was invalid[,] otherwise the money could not possibly be wrongly held because it relates to the conviction," meaning that "this is an appropriate [argument] for collateral attack on a state court judgment."  March 16 Tr. at 62:3-8 (Weaver).  The Court stated that it is not

inclined to exercise supplemental jurisdiction unless there are remaining federal claims, but that the DA Defendants should make their arguments about the Plaintiffs' State law claims in case the Court concludes that the Plaintiffs' federal claims can go forward.  See March 16 Tr. at 62:12-20 (Weaver).

The DA Defendants clarified their argument, contending that the Plaintiffs' money-had-and-received claim is "not pled correctly even under Oklahoma law because they've not stated the specific sum that . . . they're entitled to."  March 16 Tr. at 62:23-63:1 (Weaver).  According to the DA Defendants, the Plaintiffs do not identify the correct parties, nor do the Plaintiffs acknowledge that the DA Defendants do not hold the funds at issue.  See March 16 Tr. at 63:1-4 (Weaver).  The DA Defendants asserted that "this claim is really not the proper vehicle to challenge the underlying state law conviction or the state law in general, because to recover funds there must have been some kind of mistake of fact and not law."  March 16 Tr. at 63:4-8 (Weaver).  The DA Defendants contended that the OGTCA "expand[s] the definition of tort to include unjust and [un]lawful prosecutions relating to ill-gotten gains, which sounds exactly [like] what they're seeking damages for."  March 16 Tr. at 64:16-19 (Weaver).  According to the DA Defendants, the Plaintiffs allege that the DA Defendants "acted in excess of their authority," because thy "did not have the authority to prosecute them," which "clearly falls under the definition of tort."  March 16 Tr. at 63:20-23 (Weaver).

The Clerk Defendants then addressed the Plaintiffs' State law claims, noting that "the court clerks in this action were acting as state employees."  March 16 Tr. at 64:10-12 (Poe).   The Clerk Defendants asserted that the Plaintiffs' State law claim "sound[s] a whole lot like a false arrest or . . . a false prosecution claim that they're trying to allege and receive money back for that," and that the claim falls within the OGTCA's scope.  March 16 Tr. at 64:23-65:1 (Poe).  The Clerk

Defendants noted that they neither have the money at issue in their possession nor the ability to return it, "even if the claims were valid." March 16 Tr. at 65:19-20 (Poe). The Clerk Defendants, therefore, asserted that "under state law there is no claim." March 16 Tr. at 65:20-21 (Poe).

Edwards then noted that she "is in the same position" as the Clerk Defendants, because she does not retain the funds at issue, and "essentially this is a collateral attack on previous criminal or municipal traffic judgments." March 16 Tr. at 66:3-6 (Free). In response to the Court's question, Edwards stated that, were this case in State court with only the State law claims, she would argue that the Plaintiffs must seek collateral attack individually on their State convictions. See March 16 Tr. at 66:12-19 (Free). Newberry indicated that he "adopt[s] everything that was said so far," namely that the Plaintiffs do not plead adequately a money-had-and-received claim. March 16 Tr. at 66:22-23 (Shouse). Moreover, Newberry asserted that the Plaintiffs do not have standing, because the Plaintiffs do not allege that Newberry has injured them. See March 16 Tr. at 67:1-5 (Shouse).

The Municipality Defendants indicated that they adopt the Clerk Defendants' arguments and the District Court Defendants' arguments about the OGTCA, and echo Newberry's standing argument. See March 16 Tr. at 67:17-68:7 (Powell). The Municipality Defendants argue that the Plaintiffs first must seek post-conviction relief. See March 16 Tr. at 68:8-69:10 (Powell). Next, the Municipality Defendants turned to the Curtis Act, stating that it "applies only to the municipalities." March 16 Tr. at 68:16 (Powell). According to the Municipality Defendants, Curtis Act § 14 of the is a clear expression of congressional intent to try "Indians for conduct on their land." March 16 Tr. at 70:4 (Ferate). The Municipality Defendants argued that the Curtis Act sates that "municipalities should exist in Indian country" and that, as a result, any prosecution raising out of the Curtis Act "need[s] to follow the appellate procedures of the state court." March

16 Tr. at 71:1-5 (Ferate).   The Municipality Defendants noted that the Supreme Court denied certiorari on United States ex rel. Matloff v. Wallace, 497 P.3d 686 (Okla. 2021)("Wallace"), which holds that McGirt does not apply retroactively.   See March 16 Tr. at 71:11-22 (Ferate).   The Municipality Defendants asserted that the Plaintiffs do not have standing and that rule 23 does not change the "threshold requirement that" the Plaintiffs must have standing.   March 16 Tr. at 74:1 (Wilkes).   According to the Municipality Defendants, the Plaintiffs' only allegation that they "harmed at least by one of them" is "an alleged ticket in Locus Grove."   March 16 Tr. at 73:12-14 (Wilkes).   The Municipality Defendants argued that the Supreme Court's jurisdiction in McGirt depends on "McGirt's attempt to first obtain post conviction relief in state court," but that, here, the Plaintiffs "seek to bypass that entire process."   March 16 Tr. at 74:2-4 (Wilkes).

The Plaintiffs responded, contending that, under notice pleading, "all we have to do is set forth a plain statement of the facts here," and that they do not "have to plead a jurisdiction amount." March 16 Tr. at 75:19-21 (Lyons).   According to the Plaintiffs, they cannot have "thousands of people spend $1,000 or $2,000 per client to file a post conviction relief that" that "every district court is going to deny because of the Wallace decision," and that the Oklahoma Court of Criminal Appeals subsequently will affirm, saying that "the Wallace decision means what it means."   March 16 Tr. at 76:13-19 (Lyons).   The Plaintiffs argued that, for this reason, their "only possible relief is federal court."   March 16 Tr. at 76:25-77:1 (Lyons).   The Plaintiffs then turned to Sholer, arguing that, under "whatever legal theory you want," the "bottom line is the state didn't have the authority to keep the money and the refunds were ordered without compliance with the" OGTCA.   March 16 Tr. at 77:12-16 (Lyons).   The Plaintiffs then reasserted that, if their convictions were "obtained either by plea or conviction," they are "void," because they were done "in the absence of jurisdiction."   March 16 Tr. at 78:4-5 (Lyons).   According to the Plaintiffs, "this is a collateral

attack, because collateral [attacks] are specifically allowed in the absence of jurisdiction." March 16 Tr. at 78:8-10 (Lyons). The Plaintiffs stated that it "offends" them that "the state is refusing to acknowledge" that the Plaintiffs' convictions are void and that the Plaintiffs are entitled to relief. March 16 Tr. at 78:20-22 (Lyons). The Plaintiffs then discussed Nelson v. Colorado, 137 S. Ct. at 1249, and argued that it indicates that the Defendants are not permitted to retain the funds at issue. See March 16 Tr. at 78:23-80:3 (Lyons).

Turning to the Curtis Act, the Plaintiffs argued that it applies only to municipalities that were more than 200 people in 1898 and that, although it applies to "all inhabitants regardless of race," "Indian is a legal status[,] not a racial status." Tr, at 81:11-12 (Dunn). The Plaintiffs argued that the Curtis Act "never established a court" and that," at most, "it said there was a mayoral court where the mayor acted as justice of the peace," and they "doubt any of the municipalities have . . . a mayor that conducts court." March 16 Tr. at 81:6-17 (Dunn). The Plaintiffs asserted that "you can't cherry pick" the Curtis Act. March 16 Tr. at 82:25 (Dunn). According to the Plaintiffs, on "its best day," the Curtis Act "would say that" Oklahoma State courts "have jurisdiction, but everything else in it is gone as to how that jurisdiction is applied." March 16 Tr. at 84:1-3 (Dunn). The Plaintiffs argued that, of the towns that were organized after 1907, "four of them did not have the requisite 200 people," meaning that they "are not covered by the Curtis Act anyway." March 16 Tr. at 84:8-10 (Dunn).

The Plaintiffs then returned to their State law claims, and argued that Osborn v. Griffin, 865 F.3d 417 (6th Cir. 2017), and SEC v. Contorinis, 743 F.3d 296 (2d Cir. 2014), support their argument, because they stand for the proposition that "a district court possess[es] the equitable discretion to determine whether disgorgement liability should fall on all third parties or violators." March 16 Tr. at 85:5-8 (Lyons). The Plaintiffs contended that the State cannot have it both

ways -- namely, that the State cannot violate the law and retain the money at issue, because "under a disgorgement theory [that] is not appropriate." March 16 Tr. at 86:7-8 (Lyons). According to the Plaintiffs, the Court has the discretion to "order every bit of the money returned from everybody whoever touched it regardless of who it could be." March 16 Tr. at 86:8-11 (Lyons).

The Municipality Defendants responded, contending that the Plaintiffs confuse notice pleading with standing. See March 16 Tr. at 87:7-87 (Wilkes). The Municipality Defendants contended that rule 23 requires a named plaintiff to have standing. See March 16 Tr. at 87:15-24 (Wilkes). Moreover, the Municipality Defendants asserted that Congress has not changed the Curtis Act, and that the Curtis Act still applies. See March 16 Tr. at 89:7-17 (Wilkes). The Municipality Defendants alleged that the Court does not need to interpret any vague langue in the Curtis Act, because it is clear that "municipalities were restricted and" were "incorporated." March 16 Tr. at 90:13-14 (Ferate). Further, the Municipality Defendants alleged that, when the Curtis Act was passed, "Native Americans were considered to be a race." March 16 Tr. at 90:23-24 (Ferate).

The Municipality Defendants asserted that the Plaintiffs do not have standing, because "the defendants that have been named have not been shown to have any damage or any injury that's traceable [to] . . . any of the defendants in this case." March 16 Tr. at 92:17-20 (Powell). Further, according to the Municipality Defendants, the Plaintiffs "are alleged to have acted or done anything in a municipality that is a named defendant." March 16 Tr. at 92:24-93:1 (Powell). The Municipality Defendants assert that "[t]here is no authority that the Supreme Court in McGirt rendered all of these convictions and judgments void." March 16 Tr. at 93:9-11 (Powell). Next, the Municipality Defendants stated that "many legal doctrines," including res judicata and laches "are designed to protect those who have reasonably labored under a mistaken understanding of

law," and apply here.  March 16 Tr. at 93:13-17 (Powell).

Newberry then addressed <u>Sholer</u>, asserting that, there, "they were not given the power of the Government to collect they fees."  March 16 Tr. at 94:25-94:1 (Shouse).  Newberry argued that the Plaintiffs do not have standing.  <u>See</u> March 16 Tr. at 94:13-24 (Shouse).  Finally, Newberry contended that <u>McGirt</u> does not "state that every conviction was void at all," and that the Plaintiffs must "go through either habeas or post conviction relief to even . . . [get to] the point that says their convictions are actually void."  March 16 Tr. at 95:2-6 (Shouse).

The Clerk Defendants stated that the Plaintiffs "continue[] to bring up" <u>Nelson v. Colorado</u>, 137 S. Ct. at 1249, "in an attempt to show that this Court has authority to" grant the requested relief, but, in that case, "there had already [been] an adjudication," and the convictions at issue were already vacated.  March 16 Tr. at 95:19-22 (Poe).  The Clerk Defendants argued that process is "the very process plaintiffs refuse to do in this case and have not done."  March 16 Tr. at 95:25-96:2 (Poe).  In addition, the DA Defendants argued that the Plaintiffs' decision not to seek post-conviction relief "goes to this Court's jurisdiction to decide essentially any of these issues, because this is not just about the state jurisdiction," given that the Court "has to have jurisdiction to invalidate that state court conviction."  March 16 Tr. at 96:20-24 (Weaver).  According to the DA Defendants, the Plaintiffs premise their argument "on the fact that if they assert that there is no jurisdiction that . . . is all that's required and that the convictions are automatically overturned by no judicial act," which is "contrary to everything that the judiciary is."  March 16 Tr. at 96:25-97:4 (Weaver).  The DA Defendants contended that the Court cannot "issue an advisory opinion about those issues related to whether the funds were appropriate without a finding that . . . conviction was invalid, which it just cannot do, because there are procedures to follow."  March 16 Tr. at 97:15-19 (Weaver).

Next, the District Court Defendants reiterated their contention that the Plaintiffs do not state a cause of action. See March 16 Tr. at 98:10-99:16 (Moore). The Municipality Defendants then argued that Rooker-Feldman and Heck bar the Plaintiffs' claims. See March 16 Tr. at 102:5-103:22 (Powell). The Plaintiffs responded by arguing that post-conviction relief is futile, because they would be asking a State court to invalidate a conviction that is already void. See March 16 Tr. at 104:4-105:11 (Lyons). The DA Defendants asserted that the Court "absolutely has to presume that there is a valid judgment from the Oklahoma state court," because "that is the full faith and credit clause." March 16 Tr. at 106:19-22 (Weaver). According to the DA Defendants, the Plaintiffs need to seek post-conviction relief, because "this Court doesn't have jurisdiction to simply declare a state court conviction misdemeanor or traffic [violation] invalid." March 16 Tr. at 106:16-108:6 (Weaver). Before the hearing concluded, the Court indicated that there are "probably hurdles here that are going to make this case difficult to go forward." March 16 Tr. at 109:23 (Court). The Court stated that the "Eleventh Amendment is going to be a difficulty." March 16 Tr. at 110:6-7 (Court).

### 23.  **The Amicus Motion.**

On July 15, 2022, the Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Muscogee (Creek) Nation, Quapaw Nation, and Seminole Nation of Oklahoma ("the Indian Nations"), filed their Amicus Motion and Amicus Brief. See Amicus Motion at 1. In the Amicus Motion, the Indian Nations state that, pursuant to rule 7 of the Federal Rules of Civil Procedure and LCvR7 7-1, they request that the Court grant them leave to file their Amicus Brief, which will help the Court resolve the Municipality Defendants' rule 12(b)(6) arguments about the Curtis Act. See Amicus Motion at 2. See also Fed. R. Civ. P. 7; LCvR7 7-1. The Indian Nations note that they submit their Amicus Brief as "part of their effort to provide helpful information to the courts

as they consider municipalities' recent claims of authority under Section 14" of the Curtis Act. Amicus Motion at 1.

The Indian Nations argue that the Court should grant their Amicus Motion under the Northern District of Oklahoma's standards "for determining whether the allow the filing of an amicus brief." Amicus Motion at 2.  The Indian Nations assert that federal courts have "'discretion in allowing participation as an amicus curiae,'" Amicus Motion at 2 (quoting N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Health Servs., 994 F.3d 1166, 1175 (10th Cir. 2021)), and that the Court should allow an amicus brief when the amicus "has expertise in an area of law that will aid the court," Amicus Motion at 3 (citing Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926, 936 (D.N.M. 2020)(Browning, J.), aff'd sub nom. Legacy Church, Inc. v. Collins, 853 F. App'x 316 (10th Cir. 2021)(unpublished)).  According to the Indian Nations, a court has sound discretion to let an amicus participate, provided that the court agrees that the information is timely, useful, or otherwise necessary to the administrative of justice.  Amicus Motion at 3 (citing JPMorgan Chase Bank, N.A. v. Fletcher, No. CIV 06-0624 GKF/SAJ, 2008 WL 73223, at *1 (N.D. Okla. January 7, 2008)(Frizzell, J.)).  The Indian Nations assert that a court should allow an amicus brief when: (i) the amicus "'has an interest in some other case that may be affected by the decision in the present case,'" but not a sufficient interest to justify intervention; or (ii) when the "'amicus has unique information or perspective that can help the court beyond the held that the lawyers for the parties were able to provide.'"  Amicus Motion at 3 (quoting JPMorgan Chase Bank, N.A. v. Fletcher, 2008 WL 73223, at *1).

The Indian Nations contend that the Court should grant its Amicus Motion for two reasons. See Amicus Motion at 4.  First, the Indian Nations allege that they have "interest in cases that may be affected by the decision in the present case," namely an "interest in the enforcement of criminal

laws against their citizens and other Indians on their Reservations."  Amicus Motion at 4.  The Indian Nations observe that this case threatens that interest.  See Amicus Motion at 4.  According to the Indian Nations, the Municipality Defendants' argument that Curtis Act § 14 is still good law "implicates" the Indian Nations' right to self-determination and self-governance.  Amicus Motion at 5.  Second, the Indian Nations argue that they have unique information that can help the Court beyond the assistance that the existing parties can provide.  See Amicus Motion at 6.  The Indian Nations note that their "understanding of Section 14 of the Curtis Act relies on their Treaty relations with the United States and their relations with non-Indians both before and after statehood," and that, as a result, the existing parties do not share their understanding.  Amicus Motion at 6.  The Indian Nations observed that, "during the allotment era, the Indian Nations were coerced into agreeing to allotment through the impositions of laws, including the Curtis Act, which undermined the Indian Nations' ability to govern the Reservations."  Amicus Motion at 6.  According to the Indian Nations, they have "hundreds of jurisdiction-sharing agreements" that depend on a "proper understanding" and "respect for the allocation of criminal jurisdiction on the Reservations between tribal, state, and federal authorities," which gives them unique insight into the Curtis Act's effect and scope.  Amicus Motion at 7.

Moreover, the Indian Nations contend that their arguments do not duplicate arguments that other parties already have made, because no party has made their argument explaining why "Section 14 of the Curtis Act has been abrogated," even though this argument "directly affect[s]" how the Court will resolve the Municipality Defendants' arguments.  Amicus Motion at 7.  In addition, the Indian Nations assert that they explain that the decision of the Honorable William P. Johnson, Chief United States District Judge for the United States District Court for the District of New Mexico, in Hooper v. City of Tulsa, No. CIV 21-0165 JED-JFJ, 2022 WL 11605674 (N.D.

Okla. April 13, 2022)(Johnson C.J.)("Hooper"), does not provide a reason to agree with the Municipality Defendants that Section 14 of the Curtis Act is still in effect. See Amicus Motion at 7-8. The Indian Nations assert that the Municipality Defendants' Curtis Act argument both would impact significantly Tribal sovereignty and would "create a novel, far-reaching municipal authority over Indians in Indian country that exists nowhere else in this country, not even the other half of the State of Oklahoma." Amicus Motion at 8. As a result, the Indian Nations argue that the Court should grant their Amicus Motion, because it would "allow the Court to 'consider all the information it can to better make an informed decision.'" Amicus Motion at 8 (citing N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs., 340 F. Supp. 3d 1112, 1180 (D.N.M. 2018)(Browning, J.), rev'd on other grounds, N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs., 946 F.3d 1138 (10th Cir. 2019)).

In addition, the Indian Nations argue that their Amicus Motion is timely, because "[t]he clerk reassigned this case from Judge Dowdell two months ago" and a motion for leave to file an amicus brief "may be timely made even when filed three months after a motion comes before a judge." Amicus Motion at 9 (citing N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs., 340 F. Supp. 3d at 1186). The Indian Nations state that the LCvR7-1(i) permits motions to be filed up to fourteen days before a case is set for trial, and this case has not been set for trial. See Amicus Motion at 9. The Indian Nations contend that granting their Amicus Motion and considering their Amicus Brief will not prejudice unduly the Defendants, because the effect on the Municipality Defendants is "marginal." Amicus Motion at 9. The Indian Nations assert that the Curtis Act Section 14 argument could have a "dramatic effect on tribal sovereignty," but is a "small part of the pending motions in this case, as revealed by the [Municipality Defendants'] own litigation conduct," because the Municipality Defendants make many dismissal arguments that do

not hinge on the Curtis Act.  Amicus Motion at 9.  In addition, according to the Indian Nations, their Amicus Brief does not prejudice the other Defendants, because it "does not affect any of their legal interests" and the other Defendants do not raise Curtis Act Section 14 arguments "at all." Amicus Motion at 10.  The Indian Nations argue that, as a result, the Defendants who do not raise Curtis Act Section 14 arguments do not have standing to object to the Indian Nations' Amicus Motion.  See Amicus Motion at 10.

### 24.     November 21, 2022, Hearing.

On November 21, 2022, the Court held a hearing on the Amicus Motion, among other motions.  See November 21 Clerk's Minutes at 1.  At the hearing, the Court indicated that it already had read the Amicus Brief, that it would be "hard to put the genie back in the bottle," and that it was inclined to grant the Amicus Motion.  Draft Transcript of Hearing at 14:9-15:15 (taken November 21, 2022)("November 21 Tr.")(Court).[11]  The Indian Nations' and the Plaintiffs' counsel argued in support of the Court considering the Amicus Brief.  See November 21 Tr. at 15:22-19:20 (Holleman); id. at 20:2-7 (Lyons).  The District Court Defendants' counsel then indicated that the District Court Defendants' opposition to the Amicus Motion is "limited" to their concern that permitting the Indian Nations to file the Amicus Brief will delay the Court's issuance of this Memorandum Opinion and Order.  November 21 Tr. at 20:15-22 (Moore).  The Municipality Defendants' counsel asserted that the Municipality Defendants believe the Amicus Motion is untimely.  See November 21 Tr. at 22:9-11 (Powell).  Nevertheless, the Municipality Defendants' counsel noted that the Municipality Defendants' concerns would be "alleviated" if the Court permitted them to respond to the Amicus Brief.  November 21 Tr. at 22:13-15 (Powell).

---

[11]The Court's citations to the November 21 Transcript refer to the Court Reporter's original, unedited version.  The page and/or line numbers in the final transcript may vary.

Counsel for the City of Owasso emphasized that the Amicus Motion is untimely and argued that the Court should deny the Amicus Motion, because the Indian Nations "are not being neutral." November 21 Tr. at 23:23-25:4 (Wilkes). The Court granted the Amicus Motion and allowed the Indian Nations to file the Amicus Brief. See November 21 Tr. at 25:12-13 (Court). The Court also permitted the Defendants to respond to the Amicus Brief and raise additional issues if they needed or wanted to raise additional arguments. See November 21 Tr. at 25:13-14 (Court).

    **25.**   **The Amicus Brief.**

The Indian Nations filed their Amicus Brief shortly after the November 21 hearing. See Amicus Brief at 1. The Indian Nations state their interest as amici curiae: vindicating their "interest in ensuring law enforcement and criminal prosecution on their Reservations are conducted in accord with settled principles of federal law." Amicus Brief at 11. The Indian Nations note that the Cherokee Nation's interest is "directly implicated" in this case and that the other Indian Nations' interest are implicated, because the Municipality Defendants' argument regarding Curtis Act § 14 "could impact law enforcement on their Reservations within the former Indian Territory." Amicus Brief at 11. The Indian Nations indicate that they do not take a position on any other issue in this case. See Amicus Brief at 12.

The Indian Nations advance three principal arguments. See Amicus Brief at 4-25. First, the Indian Nations explain that many of the Indian Nations have "cross-deputization agreements" with municipalities that allow State, County, and Municipal law enforcement officers to enforce Tribal laws on reservations, including against Indians. Amicus Brief at 5-6. As an example, the Amicus Brief cites an agreement that the Cherokee Nation has with Defendant Town of Adair,[12]

---

    [12]The Town of Adair is small community in northeast Oklahoma, approximately fifty miles northeast of Tulsa, Oklahoma. See Google Maps, Adair, OK, https://www.google.com/maps (type

in which Adair acknowledges that "the State of Oklahoma, and the municipalities therein, do not have jurisdiction over crimes occurring on the Cherokee Reservation involving Indian defendants and/or victims," but in which the parties agree that Adair can nonetheless enforce Indian domestic violence laws on the Reservation.   Amicus Brief at 7.   According to the Indian Nations, reviving Curtis Act § 14 would "scuttle" the current practice of allowing the Indian Nations to negotiate jurisdiction with municipalities and reach cross-deputization agreements, and would "hopscotch the Nations' efforts to ensure public safety."   Amicus Brief at 5, 9.

Second, the Indian Nations assert that Oklahoma Statehood, as the Oklahoma Enabling Act, 34 Stat. 367, 367-78 (1906), permits, "abrogated" Curtis Act § 14.   Amicus Brief at 9.   The Indian Nations assert that Congress enacted the Curtis Act as a "temporary measure" during Oklahoma's transition from territory to State.   Amicus Brief at 9 (relying in part on Shulthis v. McDougal, 225 U.S. 561 (1912)("Shulthis"), and Jefferson v. Fink, 247 U.S. 288 (1918)("Jefferson").   They assert that the Municipalities that incorporated pursuant to Curtis Act § 14 were "agencies of the government of the United States," and that Congress has the power to grant and restrict their jurisdiction.   Amicus Brief at 11-12 (quoting State ex rel. West v. Ledbetter, 97 P. 834, 835 (Okla. 1908)("Ledbetter")).   According to the Indian Nations, the Curtis Act "died upon statehood," because the Oklahoma Enabling Act "entirely replaced the transitory scheme Congress had established."   Amicus Brief at 13, 14.   They also cite to Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439 (D.C. Cir. 1988)("Creek Nation"), to show that the Oklahoma Enabling Act implicitly repealed Curtis Act § 14.   In so arguing, the Indian Nations ask the Court to reject

"Adair, OK" into the search bar in the upper lefthand corner).   Adair sits within the Cherokee Nation.   See Google Maps, Cherokee Nation, https://www.google.com/maps (type "Cherokee Nation" into the search bar in the upper lefthand corner).

the recent decision in Hooper, which held that Curtis Act § 14 remains good law and forecloses arguments that Oklahoma municipalities do not have jurisdiction over certain crimes Indian commit in Indian Country.  Amicus Brief at 3-4 (citing Hooper, 2022 WL 11605674).

Finally, The Indian Nations assert that the Municipality Defendants' Curtis Act § 14 argument's practical consequences are not favorable as a matter of public policy.  See Amicus Brief at 23-25.  The Indian Nations argue that the Municipality Defendant's interpretation of the Curtis Act "would infringe on tribal self-government by subjecting reservation Indians to an additional criminal justice system, with different laws applied by different courts in which punishment would be meted out by municipalities."  Amicus Brief at 23.  They also assert that permitting municipalities to exercise jurisdiction over Indians pursuant to Curtis Act § 14 would upset State and local balance of power, because it would give Municipalities authority that States do not have.  See Amicus Brief at 24-25.  For these reasons, the Indian Nations ask the Court to reject the Municipality Defendants' Curtis Act § 14 argument.  See Amicus Brief at 25.

> ### 26.   The City of Owasso Response to the Amicus Brief.

On December 12, 2022, the City of Owasso filed the City of Owasso's Response in Opposition to the Brief of Amicus Curiae Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, and Muscogee (Creek) Nation, filed December 12, 2022 (Doc. 166)("Amicus Brief Response").  In the Amicus Brief Response, the City of Owasso raises several counterarguments. See Amicus Brief Response at 1-9.  First, the Amicus Brief Response contends that Oklahoma Statehood does not abrogate Curtis Act § 14, because Article 18, § 2 of the Oklahoma Constitution "provides that '[e]very municipal corporation now existing within this State shall continue with all its present rights and powers until otherwise provided by law,'" including the powers Congress conferred on Municipalities in Curtis Act § 14.  Amicus Brief Response at 3 (quoting Okla. Const.

Art XVIII, § 2)(alterations in Amicus Brief Response).   Second, the Amicus Brief Response contends that none of the State or federal cases that the Amicus Brief invokes for the proposition that Curtis Act § 14 did not survive Oklahoma Statehood, support that conclusion.   See Amicus Brief Response at 4-6.   To the contrary, the Amicus Brief Response gestures to the Supreme Court's recent decision in Oklahoma v. Castro-Huerta, 142 S. Ct. 2486 (2022)("Castro-Huerta"), to show that Statehood cannot "divest a state of jurisdiction over Indian Country," and that only "clear statutory language" can divest a State of jurisdiction over Indian Country.   Amicus Brief Response at 6 (quoting Castro-Huerta, 142 S. Ct. at 2503).   Third, the Amicus Brief Response asserts that the Amicus Brief's reliance on Creek Nation is misplaced, because Creek Nation concerned Curtis Act § 28, and not Curtis Act § 14.   See Amicus Brief Response at 6-7.   Finally, the Amicus Brief Response rejects the Amicus Brief's argument that Oklahoma Municipalities cannot have jurisdiction over crimes Indians commit in Indian Country where Oklahoma State does not have jurisdiction over crimes Indians commit in Indian Country, on the grounds that Congress has plenary power over Indian Country and is empowered to "wield its power however it wishes," including by giving certain powers to Municipalities, not States.   Amicus Brief Response at 7-8.

## **LAW REGARDING STANDING**

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.   First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.   Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).   The burden of establishing standing rests on the plaintiff.

See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1.      **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007) (internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cnty., Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable

decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992).

 "Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  See 416 F.3d at 1154.  Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits.  See Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a statute must be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement."  Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

## 2.     **Prudential Standing.**

 "Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's

grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." <u>Bd. of Cnty. Comm'rs v. Geringer</u>, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." <u>Lexmark Int'l v. Static Control Components</u>, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." <u>Lexmark Int'l v. Static Control Components</u>, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130 (quoting <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. <u>Lexmark Int'l v. Static Control Components</u>, 527 U.S. at 130.

## LAW REGARDING RULES 12(b)(4) AND 12(b)(5)

Rule 12(b)(5) provides, in pertinent part: "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion . . . (5) insufficient service of process." Fed. R. Civ. P. 12(b)(5).

Under rules 12(b)(4) and 12(b)(5), a "defendant may object to plaintiff's failure to comply with the procedural requirements for proper service set forth in or incorporated by Rule 4." Richardson v. Alliance Tire & Rubber Co., 158 F.R.D. 475, 477 (D. Kan. 1994)(Crow, J.)(quoting 5A C. Wright & A. Miller, Federal Practice and Procedure § 1353 (2d ed.1990)("Wright & Miller"). "Rules 12(b)(4) and 12(b)(5) allow a defendant to defend against a claim on the grounds of insufficiency of process and insufficiency of service of process." Whitsell v. United States, 198 F.3d 260, 260 (10th Cir. 1999)(citing Fed. R. Civ. P. 12(b)(4), 12(b)(5)). "A Rule 12(b)(4) motion constitutes an objection to the form of process or the content of the summons rather than the method of its delivery." Oltremari by McDaniel v. Kan. Soc. & Rehab. Serv., 871 F. Supp. 1331, 1349 (D. Kan. 1994)(Lungstrum, J.)(citation omitted). See United States v. Sharon Steel Corp., 681 F. Supp. 1492, 1499 n.14 (D. Utah 1987)(Jenkins, J.). "A Rule 12(b)(5) motion ... challenges the mode or lack of delivery of a summons and complaint." Oltremari by McDaniel v. Kansas Social & Rehabilitative Serv., 871 F. Supp. at 1349. See United States v. Sharon Steel Corp., 681 F. Supp. at 1499 n.14.

Where a plaintiff does not meet this burden, a court may dismiss for failure to properly serve. See Lasky v. Lansford, 76 F. App'x. 240, 240-41 (10th Cir. 2003)(unpublished). "Motions under Federal Rules 12(b)(4) and 12(b)(5) differ from the other motions permitted by Rule 12(b) somewhat in that they offer the district court a course of action -- quashing the process without dismissing the action -- other than simply dismissing the case when the defendant's defense or objection is sustained." 5B C. Wright & A. Miller, Federal Practice and Procedure § 1354, at 346 (3d ed. 2004). "Technical defects in a summons do not justify dismissal unless a party is able to demonstrate actual prejudice." Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1404 (9th Cir. 1994)(citing Fed. Deposit Ins. Corp. v. Swager, 773 F. Supp. 1244, 1249 (D. Minn. 1991); United

Food v. Commercial Workers Union, 736 F.2d 1371, 1382 (9th Cir. 1984)).   See U.S.A. Nutrasource, Inc. v. CNA Ins. Co., 140 F. Supp. 2d 1049, 1052-53 (N.D. Cal. 2001)(Hamilton, J.) ("Dismissals for defects in the form of summons are generally disfavored. Such defects are considered 'technical' and hence are not a ground for dismissal unless the defendant demonstrates actual prejudice." (citation omitted)).   "[W]hen a court finds that service is insufficient but curable, it generally should quash the service and give the plaintiff an opportunity to re-serve the defendant."  Pell v. Azar Nut Co., Inc., 711 F.2d 949, 950 n.2 (10th Cir. 1983)(citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1354, at 586–87 (1969)).

> Where service of process is insufficient, the courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant ... even though service will ordinarily be quashed and the action preserved where there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly.

Montalbano v. Easco Hand Tools, Inc., 766 F.2d 737, 740 (2d Cir. 1985)(internal quotations and citations omitted).   In addition, the court has discretion to dismiss the action if it appears unlikely that proper service can or will be instituted. See Pell v. Azar Nut Co., Inc., 711 F.2d at 950 n.2.

"The party on whose behalf service is made has the burden of establishing its validity when challenged; to do so, he must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law."  Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987)(internal citations and quotations omitted).   "Pro se litigants are allowed more latitude than litigants represented by counsel to correct defects in service of process and pleadings."  Moore v. Agency for Int'l Dev., 994 F.2d 874, 876 (D.D.C. 1993)(internal citations omitted).   Although "district courts do not need to provide detailed guidance to pro se litigants," they should at least "supply minimal notice of the consequences of not complying with procedural rules."  This assistance does not, of course, "constitute a license for a plaintiff filing

pro se to ignore the Federal Rules of Civil Procedure." 994 F.2d at 876.

### LAW REGARDING THE ROOKER-FELDMAN DOCTRINE

The Rooker-Feldman doctrine embodies the principle that federal district courts may not serve as courts of appeal for State courts. See Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.). Review of a State's highest court judgments is within the Supreme Court of the United States' exclusive jurisdiction. See D.C. Ct. of Appeals v. Feldman, 460 U.S. 462, 476 (1983)("Feldman"); Bolden v. City of Topeka, 441 F.3d 1129, 1140 (10th Cir. 2006). See also 28 U.S.C. § 1257 (establishing review by Supreme Court of final judgments of highest court of a state). The Rooker-Feldman doctrine bars a "federal action that tries to *modify or set aside* a state-court judgment because the state proceeding should not have led to that judgment." Mayotte, 880 F.3d at 1174 (emphasis in original). A district court has no jurisdiction over a matter in which: "(i) a state-court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *38 (citing Guttman v. Khalsa, 446 F.3d 1027, 1032 (10th Cir. 2006)).

Although Rooker-Feldman, with its four elements, appears to be a straight-forward principle, the application of the doctrine can be complex. For example, a challenge to a State court judgment is "barred even if the claim forming the basis of the challenge was not raised in the state proceedings," yet "Rooker-Feldman does not bar a federal-court suit raising a claim previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply contradict, the state-court judgment." Bolden v. City of Topeka, 441 F.3d at 1141, 1144. The Tenth Circuit has reconciled these principles by concluding that the scope of Rooker-Feldman is

"confined to the cases of the kind . . . brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Bolden v. City of Topeka, 441 F.3d at 1142-43 (citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 282 (2005)("Exxon")).  Thus, an essential characteristic of a suit barred under Rooker-Feldman is that the "loser in state court invites [a] federal district court to overturn [a] state court judgment." Exxon, 544 U.S. at 287 n.2.  Conversely, Rooker-Feldman does not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or judgment." Bolden v. City of Topeka, 441 F.3d at 1145.[13]  Thus, where a plaintiff does not put the State court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject matter, or even the same claims, as those presented in the state-court action."  Bolden v. City of Topeka, 441 F.3d at 1139.

The Tenth Circuit's application of the Rooker-Feldman doctrine elucidates the opaque distinction between claims that Rooker-Feldman bars, and those claims that allege the same cause of action asserted in the State court, but are not barred.  The Tenth Circuit provided an example of this distinction in a hypothetical child-custody case in Bolden v. City of Topeka.  See 441 F.3d at 1129.  The Tenth Circuit explained that a father, who lost custody of his child in a State court

---

[13]The Court has previously discussed the relation of Rooker-Feldman and Younger.  See F.D.I.C. v. Harger, 778 F. Supp. 2d 1123, 1135 n.6 (D.N.M. 2011)(Browning, J.).  In brief, whereas Rooker-Feldman bars a federal district court from reviewing State court judgments which are final, Younger "prevents the federal district court from interfering in an ongoing state proceeding." F.D.I.C. v. Harger, 778 F. Supp. 2d at 1135, n.6.  Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a State court judgment is final nor pray for relief from a State court judgment once it becomes final.  See Martinez v. Martinez, No. CIV 09-0281 JB/LFG, 2013 WL 3270488, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).

judgment, could not then bring suit in federal court alleging that the state court judgment was invalid.  See 441 F.3d at 1129.  The father would be barred even if his claims in federal court were different from those in State court; were the father, perhaps, to argue that the State court judgment deprived him of due process or was contrary to federal law on other grounds, Rooker-Feldman would bar such an action.  Bolden v. City of Topeka, 441 F.3d at 1129.  Rooker-Feldman would not, however, bar the father from seeking custody of his child in federal court, so long as the father's complaint did not raise any allegations regarding the State court judgment specifically. Bolden v. City of Topeka, 441 F.3d at 1145.

The Tenth Circuit in Bolden v. City of Topeka ruled that a district court was wrong to bar a plaintiff's suit under Rooker-Feldman where the plaintiff "did not seek to overturn the state-court judgment."  441 F.3d at 1138.  The City of Topeka notified the plaintiff in Bolden v. City of Topeka that several properties he owned failed to meet housing code regulations and thus would be demolished.  See 441 F.3d at 1131-32.  The plaintiff initially sought to enjoin the destruction of his buildings in State court, and the State court denied his request.  See 441 F.3d at 1131-32. The plaintiff then filed suit in federal district court, once again seeking to enjoin the destruction of his buildings.  See 441 F.3d at 1131-32.  His federal suit did not address the validity of the state court judgment or argue that federal court should override, on any grounds, the State court judgment denying his requested injunction.  See 441 F.3d at 1132.  The district court dismissed his request for an injunction under Rooker-Feldman, but the Tenth Circuit concluded that the district court misapplied the doctrine.  See Bolden v. City of Topeka, 441 F.3d at 1132, 1138.  The Tenth Circuit focused on the plaintiff's claims in federal court being "identical to what they would have been had there been no state-court proceeding."  Bolden v. City of Topeka, 441 F.3d at 1138. Because the plaintiff did not argue that the "judgment itself inflicted an injury," Rooker-Feldman

did not bar the plaintiff's claims alleging violations against the city's action of destroying his buildings.  Bolden v. City of Topeka, 441 F.3d at 1138, 1145.  Rooker-Feldman did not apply, because the plaintiff's claims "would be identical even had there been no state court judgment." Bolden v. City of Topeka, 441 F.3d at 1145.

Similarly, the Tenth Circuit has endorsed the logic of Nesses v. Shepard, 68 F.3d 1003 (7th Cir. 1995)( Posner, J.), wherein the United States Court of Appeals for the Seventh Circuit found that Rooker-Feldman does not apply to a party's claims that do not request relief from a State-court judgment.  See Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(unpublished)(quoting Nesses v. Shepard, 68 F.3d at 1005).  In Nesses v. Shepard, the plaintiff suffered several losses in State court before suing the lawyers and judges involved in those State court proceedings in federal court.  See 68 F.3d at 1004.  He "allege[d] a massive, tentacular conspiracy among the lawyers and the judges to engineer [his] defeat" in the state court suits.  Nesses v. Shepard, 68 F.3d at 1004. The federal district court dismissed the federal case for want of jurisdiction on the basis of the Rooker-Feldman doctrine.  See Nesses v. Shepard, 68 F.3d at 1004.  On appeal, the Seventh Circuit held that Rooker-Feldman did not apply.  Nesses v. Shepard, 68 F.3d at 1005. The Honorable Richard Posner, United States Circuit Judge for the Seventh Circuit, explained:

> [The Rooker-Feldman doctrine] is not that broad.  Were [a plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim.  But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm. Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment.

Nesses v. Shepard, 68 F.3d at 1005 (internal citation omitted).  Judge Posner distinguished the case

from one Rooker-Feldman bars by pointing out that, although the plaintiff "was in a sense attacking the ruling by the state court," by asserting that he lost in state court because the "lawyers and the judges [engineered the plaintiff's] defeat," the plaintiff was not "seeking to undo a remedial order of some sort."  68 F.3d at 1005.

The Tenth Circuit has barred a plaintiff's due process claims against a city, under Rooker-Feldman, where the alleged violations occurred because of a state court's order.  See Campbell v. City of Spencer, 682 F.3d, 1278, 1284 (10th Cir. 2012).  In Campbell v. City of Spencer, a plaintiff filed suit in federal court, alleging, among other claims, that the City of Spencer violated her due-process and Eighth Amendment rights by seizing her horses and imposing an "excessive fine" pursuant to a state court order.  682 F.3d at 1280.  The federal court dismissed her due-process allegations, finding that Rooker-Feldman barred the claims.  682 F.3d at 1280.  The Tenth Circuit agreed.  Because the plaintiff's "deprivation of property . . . allegedly without just compensation or due process was the deprivation ordered by the state court . . . [her] claim [had] merit only if the state court forfeiture order was unlawful on the record before the court."  682 F.3d at 1284.  The plaintiff's suit was a "direct attack on the state court's judgment because an element of [her] claim [was] that the judgment was wrongful."  682 F.3d at 1284.  "The alleged constitutional wrong was the content of the judgment . . . not . . . some act by a defendant that led to the judgment."  682 F.3d at 1285.  Thus, Rooker-Feldman barred the plaintiff's claims, because the harm the plaintiff alleged would not have occurred but-for the state court judgment.  682 F.3d at 1285-86.

## LAW REGARDING YOUNGER ABSTENTION

"Generally, federal courts must exercise their jurisdiction when available. However, principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against

federal court interference with state court proceedings.'" Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016)(unpublished)(quoting Steffel v. Thompson, 415 U.S. 452, 460-61, (1974), and citing Younger, 401 U.S. at 43-45; Sprint Commc'ns, Inc. v. Jacobs, 581 U.S. 69, 73 (2013)("Sprint")). The framers of the Constitution designed a system in which

> there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

Younger, 401 U.S. at 44.

Under the abstention doctrine that the Supreme Court of the United States articulates in Younger, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)). A court in the Tenth Circuit should abstain from entertaining cases which implicate the Younger doctrine, so long as an adequate opportunity is afforded in the State court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)). The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' rather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or

deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three conditions must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78.  See Bellotti v. Baird, 428 U.S. at 143 n.10 (noting that when all of the conditions mandating abstention clearly exist in the record, courts should address application of the Younger abstention doctrine sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether this case is one that allows for Younger abstention at all.  The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989)).

The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases." Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020).  See Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(unpublished)(noting that Sprint "significantly limited the reach of Younger to only" three situations, and that Sprint "also discounted reliance on the three factors outlined" in Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 433-434 (1982)("Middlesex")); MacIntyre v. JP Morgan Chase Bank,

No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. Of Med. Examiners, 187 F.3d 1160 (10th Cir. 1999)][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).

In Sprint, the Supreme Court clarified that "[t]he three Middlesex conditions . . . were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking Younger." Sprint, 571 U.S. at 81 (emphasis in original).  In Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016)(unpublished)("Hunter"), the Tenth Circuit continued to use similar factors to determine whether Younger abstention is non-discretionary and "must be invoked absent extraordinary circumstances."  Hunter, 660 F. App'x at 714-15.  "Younger and its progeny require federal courts to abstain from exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims, and (3) the state proceeding involves important state interests."  Hunter, 660 F. App'x at 714 (citing Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d at 1163).

The Tenth Circuit applies the three Sprint categories within its analysis of the first prong -- whether there are "ongoing state administrative proceedings."  Hunter, 660 F. App'x at 715.  It explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where the three Sprint categories define "type."  Hunter, 660 F. App'x at 715

(emphasis in the original).  See Hunter, 660 F. App'x. at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 134 S. Ct. at 588).

Once a court determines that the case is appropriate for Younger abstention, a court must then analyze the second and third elements: (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432)); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001).  When all three elements mandating abstention clearly exist in the record, courts may and should address Younger abstention doctrine's analysis sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)("Abstention may be raised by the court sua sponte."); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

Younger abstention is not discretionary once its criteria are met.  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise.").  When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation.  Deakins v. Monaghan, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is

a federal cause of action.  See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a State court can address a plaintiff's cause of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the State court proceeding.  In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007)(unpublished), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  See 242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding his parental rights and right to child support payments, and to award the parent monetary damages compensating him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado State trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the State court officials adjudicating his State custody case. 242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger.  See Wideman v. Colorado, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing. 242 F. App'x at 614. Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues. 242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigate any federal constitutional issues that may arise . . . in the

Colorado state proceedings." 242 F. App'x at 614. Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing. 242 F. App'x at 614.

According to the Tenth Circuit, ordinarily, a state proceeding is no longer "ongoing" when "the time for appeal has run." Hunter, 660 F. App'x at 715 (citing Bear v. Patton, 451 F.3d 639, 642 (10th Cir. 2006)("[I]f a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended.")). "[R]egardless of when [a state court's] judgment became final, . . . a necessary concomitant of Younger is that a party in [the federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the [federal] District Court . . . ." Hunter, 660 F. App'x at 715 (quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 608 (1975)).

## LAW REGARDING 42 U.S.C. § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186,

1197 (10th Cir. 1998))).  Section 1983 authorizes an injured person to assert a claim for relief

against a person who, acting under color of state law, violated the claimant's federally protected

rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i)

a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted

under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent

in his or her individual capacity, "a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal,

556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See

Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[14] and

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S.

---

[14]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell, 436 U.S. at 689.  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this

circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.   It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'" Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING HECK V. HUMPHREY

In Heck the Supreme Court addressed the question when a prisoner may bring a § 1983 claim relating to his conviction or sentence.  The Supreme Court held:

> A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

Heck, 512 U.S. at 487.  In other words, the Supreme Court determined that a claim for damages

that directly calls a State criminal conviction into question is not cognizable under § 1983.  See Heck, 512 U.S. at 487. Similarly, the Supreme Court clarified that the Heck doctrine bars a § 1983 suit that indirectly challenges an underlying State criminal conviction:

> An example of this latter category -- a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful -- would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest . . . . He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures.  In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, . . . the § 1983 action will not lie.

Heck, 512 U.S. at 487.  In the years since Heck, the Supreme Court has added that the Heck doctrine also bars declaratory and injunctive relief to the extent a request for declaratory or injunctive relief would necessarily invalidate the prisoner's conviction or sentence. See Wilkinson v. Dotson, 544 U.S. at 80-81 (applying Heck where the plaintiff sought declaratory and injunctive relief); Edwards v. Balisok, 520 U.S. 641 (1997)(applying Heck where the plaintiff sought money damages und declaratory relief).

## LAW REGARDING THE DECLARATORY JUDGMENT ACT

Section 2201 of Title 28 of the United States Code provides that:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  The Supreme Court, in <u>Maryland Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270 (1941), announced the test for determining whether, as contemplated by the Declaratory Judgment Act, an actual controversy exists: "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  312 U.S. at 273. <u>Accord</u> <u>United States v. Fisher-Otis, Inc.</u>, 496 F.2d 1146, 1151 (10th Cir. 1974).  "'A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act.'"  <u>Copar Pumice Co., Inc. v. Morris</u>, No. CIV 07-0079 JB/ACT, 2009 WL 5201799, at *17 (D.N.M. Oct. 23, 2009)(Browning, J.)(quoting <u>Lawrence v. Kuenhold</u>, 271 F. App'x 763, 766 (10th Cir. 2008)(unpublished), <u>aff'd</u>, 639 F.3d 1025 (10th Cir. 2011)).  <u>See</u> <u>Utah Animal Rights Coal. v. Salt Lake City Corp.</u>, 371 F.3d 1248, 1266 (10th Cir.2004)(McConnell, J., concurring)("[A] declaratory judgment action involving past conduct that will not recur is not justiciable.").

The Tenth Circuit has stated that a district court should consider the following factors when deciding whether to entertain a request for declaratory relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

<u>State Farm Fire & Cas. Co. v. Mhoon</u>, 31 F.3d 979, 983 (10th Cir. 1994).  Additionally, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.  Thus, "declaratory relief is alternative or cumulative and not exclusive or extraordinary."  Fed. R. Civ. P. 57 advisory committee's note (1937 adoption).

## LAW REGARDING AMICUS BRIEFS

Federal courts have broad discretion in allowing participation by amicus curiae.  See, e.g., United States v. Michigan, 940 F.2d 143, 165 (6th Cir. 1991); Clark v. Sandusky, 205 F.2d 915, 917 (7th Cir. 1953); United States v. Ahmed, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992)(Edelstein, J.), aff'd, 980 F.2d 161 (2d Cir. 1992).

> Historically, amicus curiae is an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another.

Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999)(Shea, J.)("CARE").  "[T]he classic role of amicus curiae . . . [is to assist] in a case of general public interest, [by] supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." Miller-Wohl Co. v. Comm'r of Labor & Indus., 694 F.2d 203, 204 (9th Cir.1982).

District courts enjoy considerable discretion in deciding whether to consider an amicus brief.  See CARE, 54 F.Supp.2d at 975 ("The privilege of being heard amicus rests in the discretion of the court which may grant or refuse leave according as it deems the proffered information timely, useful, or otherwise.").  There is no precedent directly on point in the Tenth Circuit for deciding whether to allow or deny amicus participation.  There is also not a pertinent Federal Rule of Civil Procedure.  See Alliance of Auto. Mfrs. v. Gwadowsky, 297 F. Supp. 2d 305, 306 (D. Me. 2006)(Woodcock, J.)(explaining that there is no provision in Federal Rules of Civil Procedure discussing conditions when amicus appearances should be allowed).  Instead, the Court draws on caselaw from other federal courts.

In deciding whether to allow amicus participation, federal courts often consider the

following factors:

> (1) whether the proposed amicus is a disinterested entity; (2) whether there is opposition to the entry of the amicus; (3) whether counsel is capable of making arguments without the assistance of an amicus; (4) the strength of the information and argument presented by the potential amicus curiae's interests; and, perhaps most importantly (5) the usefulness of information and argument presented by the potential amicus curiae to the court.

Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d 1326, 1328 (U.S. Ct. of Int'l

Trade 2010). Although the partiality of an amicus is a factor to be considered, there is no rule that

amici totally must be disinterested. See Waste Mgmt. of Pa., Inc. v. City of York, 162 F.R.D. 34,

36 (M.D. Pa.1995)(Vanaskie, J.). Courts also consider whether the amicus brief provides "unique

information or perspective that can help the court beyond the help that the lawyers for the parties

are able to provide." Ryan v. Commodity Futures Trading Comm'n, 125 F.3d 1062, 1063 (7th

Cir.1997)(Posner, J.).

> An amicus brief should normally be allowed when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case . . . or when the amicus has unique information or perspective that can help the court beyond the help that lawyers for the parties are able to provide.

Ryan v. Commodity Futures Trading Comm'n, 125 F.3d at 1063.

Courts can decline to consider, however, an amicus brief. In Voices for Choice v. Ill. Bell

Tel. Co., 339 F.3d 542 (7th Cir.2003), the Seventh Circuit explained various policy reasons that

might support a court's decision not to consider an amicus brief:

> The reasons for the policy [of denying or limiting amicus participation] are several: judges have heavy caseloads and therefore need to minimize extraneous reading; amicus briefs, often solicited by parties, may be used to make an end run around court-imposed limitations on the length of parties' briefs; the time and other resources required for the preparation and study of, and response to, amicus briefs drive up the cost of litigation; and the filing of an amicus brief is often an attempt to inject interest group politics into the federal [litigation] process.

339 F.3d at 544.  Courts also have observed that, "[a]t the trial level, where issues of fact as well as law predominate, the aid of amicus curiae may be less appropriate than at the appellate level where such participation has become standard procedure."  Yip v. Pagano, 606 F. Supp. 1566, 1568 (D.N.J. 1985)(Cohen, J.).  See Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970)(cautioning that, where joint consent of the parties is lacking, courts should "go slow in accepting, and even slower in inviting an amicus brief.").

## LAW REGARDING INTERPRETATION OF INDIAN LAW STATUTES

The Indian canon of construction requires that courts liberally construe treaties, agreements, statutes, and executive orders in the American Indians' favor.  See Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985)("Blackfeet").  See generally Philip P. Frickey, Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law, 107 Harv. L. Rev. 381 (1993)(offering a scholarly commentary on the Indian canon).  Courts are to construe treaties and other agreements as the American Indians who entered into the treaties or agreements would have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999)("[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.").  Any ambiguity in an agreement is to be resolved in the American Indians' favor.  See, e.g., Carpenter v. Shaw, 280 U.S. 363, 367 (1930).

> The Indian canon sometimes can come into conflict with other canons of statutory interpretation.  When canons clash, the Indian canon usually trumps competing canons.  See [Cohen Handbook] § 2.02[3], at 119-123 . . . .  See Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell, 220 F. Supp. 3d 1190, 1263-64 (D.N.M. 2016)(Browning, J.)(employing the Indian canon to override deference to the HHS and supports its conclusion that Annual Funding Agreements under the ISDA "must be negotiated, if a Tribe wishes for them to be negotiated"); Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell, 263 F. Supp. 3d 1083, 1165-66 (D.N.M. 2016)(Browning, J.)(applying the Indian canon to conclude that a hospital was a "Federal program" eligible for reimbursement under the ISDA).

<u>**ANALYSIS**</u>

The Court will: (i) grant in part, and deny in part the District Court MTD; (ii) grant in part, and deny in part the DA MTD; (iii) grant in part, and deny in part the Municipality MTD; grant in part, and deny in part the Clerk MTD; (iv) grant in part, and deny in part the Edwards MTD; (v) grant in part, and deny in part the Newberry MTD; and (vi) grant in part, and deny in part the Owasso MTD.  The Court begins by addressing the standing and service issues, respectively.  Next, the Court determines that the <u>Rooker-Feldman</u> doctrine bars the Plaintiffs' suit, and prevents the Court from dismissing this case on other grounds or otherwise reaching this case's merits.  Finally, if the Court is incorrect, and if the Court can bypass <u>Rooker-Feldman</u> and dismiss this suit on other grounds, the Court considers five alternate bases on which the Court could dismiss the case.

I.   **PICKUP, C. BUTCHER, L. BUTCHER, AND LEACH HAVE STANDING AGAINST BALLARD, CLINTON, AND THE DISTRICT COURT OF MAYES COUNTY, BUT SIXKILLER DOES NOT HAVE STANDING AGAINST ANY <u>DEFENDANT</u>.**

To establish Article III standing, a plaintiff must show: (i) an injury in fact; (ii) a sufficient causal connection between the injury and the conduct of which the plaintiff complains; and (iii) a likelihood that a favorable decision will redress the injury.  <u>See</u> <u>Seale v. Peacock</u>, 32 F.4th 1011, 1020 (10th Cir. 2022); <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560-61.  First, an injury in fact is "an invasion of a legally protected interest which is . . . concrete and particularized," and "'actual or imminent, not conjectural or hypothetical.'" <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560 (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)).  The injury does not need to be tangible, because intangible injuries can be concrete.  <u>See</u> <u>Seale v. Peacock</u>, 32 F.4th at 1020.  Second, the causal connection fairly must be traceable to the defendant's challenged conduct and cannot be the result of some third party's independent actions.  <u>See</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560.

Third, it must be "likely," and not "speculative," that a favorable decision will redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. at 561.  "At least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017).  Unnamed plaintiffs do not need to show that they have standing.  See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1214 (10th Cir. 2014).  Applied here, those principles establish that Pickup, C. Butcher, L. Butcher, and Leach have standing against Ballard, Clinton, and the District Court of Mayes County, but Sixkiller does not have standing against any Defendant.

### A.   PICKUP, C. BUTCHER, L. BUTCHER, AND LEACH HAVE STANDING AGAINST BALLARD, CLINTON, AND THE DISTRICT COURT OF MAYES COUNTY.

The Court concludes that Pickup, C. Butcher, L. Butcher and Leach have standing to bring claims against Ballard, Clinton, and the District Court of Mayes County.  As to the first standing prong -- injury -- Pickup, C. Butcher, L. Butcher, and Leach have all alleged that they suffered a judicially cognizable injury: a financial injury.  Courts often allow financial harms to serve as injuries in fact for standing purposes and "a loss of even a small amount of money is ordinarily an 'injury.'" Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 983 (2017)(no citation given for quotation).  Here, the Complaint alleges that the "Plaintiffs have each paid money for fines, court costs and/or supervision fees to the State of Oklahoma or its political subdivisions."[15]  Complaint

---

[15]The Complaint also indicates that C. Butcher and Leach were "ordered to pay $40.00 per month to the Mayes County District Attorney's Office."  Complaint ¶¶ 61, 64, at 14, 15.  It is unclear to the Court why the Complaint asserts as a general matter that the "Plaintiffs have each paid money for fines, court costs and/or supervision fees to the State of Oklahoma or its political subdivisions," Complaint ¶ 7, at 5, but then only specifies the recurring fee that C. Butcher and Leach paid.  Nevertheless, the Court accepts as true that all the Plaintiffs paid a fee or fine for the purposes of its standing analysis.  See Complaint ¶¶ 61, 64, at 14, 15.

¶ 7, at 5.  <u>See</u> Complaint at 4 (explaining that the Plaintiffs seek "to recover the monies paid to the Courts, District Attorneys, and political subdivisions that were paid as fines and costs")(no paragraph number given).  That Pickup, C. Butcher, L. Butcher, and Leach all "paid money" indicates that they all incurred a financial loss sufficient to show an injury in fact.  Complaint ¶ 7, at 5.

Second, Pickup, C. Butcher, L. Butcher, and Leach demonstrate that Ballard, Clinton, and the District Court of Mayes County caused their financial injuries.  To satisfy Article III's standing requirement, there must be a "fairly traceable" causal connection between the plaintiff's injury and the defendant's challenged conduct.  <u>Spokeo, Inc. v. Robbins</u>, 578 U.S. at 338.  An injury is "fairly traceable" when a plaintiff shows a "'substantial likelihood that the defendant's conduct caused plaintiffs' injury in fact.'"  <u>Santa Fe All. For Pub. Health and Safety v. City of Santa Fe, N.M.</u>, 993 F.3d 802, 814 (10th Cir. 2021)(quoting <u>Nova Health Sys. v. Gandy</u>, 416 F.3d 1149, 1156 (10th Cir. 2005)).  A plaintiff can satisfy the "fairly traceable" prong by "advancing allegations which, if proven, allow for the conclusion that the challenged conduct is a 'but for' cause of the injury."  <u>Santa Fe All. For Pub. Health and Safety v. City of Santa Fe, N.M.</u>, 993 F.3d at 814 (quoting <u>Petrella v. Brownback</u>, 697 F.3d 1285, 1293 (10th Cir. 2012)).

Here, Pickup, C. Butcher, L. Butcher, and Leach's financial injuries are "fairly traceable" to Ballard, Clinton, and the District Court of Mayes County.  <u>Spokeo, Inc. v. Robbins</u>, 578 U.S. at 338.  Ballard's office, the Mayes County District Attorney's Office, prosecuted Pickup, C. Butcher, L. Butcher, and Leach for various misdemeanor offenses in the District Court of Mayes County.  <u>See</u> Complaint ¶¶ 60-64, at 14-15.  Pickup, C. Butcher, L. Butcher, and Leach were convicted for those offenses.  <u>See</u> Complaint ¶¶ 60-64, at 14-15.  In turn, Pickup, C. Butcher, L. Butcher, and Leach all paid "the Courts [and] District Attorneys," Complaint at 4 (no paragraph

number given), "money for fines, court costs and/or supervision fees," Complaint ¶¶ 60-64, at 14-15.  But for the prosecutions, Pickup, C. Butcher, L. Butcher, and Leach would not have had to pay fees or fines to the District Court of Mayes County or the District Attorney's Office.  See Santa Fe All. For Pub. Health and Safety v. City of Santa Fe, N.M., 993 F.3d at 814.  Accordingly, Pickup, C. Butcher, L. Butcher, and Leach's financial injuries are "fairly traceable" to Ballard, Clinton, and the District Court of Mayes County's conduct.  Spokeo, Inc. v. Robbins, 578 U.S. at 338.

By contrast, Pickup, C. Butcher, L. Butcher, and Leach cannot show that their financial injuries are "fairly traceable" to any of the other Defendants besides Ballard, Clinton, and the District Court of Mayes County.  Spokeo, Inc. v. Robbins, 578 U.S. at 338.  Pickup, C. Butcher, L. Butcher, and Leach are all residents of Mayes County, see Complaint ¶¶ 1-5, at 4, and they were all prosecuted and made to pay court fees and fines in Mayes County, see Complaint ¶¶ 61, 64, at 14, 15.  The Complaint does not assert that any of the DA Defendants, besides Ballard, prosecuted Pickup, C. Butcher, L. Butcher, and Leach.  The Complaint also does not assert that any of the Clerk Defendants, besides Clinton, or any of the District Court Defendants, besides the District Court of Mayes County, heard a case against Pickup, C. Butcher, L. Butcher, or Leach without jurisdiction.  Finally, the Complaint does not allege that any of the Municipality Defendants played any role in prosecuting or fining Pickup, C. Butcher, L. Butcher, and Leach.  Because none of the other Defendants, besides Ballard, Clinton, and the District Court of Mayes County, were involved in prosecuting Pickup, C. Butcher, L. Butcher, or Leach, it cannot be said that there is a "substantial likelihood" that the other Defendants' conduct caused the Plaintiffs' financial injuries.  Santa Fe All. For Pub. Health and Safety v. City of Santa Fe, N.M., 993 F.3d at 814 (quoting Nova Health Sys. v. Gandy, 416 F.3d at 1156).  But for the other Defendants' conduct -- or lack thereof -- the

Plaintiffs would still have been prosecuted in Mayes County, and incurred court fees and fines in the District Court of Mayes County.  See Santa Fe All. For Pub. Health and Safety v. City of Santa Fe, N.M., 993 F.3d at 814.  For that reason, Pickup, C. Butcher, L. Butcher, and Leach cannot show causation as to the other Defendants and, accordingly, do not have standing to pursue claims against any of the Defendants other than Ballard, Clinton, and the District Court of Mayes County.

Finally, Pickup, C. Butcher, L. Butcher, and Leach satisfy the "redressability" standing prong, because they demonstrate a "substantial likelihood" that the requested relief will redress the injury alleged.  Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 75 (1978).  See Ash Creek Mining Co. v. Lujan, 969 F.2d 868, 875 (10th Cir. 1992).  If Pickup, C. Butcher, L. Butcher, and Leach succeed on their claims, the Defendants will have to pay damages for their monetary injuries.  That repayment will redress their injuries.  Accordingly, Pickup, C. Butcher, L. Butcher, and Leach have demonstrated that they have standing to pursue their claims against Ballard, Clinton, and the District Court of Mayes County.

### B.   SIXKILLER DOES NOT HAVE STANDING TO PURSUE HER CLAIMS AGAINST ANY OF THE DEFENDANTS.

Conversely, the Court concludes that Sixkiller does not have standing to pursue her claims, because, although she can show a judicially cognizable financial injury, she cannot show that her financial injury is "fairly traceable" to any of the Defendants.  Spokeo, Inc. v. Robbins, 578 U.S. at 338.  Unlike Pickup, C. Butcher, L. Butcher, and Leach, Sixkiller was not prosecuted for a misdemeanor violation in Mayes County District Court.  Instead, the Complaint alleges that she "received a traffic ticket for Speeding issued by Locust Grove Police Department, a political subdivision of the State of Oklahoma.  Ms. Sixkiller has been unlawfully prosecuted by the State of Oklahoma and/or its political subdivisions without jurisdiction."  Complaint ¶ 65, at 15.  The

Complaint also alleges that Sixkiller had to pay a fee because of her speeding ticket.  <u>See</u> Complaint ¶ 7, at 5.

In light of those circumstances, Sixkiller cannot demonstrate that she has standing to bring claims against any of the Defendants.  As was discussed in greater detail above, financial injuries -- like paying a fee -- are sufficient to show an injury in fact.  <u>See</u> <u>Czyzewski v. Jevic Holding Corp.</u>, 137 S. Ct. at 983.  Nevertheless, the Complaint does not allege sufficient facts to show that Sixkiller's financial injury is "fairly traceable" to any of the Defendants.  <u>Spokeo, Inc. v. Robbins</u>, 578 U.S. at 338.  The Complaint does not allege where Sixkiller was "unlawfully prosecuted," as the Complaint alleges for the other Plaintiffs.  <u>Compare</u> Complaint ¶¶ 60-64, at 14-15, <u>with</u> Complaint ¶ 65, at 15.  Instead, the Court is left to speculate where Sixkiller paid her fine after the Locust Grove Police Department issued her ticket.  <u>See</u> Complaint ¶ 65, at 15. Because the Court cannot determine where Sixkiller paid her fine, the Court cannot determine whether Ballard, Clinton, or the District Court of Mayes County were involved in assessing or collecting the fees or fines.  Accordingly, Sixkiller has not demonstrated that her financial injuries are "fairly traceable" to any of the Defendants that the Complaint names.  <u>Spokeo, Inc. v. Robbins</u>, 578 U.S. at 338.  It follows that she cannot show the standing doctrine's causation element.  For these reasons, Sixkiller does not have standing to pursue her claims against any Defendant.

## II.     THE PLAINTIFFS PROPERLY SERVED THE DISTRICT COURT <u>DEFENDANTS</u>.

The District Court Defendants, including the District Court of Hayes County, contend that the Court should dismiss the Plaintiffs' claims against them because the Plaintiffs failed to properly serve them.  <u>See</u> District Court MTD at 5.  Rule 4 of the Federal Rules of Civil Procedure governs summons, including service of process.  <u>See</u> Fed. R. Civ. P. 4.  Rule 4(b) states:

> On or after filing the complaint, the plaintiff may present a summons to the clerk for signature and seal. If the summons is properly completed, the clerk must sign, seal, and issue it to the plaintiff for service on the defendant.  A summons -- or a copy of a summons that is addressed to multiple defendants -- must be issued for each defendant to be served.

Fed. R. Civ. P. 4.  Rule (4)(a)(1) requires, among other things, that a summons state the court's names and the parties' names, and "be directed to the defendant."  Fed. R. Civ. P. 4(a)(1)(B).

Rule 12(b)(4) of the Federal Rules of Civil Procedure establishes that a party may move to dismiss a claim for "insufficient process."  Fed. R. Civ. P. 12(b)(4).  Similarly, rule 12(b)(5) establishes that a party may move to dismiss a claim for "insufficient service of process."  Fed. R. Civ. P. 12(b)(5).  Rules 12(b)(4) and 12(b)(5) permit a defendant to "challenge departures from the proper procedure for serving the summons and complaint and the contents of the former for purposes of giving notice of the action's commencement."  Wright & Miller § 1353.  A rule 12(b)(4) motion "concerns the form of the process rather than its service" and challenges a party's adherence to rule 4(b), whereas a rule 12(b)(5) motion "is the proper vehicle for challenging the mode of delivery or lack of delivery of the summons and complaint."  Wright & Miller § 1353.  "Dismissal under Rule 12(b)(4) or Rule 12(b)(5) does not constitute a judgment on the merits."  Abram v. Fulton Cnty. Gov., 482 F. App'x 421, 424 (11th Cir. 2012)(unpublished).

The District Court Defendants argue that the Plaintiffs do not comply with rule 12(b)(4) or rule 12(b)(5), and that the Court should, therefore, dismiss the Plaintiffs' claims against then, because "summons was issued to individual district courts, through the elected court clerks in their official capacities," but "a county district court in Oklahoma is not a political subdivision capable of being sued."  District Court MTD at 5.  According to the District Court Defendants, Oklahoma law sets out the structure of the State's district courts and establishes that the district courts are not "political subdivisions," meaning that they are not proper Defendants in this lawsuit or any lawsuit.

District Courts MTD at 8-9.  In response, the Plaintiffs contend that the District Court Defendants were properly served, and observe that the District Court Defendants' argument is "intertwined with a claim [that] a court and court clerk are not political subdivisions capable of being sued." District Courts MTD Response at 14.  The Plaintiffs argue that the District Court Defendants are proper Defendants and assert that this suit is "not against particular named judges, but against the office of the district court."  District Courts MTD Response at 15.  According to the Plaintiffs, a district court in Oklahoma is "an entity that exists without regard to the person occupying the position of judge."  District Courts MTD Response at 16.

The Plaintiffs did not give the District Court Defendants insufficient process or insufficient service of process.  As the Plaintiffs observe correctly, the District Court Defendants' argument that process and service of process are not sufficient, at core, is an argument that the District Court Defendants are not proper Defendants in this lawsuit.  The District Court Defendants' argument that the Plaintiffs' service was improper is an argument that they were served despite being improper Defendants.  The District Court Defendants confuse rule 12(b)(4)'s and rule 12(b)(5)'s purposes with rule 12(b)(6)'s purpose.  Rules 12(b)(4) and 12(b)(5) are "designed to challenge irregularities in the comments of the summons (Rule 12(b)(4)) and irregularities in the manner of delivery of the summons and complaint (Rule 12(b)(5))," and not to provide a separate vehicle to challenge the adequacy of the plaintiff's complaint.  Chilicky v.Sweiker, 796 F.2d 1131, 1136 (9th Cir. 1986), reversed on other grounds by Schweiker v. Chilicky, 487 U.S. 412 (1988).  The District Court Defendants do not argue that the Plaintiffs' summons was defective, or not signed, sealed, and delivered.  In other words, the District Court Defendants do not challenge the adequacy of the Plaintiffs' summons.  Instead, the District Court Defendants use rules 12(b)(4) and 12(b)(5) to challenge the Plaintiffs' decision to name them as Defendants.  According to the District Court

Defendants, process and service of process is defective because the Plaintiffs named the wrong defendants under Oklahoma law.  In effect, the District Court Defendants argue that process and service of process are defective, because the Plaintiffs should have named a different party as a Defendant.  If the District Court Defendants' interpretation of rules 12(b)(4) and 12(b)(5) is correct, however, then rules 12(b)(4) and 12(b)(5) render rule 12(b)(6) superfluous, because rules 12(b)(4) and 12(b)(5) permit a defendant to challenge both process and service of process and whether a plaintiff states a claim upon which a court can grant relief.  Rule 12(b)(6) is not superfluous, however, and has a purpose that is distinct from rules 12(b)(4) and 12(b)(5)'s purposes.  The District Court Defendants' argument that they are not proper Defendants under Oklahoma law is an argument that the Plaintiffs do not state a claim upon which the Court can grant relief; in fact, the District Court Defendants make this argument elsewhere.  See District Court Defendants MTD at 8-9.  Because there is no showing that the Plaintiffs did not serve properly the Defendants that the Plaintiffs chose to name -- the District Court Defendants -- the Plaintiffs do not give the District Court Defendants insufficient process or insufficient service of process.  The Court will not dismiss the Plaintiffs' claims against the District Court Defendants under rule 12(b)(4) or rule 12(b)(5).

## III.    THE <u>ROOKER-FELDMAN</u> DOCTRINE BARS THE PLAINTIFFS' CLAIMS AND PREVENTS THE COURT FROM DISMISSING THIS CASE ON OTHER GROUNDS OR OTHERWISE REACHING THIS CASE'S MERITS.

The Defendants assert that <u>Rooker-Feldman</u> bars the Plaintiffs' claims, because the Plaintiffs ask the Court to void their State court convictions.  See District Court MTD at 3; DA MTD at 11-12; Clerk MTD at 18-20.  The Court agrees with the Defendants' <u>Rooker-Feldman</u> argument.  The Court concludes that the <u>Rooker-Feldman</u> Doctrine bars the Plaintiffs' claims, because the claims impermissibly require the Court to review the Plaintiffs' State convictions.

The Court further concludes that, because <u>Rooker-Feldman</u> is a jurisdictional doctrine that the Court cannot bypass, <u>Rooker-Feldman</u> ends the Court's analysis and prevents the Court from dismissing this case on other grounds or otherwise reaching this case's merits.

**A.    THE <u>ROOKER-FELDMAN</u> DOCTRINE BARS THE PLAINTIFFS' CLAIMS.**

The <u>Rooker-Feldman</u> doctrine embodies the principle that federal district courts may not serve as courts of appeal for State courts. <u>See</u> <u>Valdez v. Metro. Prop. & Cas. Ins. Co.</u>, No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.).    The <u>Rooker-Feldman</u> Doctrine prevents district courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon</u>, 544 U.S. at 284.  It applies in cases where a plaintiff explicitly asks a federal district court "to modify or set aside a state-court judgment," <u>Mayotte</u>, 880 F.3d at 1174, and in cases where the claims presented to the district court are "inextricably intertwined" with a State court decision such that "the District Court is in essence being called upon to review the state court decision." <u>Feldman</u>, 460 U.S. at 482 n.16.  "A federal claim is inextricably intertwined with a state-court judgment if that judgment 'caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress.'" <u>Bear v. Patton</u>, 451 F.3d 639, 642 (10th Cir. 2006)(quoting <u>Kenmen Eng'g v. City of Union</u>, 314 F.3d 468, 476 (10th Cir. 2002), <u>abrogated on other grounds by</u> <u>Exxon</u>, 544 U.S. at 280).

Here, the Plaintiffs advance three claims.  <u>See</u> Complaint ¶¶ 79-95, at 19-21.  First, the Plaintiffs ask for a declaratory judgment "that the Cherokee Reservation has not been disestablished and therefore any action by the State of Oklahoma or its political subdivisions is

void because the court would have lacked subject matter jurisdiction."  Complaint ¶ 85, at 20.

Second, the Plaintiffs' money-had-and-received claim asks for "the State and its political

subdivisions to return the monies that it has been paid" by the Plaintiffs, because the Plaintiffs'

convictions were "tendered pursuant to void orders" or "were otherwise obtained without

jurisdiction."  Complaint ¶ 86, 89, at 20.  Third, the Plaintiffs seek damages under § 1983 for

"arresting, investigating, issuing citations and collecting fines from Tribal members within the

boundaries of the Cherokee Reservation" with jurisdiction in violation of "the rights of the Tribal

members, as guaranteed by treaty," specifically the Tribal members' due process rights.

Complaint ¶ 92, at 20.

The Rooker-Feldman Doctrine bars the Plaintiffs' declaratory judgment claim and money-

had-and-received claim, because both claims expressly ask the Court to void the Plaintiffs' State

court convictions.  Feldman, 460 U.S. at 482 n.16.  The Plaintiffs' declaratory judgment claim

asserts that "[t]he Plaintiffs are entitled to Declaratory Judgment that the Cherokee Reservation

has not been disestablished and therefore any action by the State of Oklahoma or its political

subdivisions is void because the court would have lacked subject matter jurisdiction."  Complaint

¶ 85, at 20.  Similarly, the Plaintiffs' money-had-and-received claim asserts that "[t]he state of

Oklahoma and its political subdivisions are currently in possession of monies that were tendered

pursuant to void orders or that were otherwise obtained without jurisdiction.  Complaint ¶ 87, at

20.  Rooker-Feldman bars both of these claims, because the Court cannot grant relief for either

claim without finding that the Plaintiffs' State court convictions are void.  See Mayotte, 880 F.3d

at 1174.  Both claims expressly "invit[e the C]ourt [to] review and reject[]" the Plaintiffs' State

court convictions, which Rooker-Feldman prohibits.  Exxon, 544 U.S. at 284.  The Plaintiffs ask

the Court "to modify or set aside [their] state-court judgment[s]" and the Court cannot do so

without running afoul of <u>Rooker-Feldman</u>.  <u>Mayotte</u>, 880 F.3d at 1174.

The <u>Rooker-Feldman</u> doctrine also bars the Plaintiffs' § 1983 claim, because it is "inextricably intertwined" with the Plaintiffs' State convictions.  <u>Bear v. Patton</u>, 451 F.3d at 642. The Plaintiffs allege in their § 1983 claim that the Defendants impermissibly collected fees and fines from Plaintiffs without jurisdiction, in violation of Plaintiffs' constitutional rights.  <u>See</u> Complaint ¶¶91-95, at 20-21.  In other words, the Plaintiffs allege that the Defendants caused their financial injuries: but for the Defendants prosecuting the Plaintiffs without jurisdictions, the Plaintiffs would not have had to pay the Defendants court fees and fines.  <u>See</u> Complaint ¶¶91-95, at 20-21.  The § 1983 claim, therefore, is "inextricably intertwined" with the Plaintiffs' State court convictions, because the Plaintiffs assert that their State court judgments caused their financial injuries.  <u>Bear v. Patton</u>, 451 F.3d at 642.  To grant relief on that claim, the Court will necessarily have to determine whether the Defendants acted without jurisdiction, and, in so doing, caused the Plaintiffs' financial injuries.  The Court can award the Plaintiffs damages under § 1983 only if the Court reviews the State court's determinations that it had subject-matter jurisdiction over the Plaintiffs' criminal cases and concludes that the State court did not have subject-matter jurisdiction over the Plaintiffs' cases.  No matter how the Court construes the § 1983 claim, the Court, on some level, will have to review the State court's subject-matter jurisdiction determination and find that it caused the Plaintiffs' injuries, which <u>Rooker-Feldman</u> prohibits.  <u>See</u> <u>Bear v. Patton</u>, 451 F.3d at 642.  In the end, the Plaintiffs are "state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments," and the <u>Rooker-Feldman</u> doctrine bars their claims.  <u>Exxon</u>, 544 U.S. at 284.  <u>See</u> <u>Palmer v. Milnor</u>, No. 19-0961-LK, 2022 WL 407389, at *4 (W.D. Wash. February 10, 2022)(King, J.)("<u>Palmer</u>")(concluding that <u>Rooker-Feldman</u> bars

the plaintiff's claims in another post-McGirt suit, which a member of the Cherokee Nation living on the Tulalip Indian Reservation brought. alleging that his Washington State false information conviction should be vacated).

The Plaintiffs contend that Rooker-Feldman does not bar their claims, however, because they fall under an exception to the doctrine: the void ab initio exception.  See District Courts MTD Response at 24; DA MTD Response at 5; Municipality MTD Response at 12; Clerk MTD Response at 20; Edwards MTD Response at 19; Newberry MTD Response at 28.  The void ab initio exception provides that the Rooker-Feldman doctrine does not apply where the underlying State court rendered the decision at issue without jurisdiction such that its decision was void from the start.  See Schmitt v. Schmitt, 324 F.3d 484, 487 (7th Cir. 2003).  The United States Court of Appeals for the Third Circuit announced the exception in In re James, 940 F.2d 46 (3d Cir. 1991), a bankruptcy case.  In In re James, the Third Circuit explains:

> There appears to be only one exception to this hard and fast rule of federal-state comity, and it comes into play only when the state proceedings are considered a legal nullity and thus void ab initio.  Kalb [v. Feuerstein], 308 U.S. [433,] . . . 438– 40 [(1940)] . . . A federal bankruptcy court may intervene only when the state proceedings are void ab initio; it lacks the power where it simply disagrees with the result obtained in an otherwise valid proceeding.
>
> . . . .
>
> Sound jurisprudential reasons underlie this concept. Because a void judgment is null and without effect, the vacating of such a judgment is merely a formality and does not intrude upon the notion of mutual respect in federal-state interests.

In re James, 940 F.2d at 53.

Since the Third Circuit announced the void ab initio exception, the exception has become the subject of some controversy in the Courts of Appeals.  Two Courts of Appeals -- the Third and the Sixth -- have applied the exception in the bankruptcy context.  See In re James, 940 F.2d at 53;

In re Hamilton, 540 F.3d 367, 375 (6th Cir. 2008).  Three Courts of Appeals -- the Eighth, Ninth, and Eleventh -- have declined to recognize the exception.  See In re Ferren, 203 F.3d 559 (8th Cir. 2000)("[W]e decline to create an exception to the Rooker-Feldman doctrine"); Doe v. Mann, 415 F.3d 1038, 1042 n.6 (9th Cir. 2005); Casale v. Tillman, 558 F.3d 1258, 1261 (11th Cir. 2009)("[O]ur circuit has never adopted that exception.").  One Court of Appeals -- the Seventh -- has "acknowledged" but "not endorsed" the ab initio exception.  Schmitt v. Schmitt, 324 F.3d at 487 (citing 4901 Corp. v. Town of Cicero, 220 F.3d 522, 528 n.6 (7th Cir. 2000)).  In so doing, the Seventh Circuit declined to apply the exception in the family law context.  See Schmitt v. Schmitt, 324 F.3d at 487 (explaining that the void ab initio exception "might be appropriate" in the bankruptcy context "in order to protect the dominant federal role in that specialized area of law," but not in the family law context).  Four Courts of Appeals -- the First, Second, Fifth, and Tenth -- have declined to address the issue and have not decided whether the exception applies, and, if so, whether it applies outside of the bankruptcy context.  See In re Berman, Nos. 06CV40240-NG, 07CV40138-NG, 2008 WL 11518554 (1st Cir. March 19, 2008)(unpublished); In re Salem, 94 F. App'x 24 (2d Cir. 2004)(unpublished); Nunu v. Texas, No. 21-20446, 2022 WL 820744 (5th Cir. March 17, 2022)(unpublished); Anderson v. Private Capital Gain Group, 549 F. App'x 715 (10th Cir. 2013)(unpublished).  In sum, only two Courts of Appeals -- the Third and the Sixth – explicitly have adopted the exception and they have applied the exception only in the bankruptcy context.

In the absence of binding precedent from the Tenth Circuit, the Court declines to apply the void ab initio exception here.  The Supreme Court announced the Rooker-Feldman doctrine in a pair of decisions, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923)("Rooker"), and Feldman, 460 U.S. at 462.  In so doing, the Supreme Court instructs that the lower federal courts do not have

authority to hear cases brought by "state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon, 544 U.S. at 284.  In the years since Rooker and Feldman, the Supreme Court never has endorsed the void ab initio exception.[16]  It is not the lower federal courts' place to carve out exceptions to a Supreme Court doctrine.  See Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 217 (1990)(instructing the lower courts that "we think it is an unwarranted and counterproductive exercise to litigate a series of exceptions" to the rule that the Supreme Court established in Hanover Show Inc. v. United Show Machinery Corp., 392 U.S. 481 (1968)("Hanover"), and adhered to in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), where the Supreme Court only had provided one exemption in Hanover itself).  If the Supreme Court wants to create exceptions to the Rooker-Feldman doctrine, it certainly knows how to create

---

[16]The Third Circuit concluded that the Supreme Court endorsed the void ab initio exception in Kalb v. Feuerstein, 308 U.S. 433 (1940)("Kalb").  In Kalb, the Supreme Court explains "[i]t is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack.  But Congress, because its power over the subject of bankruptcy is plenary, may by specific bankruptcy legislation create an exception to that principle."  Kalb, 308 U.S. at 438-39.  The Court does not read that language in Kalb, however, as a broad endorsement of the void ab initio exception.  Instead, the Court reads Kalb for the narrower proposition that Congress has power to allow federal bankruptcy courts to review certain state court decisions.  To the extent that Kalb endorses the void ab initio exception, it only does so with respect to bankruptcy cases.

Similarly, it also could be argued that the Supreme Court endorsed the void ab initio exception in Rooker.  See Rooker, 263 U.S. at 416.  In Rooker, the Supreme Court notes that "[s]ome parts of the bill speak of the judgment as given without jurisdiction and absolutely void; but this is merely mistaken characterization.  A reading of the entire bill shows indubitably that there was full jurisdiction in the state courts . . . ."  263 U.S. at 416.  Again, the Court does not read the Supreme Court's decision as an endorsement of the void ab initio exception.  Instead, the Court reads this language from Rooker as confirmation that the State court in the underlying case had jurisdiction.  The Supreme Court does not say what it would have done if it had concluded that the State court did not have jurisdiction and, therefore, provides no insight on its thinking on the void ab initio exception.

exceptions to its own doctrines, and its decision not to is telling.   In the absence of an exception

that the Supreme Court or the Tenth Circuit provides, the Court concludes that it is "unwarranted

and counterproductive" to recognize the void ab initio exception.   Kansas v. UtiliCorp United,

Inc., 497 U.S. at 217.   It certainly seems unwise to apply the void ab initio exception in an area of

law that no other federal court has applied the exception: criminal law.

Moreover, the void ab initio exception has the possibility to swallow the Rooker-Feldman

doctrine.   If the federal courts were to recognize the exception in the criminal context, the federal

courts could become the go-to forum for collateral attacks on State court criminal judgments.

There is no sound reason to move these challenges to federal court.   Litigants can make these same

collateral attacks in State court, and, if needed the Supreme Court.   The Rooker-Feldman doctrine

seems to make as much sense -- if not more -- in barring these collateral attacks on State criminal

convictions in federal court as in other areas of State litigation.    For these reasons, the Court

concludes that the Rooker-Feldman doctrine bars the Plaintiffs' suit.[17]

---

[17]If the Tenth Circuit were to recognize the void ab initio exception, however, the Court determines that it "might be appropriate" to extend the exception to apply in the federal Indian law context.   Schmitt v. Schmitt, 324 F.3d at 487.   In Schmitt v. Schmitt, the Seventh Circuit considered: (i) whether it should recognize the void ab initio exception, and, if so, (ii) whether it should extend the exception beyond the bankruptcy context and apply it to a family law case. 324 F.3d at 487.   On the second question, the Seventh Circuit asserts that the void ab initio exception "might be appropriate" in the bankruptcy context, "in order to protect the dominant federal role in that specialized area of the law," but that it has "no place" in a family law case, because State law typically governs family law.   324 F.3d at 487.   In the end, the Seventh Circuit concludes that "there [is] no need for the federal courts to intervene" and declines to apply the exception.   Schmitt v. Schmitt, 324 F.3d at 487.

The same is not true here.   Unlike family law, Indian law is federal law.   See Restatement of the Law of American Indians § 4 (Am. Law Inst. 2022) (explaining that Indian law is federal law because "[t]he Supreme Court initially analogized the relationship of Indian tribes to the United States to a doctrine of the law of nations").   Historically, the federal courts have dominated the States when it comes to passing and interpreting laws that concern Indians.   See Restatement of the Law of American Indians § 31 (Am. Law Inst. 2022) ("State regulation of tribal-member and Indian-tribe activities and property in Indian country is presumptively preempted.").   Thus, if

**B.**     **THE <u>ROOKER-FELDMAN</u> DOCTRINE PREVENTS THE COURT FROM EXCERCISING SUBJECT-MATTER JURISDICTION IN THIS CASE.**

Finally, the Court determines that, because the <u>Rooker-Feldman</u> doctrine is a jurisdictional doctrine, it prevents the Court from reaching the merits of this suit.  The Court's analysis proceeds in four steps.  First, the Court begins by surveying the debate whether <u>Rooker-Feldman</u> is a preclusion doctrine or a jurisdictional doctrine, and summarizing the arguments in support of both sides of the conflict.  Second, after considering those viewpoints, the Court determines that the jurisdiction theory is more likely the state of the law.  Third, the Court determines that, although <u>Rooker-Feldman</u> is a jurisdictional doctrine, it is not an Article III jurisdictional doctrine.  Finally, the Court concludes that even though <u>Rooker-Feldman</u> is not an Article III jurisdictional doctrine, it nevertheless prevents the Court from reaching this case's merits.

**1.**     **The Debate Between <u>Rooker-Feldman</u>'s Preclusion Theory and Jurisdiction Theory.**

There is debate whether <u>Rooker-Feldman</u> is a preclusion doctrine or a jurisdictional doctrine.  <u>See</u> Wright & Miller § 4469.1 (explaining that there is a <u>Rooker-Feldman</u> "jurisdiction theory" and "preclusion theory").  The preclusion theory posits that the <u>Rooker-Feldman</u> doctrine is akin to claim preclusion, because it prevents a federal district court from relitigating or reviewing issues or claims that were raised in a prior State proceeding.  <u>See</u> Wright & Miller § 4469.1.  The preclusion theory is based on the "close affinity" between <u>Rooker-Feldman</u> and claim preclusion.  <u>Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell</u>, 363 F.3d 1072, 1075 (10th Cir. 2004).  Claim

_____

the Tenth Circuit decides to adopt the void ab initio exception, the Seventh Circuit's analysis suggests that because there is a "dominant federal role," in Indian law, a "specialized area of the law," it "might be appropriate" to extend the void ab initio exception to apply in Indian law cases. <u>Schmitt v. Schmitt</u>, 324 F.3d at 487.  For the reasons stated in the text, however, the Court does not want to promote collateral attacks on State court judgments in federal court just because the cases implicate Indian law or any other federal law.

preclusion -- also known as "res judicata" -- is the principle that an action may not be relitigated after a court has reached a final a judgment on the merits.  See Wright & Miller § 4401.  In practice, claim preclusion prevents a losing party in one action from relitigating a claim that it brought in a prior action, or a claim that it did not bring in the prior action but could have.  See Wright & Miller § 4401.  Because Rooker-Feldman and res judicata both prevent losing parties from relitigating claims from prior cases, courts and scholars sometimes treat Rooker-Feldman and res judicata as interchangeable or coextensive.  See, e.g., In re Lease Oil Antitrust Litig. (No. II), 200 F.3d 317, 319 n.1 (5th Cir. 2000); Moccio v. N.Y. State Office of Ct. Admin., 95 F.3d 195, 199-200 (2d Cir. 1996); Robinson v. Ariyoshi, 753 F.2d 1468, 1472 (9th Cir. 1985), vacated on other grounds, 477 U.S. 902 (1986); Williamson B.C. Chang, Rediscovering the Rooker Doctrine: Section 1983, Res Judicata, and the Federal Courts, 31 Hastings L.J. 1337 (1980)(suggesting that Rooker-Feldman is largely interchangeable with res judicata).

By contrast, the jurisdiction theory asserts that Rooker-Feldman is a jurisdictional bar which prevents a federal district court from exercising authority over a case.  See Wright & Miller § 4469.1.  The jurisdiction theory is derived from a negative inference.  It is well settled that "only the United States Supreme Court has been given jurisdiction to review a state-court decision." Friends of Lake View Sch. Dist. Inc. No. 25 of Philips Cnty. v. Beebe, 578 F.3d 753, 758 (8th Cir. 2009).  See 28 U.S.C. § 1257 (granting the Supreme Court jurisdiction to review decisions from a State's highest court).  It follows that lower "federal district courts generally lack subject-matter jurisdiction over attempted appeals from a state-court judgment."  Friends of Lake View Sch. Dist. Inc. No. 25 of Philips Cnty. v. Beebe, 578 F.3d at 758.  The jurisdiction theory is more widely accepted among legal academics.  See Suzanna Sherry, Judicial Federalism in the Trenches: The Rooker-Feldman Doctrine in Action, 74 Notre Dame L. Rev. 1085, 1101 (1999)("Res judicata is

about parties; Rooker-Feldman is about courts.  That difference explains why Rooker-Feldman, unlike res judicata, is a jurisdictional doctrine . . . .");  Susan Bandes, The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status, 74 Notre Dame L. Rev. 1175, 1179 (1999)("Jurisdictional Status")(arguing that Rooker-Feldman is a jurisdictional doctrine, but that federal courts should narrow its scope).  It is also the theory that the Supreme Court and the Tenth Circuit embrace.  See Lance v. Coffman, 549 U.S. at 439 n.* ("Rooker-Feldman concerns a district court's subject-matter jurisdiction." (citing Exxon, 544 U.S. at 291)); Feldman, 460 U.S. at 482 ("[T]o the extent that [the plaintiffs] sought review in District Court of the District of Columbia Court of Appeals' denial of their petitions for waiver the District Court lacked subject matter jurisdiction over their complaints"); Erlandson v. Northglenn Municipal Court, 528 F.3d 785, 788-89 (10th Cir. 2008)("The Rooker-Feldman doctrine prevents the lower federal courts from exercising jurisdiction . . . ."  (quoting Mann v. Boatright, 477 F.3d 1140, 1146 (10th Cir. 2007)).

Although the jurisdiction theory is more widely accepted, it has "subtle and pervasive consequences."  Jurisdictional Status at 1178.  First, there is the "ever-present risk . . . that the jurisdiction label will stop up thought, invoking inappropriate reflexes rather than independent consideration of distinctive problems."  Wright & Miller § 4469.1. Second, and relatedly, the jurisdiction theory "gives courts implicit permission to fail to discuss the policies inherent in the decision to deny jurisdiction."  Jurisdictional Status at 1178.  Third, the jurisdiction theory risks hampering judicial efficiency because, "dismissal for want of jurisdiction gains little and incurs the risk that a dismissal without prejudice for lack of jurisdiction will be followed by yet another action to resolve the preclusion dispute."  Wright & Miller § 4469.3.  Finally, the jurisdiction theory creates the perception of "lack of judicial choice and responsibility."  Jurisdictional Status at 1178.

2.    __The Court Applies__ Rooker-Feldman__'s Jurisdictional Theory__.

The Court will follow the Supreme Court and Tenth Circuit's guidance, and apply the jurisdictional theory.  See Feldman, 460 U.S. at 482; Erlandson v. Northglenn Municipal Ct., 528 F.3d at 788-89.  As it stands, the jurisdiction theory is controlling in the Tenth Circuit and "[t]here is not much reason to anticipate that the Supreme Court will abandon the jurisdiction theory."[18] Wright & Miller § 4469.3.  Nevertheless, the Court applies the jurisdictional theory with some hesitation.  This case demonstrates how the "ever-present risk . . . that the jurisdiction label will stop up thought" materializes in practice.  Wright & Miller § 4469.1.  Here, the Court cannot weigh in on important and quickly evolving questions concerning Indian law in the wake of the Supreme Court's McGirt decision.  Although the Court does not want the federal courts to become the go to forum for Indians challenging their criminal convictions after McGirt, as it describes in greater detail above, the Court fears that the "jurisdictional label" is "stop[ping] up thought" on these pressing and timely cases.  Wright & Miller § 4469.1.  Nevertheless, the Court applies the jurisdictional theory and concludes that the Rooker-Feldman doctrine prevents the Court from exercising subject-matter jurisdiction over this case.

3.    Rooker-Feldman __Is Not an Article III Jurisdictional Doctrine__.

Having concluded that Rooker-Feldman is a jurisdictional doctrine, the Court next concludes that it is not an Article III jurisdictional doctrine.  The Court must decide whether Rooker-Feldman is an Article III jurisdictional bar or a statutory jurisdictional bar, because the resolution may impact whether the Court is able to reach this case's merits.

---

[18]On a clean slate, the Court would also adopt the jurisdiction theory because Congress gives appellate jurisdiction over State court decisions to the United States Supreme Court, not to the lower federal courts.  See 28 U.S.C. § 1257.

Federal courts derive subject-matter jurisdiction from one of two sources: Article III or statute.   Article III creates the United States Supreme Court and outlines the Supreme Court's original jurisdiction.   See U.S. Const. art. III, §§ 1, 2.  It also empowers Congress to create "lower federal courts" and implies that Congress may regulate those lower courts' jurisdiction.   U.S. Const. art. III, § 1.   Accordingly, Congress has passed several statutes that provide the federal courts with jurisdiction, including 28 U.S.C. § 1331 -- federal question jurisdiction -- and 28 U.S.C. § 1332 -- diversity jurisdiction.

Here, Rooker-Feldman implicates statutory subject-matter jurisdiction and not Article III subject-matter jurisdiction.  "The Constitution does not command the Rooker-Feldman doctrine." Doe v. Mann, 415 F.3d at 1043.  Article III does not permit or prohibit the lower federal courts from reviewing State court decisions.  Instead, the Supreme Court derived the Rooker-Feldman doctrine from "a pair of negative inferences drawn from" two jurisdictional statutes:  28 U.S.C. § 1331, which provides federal courts with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1257, which grants the Supreme Court review of "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had."  In re Gruntz, 202 F.3d 1074, 1078 (9th Cir. 2000).  See Rooker, 263 U.S. at 415-16 (analyzing §§ 1331 and 1257's predecessors in the Judicial Code); Feldman, 460 U.S. at 476 (analyzing § 1257).  After reviewing those statutes, the Supreme Court in Rooker concludes that "[u]nder the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of that character," that is proceedings reviewing State court decisions.  Rooker, 263 U.S. at 416.  Notably, the Supreme Court's decisions in Rooker and Feldman do not rely on Article III to conclude that lower federal courts do not have jurisdiction to review State court decisions.  See Feldman, 460 U.S. at

- 138 -

477, 479 (invoking Article III for the limited purpose of demonstrating that there was a live case or controversy at issue).  Given that the Supreme Court derived the Rooker-Feldman doctrine from statute, and not Article III, the Court concludes that the Rooker-Feldman doctrine is a statutory jurisdictional doctrine, and not an Article III jurisdictional doctrine.  Accord Sinapi v. Rhode Island Bd. of Law Examiners, 910 F.3d 544, 550 (1st Cir. 2018); Edwards v. City of Jonesboro, 645 F.3d 1014, 1017-18 (8th Cir. 2011)("Edwards"); Doe v. Mann, 415 F.3d at 1043; In re Gruntz, 202 F.3d at 1078.

      **4.**      **Although Rooker-Feldman Is Not an Article III Jurisdictional Doctrine, It Prevents the Court from Dismissing This Case on Other Grounds or Otherwise Reaching This Case's Merits.**

      Finally, the Court concludes that the Rooker-Feldman doctrine prevents the Court from reaching this case's merits.  There is disagreement among the Courts of Appeals on whether a district court can consider a case's merits if a non-Article III jurisdictional doctrine, like the Rooker-Feldman doctrine, prevents the court from exercising subject-matter jurisdiction.  The Eighth Circuit documents the disagreement in Edwards.  See 645 F.3d at 1017-18.  There, the Eighth Circuit explains:

> With a few limited exceptions, federal courts must address *Article III subject-matter jurisdiction* before reaching the merits of a claim or another non-jurisdictional question such as issue preclusion. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93-97 . . . (1998). Whether this rule also applies to statutory jurisdiction, however, is a matter of some dispute.  *Steel Co.* noted that the limitations of statutory and Article III jurisdiction have similar purposes, [Steel Co. v. Citizens for a Better Env't, 523 U.S.] at 101 . . . but the Court also acknowledged that a federal court may reach a merits question before deciding a question of statutory *standing. Id.* at 96-97 & n. 2 . . . The courts of appeals disagree about whether a federal court may bypass *Rooker-Feldman*, a question of statutory jurisdiction, to reach an easier question of preclusion or the merits.  *Compare Alyshah v. United States,* 241 Fed. Appx. 665, 668 n. 3 (11th Cir. 2007)(stating that *Steel Co.* prevents federal courts from assuming that *Rooker-Feldman* does not apply in order to reach the merits), *Shell v. Meconi,* 123 Fed.

Appx. 866, 867-68 (10th Cir. 2005)[(unpublished)("Shell")](same), *Nguyen v. Phillips,* 69 Fed. Appx. 358, 359 n. 3 (9th Cir. 2003)(same), *In re Knapper,* 407 F.3d 573, 580 n. 15 (3d Cir. 2005)(stating, without mentioning *Steel Co.,* that courts may not bypass *Rooker-Feldman* to reach the merits), *Hutcherson v. Lauderdale Cnty.,* 326 F.3d 747, 755 (6th Cir. 2003)(same), and *Ctrs., Inc. v. Town of Brookfield,* 148 F.3d 699, 703 (7th Cir. 1998)(same), *with Laychock v. Wells Fargo Home Mortg.,* 399 Fed. Appx. 716, 7180-19 (3d Cir. 2010)(bypassing *Rooker-Feldman* to decide the case based on preclusion), *Torromeo v. Town of Fremont,* 438 F.3d 113, 115 (1st Cir. 2006)(same), *Quadrozzi Concrete Corp. v. City of N.Y.,* 149 Fed. Appx. 17, 18 (2d Cir. 2005)(same), *and Garcia v. Vill. of Mount Prospect,* 360 F.3d 630, 634 n. 5 (7th Cir. 2004)(same).

Edwards, 645 F.3d at 1017-18.

More recently, the Tenth Circuit explained in Estate of Angel Place v. Anderson, No. 19-1269, 2022 WL 1467645 (10th Cir. May 10, 2022)(unpublished):

Some controversy exists -- even within our circuit -- as to whether a court may bypass a Rooker-Feldman issue when it can more easily resolve the case on the merits.  Compare Yancey v. Thomas, 441 F. App'x 552, 555 n.1 (10th Cir. 2011)[(unpublished)("Yancey")](declining to address Rooker-Feldman because the jurisdictional bar stems from a statute, not Article III of the Constitution), with Shell . . . , 123 F. App'x . . . [at] 867-68 . . . (holding the district court should have disposed of the case on Rooker-Feldman jurisdictional grounds before reaching the merits) . . . . But we need not address that question today.

2022 WL 1467645, at *3.

More specifically, in Shell, two plaintiffs filed two identical civil suits in federal court after a Colorado State court granted custody of one of the plaintiff's children to the County's health department.  See 123 F. App'x at 688-89.  One suit was against the County and the other was against two attorneys involved in the State proceeding.  See 123 F. App'x at 688-89.  A magistrate judge recommended that the court dismiss the suit against the County defendants under Younger and Rooker-Feldman, and that the court dismiss the suit against the attorneys under rule 12(b)(6). See 123 F. App'x at 689.  The district court judge adopted the magistrate judge's recommendation,

dismissed the suits, but did not make it clear whether it dismissed under <u>Younger</u>, <u>Rooker-Feldman</u>, or both.  <u>See</u> 123 F. App'x at 689.  On review, the Tenth Circuit concluded:

> The district court properly concluded that it was without subject matter jurisdiction under the Rooker-Feldman doctrine to entertain plaintiffs' claims against the . . . County defendants.  For the same reason, the district court did not have subject matter jurisdiction to hear plaintiffs' identical claims against [the attorney defendants].  The district court should have sua sponte dismissed the claims against [the attorney defendants] for lack of subject matter jurisdiction rather than address the merits of plaintiffs' claims against these two defendants.  See Tafoya v. United States Dep't of Justice, 748 F.2d 1389, 1390 (10th Cir. 1984) ("Insofar as subject matter jurisdiction is concerned, it has long been recognized that a federal court must, sua sponte, satisfy itself of its power to adjudicate in every case and at every stage of the proceedings . . . . ").

<u>Shell</u>, 123 F. App'x at 871.

By contrast, in <u>Yancey</u>, the Tenth Circuit confronted another custody dispute.  <u>See</u> 441 F. App'x at 553.  There, an Oklahoma State court granted custody of a child to two adoptive parents under the Indian Child Welfare Act, 25 U.S.C. § 1901 <u>et seq.</u> ("ICWA").  <u>See</u> 441 F. App'x at 553-54.  One of the child's biological parents then filed suit against the adoptive parents in federal court.  <u>See</u> 441 F. App'x at 554.  The adoptive parents moved to dismiss the suit under <u>Rooker-Feldman</u> or, in the alternative, under <u>Younger</u>.  <u>See</u> 441 F. App'x at 554.  The district court bypassed the <u>Rooker-Feldman</u> issue, and instead determined that the State proceedings are ongoing and that it would abstain under <u>Younger</u>.  <u>See</u> 441 F. App'x at 555.  The district court added, in the alternative, that if the State proceedings were not ongoing, the court would dismiss, because the State proceedings preclude the federal proceedings.  <u>See</u> 441 F. App'x at 555.  On appeal, the biological parent argued that <u>Rooker-Feldman</u> does not apply in ICWA cases.  <u>See</u> 441 F. App'x at 555.  The Tenth Circuit was "not persuaded," and affirmed the district court's dismissal on the grounds that the suit was "barred by res judicata and that the state-court ruling must be given full faith and credit . . . ."  441 F. App'x at 556-57.

In light of the apparent conflict between Shell and Yancey, and in the absence of clearer guidance from the Tenth Circuit, the Court declines to proceed beyond Rooker-Feldman, and to dismiss this case on other grounds or otherwise reach this case's merits.  The Court makes this conclusion for several reasons.  First, although there is a split among the Courts of Appeals on the question whether a court can bypass Rooker-Feldman to address the merits or to dismiss on other grounds, a plurality of the Courts of Appeal hold that a court cannot bypass Rooker-Feldman.  See Edwards, 645 F.3d at 1017-18 (cataloguing cases and illustrating that the plurality of the courts of appeals do not permit courts to go beyond Rooker-Feldman).  Second, all of the Courts of Appeal that permit courts to bypass Rooker-Feldman -- including the Tenth Circuit -- do so only to allow those courts to dismiss the suit on the basis of res judicata.  See Laychock v. Wells Fargo Home Mortg., 399 F. App'x at 718-19 (bypassing Rooker-Feldman to decide the case on res judicata); Torromeo v. Town of Fremont, 438 F.3d at 115 (same); Quadrozzi Concrete Corp. v. City of N.Y., 149 F. App'x at 18 (same); Garcia v. Village of Mount Prospect, 360 F.3d at 634 n. 5 (same); Yancey, 441 F. App'x at 556-57 (same).  At most, the Court reads these cases to permit courts to bypass Rooker-Feldman to address res judicata alone.  Third, the court in Palmer dismissed the suit under Rooker-Feldman without bypassing Rooker-Feldman to address another dispositive issue.  See Palmer, 2022 WL 407389, at *4 (dismissing under Rooker-Feldman and moving onto other issues raised in other motions pending before the court).  Finally, the Court's decision not to bypass Rooker-Feldman is consistent with the principle that federal courts are courts of limited jurisdiction and that they should act only where they have subject-matter jurisdiction.  See Tafoya v. U.S. Dep't of Justice, Law Enforcement Assistance Admin., 748 F.2d at 1390 (emphasizing that federal courts are "not courts of general jurisdiction" and that they should not adjudicate "[w]here jurisdiction is lacking").  Subject-matter jurisdiction is the

touchstone of the Court's authority to adjudicate cases, and it is unwilling to skip over a jurisdictional question in an effort to resolve this case on other, non-jurisdictional grounds.

For these reasons, the Court declines to bypass the Rooker-Feldman doctrine, and to dismiss this case on other grounds or otherwise consider this case's merits. If, however, the Court is incorrect and the Tenth Circuit permits the Court to proceed past Rooker-Feldman, then the Court would dismiss this suit on other grounds. Accordingly, in the following sections, the Court considers five alternate bases on which the Court might have dismissed this suit.[19]

## IV.     YOUNGER ABSTENTION DOES NOT APPLY.

The DA Defendants and Edwards argue that Younger requires the Court to abstain. See DA MTD at 26; Edwards MTD at 17, 20. Under Younger, a federal court must abstain when:

---

[19]The Plaintiffs ask the Court for leave to amend their Complaint if the Court dismisses all their claims. See Clerk MTD Response at 33, Edwards MTD Response at 32. Rule 15 of the Federal Rules of Civil Procedure states that, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15. In Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court provides:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. at 182. See McGoffin v. Sun Oil Co., 539 F.2d 1245, 1248 (10th Cir.1976)(stating "leave to amend should be freely granted")(citing Polin v. Dunn & Bradstreet, Inc., 511 F.2d 875 (10th Cir.1975)(quoting Foman v. Davis, 371 U.S. at 182)).

Here, the Court denies the Plaintiffs' request for leave to amend, because any amendment would be futile. See Foman v. Davis, 371 U.S. at 182. The Court dismisses this case for lack of jurisdiction under the Rooker-Feldman doctrine. The Court does not see how the Plaintiffs could revise their claims in a way that would not run afoul of the Rooker-Feldman doctrine. At bottom, the Plaintiffs' suit asks the Court to review the Plaintiffs' State court convictions, which Rooker-Feldman proscribes. It would be futile to allow the Plaintiffs to amend because no matter how they stylize their claims, the Rooker-Feldman doctrine will prevent the Court from reviewing their State convictions.

(i) there is an ongoing State criminal, civil, or administrative proceeding; (ii) the State court provides an adequate forum to hear the federal claims; and (iii) the State proceedings involve important state interests. See Winn v. Cook, 945 F.3d 1253, 1258 (10th Cir. 2019)(citing Chapman v. Oklahoma, 472 F.3d 747, 749 (10th Cir. 2006)). Circumstances warranting Younger abstention are "'exceptional,'" and include: "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368). See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d at 670. Here, Younger abstention is not required, because Younger's three requirements are not met.

The first Younger requirement -- ongoing State proceedings -- is not met because there are no ongoing State proceedings at issue in this case. The DA Defendants urge that the Court abstain, asserting that the Oklahoma Court of Criminal Appeals remanded numerous cases after the Supreme Court decided McGirt so that State district courts could consider whether Congress ever disestablished the Cherokee reservation. See DA MTD at 26. In addition, the DA Defendants indicate that a State court was scheduled to hold an evidentiary hearing before November, 2020, to determine whether the Cherokee nation's boundaries had been disestablished. See DA MTD at 28. Further, Edwards asserts that there are ongoing criminal proceedings related to each Plaintiff, because each Plaintiff "has a right to seek redress" in the form of post-conviction relief under the OUPCA. Edwards MTD at 20. The Defendants do not alert the Court of any ongoing State proceeding. In fact, the Defendants elsewhere chastise the Plaintiffs for choosing to file this case rather than seeking individual post-conviction relief in the State courts. See District Courts MTD at 3; Municipality MTD at 23; Clerk MTD Reply at 8; Newberry MTD Reply at 8-9; Owasso MTD

at 20.  The Plaintiffs maintain that they are not required to seek individual post-conviction relief.

See District Courts MTD Response at 23.  Further, the Oklahoma State courts already have

reaffirmed their recognition of the Cherokee Reservation.  See Wallace, 497 P.3d at 689 ("After

careful examination . . . we reaffirm our recognition of the Cherokee, Choctaw, and Chickasaw

Reservations.").  See also Castro-Huerta, 142 S. Ct. at 2491-92 (citing Wallace for the proposition

that the Oklahoma Court of Criminal Appeals "later recognized that several other Indian

reservations in Oklahoma had likewise never been properly disestablished").  There is, therefore,

no indication that any Plaintiff has filed for individual post-conviction relief, or that there are any

other ongoing State criminal, civil, or administrative proceedings that this case may implicate.

There is no ongoing State proceeding with which the Plaintiffs' requested relief might interfere.

The second Younger requirement -- adequate State forum -- is met because a State court

offers an adequate forum for the Plaintiffs' claims.  A plaintiff "typically has 'an adequate

opportunity to raise federal claims in state court'" unless State law "'clearly bars the interposition

of the federal statutory and constitutional claims.'"  Winn v. Cook, 945 F.3d at 1258 (quoting

Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1215 (10th Cir. 2003)).

The Plaintiffs assert two federal claims: a declaratory judgment under rule 57, see Complaint

¶¶ 79-85, at 19-20, and damages under § 1983 for due process violations, see Complaint ¶¶ 90-95,

at 20-21.  The Court has looked at the Oklahoma code to determine whether any State statute bars

the Plaintiffs' federal claims and found none, and the parties do not alert the Court of any such

statute; the Court is not aware of any problem with raising these claims in State court.  Absent any

indication that the Oklahoma Legislature prohibits its courts from hearing the Plaintiffs' federal

claims, the Court concludes that the State courts offer an adequate forum for the Plaintiffs' federal

claims.  See Tafflin v. Levitt, 493 U.S. 455, 458 (1990)(stating that State courts "have inherent

authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States").  This factor, however, does not favor abstention, because there is no ongoing State proceeding and federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996), so "in the absence of a congressional directive, federal courts should not decline lightly to carry out their obligation," Courthouse News Serv. v. N.M. Admin. Off. of the Cts., 566 F. Supp. 3d 1121, 1168 (D.N.M. 2021)(Browning, J.).

Third, without any State proceedings to consider, the Court cannot assess meaningfully whether the State proceedings involve important State interests.  Were there ongoing State criminal proceedings, those proceedings would present "a traditional area of state concern" that would counsel in favor of Younger abstention.  Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.2d 709, 713 (10th Cir. 1989).  The Court is mindful of the Supreme Court's caution against issuing relief that would lead to unnecessary oversight of State proceedings.  See O'Shea v. Littleton, 414 U.S. 499, 500 (1974).  Absent any State proceedings to oversee, however, Younger does not require abstention.

## V.     THE PLAINTIFFS SEEK PROHIBITED RETROSPECTIVE DECLARATORY RELIEF.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states that, subject to two listed exceptions, in "a case of actual controversy within its jurisdiction," a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction."  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950).  The Declaratory Judgment Act "confers

upon courts the power, but not the duty, to hear claims for declaratory relief." Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners Ass'n, Inc., 685 F.3d 977, 980 (10th Cir. 2012).   In determining whether to issue an declaratory judgment, a district court should consider: (i) whether the declaratory judgment will settle the controversy; (ii) whether the declaratory judgment will serve a useful purpose in clarifying the legal relations at issue; (iii) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; (iv) whether the use of a declaratory action would increase friction between the federal courts and state courts, and will encroach improperly upon state jurisdiction; and (v) whether there is an alternative remedy that is better or more effective.  See Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners Ass'n, Inc., 685 F.3d at 980-81.  A plaintiff can maintain a declaratory or injunctive action only if "he or she can demonstrate a good chance of being likewise injured in the future."  Facio v. Jones, 929 F.2d 541, 554 (10th Cir. 1991).  A declaratory judgment action "involving past conduct that will not recur is not justiciable."  Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1266 (10th Cir. 2004)(McConnell, J., concurring).

Generally speaking, district courts cannot grant retrospective declaratory relief.  See PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002).  Declaratory relief is retrospective "to the extent that it is intertwined with a claim for monetary damages" and requires a court to "declare whether a past constitutional violation occurred."  PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d at 1202 n.2.  An action under the Declaratory Judgment Act "must comport with the same mootness principles as any other suit,"  Cardtoons L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 965 (10th Cir. 1996), meaning that an action is moot unless the decision's effect "settles 'some dispute which affects the behavior of the defendant toward the plaintiff,'"  Prier v. Steed,

456 F.3d 1209, 1213 (10th Cir. 2006)(quoting <u>Cox v. Phelps Dodge Corp.</u>, 43 F.3d 1345, 1348 (10th Cir. 1994)).

Here, Plaintiffs seek a declaratory judgment stating that "the Cherokee Reservation has not been disestablished and therefore any action by the State of Oklahoma or its political subdivisions is void because the court would have lacked subject matter jurisdiction."  Complaint ¶ 85, at 20. The District Court Defendants, DA Defendants, Clerk Defendants, Edwards, and Newberry argue that the Plaintiffs are not entitled to declaratory relief, because the requested declaratory relief is retrospective, and the Declaratory Judgment Act does not extend to retrospective relief.  <u>See</u> District Courts MTD at 10.; DA MTD at 15; Clerk MTD at 21-22; Edwards MTD at 28; Newberry MTD at 17.   The Court concludes that the Plaintiffs seek retrospective declaratory relief and, accordingly, the Court cannot award it.  Although the Plaintiffs seek a declaratory judgment that the Cherokee Reservation has not been disestablished -- a prospective form of relief -- they do so only to vindicate alleged wrongs that occurred in the past.  The Tenth Circuit states, however, that declaratory judgment is "meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act." <u>Lawrence v. Kuenhold</u>, 271 F. App'x 763, 766 (10th Cir. 2008)(unpublished).  Although a declaration that the Cherokee Reservation has not been disestablished could be prospective, because it affects the legal relationship between the Cherokee Nation, the State of Oklahoma, and people who are subject to their respective laws, the Plaintiffs' requested relief here does not hinge on any anticipated change in legal relations between the Plaintiffs and any of the Defendants.  Rather, the Plaintiffs' requested declaratory relief is an apparent vehicle to vindicate their monetary claims.

If the Plaintiffs' request for relief hinged on a likelihood that they would suffer the same injury again the future, then it would be a "traditional claim for prospective relief." <u>Baca v. Colo.</u>

- 148 -

Dep't of State, 935 F.3d 887, 911 (10th Cir. 2019), rev'd on other grounds, 140 S. Ct. 2316 (2020).

The Plaintiffs, however, do not alert a "good chance" that the Defendants will injure them in the future.  Facio v. Jones, 929 F.2d at 554.  Rather, as the Plaintiffs have worded their request for relief in their Complaint, the declaratory relief is "superfluous in light of the damages claim." Green v. Branson, 108 F.3d 1296, 1300 (10th Cir. 1997).  The Plaintiffs' requested declaratory relief "would amount to nothing more than a declaration that [the Plaintiffs were] wronged" and that the Plaintiffs should be compensated.  Green v. Branson, 108 F.3d at 1300.  Accordingly, the Plaintiffs' request for declaratory relief, as stated in the Complaint, is retrospective.  Moreover, for a declaratory judgment's purposes, the "'presence of a controversy must be measured at the time the court acts," and it is not sufficient if there was a "'controversy when the action was commenced if subsequent events have put an end to the controversy, or if the opposing party disclaims the assertion of countervailing rights.'"  Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1381-82 (10th Cir. 2011)(quoting Wright & Miller § 2757)).  Further, in light of Wallace, a declaratory judgment is moot, because the controversy that the Plaintiffs hope to solve as a vehicle to vindicate their damages claims is at an end.  See Wallace, 497 P. 3d at 689.  The Plaintiffs' requested declaratory relief, therefore, is prohibited retrospective relief.

## VI.     THE DISTRICT COURT DEFENDANTS ARE NOT "PERSON[S]" UNDER § 1983.

42 U.S.C. § 1983 creates a right of action against "[e]very person who," under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  Neither a State nor its officials acting in their official capacities are proper § 1983 defendants, however, because neither "are 'persons' under § 1983." Will v. Mich. Dep't of State Police, 491 U.S. at 71 (no citation given for quotation).  In other

words, "the State and arms of the State . . . are not subject to suit under § 1983." Howlett v. Rose, 496 U.S. 356, 365 (1990).  Unlike States and State agencies, however, Municipalities are persons under § 1983 and thus subject to suit.  See Monell, 436 U.S. at 690.

Here, the District Court Defendants are not "person[s]" under 42 U.S.C. § 1983 because neither a State nor a governmental entity that is an arm of a State is a "person" under § 1983.  42 U.S.C. § 1983. See Will v. Mich. Dep't of State Police, 491 U.S. at 70-71.   An entity is an arm of the State if it is given little autonomy under State law and the entity's funding is not independent from the State.  See Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 574-75 (10th Cir. 1996). There are four factors to consider in determining whether an entity is an arm of the State: (i) whether, under State law, the entity is identified as a State agency; (ii) the entity's autonomy under State law; (iii) the entity's financial autonomy; and (iv) whether the entity is concerned primarily with State affairs or with local affairs.  See Steadfast Ins. Co. v. Ag. Ins. Co., 507 F.3d 1250, 1253 (10th Cir. 2007).  All four factors indicate that the District Court Defendants are arms of the State.  First, the Constitution of the State of Oklahoma creates the State District Courts.  See Okla. Const. Art. VII, § 7(a).   State statutes also set out the number of judicial districts in Oklahoma.  See Okla. Stat. tit. 20 §§ 92.2-27.  Additionally, State law indicates that the "District Court shall hold court in the county seat of every county in the district."  Okla. Stat. tit. 20 § 95.1. Second, the State courts in Oklahoma are given little autonomy, because the Oklahoma State legislature has outlined strictly how they operate.  See Okla. Stat. tit. 20 §§ 91-130.  Third, State law set outs the district judges' salaries.  See Okla. Stat. tit. 20 § 92.1A.  Finally, the District Courts in Oklahoma are concerned primarily with State affairs, because they have "unlimited original jurisdiction of all justiciable matters" under State law, except with a handful of constitutional and statutory exceptions.  Okla. Const. Art. VII, § 7(a).  The District Court Defendants, therefore, are

arms of the State of Oklahoma, and, accordingly, are not persons for § 1983's purposes. See

Coopersmith v. Supreme Ct. State of Colo., 465 F.2d 993, 994 (10th Cir. 1972)(concluding that

various Colorado State courts and court entities were "not 'persons' as . . .contemplated [by

§1983]."); Harris v. Champion, 51 F.3d 901, 906 (10th Cir. 1995)(concluding that a State court is

not a person under § 1983).

      The Court's conclusion that Oklahoma State courts are not "person[s]" within the meaning

of § 1983 is consistent with the conclusions of other district courts in the Tenth Circuit. For

example, in Barela v. First Judicial District Court, No. CIV 10-0352 RB/RHS, 2010 WL 11619272

(D.N.M. July 13, 2010)(Brack, J.), the Honorable Robert C. Brack, United States District Judge

for the United States District Court for the District of New Mexico, dismisses § 1983 claims

against the First Judicial District Court, State of New Mexico, because "a state court does not

qualify as a 'person' under the civil-rights statutes," 2010 WL 11619272, at *3 (no citation for

quotation). Similarly, in Gomez v. Eleventh Judicial District Court, No. CIV 10-9594 JP/LFG,

2010 WL 11618815 (D.N.M. October 14, 2010)(Parker, J.), the Honorable James A. Parker, Senior

United States District Judge for the United States District Court for the District of New Mexico,

dismisses § 1983 claims against the Eleventh Judicial District Court, State of New Mexico,

because it is an arm of the State, and the State controls it and funds it, see 2010 WL 11618815, at

*4. Finally, in Peel v. Smith, No. CIV 07-0554 JHP, 2008 WL 376211 (N.D. Okla. February 8,

2008)(Payne, J.), the Honorable James H. Payne, United States District Judge for the United States

District Court for the Northern District of Oklahoma, dismisses § 1983 claims against the

Oklahoma Drug Court, because the Drug Court is not a person capable of being sued under § 1983,

see 2008 WL 376211, at *1 (citing Coopersmith v. Supreme Ct. State of Colo., 465 F.2d at 994).

## VII.      HECK <u>BARS THE PLAINTIFFS' CLAIMS</u>.

In their Complaint, the Plaintiffs assert a § 1983 claim alleging that the "Defendants have executed a policy of arresting, investigating, issuing citations to and collecting fines from Tribal members within the boundaries of the Cherokee Reservation," and "[i]n so doing . . . have violated the rights of the Tribal members, as guaranteed by treaty, United States Federal Law and the United States Constitution."  Complaint ¶¶ 91-92, at 20.   The Defendants contend that the Court should dismiss the Plaintiffs'§ 1983 claim -- along with the Plaintiffs' two other claims -- because it implies that the Plaintiffs' underlying convictions are invalid, and that Oklahoma State courts and not a federal court should "decide whether state law demands a <u>Heck</u>-like favorable termination rule based on collateral attacks implicit in civil actions outside post-conviction relief."  DA MTD at 23.  <u>See</u> Municipality MTD at 19; Clerk MTD at 18-20; Edwards MTD at 22-23; Newberry MTD at 23; Owasso MTD at 15.   The Plaintiffs respond that <u>Heck</u> does not bar their claims, because their underlying convictions are not valid.  <u>See</u> Municipality MTD Response at 20; Owasso MTD Response at 16.  The Court concludes that <u>Heck</u> bars the Plaintiffs' claims, because they "necessarily impl[y] the invalidity of [the Plaintiffs'] conviction[s]," and the Plaintiffs cannot "demonstrate that the[ir] conviction[s] or sentence[s] ha[ve] already been invalidated."  <u>Heck</u>, 512 U.S. at 487.

<u>Heck</u> establishes that a court must dismiss a § 1983 claim if it seeks to recover damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," and the plaintiff cannot show that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. at 486-87.   The plaintiff in <u>Heck</u> was in custody, <u>see</u> <u>Heck</u>, 512 U.S. at 478, and the

doctrine is most frequently applied in cases where a plaintiff in custody challenges the validity of their conviction, see, e.g., Baldwin v. O'Connor, 466 F. App'x 717 (10th Cir. 2012)(unpublished). Nevertheless, Courts have applied the Heck doctrine in post-McGirt cases where the plaintiff is out of custody and brings a suit challenging the validity of his or her prior conviction.  See Palmer, 2022 WL 407389, at *3.[20]

Here, Heck bars the Plaintiffs' three claims.  Heck bars the Plaintiffs' § 1983 claim, because it is a § 1983 claim for damages that "necessarily implies the invalidity of [the Plaintiffs'] conviction[s]," and the Plaintiffs cannot "demonstrate that the[ir] conviction[s] or sentence[s] ha[ve] already been invalidated."  Heck, 512 U.S. at 487.  The Court cannot grant the Plaintiffs' § 1983 claim without first determining that Oklahoma State courts "had no subject matter jurisdiction," such that their judgments against the Plaintiffs are invalid.  Complaint ¶ 92, at 21. Accordingly, it cannot grant the Plaintiffs' § 1983 claim without "necessarily impl[ying] the invalidity of [the Plaintiffs'] conviction[s]."  Heck, 512 U.S. at 487.  Further, even if the Court could decide the Plaintiffs' claims without implying that their State court convictions are invalid, the Plaintiffs have not demonstrated that "the[ir] conviction[s] or sentence[s] ha[ve] already been invalidated."  Heck, 512 U.S. at 487.  For the same reasons, Heck also bars the Plaintiffs' money-had-and-received claim and declaratory judgment claim, because both seek relief that also would necessarily invalidate the their convictions.  See Wilkinson v. Dotson, 544 U.S. at 80-81 (applying Heck where the plaintiff sought declaratory and injunctive relief); Edwards v. Balisok, 520 U.S.

---

[20]The court's decision in Palmer does not specify whether the plaintiff is in or out of custody.  See Palmer, 2022 WL 407389.  The Court infers, however, that the plaintiff in Palmer is out of custody because the plaintiff's address listed on the complaint in Palmer is a residential address in Ellensburg, Washington, and not a state or federal detention facility.  See Complaint for Damages at 22, filed June 20, 2019, in W.D. Wash. Case No. 19-cv-0961-LK (Doc. 1).

at 648 (applying <u>Heck</u> where the plaintiff sought money damages und declaratory relief).

The Plaintiffs' argument that <u>Heck</u> does not apply, because their underlying convictions are invalid, is unavailing.  <u>See</u> Municipality MTD Response at 20; Owasso MTD Response at 16.  The Plaintiffs contend that <u>Heck</u> does not bar their claims, because their underlying convictions are not valid.  <u>See</u> Municipality MTD Response at 20; Owasso MTD Response at 16.   In the Plaintiffs' view, <u>Heck</u> does not apply, because their State convictions were void from the start, such that the Court will not "necessarily impl[y] the invalidity" of the Plaintiffs' already-invalid convictions.  <u>Heck</u>, 512 U.S. at 487.   The Plaintiffs' argument on this point is essentially a repackaging of their <u>Rooker-Feldman</u> void ab initio exception argument, which the Court discussed -- and rejected -- above.   For the reasons stated above, the Court again rejects the argument here.   If anything, the Plaintiffs' void ab initio argument is weaker with respect to the <u>Heck</u> doctrine than it is with respect to the <u>Rooker-Feldman</u> doctrine, because no court has ever recognized a void ab initio exception to the <u>Heck</u> doctrine.   Many similarly situated plaintiffs in other cases have argued in favor of a void ab initio exception to <u>Heck</u>, but district courts across the country consistently have rejected those arguments.   <u>See</u> <u>Sandstorm v. New York</u>, No. 18-cv-1514S(F), 2022 WL 3949344, at *11 (W.D.N.Y. February 20, 2020)(Foschio, J.)(rejecting the plaintiff's argument that <u>Heck</u> does not bar his claim because the underlying State court judgment was void ab initio); <u>Johnson v. Baker</u>, No. CV 306-100, 2007 WL 4995540, at *3 (S.D. Ga. September 26, 2007)(Barfield, J.)(applying the <u>Heck</u> bar where the plaintiff claimed his underlying conviction is void ab initio); <u>Sierra v. Daneri</u>, No. 19-cv-208, 2019 WL 5597197, *2 (W.D. Pa. October 30, 2019)(Baxter, J.)(applying the <u>Heck</u> bar over the plaintiff's objection that his underlying conviction is void ab initio).   The Court will not recognize a void ab initio exception to <u>Heck</u> here as well.   For these reasons, the Court concludes that <u>Heck</u> bars the Plaintiffs' claims.

VIII. **THE COURT WILL CONSIDER THE AMICUS BRIEF, AND DETERMINES THAT THE CURTIS ACT BARS THE PLAINTIFFS' CLAIMS AGAINST THE MUNICIPALITY DEFENDANTS OR THE CITY OF OWASSO.**

The Municipality Defendants and the City of Owasso contend that the Curtis Act bars the Plaintiffs' claims against them, because the Curtis Act "unequivocally says cities and towns may adopt and enforce municipal ordinances," and forecloses the Plaintiffs' claims, because the Municipality Defendants and the City of Owasso "were merely exercising their congressionally created grant of authority." Municipality MTD at 13. See Owasso MTD at 18-19. The Plaintiffs respond that the Curtis Act does not bar their claims, because the Curtis Act never gave Towns or Municipalities, including the Municipality Defendants, "the ***authority*** to ***prosecute*** the Indians for violating those laws." Municipality MTD Response at 15 (emphasis in original). See Owasso MTD Response at 18. The Indian Nations ask the Court to consider their Amicus Brief, see Amicus Motion at 1, which asserts that "Oklahoma's admission to statehood less than ten years after enactment of the Curtis Act extinguished the federal law authority of the municipalities Congress had authorized in the Indian Territory." Amicus Brief at 2. The Court concludes that: (i) it will grant the Amicus Motion and rely on the Amicus Brief, and (ii) the Curtis Act bars the Plaintiffs' claims against the Municipality Defendants and the City of Owasso.

A. **THE COURT WILL CONSIDER THE AMICUS BRIEF BECAUSE THE AMICUS BRIEF IS USEFUL IN DETERMINING WHETHER THE CURTIS ACT BARS THE PLAINTIFFS' CLAIMS AGAINST THE MUNICIPALITY DEFENDANTS OR THE CITY OF OWASSO.**

As a threshold matter, the Court determines that it will consider the Amicus Brief in deciding the Curtis Act issue. When deciding whether to consider an amicus brief, federal courts often consider the following factors:

> (1) whether the proposed amicus is a disinterested entity; (2) whether there is opposition to the entry of the amicus; (3) whether counsel is capable of making

arguments without the assistance of an amicus; (4) the strength of the information and argument presented by the potential amicus curiae's interests; and, perhaps most importantly (5) the usefulness of information and argument presented by the potential amicus curiae to the court.

Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328.  Although the partiality of an amicus is a factor to be considered, there is no rule that amici must be totally disinterested.  See Waste Mgmt. of Pa., Inc. v. City of York, 162 F.R.D. at 36.  Courts also consider whether the amicus brief provides "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  Ryan v. Commodity Futures Trading Comm'n, 125 F.3d at 1063.

Here, the Court will consider the Amicus Brief.  Several considerations support that determination.  First, the Indian Nations present strong arguments in favor of the Court deciding that the Curtis Act does not bar the Plaintiffs' claims in the Amicus Brief.  See Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328.  The Indian Nations' arguments are well researched, well written, and persuasive.  Second, those well-crafted arguments are useful to the Court in determining whether the Curtis Act bars the Plaintiffs' claims against the Municipality Defendants and the City of Owasso.  See Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328.  The Plaintiffs raise their own Curtis Act arguments in their briefing, see Municipality MTD Response at 15; Owasso MTD Response at 18, but the Indian Nations devote more attention to the Curtis Act issue in the Amicus Brief, see Amicus Brief at 4-23.  The Amicus Brief is focused solely on the Curtis Act issue.  See Amicus Brief at 2 (explaining that "[t]he Nations take no position on any other issue," other than the Curtis Act issue).  The Court finds that the Indian Nations' more robust discussion of the Curtis Act is helpful in resolving the Curtis Act issue.  See Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328.  Without

slighting in any way the good briefing provided by the Plaintiffs, the Indian Nations' discussion "help[s] the court beyond the help that the lawyers for the parties" have provided in their own briefing. Ryan v. Commodity Futures Trading Comm'n, 125 F.3d at 1063.

The Court acknowledges that, if the Court were to use the test provided in Ass'n of American School Paper Suppliers v. United States, some considerations may counsel against relying on the Amicus Brief. See 683 F. Supp. 2d at 1328. First, the Amicus Motion is contested. See City of Owasso's Response in Opposition to the Motion and Opening Memorandum in Support of Leave to File Brief of Amici Curiae, filed July 27, 2022 (Doc. 146); Response to Certain Tribes Request to File Amicus Brief, filed August 4, 2022 (Doc. 147); Defendant Municipalities' Response to Motion for Leave to File Amicus, filed August 4, 2022 (Doc. 148); Response and Objection to Certain Tribes' Motion and Opening Memorandum in Support of Leave to File Brief of Amici Curiae, Etc., filed August 5, 2022 (Doc. 149); Defendant Cathi Edwards' Response to Non-Parties Request to File Amicus Brief, filed August 5, 2022 (Doc. 150); Defendants Frauenberger, Spitzer, Weaver, Mason, and Clinton's Response to Non-Parties Request to File Amicus Brief, filed August 5, 2022 (Doc. 151); Defendant Don Newberry's Response to Non-Parties' Request to File Amicus Brief (Doc. #143), filed August 5, 2022 (Doc. 152); Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328. Second, the Indian Nations are interested entities. See Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328. The Indian Nations ask the Court to conclude that Curtis Act § 14 does not bar the Plaintiffs' claims against the Municipality Defendants or the City of Owasso, because Curtis Act § 14 is no longer good law. See Amicus Brief at 2. Although the Indian Nations are not Plaintiffs, the Indian Nations would benefit from a ruling for the Plaintiffs on the Curtis Act issue, should the Indian Nations choose to bring similar suits in the future. Further, Amici Cherokee Nation would

especially benefit from a decision in favor of the Plaintiffs on the Plaintiffs' declaratory judgment claim, which asks the Court to issue a declaratory judgment asserting that the Cherokee Nation has never been disestablished.  See Complaint ¶ 86, at 20.   Additionally, the Plaintiffs' counsel is capable of making -- and in fact makes -- the same arguments in the Plaintiffs' briefing.  See Municipality MTD at 13; Owasso MTD at 18-19; Ass'n of Am. Sch. Paper Suppliers v. United States, 683 F. Supp. 2d at 1328.  Nevertheless, the Court determines that the Amicus Brief's usefulness outweighs any factors that counsel against relying on the Amicus Brief.  The Court appreciates the Amicus Brief's robust discussion of the Curtis Act and finds it helpful in working through its own analysis.

Finally, once the parties raised the issue, and once the Indian Nations filed their Amicus Motion -- which appends the Amicus Brief -- the Court cannot ignore it.  See Brief of Amici Curiae Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Muscogee (Creek) Nation, Quapaw Nation and Seminole Nation of Oklahoma in Support of Plaintiff's Oppositions to the Curtis Act Arguments Raised in Defendant Municipalities' Motions to Dismiss, filed July 15, 2022 (Doc. 143-1)(Amicus Brief filed with Amicus Motion before the Indian Nations filed the Amicus Brief as a standalone docket entry).  As the Court stated at the November 21 hearing, it had already read the Amicus Brief and it is "hard to put the genie back in the bottle."  November 21 Tr. at 14:9-15:15 (Court).  In any case, it would not be in anyone's interest for the Court to ignore the analysis the Indian Nations provide in the Amicus Brief.  For these reasons, the Court will grant the Amicus Motion and consider the Amicus Brief.

### B.      THE CURTIS ACT BARS THE PLAINTIFFS' CLAIMS AGAINST THE MUNICIPALITY DEFENDANTS AND THE CITY OF OWASSO.

The Municipality Defendants and the City of Owasso contend that the Curtis Act bars the Plaintiffs' claims against them, because the Curtis Act "unequivocally says cities and towns may adopt and enforce municipal ordinances," including against Indians, and forecloses the Plaintiffs' claims, given that the Municipality Defendants and City of Owasso "were merely exercising their congressionally created grant of authority."  Municipality MTD at 13.  See Owasso MTD at 18-19.  The Plaintiffs respond that the Curtis Act does not bar their claims, because the Curtis Act never gave Towns or Municipalities, including the Municipality Defendants, "the ***authority*** to ***prosecute*** the Indians for violating those laws."  Municipality MTD Response at 15 (emphasis in original).  See Owasso MTD Response at 18.  The Indian Nations further contend that "Oklahoma's admission to statehood less than ten years after enactment of the Curtis Act extinguished the federal law authority of the municipalities Congress had authorized in the Indian Territory."  Amicus Brief at 2.

The Court concludes that the Curtis Act bars the Plaintiffs' claims against the Municipality Defendants and the City of Owasso.  The Court's conclusion is based, first on the Curtis Act's plain language, and on what the plain language says and does not say.  Second, the Court's conclusion is based on the Curtis Act's historical context, and the judicial decisions that that have interpreted it since Congress passed it in 1898.  The Court begins its analysis with a brief summary of the Curtis Act's historical background.  Next, the Court provides an overview of caselaw concerning the Curtis Act.  Finally, the Court analyzes the Curtis Act's plain language -- along with the history and the caselaw -- and determines that the Curtis Act bars the Plaintiffs' suit.

### 1.      The Curtis Act's Historical Context.

Of the fifty states, Oklahoma "has one of the oldest records of human occupation."
Encyclopedia Britannica, Oklahoma (2010).  As early as 9500 B.C.E., peoples from the Clovis[21]
and Folsom[22] cultures inhabited what is now Oklahoma.  See Encyclopedia Britannica, Oklahoma
(2010).  Over the following centuries, various groups populated the region.  See Encyclopedia
Britannica, Oklahoma (2010).  In the sixteenth century, European colonizers traveled throughout
the region.  See Encyclopedia Britannica, Oklahoma (2010).  Spain later claimed the territory.  See
Encyclopedia Britannica, Oklahoma (2010).  Throughout the seventeenth and eighteenth centuries,
Spain and France struggled for control over Oklahoma.  See Encyclopedia Britannica, Oklahoma
(2010).   In 1803, The United States acquired the area as part of the Louisiana Purchase.  See
Encyclopedia Britannica, Oklahoma (2010).

As the United States began to develop the Eastern seaboard in the eighteenth and nineteenth
centuries, the public put pressure on Congress to remove Tribes from the East to Oklahoma.  See
Encyclopedia Britannica, Oklahoma (2010).  Accordingly, in 1834, Congress declared that most
of what is now Oklahoma would be reserved as Indian Territory.[23]  See Encyclopedia Britannica,
Indian Territory (2010).  Throughout the 1830s and 1840s, the United States forcibly removed

---

[21]The Clovis people were a prehistoric group that populated Oklahoma, among other
regions, approximately 11,000 to 12,000 years ago.  See Prehistoric Native Peoples, Oklahoma
Historical       Society,       https://www.okhistory.org/publications/enc/entry.php?entry=PR008
("Prehistoric Native Peoples").

[22]The Folsom people were also a prehistoric group that populated Oklahoma, albeit
somewhat later than the Clovis people, around 10,000 years ago.  See Prehistoric Native Peoples.

[23]The Indian Territory's boundaries and composition changed over time.  For various maps
depicting that change, see Removal of Tribal Nations to Oklahoma, Oklahoma Historical Society,
https://www.okhistory.org/research/airemoval (scroll down to "Maps of Tribal Nation Land").

eastern tribes to Oklahoma.  See Encyclopedia Britannica, Oklahoma (2010).  The first five Tribes to arrive in Oklahoma from the East were the Choctaw, Chickasaw, Creek, Cherokee, and Seminole, which are often referred to collectively as the "Five Tribes."  Cohen Handbook § 4.07[1][a].  In 1866, the United States acquired the western half of the Indian Territory from the Five Tribes and opened it up to non-Indian settlers.  See Encyclopedia Britannica, Oklahoma (2010); Cohen Handbook § 4.07[1][a].  By the 1880s, more than sixty Tribes -- including many from the eastern United States, like the Creek, Cherokee, and Choctaw -- were in Oklahoma.  See Encyclopedia Britannica, Oklahoma (2010).

In 1887, Congress passed the Dawes Allotment Act.[24]  See Pub. L. No. 49-119, 24 Stat. 388 (1887)("Dawes Act").  The Dawes Act creates the "allotment system," a program that broke up the large reservations in Oklahoma and allotted portions of the land that used to comprise those reservations to individual Tribe members.  See Dawes Act §§ 1-5.  "Additionally, the Dawes Act provided that once portions of tribally held lands had been allotted to all members, the Secretary of the Interior could purchase the remaining 'surplus' lands.'" Yuanchung Lee, Rediscovering the Constitutional Lineage of Federal Indian Law, 27 N.M. L. Rev. 273, 284 (1997)("Rediscovering Constitutional Lineage").  Because the Dawes Act split up and sold off large swaths of Tribal land, it "pulvariz[ed]" reservations.  Rediscovering Constitutional Lineage at 285.  The Dawes Act, however, expressly exempted the Five Tribe's land.  See Dawes Act § 8; Cohen Handbook § 4.07[1][a].  In other words, in the wake of the Dawes Act, the lands held by the Five Tribes

---

[24]The Dawes Act was named after Henry L. Dawes, a senator from Massachusetts who served from 1875 to 1893.  See DAWES, Henry Laurens, History, Art & Archives, United States House of Representatives, https://history.house.gov/People/Detail/12015#biography ("Dawes Biography").  He served on the Indian Affairs Committee from 1881 to 1893.  See Dawes Biography.

stayed intact and were not divided up among individual members.  See Dawes Act § 8; Cohen Handbook § 4.07[1][a].

Throughout the 1890s and 1900s, Congress continued to pass legislation that "diminish[ed] tribal authority," in an effort to pave the way for Oklahoma Statehood.  Maria Conversa, Righting the Wrongs of Native American Removal and Advocating for Tribal Recognition: A Binding Promise, the Trail of Tears, and the Philosophy of Restorative Justice, 54 Univ. Ill. Urbana-Champaign L. Rev. 933, 943 (2021)("Righting the Wrongs").  For example, in 1890, Congress passed the Oklahoma Organic Act, Pub L. No. 51-182, 26 Stat. 81 (1890)("Organic Act"), which establishes that the portion of the Indian Territory that the United States acquired in 1866 would become the Oklahoma Territory.[25]  See Encyclopedia Britannica, Indian Territory (2010).  The Organic Act "expressly preserved tribal authority and federal Indian jurisdiction in both the Oklahoma and Indian Territories."  Cohen Handbook § 4.07[1][a] (citing Organic Act §§ 1, 12).  Similarly, in 1906, Congress passed the Five Tribes Act of 1906, Pub. L. No. 59-129, 34 Stat. 137 (1906)("Five Tribes Act"), which "empowered the President in certain limited circumstances to fill the office of the principal chief, abolished all tribal taxes accruing under tribal laws or federal regulations, required presidential approval of all tribal legislation and contracts affecting tribal property, and limited the length of council sessions to 30 days."  Cohen Handbook § 4.07[1][c][i].

---

[25]For a historical map of the Oklahoma and Indian Territories, visit Map of the Indian and Oklahoma Territories, 1894, Library of Congress, https://www.loc.gov/resource/g4020.rr002880 /?r=-0.26,-0.197,1.551,0.705,0.

2.    **The Curtis Act**.

On February 24, 1898, Representative Charles Curtis of Kansas[26] introduced A Bill for the

Protections of the People of the Indian Territory, and for Other Purposes in the House of

Representative's Committee on Indian Affairs.  See H.R. 8581, 55th Cong. (2d Sess. 1898)("Curtis

Bill").  Curtis also submitted a Report along with the Curtis Bill.  See H.R. Rep. No. 55-593

(1989)("Curtis Report").  The Curtis Report explains that the Curtis Bill aims to "provide[] a way

by which many of the evils existing in the Indian Territory may be corrected."  Curtis Report at 1.

He describes that one such "evil" is that,

> while there [are] only about 65,000 Indians in said Territory, there are at
> this time about 300,000 white people. Lines of railroads have been constructed
> through the Territory in various directions. These people have built up a large
> number of prosperous cities and towns; they have no title to their lands, no
> municipal government, no provision for the erection of schoolhouses and the
> education of their children except by private means.

Curtis Report at 3.  Curtis explains that the Curtis Bill will address that "evil" by

> authorizing the inhabitants of any city or town of said Territory having more than
> two hundred residents to incorporate under the laws of Arkansas. Consent of the
> United States is given to the tribes to convey by deed to any city or town title lands
> embraced within territorial limits of said corporation and provide for the disposition
> of the lands so purchased.

Curtis Report at 3.  He emphasizes that the Curtis Bill would benefit the Indian Territory, because,

among other things, it "authorizes the laying out of cities and towns, and gives them power to enact

and enforce ordinances."  Curtis Report at 3.

---

[26]Curtis was a member of the Kaw Nation, a Tribal Nation in northern Oklahoma, and was
the first Indian to serve in the House of Representatives.  See Jennifer Davis, Charles Brent Curtis,
first Nation American Congressional member (2018), https://blogs.loc.gov/law/2018/01/charles-
brent-curtis-first-native-american-congressional-member/ ("Charles Brent Curtis").  Curtis went
on to serve as a United States Senator, representing Kansas, and later to serve as the Vice President
of the United States under President Herbert Hoover.  See Charles Brent Curtis.

Later that year, Congress passed the Curtis Act, Pub. L. No. 55-517, 30 Stat. 495 (1898)("Curtis Act"), and "the other shoe dropped." Oklahoma's Tribal Courts: A Prologue, the First Fifteen Years of the Modern Era, and a Glimpse at the Road Ahead, 19 Okla. City L. Rev. 5, 14 (1994)("Tribal Courts").  While the Dawes Act expressly exempted the Five Tribes' land from allotment, see Dawes Act § 8, the Curtis Act "divided the communally held lands of the Five Civilized Tribes of Indian Territory into individually sized parcels and allotted these plots to individual tribal members in typical Dawes Act fashion."  Rediscovering Constitutional Lineage at 310.  See Cohen Handbook § 4.07[1][a].  Congress passed the Curtis Act "with statehood in mind" and, as a result, it "was a direct affront to the Five . . . [T]ribes."  Abi Fain & Mary Kathryn Nagle, Close to Zero: The Reliance on Minimum Blood Quantum Requirements to Eliminate Tribal Citizenship in the Allotment Act and the Post-Adoptive Couple Challenge to the Constitutionality of ICWA, 43 Mitchell Hamline L. Rev. 801, 833 (2017)("Close to Zero").  Aside from providing for the allotment of the Five Tribes' land, the Curtis Act contains several other provisions that diminish Tribal authority.  For example, § 23 voids all agricultural leases "belonging to any tribe" made after January 1, 19898.  Curtis Act § 23.  Similarly, § 28 abolishes tribal courts starting July 1, 1898.  See Curtis Act § 28.

The Curtis Act also did what Curtis had hoped: it "authorize[d] the laying out of cities and towns, and g[ave] them power to enact and enforce ordinances."  Curtis Report at 3.  More specifically, Curtis Act § 14 provides, in part:

> That the inhabitants of any city or town in said Territory having two hundred or more residents therein may proceed, by petition to the United States court in the district in which such city or town is located to have the same incorporated as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas,[27] if not already incorporated thereunder; and the clerk of said court shall

---

[27]The Mansfield's Digest was the "[f]irst comprehensive collections of Arkansas statutes

record all papers and perform all the acts required of the recorder of the county, or the clerk of the county court, or the secretary of state, necessary for the incorporation of any city or town, as provided in Mansfield's Digest, and such city or town government, when so authorized and organized, shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas.[28]

. . . .

All elections shall be conducted under the provisions of chapter fifty-six of said digest, entitled 'Elections,' so far as the same may be applicable; and all inhabitants of such cities and towns, without regard to race, shall be subject to all laws and ordinances of such city or town governments, and shall have equal rights, privileges, and protection therein.

. . . .

For the purposes of this section all the laws of said State of Arkansas herein referred to, so far as applicable, are hereby put in force in said Territory . . . .

Curtis Act § 14.  Chapter 29 of Mansfield's Digest provides, in relevant part:

By-laws and ordinances of municipal corporations may be enforced by the imposition of fines, forfeitures, and penalties, on any person offending against or violating such by-laws or ordinances, or any of them; and the fine, penalty, or forfeiture, may be prescribed in each particular by-law or ordinance, or by a general by-law or ordinance made for that purpose; and municipal corporations shall have power to provide in like manner for the prosecution, recovery and collection of such fines, penalties and forfeitures.

Mansfield's Digest, ch. 29, § 765 (1884).

---

for publication . . . ."  Encyclopedia of Arkansas, <u>Mansfield Digest</u> (2022).

[28]The legislative record does not indicate why Congress chose Arkansas law.  The Court hypothesizes, however, that the choice may be related to the fact that before the Indian Territory became the Indian Territory in 1834, it was part of the Arkansas Territory until 1824.  <u>See</u> Arkansas Territory, Oklahoma Historical Society, https://www.okhistory.org/publications/enc/entry?entry=AR012.

### 3.     Developments After the Curtis Act.

The Curtis Act dramatically changed Oklahoma's local political landscape.  After Congress passed the Curtis Act, "[t]he[] changes [that § 14 introduced] reorganized the approximately 150 towns in the territory -- including Tulsa [and] Muscogee . . . -- that were home to tens of thousands of people and nearly one third of the territory's population at the time . . . ."  McGirt, 140 S. Ct. at 2490 (Roberts, C.J., dissenting).  Those cities and towns were -- and remain -- enclave cities, that is "cities of a particular people or tribe that are enclosed within the territory of a different tribe." Watchtower Online Library, Enclave Cities, https://wol.jw.org/en/wol/d/r1/lp-e/1200001357.

Curtis Act § 14's impact came to a head in 1906, when Congress passed the Oklahoma Enabling Act.  See Pub. L. No. 59-234, 34 Stat. 267 (1906)("Oklahoma Enabling Act").  The Oklahoma Enabling Act provides that the Indian Territory and Oklahoma Territory "may adopt a constitution and become the State of Oklahoma."   Oklahoma Enabling Act § 1.  The Oklahoma Enabling Act permits Oklahoma to ratify its State constitution.  See Oklahoma Enabling Act §§ 1-4.  Section 13 sets out, among other things that the "laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State until changed by the legislature thereof." Oklahoma Enabling Act § 13.  Section 21 reiterates that

> all laws in force in the Territory of Oklahoma at the time of the admission of said State into the Union shall be in force throughout said State, except as modified or changed by this Act or by the constitution of the State, and the laws of the United States not locally inapplicable shall have the same force and effect within said State as elsewhere within the United States.

Oklahoma Enabling Act § 21.

**4.      Judicial Decisions Impacting the Oklahoma Enabling Act and the Curtis Act.**

The Court does not write on a blank page.  Other courts have addressed the impact of Oklahoma's admission to the Union on legislation passed at the turn-of-the-century that was passed in an effort to facilitate Oklahoma Statehood.  The Court summarizes some of those decisions in turn, starting with the Supreme Court's decision in Shulthis v. McDougal, 225 U.S. 561 (1912)("Shulthis").

In Shulthis, the Supreme Court decided, among other things, what law governed a corporation that was incorporated in the Indian Territory shortly before Oklahoma became a State.  See 225 U.S. at 570-71.  The corporation at issue "was incorporated in the Indian territory under the Arkansas statutes, which were put in force therein by an act of Congress."  See 225 U.S. at 571.  The corporation argued that it "became an Oklahoma corporation when that state was admitted into the Union."  225 U.S. at 571.  The Supreme Court accepted the corporation's argument.  See 225 U.S. at 572.  The Supreme Court reasoned:

> The corporation laws of Arkansas were put in force in the Indian territory by the act of February 18, 1901, 31 Stat. [794, 795 (1901)] . . . , which was but one of a series of acts of that character.  Congress was then contemplating the early inclusion of that territory in a new state, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern.  There being no local legislature, Congress alone could act.  Plainly, its action was intended to be merely provisional, and not to encroach upon the powers which rightfully would belong to the prospective state.  The situation, therefore, is practically the same as it would be had the corporation laws of Arkansas been adopted and put in force by a local or territorial legislature.  United States v. Pridgeon, 153 U. S. 48, 52-54 . . . [(1894)].
>
> In Kansas P. R. Co. v. Atchison T. & S. F. R. Co. 112 U. S. 414 . . . [(18840], this court had occasion to consider the effect of the admission of a territory as a state on corporations existing at the time under the territorial laws, and it was there said:
>
> The admission of Kansas as a state into the Union, and the

> consequent change of its form of government, in no respect affected the essential character of the corporations or their powers or rights. They must, after that change, be considered as corporations of the state, as much so as if they had derived their existence from its legislation. As its corporations they are to be treated, so far as may be necessary to enforce contracts or rights of property by or against them, as citizens within the clause of the Constitution declaring the extent of the judicial power of the United States.

> Adhering to the principle of that ruling, we hold that the corporate defendant here is an Oklahoma, and not a Federal, corporation, and therefore must be regarded as a citizen of that state for jurisdictional purposes.

Shulthis, 225 U.S. at 571-72.

Six years later, the Supreme Court decided a similar choice-of-law case in Jefferson v. Fink, 247 U.S. 288 (1918)("Jefferson").   In Jefferson, the Supreme Court decided whether Oklahoma State law or Arkansas State law applied to the inheritance of an allotment of Creek territory.  See 247 U.S. at 289.  The allottee obtained the deed to the land at issue when the land was still part of the Indian Territory.  See Jefferson, 247 U.S. at 289.  The allottee later died.  See 247 U.S. at 290.  At some point between the allottee receiving the deed to the land and the allottee dying, Congress passed the Oklahoma Enabling Act, and Oklahoma became a state.  See 247 U.S. at 290.

The Supreme Court first turned to Dawes Act § 5, "which says that for a designated period the United States will hold the land in trust for the allottee, 'or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located . . . .'" 247 U.S. at 290 (quoting Dawes Act § 5).   The Supreme Court noted, however, that, in Oklahoma's case, a "territorial government never was established . . .  and it never had a terri[t]orial Legislature." 247 U.S. at 290.  The Supreme Court explained that, at the time the allotment was made:

> Apart from the tribal laws of the Indians, among which were laws relating to descent and distribution, the only laws which became operative there were such as

Congress enacted or put in force [in Oklahoma].

> By acts passed in 1890, 1893, 1897 and 1898, Congress manifested its purpose to allot or divide in severalty the lands of the Five []Tribes with a view to the ultimate creation of a state embracing the Indian Territory; put in force in the territory several statutes of Arkansas, including chapter 49 of Mansfield's Digest relating to descent and distribution; provided that those statutes should apply to all persons in the territory, irrespective of race; and substantially abrogated the laws of the several tribes, including those relating to descent and distribution. Acts May 2, 1890, c. 182, 26 Stat. 81, § 31; March 3, 1893, c. 209, 27 Stat. 645, § 16; June 7, 1897, c. 3, 30 Stat. 83; June 28, 1898, c. 517, 30 Stat. 495, §§ 11 and 26.

Jefferson, 247 U.S. at 290-91.

The Supreme Court then turned to the Oklahoma Enabling Act and its prior decision in

Shulthis.  See Jefferson, 247 U.S. at 292.  The Court reasoned:

> Referring to the purpose with which the Arkansas statutes were put in force in that territory and to their status there, this court said in [Shulthis]:

>> Congress was then contemplating the early inclusion of that territory in a new state, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern.  There being no local Legislature, Congress alone could act.  Plainly, its action was intended to be merely provisional.

> [The Oklahoma Enabling Act] was made for admitting into the Union both the territory of Oklahoma and the Indian Territory as the state of Oklahoma. Each territory had a distinct body of local laws.  Those in the Indian Territory, as we have seen, had been put in force there by Congress.  Those in the territory of Oklahoma had been enacted by the territorial Legislature.  Deeming it better that the new state should come into the Union with a body of laws applying with practical uniformity throughout the state, Congress provided in [Oklahoma Enabling Act § 13] that 'the laws in force in the territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the Legislature thereof,' and also [in Oklahoma Enabling Act § 21] that 'all laws in force in the territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state.'  The people of the state, taking the same view, provided in [Oklahoma Const. art. 25, § 2] that 'all laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally

inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law.'

The state was admitted into the Union November 16, 1907; and thereupon the laws of the territory of Oklahoma relating to descent and distribution . . . became laws of the state.

. . . .

As before indicated, the allottee died in June, 1908, and the courts below in determining who inherited the land from her gave effect to the state law of Oklahoma existing at the time of her death.

Two objections to that ruling are pressed on our attention: One that the allotment was made and the tribal deeds issued under the act of 1902, which contained a provision that the descent should be according to the Arkansas law, and that thereby those who would be heirs under that law became invested with a right to inherit which could not be taken away or impaired by subsequent legislation, either federal or state; and the other that, even if Congress possessed the power to substitute some other law of descent, that power was not exercised. Both objections are untenable.

. . . .

We have seen that Congress was accustomed to subjecting allotted Indian lands to the local laws of descent, and also that its action in putting the Arkansas law in force in the Indian Territory was intended to be merely provisional. With this in mind it seems very plain that the provisions before quoted from the Enabling Act were intended to result, at the time of the admission of the new state, in the substitution of the Oklahoma law of descent for that of Arkansas theretofore put in force in the Indian Territory . . . . .

Jefferson, 247 U.S. at 293-94.

Seven decades later, the United States Court of Appeals for the District of Columbia Circuit decided Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439 (D.C. Cir. 1988)("Creek Nation").  In 1936, Congress passed the Oklahoma Indian Welfare Act, Pub. L. No. 74-816, 49 Stat 1967 (1936)("OIWA"), which permitted Tribes in Oklahoma to create constitutional governments.  See 851 F.2d at 1442.  In turn, the Creek Nation, "adopted a constitution providing for three separate branches of government, including a judiciary." 851 F.2d at 1442.  The Creek Nation then applied

- 170 -

for funding for its new courts from the Bureau of Indian Affairs ("BIA").  See 851 F.2d at 1442.

The BIA denied the funding application on the grounds that, under Curtis Act § 28, the Creek

Nation did not have authority to establish Tribal courts.  See 851 F.2d at 1440.  The Creek Nation

challenged the decision and the district court upheld the BIA's decision.  See 851 F.2d at 1442.

The D.C. Circuit reversed.  See Creek Nation, 851 F.2d at 1440.  The D.C. Circuit

determined that Curtis Act § 28 "unequivocally abolished" Tribal courts.  851 F.2d at 1442.

Nevertheless, the D.C. Circuit concluded "that the Curtis Act was repealed by the OIWA and

therefore the Muscogee (Creek) Nation has the power to establish Tribal Courts with civil and

criminal jurisdiction."  851 F.2d at 1446.  The court reasoned:

> The OIWA clearly does not *expressly* repeal the abolition of the Tribal
> Courts. It contains no reference to the Curtis Act or the related legislation.  It does,
> however . . . contain a general repealer clause. . . . 49 Stat. 1967, § 9 [(1934)] . . .
> Therefore, any repeal would be by implication.  Generally, repeal by implication is
> not favored.  See e.g., United States v. Borden Co., 308 U.S. 188, 198 . . . (1939).
> Under that general rule, statutes are repealed by a general repealer clause only if
> they conflict.  Kremer v. Chemical Construction Co., 456 U.S. 461, 469 . . . (1982).
> However, the standard principles of statutory construction do not have their usual
> force in cases involving Indian law.  . . . Blackfeet . . . , 471 U.S . . . [at] 766 . . . .
>
> . . .
>
>  '[T]he canons of construction applicable in Indian law are rooted in the unique
> trust relationship between the United States and the Indians.'  [S]tatutes are to be
> construed liberally in favor of the Indians, with ambiguous provisions interpreted
> to their benefit."  [Blackfeet, 471 U.S.] at 766 . . . .  If there is any ambiguity as to
> the inconsistency and/or the repeal of the Curtis Act, the OIWA must be construed
> in favor of the Indians, i.e., as repealing the Curtis Act and permitting the
> establishment of Tribal Courts.  The result, then, is that if the OIWA can reasonably
> be construed as the Tribe would have it construed, it must be construed that way.

> The OIWA confers the power to adopt a constitution. Black's Law
> Dictionary defines constitution as:

>> The organic and fundamental law of a nation or state, which may be
>> written or unwritten, establishing the character and conception of its
>> government, laying basic principles to which its internal life is to be

> conformed, organizing the government, and regulating, distributing and limiting the functions of its different departments, and prescribing the extent and manner of sovereign powers.

Black's Law Dictionary 282 (5th ed. 1979). The Regulations designed to implement both the IRA and the OIWA define constitution as follows:

> 'Constitution' or 'Constitution and Bylaws' means the written organizational framework of any tribe reorganized pursuant to a Federal statute for the exercise of governmental powers.

25 C.F.R. § 81.1(g) (emphasis added).

> Both definitions certainly encompass the power to create courts with general civil and criminal jurisdiction. The United States Constitution contains such powers and has undoubtedly been used as a model for tribal constitutions. Constitutions are vehicles of self-government. Inherent in self-government is the power to make laws and to create mechanisms to enforce them. See United States v. Wheeler, 435 U.S. 313, 320 . . . (1978). It is therefore reasonable to conclude that the OIWA conferred all powers associated with self-government, limited of course by statutes of general applicability.

> In addition, if a later act covers the whole subject of an earlier one and is clearly intended as a substitute, it will operate to repeal the earlier act. [Kremer v. Chem. Const. Corp, 456 U.S. 461, 469 (1982).] The OIWA was passed to "reorganize" the Oklahoma tribes. It did away with allotment and included a provision for establishing a tribal government. It appears to cover the "whole subject" of the earlier legislation. It would be absurd to hold that isolated portions of the Curtis Act and the Creek Agreement survive even though the statutory context in which they appeared -- allotment and assimilation -- has been stripped away by the OIWA.

> . . . .

> The District Court aptly noted that this issue is not free from doubt. The legislative history is not clear and the language of [the OIWA] can easily be construed as permitting the establishment of Tribal Courts. For this very reason, this Court must construe the OIWA to benefit the [Creek Nation]. Blackfeet, 471 U.S. at 766 . . . Accordingly, we hold that the Curtis Act was repealed by the OIWA and that therefore the Muscogee (Creek) Nation has the power to establish Tribal Courts with civil and criminal jurisdiction, subject, of course, to the limitations imposed by statutes generally applicable to all tribes.

Creek Nation, 851 F.2d at 1444-47 (emphasis in original).

- 172 -

The Supreme Court briefly revisited the Curtis Act in <u>McGirt</u>.  <u>See</u> 140 S. Ct. at 2476.  In

<u>McGirt</u>, Oklahoma argues that Congress disestablished the Creek Nation.  <u>See</u> 140 S. Ct. at 2463.

As an alternative argument, Oklahoma asserts that the Major Crimes Act never applied in eastern

Oklahoma.  <u>See</u> 140 S. Ct. at 2476.  Justice Gorsuch, writing for the majority, rejects that argument.

<u>See</u> 140 S. Ct. at 2478.  He explains:

> In support of its argument, Oklahoma points to statutory artifacts from its territorial history.  The State of Oklahoma was formed from two territories: the Oklahoma Territory in the west and Indian Territory in the east.  Originally, it seems criminal prosecutions in the Indian Territory were split between tribal and federal courts. See Act of May 2, 1890, § 30, 26 Stat. 94.  But, in 1897, Congress abolished that scheme, granting the U. S. Courts of the Indian Territory "exclusive jurisdiction" to try "all criminal causes for the punishment of any offense."  Act of June 7, 1897, 30 Stat. 83.  These federal territorial courts applied federal law and state law borrowed from Arkansas "to all persons . . .  irrespective of race." [Act of June 7, 1897, 30 Stat. 83.]  A year later, Congress abolished tribal courts and transferred all pending criminal cases to U. S. courts of the Indian Territory.  [Curtis Act § 28].  And, Oklahoma says, sending Indians to federal court and all others to state court would be inconsistent with this established and enlightened policy of applying the same law in the same courts to everyone.
>
> Here again, however, arguments along these and similar lines have been "frequently raised" but rarely "accepted."  *United States v. Sands*, 968 F.2d 1058, 1061 ([10th Cir.] 1992) (Kelly, J.).  "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history."  *Rice v. Olson*, 324 U.S. 786, 789 . . . (1945).  Chief Justice Marshall, for example, held that Indian Tribes were "distinct political communities, having territorial boundaries, within which their authority is exclusive . . . which is not only acknowledged, but guarantied by the United States," a power dependent on and subject to no state authority.  *Worcester v. Georgia*, 6 Pet. 515, 557 . . . (1832) . . . .  And in many treaties, like those now before us, the federal government promised Indian Tribes the right to continue to govern themselves.  For all these reasons, this Court has long "require[d] a clear expression of the intention of Congress" before the state or federal government may try Indians for conduct on their lands. *Ex parte Crow Dog*, 109 U.S. 556, 572 . . . (1883).

<u>McGirt</u>, 140 S. Ct. at 2476-77.

The dissenting Justices in <u>McGirt</u> also engage with Curtis Act § 14.  Specifically, Chief

Justice Roberts, joined by Justices Alito, Kavanaugh, and Thomas, notes that

the Curtis Act established municipalities to govern both Indians and non-Indians. It authorized "any city or town" with at least 200 residents to incorporate. [Curtis Act] § 14 . . . The Act gave incorporated towns "all the powers" and "all the rights" of municipalities under Arkansas law. [Curtis Act § 14]. "All male inhabitants," including Indians, were deemed qualified to vote in town elections. [Curtis Act § 14]. And "all inhabitants" -- "without regard to race" -- were made subject to "all" town laws and were declared to possess "equal rights, privileges, and protection."

McGirt, 140 S. Ct. at 2490 (Roberts, C.J., dissenting)(quoting Curtis Act § 14).  Chief Justice

Roberts acknowledges that Curtis Act § 14 was "laying the foundation for the state governance

that was to come."  McGirt, 140 S. Ct. at 2491 (Roberts, C.J., dissenting).

Next, in Hooper,[29] The Honorable William P. Johnson, Chief Judge of the United States

District Court for the District of New Mexico,[30] concluded that Curtis Act § 14 permits Oklahoma

municipalities to prosecute crimes that Indians commit against Indians.  See 2022 WL 1105674,

at *5.  Hooper is a member of the Choctaw Nation.  See 2022 WL 1105674, at *1.  In 2018, Hooper

received a speeding ticket in Tulsa, Oklahoma, and the Tulsa Municipal Court ordered that he pay

a fine.  See 2022 WL 1105674, at *1.  Years later -- after the Supreme Court issued its McGirt

decision -- Hooper appealed his conviction in the Tulsa Municipal Court.  See 2022 WL 1105674,

at *1.  The Tulsa Municipal Court determined that it had jurisdiction over the case pursuant to the

Curtis Act and denied Hooper relief.  See 2022 WL 1105674, at *1.

---

[29]Hooper is currently on appeal to the United States Court of Appeals for the Tenth Circuit. See Hooper v. City of Tulsa, No. 22-5034 (10th Cir. 2022).  As of the date of this Memorandum and Opinion's issuance, the parties have completed briefing, and the matter has been set for oral argument on March 23, 2023.  See Hooper v. City of Tulsa, No. 22-5034 (10th Cir. 2022).

[30]Chief Judge Johnson "was assigned [Hooper] as a result of the Tenth Circuit Order designating Judge Johnson to hear and preside over cases in the Northern District of Oklahoma." Hooper, 2022 WL 1105674, at *1 n.1.

Hooper appealed[31] that decision to the United States District Court for the Northern District of Oklahoma.  See 2022 WL 1105674, at *1.  Tulsa moved to dismiss the suit on the grounds that "the Curtis Act remains good law and grants the City of Tulsa municipal authority over everyone within city limits, whether or not that land is part of a reservation."  2022 WL 1105674, at *2.  Chief Judge Johnson agreed with Tulsa and dismissed the suit.  2022 WL 1105674, at *5.  He explains:

> The relevant portions of [Curtis Act § 14] deal with Indian Territory state and municipal law and ordinances.  On a state law level, this provision copied over Arkansas law to part of what would be Oklahoma, which was not yet a state and was referred to as Indian Territory.  See [Curtis Act § 14].  Federal district courts had the authority to punish violations of Arkansas state law within Indian Territory because, since the land was not yet a state, there was not a state court to do so.  See [Curtis Act § 14].  On a municipal law level, this provision allowed for incorporation of cities and towns with two hundred or more residents.  [Curtis Act § 14].  It stated that incorporation would take place "as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas" and that once incorporated,

---

[31]The court's procedural posture in Hooper was "uncommon."  Hooper, 2022 WL 1105674, at *1.  Chief Judge Johnson explains:

> Plaintiff, as a member of the federally recognized Choctaw Tribe, is an Indian by law.  On or about August 13, 2018, he received a speeding ticket from the City of Tulsa within the boundaries of the Creek Reservation.  On or about August 28, 2018, he was found guilty by Tulsa's municipal criminal court and was ordered to pay a $150 fine, which was paid.

> Years later, on or about December 17, 2020, Plaintiff filed an application for postconviction relief in the Municipal Criminal Court of the City of Tulsa.  After arguments, the court found that it had jurisdiction pursuant to the Curtis Act, 30 Stat. 495 (1898), and denied postconviction relief.  The Municipal Criminal Court found that the appropriate court to which Plaintiff (there Defendant) could appeal his municipal conviction would be the U.S. Federal District Court . . . . Accordingly, Plaintiff appeals that decision here as Count I.  For Count II, Plaintiff seeks a declaratory judgment that municipalities, such as the City of Tulsa, do not have subject matter jurisdiction over "Indians" within the boundaries of a reservation.  Plaintiff's case therefore contains both a criminal appeal (Count I) and a civil request for declaratory judgment (Count II), an unusual procedural posture.

Hooper, 2022 WL 1105674, at *1.

the city or town government "shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas." [Curtis Act § 14]. Additionally, [Curtis Act § 14] granted city or town councils the authority to pass ordinances and gave the mayors of such towns "the same jurisdiction in all civil and criminal cases arising within the corporate limits of such cities and towns as, and coextensive with, United States Commissioners in the Indian Territory[.]" [Curtis Act § 14]. And most importantly, the law provided that "all inhabitants of such cities and towns, without regard to race, shall be subject to all laws and ordinances of such city or town governments, and shall have equal rights, privileges, and protections therein." [Curtis Act § 14].

. . . .

Additionally, the language of [Curtis Act § 14] governs incorporation based on the provisions of Mansfield's Digest, chapter twenty-nine. Section 765 of this chapter provides:

> By-laws and ordinances of municipal corporations may be enforced by the imposition of fines, forfeitures, and penalties, on any person offending against or violating such by-laws or ordinances, or any of them; and the fine, penalty, or forfeiture, may be prescribed in each particular by-law or ordinance, or by a general by-law or ordinance made for that purpose; and municipal corporations shall have power to provide in like manner for the prosecution, recovery and collection of such fines, penalties and forfeitures.

Mansfield's Digest, ch. 29, § 765 (1884).

Hooper, 2022 WL 1105674, at *2-3. In other words, Chief Judge Johnson determined that Curtis Act § 14 provides Oklahoma Municipalities with jurisdiction to prosecute Indians in Oklahoma State court. See 2022 WL 1105674, at *2-3.

Chief Judge Johnson also rejects several of Hooper's arguments to the contrary. First, Hooper argues that Oklahoma Statehood ended Municipalities' jurisdiction over crimes that Indians commit under the Curtis Act. See 2022 WL 1105674, at *4. Chief Judge Johnson dismisses that argument because "the Oklahoma Constitution provided that '[e]very municipal corporation now existing within this State shall continue with all of its present rights and powers

until otherwise provided by law, and shall always have the additional rights and powers conferred by the Constitution.'"   2022 WL 1105674, at *4 (quoting Okla. Const. Art. 18, § 2).   Second, Hooper asserts that <u>Creek Nation</u> repealed the Curtis Act.   <u>See</u> 2022 WL 1105674, at *4.   Chief Judge Johnson also rebuffs that argument on the grounds that <u>Creek Nation</u> repealed only Curtis Act § 28, and not Curtis Act § 14.   <u>See</u> 2022 WL 1105674, at *4.   Third, Hooper contends that Curtis Act § 14 never applied to Indians because "Indian" is not a "race," such that Curtis Act § 14 -- which applies to "all races" -- does not apply to Indians.   <u>See</u> 2022 WL 1105674, at *3. Chief Judge Johnson was not persuaded by that argument because "[t]he statutory language plainly covers *all inhabitants*."   2022 WL 1105674, at *3 (citing Curtis Act § 14)(emphasis in original).

Finally, Hooper argues that <u>McGirt</u> establishes that Oklahoma municipalities lack subject matter jurisdiction over crimes that Indians commit in Indian Country.   <u>See</u> 2022 WL 1105674, at *4.   Chief Judge Johnson rejects that argument, reasoning:

> This characterization of McGirt's holding is incorrect. McGirt makes no mention of municipal jurisdiction and only briefly mentions the Curtis Act in the dissent. [McGirt,]140 S. Ct. at 2490 (Roberts, C.J., dissenting).  This mention is made in the context of Congress "laying the foundation for the state governance that was to come," i.e., that the Curtis Act was an indication of Congress's intent to disestablish the reservation in the future.  [McGirt,140 S. Ct.] at 2491.  McGirt says nothing about repealing or overriding the Curtis Act, and it does not deal with municipal law at all.  Its holding is that the Creek reservation is still intact, which has implications for felony crimes within the scope of the [Major Crimes Act].
>
> In contrast, Congress passed the Curtis Act to, among other things, give municipalities jurisdiction over local ordinance violations -- a classification of crimes entirely distinct from the [Major Crimes Act]'s litany of serious offenses. See 18 U.S.C. § 1153 . . . Plenty of other criminal violations also do not trigger the [Major Crimes Act]'s jurisdiction; for example, it is not federal courts but tribal courts that have jurisdiction over misdemeanors that Indians commit within reservation boundaries.  See United States v. Lara, 541 U.S. 193, 199 . . . (2004).  It is not contradictory that Congress granted federal jurisdiction over major crimes through the [Major Crimes Act] and municipal jurisdiction over violations of local ordinances through the Curtis Act.  McGirt's implications for the former do not demonstrate an effect on the latter.

Hooper, 2022 WL 1105674, at *4.

Finally, the Supreme Court revisits the Oklahoma Enabling Act in Castro-Huerta.  See 142 S. Ct. at 2486.   In Castro-Huerta, the Supreme Court decides whether State and federal governments have concurrent jurisdiction over non-Indian's crimes against Indians in Indian Country.  See 142 S. Ct. at 2491.  Castro-Huerta argues, among other things, that the Oklahoma Enabling Act "established a jurisdictional division between the State and Indian country."  142 S. Ct. at 2503.  Writing for the majority, Justice Kavanaugh rejects that argument, explaining:

> This Court long ago explained that interpreting a statehood act to divest a State of jurisdiction over Indian country "wholly situated within [its] geographical boundaries" would undermine "the very nature of the equality conferred on the State by virtue of its admission into the Union."  Draper [v. United States], 164 U.S. [240,] . . . 242-243 . . . [(1896)("Draper")].  So the Court requires clear statutory language "to create an exception" to that "rule." [Draper, 164 U.S.] at 244 . . . . . To reiterate, the Oklahoma Enabling Act contains no such clear language. Indeed, the Court has interpreted similar statutory language in other state enabling acts not to displace state jurisdiction.  See [Draper, 164 U.S.] at 243-247 . . . ; Organized Village of Kake, 369 U.S. [60], . . . 67-71 . . . [(1962)].

142 S. Ct. at 2503-04.  In the end, the majority concludes in Castro-Huerta "that the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country."  142 S. Ct. at 2491.

Writing for the dissent, Justice Gorsuch responds:

> In 1906, Congress sought to deliver on its treaty promises when it adopted the Oklahoma Enabling Act. That law paved the way for the new State's admission to the Union.  But in doing so, Congress took care to require Oklahoma to "agree and declare" that it would "forever disclaim all right and title in or to . . . all lands lying within [the State's] limits owned or held by any Indian, tribe, or nation." [Oklahoma Enabling Act].  Instead of granting the State some new power to prosecute crimes by or against tribal members, Congress insisted that tribal lands "shall be and remain subject to the jurisdiction, disposal, and control of the United States."   [Oklahoma Enabling Act].   Oklahoma complied with Congress's instructions by adopting both of these commitments verbatim in its Constitution. {Okla. Const.] Art. I, § 3.

- 178 -

Underscoring the nature of this arrangement, the Enabling Act further provided that "nothing contained in the [Oklahoma] constitution shall be construed . . . to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed." [Oklahoma Enabling Act] (emphasis added). Prior to statehood, too, no one could have questioned Congress' exclusive authority to regulate tribal lands and affairs in the Oklahoma territory . . . The Oklahoma Enabling Act and the commitments it demanded in the new Oklahoma Constitution sought to maintain this status quo.

142 S. Ct. at 2515-16 (Gorsuch, J., dissenting)(alterations to internal quotations in original).

   5. **The Curtis Act Bars the Plaintiffs' Claims Against the Municipality Defendants and the City of Owasso.**

In the end, this issue boils down to a question whether Curtis Act § 14 remains good law. It is uncontested that Congress never has explicitly repealed Curtis Act § 14. Accordingly, the primary question presented is whether Congress implicitly repealed Curtis Act § 14 when it passed the Oklahoma Enabling Act. The Court Concludes that Congress has not implicitly repealed Curtis Act § 14.

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible." United States v. Borden Co., 308 U.S. 188, 198 (1939). The Supreme Court has long held that

[t]he intention of the legislature to repeal 'must be clear and manifest'. Red Rock v. Henry, 106 U.S. 596, 601 . . . [(1883)]. It is not sufficient as was said by Mr. Justice Story in Wood v. United States, 16 Pet. 342, 362 . . . [(1842)], 'to establish that subsequent laws cover some or even all of the cases provided for by (the prior act); for they may be merely affirmative, or cumulative, or auxiliary'. There must be 'a positive repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by implication only, pro tanto, to the extent of the repugnancy'.

United States v. Borden Co., 308 U.S. at 198-99. In other words, when determining whether one act impliedly repeals another, courts proceed in two steps. First, courts ask "if a later act covers

the whole subject of an earlier one." Creek Nation, 851 F.2d at 1445 (citing Kremer v. Chem. Const. Corp., 456 U.S. at 469). In particular, courts look for "manifest incompatibility" between the two statutes. Kremer v. Chem. Const. Corp., 456 U.S. at 469. Such incompatibility "must ordinarily be evident from the language or operation" of the statutes. Kremer v. Chem. Const. Corp., 456 U.S. at 469. If the statutes are conflicting, courts then consider whether the more recent act "is clearly intended as a substitute" for the older act such that "it will operate to repeal the earlier act." Creek Nation, 851 F.2d at 1445 (citing Kremer v. Chemical Const. Corp., 456 U.S. at 469). "This express intent requirement is a high bar. Courts will not find repeal by implication just because a later statute is 'not entirely harmonious with an earlier one.'" United States v. Allen, 983 F.3d 46, 471 (10th Cir. 2020)(quoting United States v. Barrett, 837 F.2d 933, 934 (10th Cir. 1988). Instead, courts must closely consider the acts' plain language and legislative histories to determine whether Congress intended to use one act to substitute another. See Creek Nation, 851 F.2d at 1445. In the Indian law context, the Supreme Court has cautioned that the "standard principles of statutory construction do not have their usual force." Blackfeet, 471 U.S. at 766. Instead, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Blackfeet, 471 U.S. at 766.

Applied here, those principles indicate that Oklahoma Enabling Act § 21 does not impliedly repeal Curtis Act §14, because there is no "manifest incompatibility" between the two statutes. Kremer v. Chem. Const. Corp., 456 U.S. at 469. The relevant portion of Curtis Act § 14 provides: "all inhabitants of such cities and towns, without regard to race, shall be subject to all laws and ordinances of such city or town governments." Curtis Act § 14. Meanwhile, the relevant portion of Oklahoma Enabling Act § 21 provides: "all laws in force in the Territory of Oklahoma at the time of the admission of said State into the Union shall be in force throughout said State

except as modified or changed by this Act or by the constitution of the State." Oklahoma Enabling Act § 21. In other words, the Curtis Act permits non-Indian settlors in the Oklahoma Territory to incorporate towns, and to enforce laws and ordinances against people of all races, while the Oklahoma Enabling Act preserves and extends the laws that were in force in the Territory of Oklahoma after Statehood to the entire State. There is no "manifest incompatibility" between the two statutes, because they occupy different fields: one establishes, pre-Statehood, that municipalities can enforce laws and ordinances against all people, while the other preserves Territorial law after Statehood. Kremer v. Chem. Const. Corp., 456 U.S. at 469. The Court can -- and does -- "give effect to both" statutes by concluding that Curtis Act § 14 empowers Oklahoma municipalities to enforce laws and ordinances against all people, including Indians, and that Oklahoma Enabling Act § 21 preserves that authority after Oklahoma Statehood. United States v. Borden Co., 308 U.S. at 198.

The Indian Nations contend in their Amicus Brief, however, that "Section 14 of the Curtis Act was not one of the '[l]aws in force in the Territory of Oklahoma' which the Enabling Act made applicable throughout the State." Amicus Brief at 16.[32] The Indian Nations do not elaborate on this point. The Court construes the Indian Nations' argument on this point to assert that the Oklahoma Enabling Act does not extend the Curtis Act into Statehood, because the Oklahoma Enabling Act extends Oklahoma Territorial law, but the Curtis Act was Indian Territorial law.

---

[32]The Plaintiffs and Indian Nations also make many of the same arguments that Hooper raises in Hooper. See Hooper, 2022 WL 1105674, at *3-4. For example, like Hooper, the Plaintiffs assert that "Indian is a legal status[,] not a racial status." March 16 Tr. at 81:11-12 (Dunn). Similarly, like Hooper, the Indian Nations assert that Creek Nation repealed Curtis Act § 14. See Amicus Brief at 3-4. The Court rejects those arguments for the same reasons that Judge Johnson rejects those same arguments in Hooper. See Hooper, 2022 WL 1105674, at *3-4.
.

This argument stems from the fact that the Oklahoma Enabling Act took the Territory of Oklahoma and the Indian Territory, combined them, and admitted them into the Union as Oklahoma State. See Oklahoma Enabling Act § 1 (explaining that the Territory of Oklahoma and Indian Territory would combine to form Oklahoma State). The Curtis Act's plain text applies to "Indian Territory," and not to the Territory of Oklahoma. See generally Curtis Act (entitled "An Act for the protection of the people of the Indian Territory" and referring to the Indian Territory as "said Territory" throughout); Curtis Report at 3 (expressing concern for Municipalities in Indian Territory, not the Territory of Oklahoma). The Oklahoma Enabling Act extends the "laws in force in the Territory of Oklahoma" to Oklahoma State. Oklahoma Enabling Act § 21. It is silent with respect to the "laws in force" in Indian Territory. Therefore, according to the Indian Nations, the Oklahoma Enabling Act does not extend the Curtis Act into Statehood, because the Curtis Act was a law in force in the Indian Territory, not the Oklahoma Territory.

The interpretive canon expressio unius est exclusio alterius establishes that the expression of "one item of [an] associated group or series excludes another left unmentioned." Chevron U.S.A. v. Echazabal, 536 U.S. 73, 80 (2002). While the Indian Nations' argument is not fully clear, it appears that they are invoking that cannon and arguing that Congress' decision to extend "all laws in force in the Territory of Oklahoma" into Statehood implies that Congress did not extend "the laws in force in Indian Territory" into Statehood. Oklahoma Enabling Act § 21. This is not a sound application of the cannon. Congress' decision to extend "all laws in force" in the Territory of Oklahoma into Statehood does not imply, or in any way suggest, necessarily that Congress intended to eliminate or repeal "all laws in force" in the Indian Territory at Statehood. While Congress expressed its clear intent to preserve and extend Oklahoma Territorial law into Oklahoma Statehood, it was silent with respect to Indian Territorial law. The Court will not

construe that silence to mean that Congress intended all laws in force in the Indian Territory -- potentially federal laws -- to vanish at Oklahoma Statehood.  To the contrary, Congressional acts do not suddenly disappear where Congress decides to extend or amend one set of laws but not another.   While Castro-Huerta's analysis is not directly on point, it is instructive: only "clear statutory language" can divest a State of its territorial authority after Statehood.  Castro-Huerta, 142 S. Ct. at 2503.  No such statutory language exists here that divests Oklahoma of the powers that the Indian Territory, or the political subdivisions within it, possess under the Curtis Act.

Further, concluding that the Oklahoma Enabling Act implicitly repeals the Curtis Act by not extending it into Statehood would frustrate Congress' intent to extend Territorial laws into Statehood.[33]  The Oklahoma Enabling Act preserves "all laws in force . . . ."  Oklahoma Enabling Act § 21.  "All" refers to "the whole amount, quantity, or extent" of the particular group or thing at issue.  All, Merriam-Webster Dictionary (Online Edition, 2023).  Accordingly, Congress' decision to extend "all laws" into Statehood, as opposed to "some laws," evinces Congress' desire to provide the new State of Oklahoma with a robust body of State law based on its Territorial law.

---

[33]In Shulthis and Jefferson, the Supreme Court determines that Congress intended the Curtis Act to be "provisional." Jefferson, 247 U.S. at 293-94; Shulthis, 225 U.S. at 571-72. See McGirt, 140 S. Ct. at 2476-77 (calling the Curtis Act an "artifact[]"); Close to Zero at 833 (explaining that Congress passed the Curtis Act "with statehood in mind").  Nevertheless, that Congress intended for an act to be provisional is not sufficient to justify striking that act.  It is Congress' role -- not the courts' -- to determine what laws are "provisional."  As discussed above, Congressional acts do not disappear suddenly absent Congressional action.  If Congress wanted to ensure that the Curtis Act would fall at Statehood, it certainly knew how to make that happen.  For example, it could have included a sunset provision in the Curtis Act explaining that the Curtis Act would expire on a certain date or whenever Oklahoma became a State.  Similarly, it could have included express language in the Oklahoma Enabling Act that repeals the Curtis Act.  Without any such a clear Congressional directive, the Court hesitates to strike the Curtis Act.

Oklahoma Enabling Act § 21.  See Jefferson, 247 U.S. at 293-94 (explaining Congress' desire to admit Oklahoma "with a body of laws applying with practical uniformity throughout the state"). The Court would frustrate that intention if it held that the Curtis Act did not survive Statehood.

Also, it would be odd that Congress in the Oklahoma Enabling Act wanted to extend Oklahoma Territorial Law to Indian Country and for the Court to conclude from that extension that Municipalities in Indian Territory lost powers at Statehood.  Municipalities in the Oklahoma Territory undoubtedly could enforce their laws against Indians. See Wilson's Revised and Annotated Statutes of Oklahoma 1903Art. II, § 15 (Wilson, W.F., ed., 1903)("The following persons are liable to punishment under the laws of this Territory . . . All persons who commit, in whole or in part, any crime within this Territory . . . .")("Oklahoma Territorial Laws").  It would be incongruous to conclude from the extension of Oklahoma Territorial laws into the Indian Territory that Municipalities in Indian Territory do not have the same powers to prosecute "[a]ll persons," like the Municipalities in the Oklahoma Territory.  If anything, it seems that Congress wanted Oklahoma Municipalities and Oklahoma State to have prosecutorial power against Indians.

Congress' later enactment of Pub. L. No. 83-280, 67 Stat. 588 (1953), bolsters the Court's determination that Congress wants Oklahoma and its political subdivisions to have jurisdiction over Indians.  See Pub. L. No. 83-280, 67 Stat. 588 (1953)(colloquially referred to as "Public Law 280").  Public Law 280 grants five States -- California, Minnesota, Nebraska, Oregon, and Wisconsin -- jurisdiction to prosecute crimes committed by Indians in Indian Country.  See Public Law 280 § 1.  Ten States have since elected to assume full or partial jurisdiction: Arizona, Florida, Idaho, Iowa, Montana, Nevada, North Dakota, South Dakota, Utah, and Washington.  See What Is Public Law 280 and Where Does it Apply?, U.S. Department of the Interior, Indian Affairs,

https://www.bia.gov/faqs/what-public-law-280-and-where-does-it-apply.   Public Law 280 is salient for two reasons. First, it demonstrates that Congress wants some States to be able to prosecute Indians in Indian Country, because it expressly permits five States to prosecute Indians, and has permitted ten others to do the same.  Second, that Congress did not include Oklahoma as one of the five original States that would have criminal jurisdiction over Indians in Indian Country suggests that Congress may have believed that Oklahoma already had such authority, or, at least, that its municipalities had that power.

**IT IS ORDERED** that: (i) Defendants District Court of Nowata County, the District Court of Washington County, the District Court of Delaware County, the District Court of Craig County, the District Court of Mayes County and the District Court of Rogers County's Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 18), is granted in part and denied in part; (ii) Defendants Kevin Burchanan, Kenny Wright, Matt Ballard and Steve Kunzweiler's Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 24), is granted in part and denied in part; (iii) Defendants Town of Adair, City of Bartlesville, Town of Big Cabin, Town of Bluejacket, City of Catoosa, City of Collinsville, Town of Copan, City of Dewey, Town of Disney, City of Grove, City of Jay, Town of Kansas, Town of Langley, Town of Locust Grove, Town of Nowata, Town of Oologah, City of Pryor, Town of Ramona, Town of Salina, Town of South Coffeyville, Town of Spavinaw, Town of Strang, Town of Talala, Town of Verdigris, City of Vinita, Town of Warner and Town of West Siloam Springs, Motion to Dismiss and Brief in Support, filed August 27, 2020 (Doc. 27), is granted in part and denied in part; (iv) Defendants April Frauenberger, Jill Spitzer, Caroline Weaver, Deborah Mason and Laura Wade's Motion to Dismiss and Brief in Support, filed September 16, 2020 (Doc. 70), is granted in part and denied in part; (v) the Motion to Dismiss and Brief in Support of Defendant Cathi Edwards, Court Clerk of Rogers County, in

Her Official Capacity, filed September 17, 2020 (Doc. 71), is granted in part and denied in part;

(vi) Defendant Don Newberry's Motion to Dismiss and Brief in Support, filed September 17, 2020

(Doc. 72), is granted in part and denied in part; (vii) Defendants' Motion to Dismiss, filed October

19, 2020 (Doc. 87), is granted in part and denied in part; and (viii) the Motion and Opening

Memorandum in Support of Leave to File Brief of Amici Curiae Cherokee Nation, Chickasaw

Nation, Choctaw Nation of Oklahoma, Muscogee (Creek) Nation, Quapaw Nation, and Seminole

Nation of Oklahoma in Support of Plaintiffs' Oppositions to the Curtis Act Arguments Raised in

Defendant Municipalities' Motions to Dismiss, filed July 15, 2022 (Doc. 143), is granted.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

John Mikel Dunn
John M Dunn Law Office PLLC
Tulsa, Oklahoma

-- and --

Mark Donaldson Lyons
Lyons & Clark, Inc.
Tulsa, Oklahoma

  *Attorneys for the Plaintiffs*

John M. O'Connor
 Oklahoma Attorney General
Erin Morgan Moore
Stefanie Erin Lawson
 Deputy Attorney Generals
Office of the Attorney General
Oklahoma City, Oklahoma

*Attorneys for Defendants District Court of Nowata County, Oklahoma; District Court of Washington County, Oklahoma; District Court of Delaware County, Oklahoma; District Court of Craig County, Oklahoma; District Court of Mayes County, Oklahoma and District Court of Rogers County, Oklahoma*

John M. O'Connor
  Oklahoma Attorney General
Audrey A Weaver
Jacqueline R Clayton
  Deputy Attorney Generals
Office of the Attorney General
Oklahoma City, Oklahoma

-- and --

Mithun S Mansinghani
Lehotsky Keller
Oklahoma City, Oklahoma

*Attorneys for Defendants Kenny Wright, Matt Ballard, and Steve Kunzweiler*

Christopher James Collins
Jamison Craig Whitson
Wellon B Poe, Jr
Collins Zorn & Wagner
Oklahoma City, Oklahoma

*Attorneys for Defendants April Frauenberger, Jill Spitzer, Caroline Weaver, Deborah Mason and Jenifer Clinton*

Matthew Benjamin Free
Thomas Adrian LeBlanc
Best & Sharp
Tulsa, Oklahoma

*Attorneys for Defendant Cathi Edwards*

Steve Kunzweiler
  Tulsa County District Attorney
Douglas Allen Wilson
Michael Shouse
  Deputy District Attorneys
Tulsa County District Attorney's Office
Tulsa, Oklahoma

*Attorneys for Defendant Don Newberry*

Andrew W Lester
Courtney Jo Davis Powell
Anthony J Ferate
Spencer Fane LLP
Oklahoma City, Oklahoma

*Attorneys for Defendants Town of Adair, Oklahoma; City of Bartlesville, Oklahoma; Town of Big Cabin, Oklahoma; Town of Bluejacket, Oklahoma; City of Catoosa, Oklahoma; Town of Chelsea, Oklahoma; Town of Choteau, Oklahoma; City of Claremore, Oklahoma; City of Collinsville, Oklahoma; Town of Copan, Oklahoma; City of Dewey, Oklahoma; Town of Disney, Oklahoma; City of Grove, Oklahoma; City of Jay, Oklahoma; Town of Kansas, Oklahoma; Town of Langley, Oklahoma; City of Nowata, Oklahoma; Town of Oologah, Oklahoma; City of Owasso, Oklahoma; City of Pryor, Oklahoma; Town of Ramona, Oklahoma; Town of Salina, Oklahoma; Town of Coffeyville, Oklahoma; Town of Spavinaw, Oklahoma; Town of Strang, Oklahoma; Town of Talala, Oklahoma; Town of Verdigris, Oklahoma; City of Vinita, Oklahoma; Town of Warner, Oklahoma and Town of West Siloam Springs, Oklahoma.*

Frank Sharp Holleman, IV
Sonosky, Chambers, Sachse, Emerson & Perry, LLP
Bonita, California

-- and --

Stephen Greetham
Office of Senior Counsel
Chickasaw Nation
Oklahoma City, Oklahoma

*Attorneys for Amicus Chickasaw Nation*

Frank Sharp Holleman, IV
Sonosky, Chambers, Sachse, Emerson & Perry, LLP
Bonita, California

-- and --

Brian R Danker
Choctaw Nation of Oklahoma
Durant, Oklahoma

     *Attorneys for Amicus Choctaw Nation of Oklahoma*

Sara Elizabeth Hill
Cherokee Nation Attorney General Office
Tahlequah, Oklahoma

-- and --

Frank Sharp Holleman, IV
Sonosky, Chambers, Sachse, Emerson & Perry, LLP
Bonita, California

     *Attorneys for Amicus Cherokee Nation*

Robert Harlan Henry
Robert Henry Law Firm
Oklahoma City, Oklahoma

     *Attorney for Amicus Quapaw Nation*

Garrett Eller
Devol & Associates, Attorneys at Law
Edmond, Oklahoma

     *Attorney for Amicus Seminole Nation of Oklahoma*